**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

_____
                                                        )
IMMANUEL CAMPBELL et al.                 )
                                                        )
   Plaintiffs,                                   )
                                                        )          Case No. 17-cv-4467
           v.                              )
                                                        )
CITY OF CHICAGO, et al.                       )
                                                        )
   Defendants.                                  )
_____ )

**PLAINTIFFS' MOTION AND
INCORPORATED MEMORANDUM IN SUPPORT OF MOTION FOR
<u>CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................ 4

I.     THE COURT SHOULD CERTIFY THE CLASS, CONSISITING OF ALL
PERSONS WHO HAVE BEEN OR WILL BE SUBJECT TO FORCE BY
THE CPD, AS WELL AS A SUBCLASS OF BLACK AND LATINO CLASS
MEMBERS ...................................................................................................... 4

     A.     The Proposed Class Meets All of the Requirements for Maintenance of A
Class Action. ........................................................................................ 4

          1.     Numerosity is Satisfied: The Class Includes Thousands of Members. ........ 4

          2.     Commonality is Satisfied: The CPD's Use of Excessive Force
Targeted at Communities of Color Presents Numerous Common
Questions of Fact and Law. ...................................................... 5

          3.     Typicality is Satisfied: The Named Plaintiffs' Claims are
Representative of Those of the Class at Large ......................................... 16

          4.     The Named Plaintiffs Will Fairly and Adequately Protect the
Interests of the Classes. ............................................................ 17

               a.     Absence of Conflict within the Class ............................................. 18

               b.     Adequacy of Representation. ........................................................ 18

          5.     Plaintiffs Satisfy Fed. R. Civ. P. 23(b)(2): This Case Seeks
Declaratory and Injunctive Relief from Policies and Practices that
Place the Entire Proposed Class at Risk of Brutal Violence ..................... 21

II.    THE COURT SHOULD DESIGNATE PLAINTIFFS' COUNSEL AS CLASS
COUNSEL UNDER RULE 23(g)(1) .............................................................. 23

CONCLUSION ............................................................................................................ 24

ii

## Table of Authorities

Page(s)

**Rules and Statutes**

Fed. R. Civ. P. 23(a)(1) ................................................................................ 4

Fed. R. Civ. P. 23(a)(2) ................................................................................ 5, 15

Fed. R. Civ. P. 23(a)(3) ................................................................................ 16

Fed. R. Civ. P. 23(a)(4) ................................................................................ 18

Fed. R. Civ. P. 23(b)(2) ................................................................................ 21

Fed. R. Civ. P. 23(c)(1)(B) ........................................................................... 22

Fed. R. Civ. P. 23(g)(1) ................................................................................ 22

Fed. R. Civ. P. 23(g)(1)(A) ........................................................................... 23

Fed. R. Civ. P. 23(g)(1)(B) ........................................................................... 22

**Cases**

*Anderson v. Garner*,
22 F. Supp. 2d 1379 (N.D. Ga. 1997) .......................................................... 17

*Arreola v. Godinez*,
546 F.3d 788 (7th Cir. 2008) ....................................................................... 7

*Barragan v. Evanger's Dog & Cat Food Co.*,
259 F.R.D. 330 (N.D. Ill. 2009) .................................................................. 4

*Bolden v. Walsh Constr. Co.*,
688 F.3d 893 (7th Cir. 2012) ....................................................................... 6

*Bullock v. Sheahan*,
225 F.R.D. 227 (N.D. Ill. 2004) .................................................................. 18

*Casale v. Kelly*,
257 F.R.D. 396 (S.D.N.Y. 2009) ................................................................. 22

**Page(s)**

*Coleman v. County of Kane*,
196 F.R.D. 505 (N.D. Ill. 2000) ........................................................... 5

*Corey H. v. Bd. of Educ. of City of Chi.*,
No. 92 C 3409, 2012 WL 2953217 (N.D. Ill. Jul. 19, 2012) ............................... 5

*Daniels v. City of New York*,
198 F.R.D. 409 (S.D.N.Y. 2001) ........................................................... 6

*De La Fuente v. Stokely-Van Camp, Inc.*,
713 F.2d 225 (7th Cir. 1983), *overruled on other grounds*,
*Green v. Mansour*, 474 U.S. 64 (1985) ...................................................... 17

*Doulin v. City of Chicago*,
No. 82 C 6771, 1984 WL 712 (N.D. Ill. June 29, 1984) ................................... 21

*Floyd v. City of New York*,
283 F.R.D. 153 (S.D.N.Y. 2012) ........................................................ 5, 22

*Fonder v. Sheriff of Kankakee Cty..*,
No. 12-CV-2115, 2013 WL 5644754 (C.D. Ill. Oct. 15, 2013) ........................ 16, 17

*Gaspar v. Linvatec Corp.*,
167 F.R.D. 51 (N.D. Ill. 1996) ........................................................... 17

*Gomez v. St. Vincent Health, Inc.*,
649 F.3d 583 (7th Cir. 2011) ............................................................. 18

*Ingles v. City of New York*,
No. 01 Civ. 8279 (DC), 2003 WL 402565 (S.D.N.Y. Feb. 20, 2003) ...................... 17

*Inmates of Attica Corr. Facility v. Rockefeller*,
453 F.2d 12 (2d Cir. 1971) ............................................................... 17

*Jackson v. Sheriff of Cook Cty.*,
No. 06 C 0493, 2006 WL 3718041 (Dec. 14, 2006) ..................................... 16

*Johnson v. Gen. Motors Corp.*,
598 F.2d 432 (5th Cir. 1979) ............................................................. 21

*Jones v. Blinziner*,
536 F. Supp. 1181 (N.D. Ind. 1982) ...................................................... 16

**Page(s)**

*King v. Kan. City S. Indus.*,
519 F.2d 20 (7th Cir. 1975) ............................................................................. 5

*Ligon v. City of New York*,
288 F.R.D. 72 (S.D.N.Y. 2013) ........................................................................ 5

*Marcera v. Chinlund*,
595 F.2d 1231 (2d Cir.), *vacated on other grounds*, 442 U.S. 915 (1979) ....................... 21

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir 2012) ............................................................................ 15

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*,
246 F.R.D. 621 (C.D. Cal. 2007) ...................................................................... 5

*Muro v. Target Corp.*,
580 F.3d 485 (7th Cir. 2009) ........................................................................... 18

*Olson v. Brown*,
284 F.R.D. 398 (N.D. Ind. 2012) ...................................................................... 17

*Osada v. Experian Info. Sols., Inc.*,
290 F.R.D. 485 (N.D. Ill. 2012).......................................................................... 15

*Patrykus v. Gomilla*,
121 F.R.D. 357 (N.D. Ill. 1988).......................................................................... 21

*Phipps v. Sheriff of Cook Cty.*,
249 F.R.D. 298 (N.D. Ill. 2008).......................................................................... 16

*Rodriguez v. Swank*,
318 F. Supp. 289 (N.D. Ill.1970), *aff'd*, 403 U.S. 901 (1971)............................................ 18

*Rosario v. Livaditis*,
963 F.2d 1013 (7th Cir. 1992) ........................................................................... 4, 5

*Scholes v. Stone, McGuire & Benjamin*,
143 F.R.D. 181 (N.D. Ill. 1992)........................................................................... 5

*Sherman ex rel. Sherman v. Twp. High Sch. Dist. 214*,
540 F. Supp. 2d 985 (N.D. Ill. 2008) ................................................................. 16

**Page(s)**

*Stinson v. City of New York*,
282 F.R.D. 360 (S.D.N.Y. 2012) ........................................................................ 22

*Streeter v. Sheriff of Cook Cty.*,
256 F.R.D. 609 (N.D. Ill. 2012) ................................................................... 4, 5, 18

*Vodak v. City of Chicago*,
No. 03 C 2463, 2006 WL 1037151 (N.D. Ill. Apr. 17, 2006) ........................... 6, 22

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .................................................................................. 6, 7, 15

## **Other Authorities**

A. Conte & H. Newberg, Newberg on Class Actions § 25.20 (4th ed. 2002) .................... 21

William B. Rubenstein, et al., Newberg on Class Actions, § 3:12 (5th ed. 2011) ............. 4

Pursuant to Federal Rule of Civil Procedure 23, including Rule 23(b)(2), Plaintiffs move the Court to enter an order that this case may be maintained as a class action seeking solely equitable relief on behalf of all persons who, since June 14, 2015, have been or will in the future be subject to the use of force by the Chicago Police Department, and a subclass comprised of all Black and Latino members of the class.

If the Defendants oppose class certification, Plaintiffs will request class discovery in order to fully develop the facts relating to class certification. Plaintiffs will also request an evidentiary hearing on the issue of certification at which plaintiffs would anticipate presenting live testimony from experts and other relevant witnesses.

## BACKGROUND AND SUMMARY OF ARGUMENT

Plaintiffs' suit for injunctive relief under the Fourth and Fourteenth Amendments and the Illinois Civil Rights Act is based on their contention that the City of Chicago and the Chicago Police Department ("CPD") subject people within its jurisdiction, in particular Black and Latino individuals, to excessive and often brutal force. This pervasive pattern involving the unconstitutional discriminatory and excessive use of force is directly caused by and allowed to continue by a failed system of training, supervision and accountability that enables a code of silence that insulates and perpetuates this illegal activity.

As a direct and proximate result of this failed system the named individual Plaintiffs have all suffered brutal, abusive and racially discriminatory uses of force at the hands of CPD officers, and they bring this action on behalf of themselves and thousands of other similarly situated people who, like them, have been and/or will be at risk of experiencing force by the CPD.

The claims of the class are ideally suited to proceed as a class action under Federal Rule of Civil Procedure 23(b)(2). This is so because (a) class members all seek the same general

equitable relief; (b) every single member of the class has the same legal theory as to why CPD violates their rights; (c) a policy and practice of excessive force, rooted in a failed system of inadequate training, supervising, monitoring and disciplining is the root cause of all of the injuries suffered by class members and; (d) every single member of the class will rely on precisely the same evidence in support of his cause of action.  In other words, the named Plaintiffs and the putative class all seek the same injunctive relief, share all legal claims, and all factual questions regarding the city's policy and practice are common to the named Plaintiffs and the putative class.

While it is true that Plaintiffs will rely, in part, on a series of different incidents of officer abuse—they will do so to show manifestations of a larger systemic failure that causes and allows officers to brutalize people they are supposed to protect and serve and that especially harms people of color.  Thus, individual incidents will be marshaled as anecdotal evidence as part of a mosaic of overwhelming proof, including admissions by the defendants themselves, with respect to the common question of whether the CPD's use of force practices violate the constitutional and statutory rights of the putative class and subclass.

In addition to commonality, the class easily satisfies the other requirements of Rule 23(a) as well as the requirements of Rule 23(b)(2).  Joinder is impracticable because the class contains thousands of people.  The CPD uses force several thousand times each year—in total force was used against an adult approximately 42,500 times between 2005 and 2015.  In 2015 alone, force was used on an adult approximately 3,500 times.  There is good reason to suspect that these reported numbers underestimate the use of force.  Because of the unconstitutional system of supervision and accountability concerning the use of force each one of these encounters is to some degree suspect.  In addition, this use of force falls largely on minority individuals, as

discussed below. The examples of excessive and discriminatory use of force are legion, as outlined in the recent DOJ report. *See infra* at [p. 7.]

The claims of the named Plaintiffs are typical of those of the class as a whole. That typicality is the result of their being subject to the CPD's unreasonable use of force as well as their claim that Defendants have failed to take appropriate steps to prevent such abuses by CPD officers. That claim is identical across the whole of the proposed class.

Named Plaintiffs have no conflicts with the unnamed members of the proposed class. Their lawyers are experienced in federal court civil rights class actions, particularly those involving police, race discrimination and class action litigation. Thus, named Plaintiffs and their counsel will adequately represent the interests of the proposed class.

Finally, Defendants have acted in a manner applicable to the class as a whole. The CPD's policy and practice of using excessive force applies across the entire class. In addition, the Defendants have failed to act to prevent this abusive use of force by providing inadequate training, supervision, and discipline of officers and thereby enabling a code of silence to exist that perpetuates these behaviors. In short, Defendants have acted in a manner that applies generally to the class as a whole, rendering class-wide injunctive relief appropriate under Federal Rule of Civil Procedure 23(b)(2).

ARGUMENT

I.  **THE COURT SHOULD CERTIFY THE CLASS, CONSISTING OF ALL PERSONS WHO HAVE BEEN OR WILL BE SUBJECT TO FORCE BY THE CPD, AS WELL AS A SUBCLASS OF BLACK AND LATINO CLASS MEMBERS**

   A.  **The Proposed Class Meets All of the Requirements for Maintenance of A Class Action.**

For a district court to certify a class action, the named plaintiffs or the proposed class must satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) and at least one requirement of Rule 23(b).  *Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir. 1992).  Because named Plaintiffs and the proposed class and subclass meet all four Rule 23(a) requirements and the requirements of Rule 23(b)(2), the class should be certified.

1.  **Numerosity is Satisfied: The Class Includes Thousands of Members.**

Federal Rule of Civil Procedure 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "[A] class including more than 40 members is generally believed to be sufficient."  *Barragan v. Evanger's Dog & Cat Food Co.,* 259 F.R.D. 330, 333 (N.D. Ill. 2009); *Streeter v. Sheriff of Cook Cty.*, 256 F.R.D. 609, 612 (N.D. Ill. 2012) (same); *accord* William B. Rubenstein, et al., Newberg on Class Actions, § 3:12 (5th ed. 2011) ("a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone").  Numerosity is easily satisfied here.  Thousands of people are subject to force by the CPD each year.  In 2015 alone, the CPD used force against an adult approximately 3,500 times.  The subclass also contains thousands of people as the CPD's use of force falls disproportionately on minority individuals.  Between 2005 and 2015, approximately 72% of the incidents of CPD force were against Black individuals, despite the fact that approximately one-third of the population in Chicago is Black.

2.      **Commonality is Satisfied: The CPD's Use of Excessive Force Targeted at
        Communities of Color Presents Numerous Common Questions of Fact and Law.**

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed.

R. Civ. P. 23(a)(2).  "A common nucleus of operative fact is usually enough to satisfy the

commonality requirement."  *Rosario*, 963 F.2d at 1018; *Streeter*, 256 F.R.D. at 612 (same).

"Rule 23 must be liberally interpreted" and should be read to favor maintenance of class actions,

*King v. Kan. City S. Indus.,* 519 F.2d 20, 25-26 (7th Cir. 1975); *Scholes v. Stone, McGuire &
Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992) ("[T]he commonality requirement has been

characterized as a 'low hurdle' easily surmounted.").

An injunctive challenge to a systemic failure to protect class members from rampant

police misconduct is a textbook example of a case that satisfies the commonality requirement

and warrants class certification.  Indeed, "[a] class action is . . . an appropriate vehicle to address

what is alleged to be a systemic problem . . . ."  *Coleman v. County of Kane*, 196 F.R.D. 505, 507

(N.D. Ill. 2000) (finding commonality in case against sheriff regarding bond fees); *see also
Ligon v. City of New York*, 288 F.R.D. 72, 77, 84 (S.D.N.Y. 2013) (certifying class of individuals

who have been or will be stopped without reasonable suspicion of trespass outside of targeted

private residential buildings); *Corey H. v. Bd. of Educ. of City of Chi.*, No. 92 C 3409, 2012 WL

2953217, at *7 (N.D. Ill. Jul. 19, 2012) ("Plaintiffs have attacked … systemic failures and

district-wide policies that apply to every member of the certified class."); *Floyd v. City of New
York*, 283 F.R.D. 153, 160, 178 (S.D.N.Y. 2012) (certifying class of individuals who have been

or will be subjected to the police practice of stop and frisk); *Multi-Ethnic Immigrant Workers
Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 625-26, 637 (C.D. Cal. 2007) (certifying

class of individuals who were subjected to police officers' use of force, dispersal order, and other

unlawful police activity during a march and rally); *Vodak v. City of Chicago*, No. 03 C 2463,

2006 WL 1037151, at *1 (N.D. Ill. Apr. 17, 2006) (certifying class of individuals challenging their seizure and arrest by police officers during a march); *Daniels v. City of New York*, 198 F.R.D. 409, 412, 422 (S.D.N.Y. 2001) (certifying class of individuals who have been or will be stopped and frisked by police officers without reasonable suspicion and on the basis of race and/or national origin).

To be sure, as the Supreme Court held in its latest major pronouncement on commonality, Plaintiffs must demonstrate that there is "some glue" holding the claims together; the class claims "must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-52 (2011) ("What matters to class certification . . . is not the raising of common 'questions . . . but, rather the capacity of a classwide proceeding to generate common *answers* . . .") (citations and quotations omitted).

The "glue" that was lacking in *Wal-Mart* exists in this case: Plaintiffs, including the subclass, seek a common equitable remedy—the same remedy the defendant City of Chicago agreed earlier this year was the appropriate remedy for the problem confronted here—to redress the single, overarching policy and practice of the CPD that has resulted in the excessive force that affects all members of the class and that allows the discriminatory and abusive use of force to persist. Members of the subclass have an additional justification for this relief because the CPD's use of force policies and practices have a disparate racial and ethnic impact. Also unlike in *Wal-Mart*, here there is proof that the CPD also "operated under a general policy of discrimination." 564 U.S. at 355. *See also Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 897 (7th Cir. 2012) (explaining that an across the board procedure or policy would have supplied the commonality that was lacking in *Wal-Mart*); *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir.

6

2008) (finding commonality in case challenging Illinois Department of Corrections policy that restricted the use of crutches).

Resolving whether the CPD operates under a general policy and practice of excessive force that Defendants have not only failed to rectify but have fostered and encouraged, will yield exactly the kind of "common answer" to Plaintiffs' claims that the Supreme Court was seeking in *Wal-Mart*. 564 U.S. at 349-50.

As the Supreme Court explained in *Wal-Mart*, "for purposes of Rule 23(a)(2) [e]ven a single [common] question will do . . ." *Id.* at 352 (citation and internal quotations omitted). Plaintiffs here, however, can show multiple common questions: all of the following factual and legal contentions (each of which pertains to overarching patterns and practices) are common to the class and/or subclass and will lead to common answers. Specifically, the first four contentions are common to the entire class, and all contentions are common to the subclass.

### Common Contention No. 1

The CPD engages in a pattern and practice of excessive force that places individuals who interact with the CPD at a substantial risk of harm.

### Support for Common Contention No. 1:

In December 2015, the U.S. Department of Justice, Civil Rights Division, Special Litigation Section, and the U.S. Attorney's office for the Northern District of Illinois (together, "DOJ") initiated an investigation into the conduct of the CPD. DOJ published its findings in January 2017 after a comprehensive review of the CPD's records, policies, and practices related to the use, reporting, and investigation of force; officer reports of force; civilian complaints of force; the CPD's reviews of force incidents and investigations of allegations of excessive force;

interviews of CPD officers at all ranks regarding use of force training; and use of force incidents captured on video. *See* Ex. 1 to [Bedi] Declaration (p. 24).

In short, the DOJ concluded that the CPD engages in a pattern or practice of excessive force.

- The DOJ found that the CPD is engaging in a pattern or practice of "unnecessary and unreasonable force in violation of the Constitution . . . and that unconstitutional force has been historically tolerated by CPD." *Id.*

- In addition, the DOJ found that the CPD's pattern of unconstitutional use of force includes the use of deadly force and excessive less-lethal force against people who present no threat in violation of the Fourth Amendment and certain CPD protocols. *See id.* (pp. 25, 32).

The DOJ also identified specific types of conduct that reflect the CPD's policy of using excessive force. For example, the DOJ found a pattern or practice of unreasonable force by the CPD relating to foot pursuits, including in connection with the following problematic behaviors:

- CPD officers conduct foot pursuits in a tactically unsound, often reckless, manner, sometimes culminating in officer-involved shootings. *See id.* (p. 30).

- CPD officers initiate foot pursuits without a basis for believing the individual has committed a serious crime. The act of fleeing alone appears to be sufficient to trigger a pursuit resulting in gunfire that is sometimes fatal. *See id.* (p. 25).

- CPD officers engage in a dangerous tactic called "partner-splitting," where officer partners will split up to pursue one or more suspects. This is not a trained CPD technique and inhibits officer communication as well as increasing the risk that officers or innocent bystanders can be caught in crossfire. *See id.* (pp. 30-31).

- CPD officers also employ a "jump out" technique where officers, frequently in plain clothes and riding in unmarked vehicles, approach a street corner or group of individuals, jump out, and rapidly approach, often with guns drawn. This tactic often causes targets to flee, resulting in unplanned foot pursuits. *See id.* (p. 31)

The DOJ found a pattern or practice of unreasonable force relating to vehicle pursuits as well, including in the following ways:

- CPD officers fire at fleeing vehicles without justification. *See id.* (p. 27).

8

- CPD officers fire at vehicles after recklessly positioning themselves in the path of a moving vehicle. *See id.*

- CPD officers also fire at vehicles after refusing to move from the path of a moving vehicle. *See id.*

The DOJ also identified excessive force in connection with the CPD's use of Tasers. For example:

- CPD officers use Tasers against people who are only passively resisting. *See id.* (p. 33).

- CPD officers resort to Tasers as a tool of convenience even against individuals committing minor violations, with insufficient concern or acknowledgment that Tasers inflict significant pain. *See id.*

**Common Contention No. 2:** CPD officers engage in a pattern and practice of escalating incidents and engaging in the most intrusive policing possible leading to instances of unnecessary and excessive force.

**Support for Contention No. 2:**

In addition to the CPD's excessive force practices discussed above relating to foot pursuits, vehicle pursuits, and Tasers, the DOJ identified specific ways in which CPD officers unnecessarily escalate encounters.

For example, the DOJ found that CPD officers exhibit poor discipline in discharging their weapons. *See id.* (p. 28). Specifically, the DOJ found that:

- CPD officers shoot at fleeing suspects who present no immediate threat to officers or the public. *See id.* (p. 25).

- CPD officers fire recklessly at moving vehicles even though stopping or disabling the vehicle is unlikely. This practice also ignores the risk that stray bullets may strike innocent passengers, provoke a fight-or-flight response, or disable the driver and result in a runaway vehicle that endangers the lives of officers or bystanders. *See id.* (p. 27).

- CPD officers fire their weapons when other officers have done so and not because of a specific, articulable threat. *See id.* (p. 28).

9

In addition, the DOJ found that the CPD officers make poor tactical decisions that unnecessarily increase the risk of deadly encounters.  For example:

- CPD officers act too quickly, failing to await backup and unnecessarily exposing themselves and innocent bystanders to high-risk situations without an exigent need to do so.  *See id.* (pp. 28-29).

- CPD officers use reckless vehicle maneuvers designed to box in suspects' cars despite never being trained on such techniques.  Such maneuvers unnecessarily compromise the safety of officers and increase the likelihood of a deadly force encounter.  *See id.* (p. 30).

**Common Contention No. 3:** CPD and its dysfunctional accountability systems have maintained and continue to promote a "code of silence" by which police officers are trained to and required to remain silent about police misconduct—including excessive force. The promotion of the code of silence and the lack of functioning police accountability systems have resulted in the widespread violation of the Plaintiff class' rights to be free from excessive force.

**Support for Contention No. 3:**

The DOJ report, as well as a report published by the Chicago Police Accountability Task Force (the "Task Force") in April 2016, reflect that a well-known code of silence exists within the CPD.

- The DOJ found that a "code of silence" under which officers affirmatively lie about, deliberately omit material facts regarding, or falsify reports concerning police misconduct, pervades the CPD.  *See id.* (pp. 8, 75).

- DOJ noted that "City, police officers and leadership within CPD and its police officer union acknowledge a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence."  *See id.* (p. 8).

- Chicago officials have themselves admitted the existence of the code of silence. In a speech on December 9, 2015, Mayor Rahm Emanuel voiced his concerns about the code of silence when he said, "[w]e cannot ask citizens in crime-ravaged neighborhoods to break the code of silence if we continue to allow a code of silence to exist within our own police department."  *See* Ex. 2 to [Bedi] Declaration (pp. 69-70).

In addition, the DOJ and Task Force concluded that the code of silence exists as a result of the CPD's own policies and practices.

- According to the DOJ, the "code is apparently strong enough to incite officers to lie even when they have little to lose by telling the truth" and that this occurs "in part because officers do not believe there is much to lose by lying." *See* Ex. 1 to [Bedi] Declaration (p. 75).

- The Task Force found that CPD's "code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City." *See* Ex. 2 to [Bedi] Declaration (p. 70).

Specifically, CPD's deficient accountability systems perpetuate CPD's code of silence, including in the following ways:

- Investigators "treat such efforts to hide evidence as ancillary and unexceptional misconduct, and often do not investigate it, causing officers to believe there is not much to lose if they lie to cover up misconduct." *See* Ex. 1 to [Bedi] Declaration (p. 9).

- For example, investigators fail to adequately enforce Rule 14 of CPD's Rules and Regulations, which prohibits making false statements. *See id.* (p. 75). The failure to pursue Rule 14 charges against any of the officers who witnessed the shooting in the Laquan McDonald case and who prepared reports that were inconsistent with video footage of the shooting underscores this truth. *See id.* (pp. 57-58).

- In addition, collective bargaining agreements between the City and police unions "have essentially turned the code of silence into official policy" by imposing requirements and restrictions related to misconduct complaints that discourage reporting misconduct and thereby impede effective oversight. *See* Ex. 2 to [Bedi] Declaration (p. 14).

- CPD also takes insufficient action to investigate and discipline officers who intimidate potential complainants or witnesses to police abuse, including through the filing of false assault and battery charges against victims of and witnesses to misconduct. *See* Ex. 1 to [Bedi] Declaration (p. 79).

**Common Contention No. 4:** CPD's failure to adequately train, supervise, monitor and discipline its officers results in the widespread violation of the Plaintiff class' right to be free from excessive force.

11

**Support for Common Contention No. 4:**

CPD's failure to adequately train, supervise, monitor and discipline its officers is a

critical part of the code of silence. The DOJ found the CPD's training program to be deficient

and ineffective, for reasons including the following:

- The Academy's training materials are outdated and "fail to account for updates in legal standards, widely accepted law enforcement standards, and departmental policies." *See id.* (p. 95). For instance, the DOJ found that one use of force training relied on a video made approximately 35 years ago, before several key Supreme Court decisions that changed legal standards concerning the reasonableness of use of force. *See id.* (p. 95).

- CPD's Academy training also makes little effort to ensure that training content is effectively delivered to new recruits. *See id.* (pp. 95-96). One training supervisor described the experience as "'check the box' training, meaning that the emphasis is on making a record of having provided training as opposed to actually providing effective instruction." *See id.* (p. 96).

- CPD officers' transition from the Academy to the field is also flawed and does not adequately prepare them for their line of work. *See id.* (p. 97). The DOJ's investigation concluded that the CPD Field Training Program "actively undermines, rather than reinforces, constitutional policing." *See id.* (p. 97.)

CPD's supervision, monitoring and disciplinary policies and practices are similarly

inadequate. For example:

- Complaints against CPD officers rarely result in discipline. *See* Ex. 2 to [Bedi] Declaration (p. 63). Of the 28,567 allegations of misconduct made against CPD officers from March 2011 through September 2015, only 2% resulted in discipline. *See id.*

- Some complaints about the CPD's use of force are not investigated at all. *See id.* (p. 52-53). These include complaints alleging uses of force that are considered "de-minimis" (such as complaints concerning the use of force employed in connection with a take-down incidental to arrest, handcuffing, or an officer's display of his gun). *See id.*

- When alleged officer misconduct is investigated, the investigation is often flawed and biased towards CPD officers. *See id.* (pp. 61-63).

- Investigations into misconduct also lack timely resolutions, which undermines the quality and credibility of the process. *See id.* (pp. 72-73), Ex. 2 to [Bedi] Declaration (p. 80).

- In the infrequent cases when misconduct complaints are sustained, the DOJ found that "discipline is haphazard and unpredictable, and is meted out in a way that does little to deter misconduct." *See* Ex. 1 to [Bedi] Declaration (p. 9).

**Common Contention No. 5:** The CPD has discriminatory policing policies and practices that unlawfully target Black and Latino people and that result in racially discriminatory and disproportionate rates of excessive force.

**Support for Common Contention No. 5:**

Statistics in the DOJ report and the Task Force report reflect a pattern of discriminatory policing and use of force.

- The DOJ noted that of all instances involving uses of force by the CPD between January 2011 and April 18, 2016 for which race was documented, blacks were subject to approximately 76% of the uses of force and whites were subject to 8% of the incidents. By contrast, blacks constitute approximately 33% of Chicago's population and whites comprise approximately 32%. *See id.* (pp. 15-16, 144-46).

- The Task Force reported that of the 404 officer-involved shootings resulting in injury or death between 2008 and 2015, 74% of those killed were black and 8% were white. And of the 1,886 officer-involved Taser discharges between 2012 and 2015, blacks were subject to 76% of the discharges; whites were subject to only 8% of the discharges. *See* Ex. 2 to [Bedi] Declaration (pp. 35-36.)

- The Task Force report also concluded that "CPD's own data gives validity to the widely held belief the police have no regard for the sanctity of life when it comes to people of color." *See id.* (pp. 6, 7, 9.)

Relatedly, the DOJ found that CPD officers regularly use racially charged and abusive language without consequence. Specifically, the DOJ found that:

- Black youth are routinely called the n-word, "animal," or "pieces of s***" by CPD officers. One officer interviewed by the DOJ stated that "he personally has heard coworkers and supervisors refer to black individuals as monkeys, animals, savages, and 'pieces of s***.'" *See* Ex. 1 to [Bedi] Declaration (p. 146.)

- In one instance, an officer became involved in an altercation with the victim at a dog park and said, "F*** you, you f***ing [n-word], you should keep your big mouth shut." When the victim's husband, who was himself a police officer in another municipality, objected to the CPD officer's behavior, the CPD officer responded, "Why? Because she's pregnant? I don't care if she's pregnant. I'll beat her f***in' ass too." *See id.* (pp. 15, 146-48.)

13

- Moreover, of 980 police misconduct complaints categorized as involving racially or ethnically discriminatory verbal abuse between 2011 and March 2016, only 1.3% of the complaints were sustained. Further, 354 complaints were for use of the n-word. *See id.*

In addition, the DOJ found that CPD officers regularly express discriminatory views on social media. For example:

- One officer recently posted two graphic photos of slain black men with the caption: "Hopefully one of these pictures will make the black lives matter activist organization feel a whole lot better!" *See* Ex. 1 to [Bedi] Declaration (pp. 147-48.)

- Other CPD officers posted discriminatory remarks about Muslims, referring to them as "Ragtop" and stating, "[t]he only good Muslim is a f***ing dead one." Supervisors were responsible for many of these statements. *See id.*

- A sergeant posted twenty-five anti-Muslim statements and at least forty-three other discriminatory posts. *See id.*

- A lieutenant posted at least five anti-immigrant and anti-Latino statements. *See id.*

Of course, prior to discovery and even initial disclosures, Plaintiffs need not prove each of these contentions. "[T]he court," after all, "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir 2012); *Osada v. Experian Info. Sols., Inc.*, 290 F.R.D. 485, 492 (N.D. Ill. 2012) (same). The evidence above is put forward at this stage only to show that the risk of harm faced by Plaintiffs, and Defendants' knowledge of such risk, present "*questions* of law or fact common to the class," Fed. R. Civ. P. 23(a)(2) (emphasis added), that lend themselves to common answers, therefore making class-wide adjudication appropriate. To satisfy the commonality requirement, a "common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. This litigation is ideally suited to proceed as a class action because each class member's

14

claim rises or falls based on whether the CPD operates according to a policy and practice of excessive force that Defendants have supported and encouraged.

In light of the common questions identified above, differences among class members with respect to the specific uses of force against them do not undermine the commonality of legal and factual issues in this case. That is true because, as explained above, Plaintiffs will rely on numerous individual incidents of violence including but not limited to those involving the class members, statistical evidence and admissions by the defendants, to prove that there is a common pattern of fostering officer abuse that shows that there is a substantial risk of severe injury to those who come into contact with the CPD.

The fact that class members in this case suffered various means of excessive force—is immaterial to commonality because each such use of force was the result of a common system of policies and practices of oversight and the differences in the means of force are not relevant to establishing the existence of a common system. *See Phipps v. Sheriff of Cook Cty.*, 249 F.R.D. 298, 301 (N.D. Ill. 2008) (certifying class of all detainees needing wheelchairs in the Cook County Jail; commonality exists even though "particular conditions may differ slightly from one cell block to the next" (citation omitted)); *Jackson v. Sheriff of Cook Cty.*, No. 06 C 0493, 2006 WL 3718041, at *4 (Dec. 14, 2006) (certifying class of detainees involuntarily subjected to an STD screening at the Cook County Jail; in contesting commonality, the Sheriff relied "too much on select factual determinations that might [v]ary on a case-by-case basis."*); Fonder v. Sheriff of Kankakee Cty..*, No. 12-CV-2115, 2013 WL 5644754, at * 6 (C.D. Ill. Oct. 15, 2013) (rejecting Defendants' argument that a jail strip search class action would "require a fact-bound inquiry into the individual circumstances and facts of each search," thus precluding a finding of commonality). Indeed, "if factual distinctions could preclude findings of commonality and

15

typicality under Rule 23(a), they would be the death knell for class actions challenging the systemic enforcement of an unconstitutional statute." *Sherman ex rel. Sherman v. Twp. High Sch. Dist. 214*, 540 F. Supp. 2d 985, 992 (N.D. Ill. 2008) (quoting *Brown v. Kelly*, 244 F.R.D. 222, 230 (S.D.N.Y.2007)).

### 3.  Typicality is Satisfied: The Named Plaintiffs' Claims are Representative of Those of the Class at Large.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The standard for determining typicality is not an identity of interest between the named plaintiffs and the class, but rather a "sufficient homogeneity of interest." *See, e.g.*, *Jones v. Blinziner*, 536 F. Supp. 1181, 1190 (N.D. Ind. 1982) (citing *Sosna v. Iowa*, 419 U.S. 393, 403 n.13 (1975)). "[T]he typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996).

In this case, the claims of the Plaintiffs are typical of the class as a whole. The class consists of individuals who have been or will be subject to force by the CPD. Each individual class representative has been subject to force by the CPD, and each class member's claims are based on the same legal theories—that the CPD's use of force toward civilians is unconstitutional, and further, that the City has allowed this illegal system of policies and practices concerning the use of force to exist. Members of the subclass further allege that this system is racially discriminatory. Complaint ¶¶ [ ]. *See Fonder*, 2013 WL 5644754, at *6 (typicality satisfied where "Plaintiff is challenging the same strip search policy as the class he seeks to represent"); *Olson v. Brown*, 284 F.R.D. 398, 411 (N.D. Ind. 2012) (typicality satisfied where class representative and members of proposed class had legal mail opened improperly by correctional officers); *Inmates of Attica Corr. Facility v. Rockefeller*, 453 F.2d 12, 24-25 (2d Cir.

16

1971) (finding typicality in lawsuit challenging excessive force by guards, despite individual factual differences); *Ingles v. City of New York*, No. 01 Civ. 8279 (DC), 2003 WL 402565, at *5 (S.D.N.Y. Feb. 20, 2003) (same); *Anderson v. Garner*, 22 F. Supp. 2d 1379, 1385 (N.D. Ga. 1997) (finding typicality in prison excessive force case even though "when compared to the Plaintiffs' claims, the unnamed class members may have suffered different injuries under different circumstances . . .").

"Typical," as this Court has stated, "does not mean identical." *Gaspar*, 167 F.R.D. at 57. *See also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members."), *overruled on other grounds*, *Green v. Mansour*, 474 U.S. 64 (1985); *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (same). Thus, the "typicality" requirement is satisfied when the representative's injuries arise from the same practice affecting the rest of the class, even if factual differences exist. *Streeter,* 256 F.R.D. 612-13 (certifying class of detainees strip searched upon entry to Cook County Jail, despite the Sheriff's argument that there were differences in the circumstances of each search "because 'the likelihood of some range of variation in how different groups of … detainees were treated does not undermine the fact that the claims of each class [member] share a common factual basis and legal theory.'") (quoting *Young v. County of Cook*, No. 06 C 552, 2007 WL 1238920, at *6 (N.D. Ill. Apr. 25, 2007); *Bullock v. Sheahan*, 225 F.R.D. 227, 230 (N.D. Ill. 2004) ("[p]otential factual differences" relating to individual searches held insufficient to defeat typicality in a jail strip search case).

    **4.**    **The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Classes.**

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This adequate representation inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). All Plaintiffs here are represented by counsel experienced in the protection and enforcement of constitutional and statutory rights. Plaintiffs each have a strong personal stake in the proceedings that will "insure diligent and thorough prosecution of the litigation." *Rodriguez v. Swank*, 318 F. Supp. 289, 294 (N.D. Ill.1970), *aff'd*, 403 U.S. 901 (1971).

> **a.       Absence of Conflict within the Class.**

The named Plaintiffs and the class members raise the same claims, giving rise to common questions of fact and law. The class representatives do not have interests antagonistic to the interests of the class. Both the representatives and the class members have a common interest in ensuring that individuals who interact with the CPD are protected from its failed system of policies and practices concerning use of force that is fostered and encouraged by Defendants. There is no suggestion of any collusion between named Plaintiffs and any of the Defendants. Moreover, no conflicts exist that could hinder the named Plaintiffs' ability to pursue this lawsuit vigorously on behalf of the class. The named Plaintiffs will fairly and adequately protect the interests of the class.

> **b.       Adequacy of Representation.**

Plaintiffs' counsel are qualified, experienced, and able to conduct the proposed litigation. Plaintiffs are represented by attorneys from the Roderick and Solange MacArthur Justice Center at Northwestern University Pritzker School of Law and the Edwin F. Mandel Legal Aid Clinic at

the University of Chicago Law School, Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), Shiller Preyar LLC, and Action Injury Law Group.

The Roderick and Solange MacArthur Justice Center is a public interest law firm founded in 1985 by the family of J. Roderick MacArthur to advocate for human rights and social justice through litigation. The MacArthur Justice Center became part of Northwestern University School of Law's Bluhm Legal Clinic in 2006.

Prior to joining the MacArthur Justice Center in September 2012, Sheila Bedi served as the deputy legal director of the Southern Poverty Law Center in New Orleans where she represented people who are imprisoned in federal class action litigation challenging abusive prison conditions and worked on policy campaigns aimed at reducing incarceration rates and reforming criminal and juvenile justice systems. Some of her honors include the 2010 The Peter M. Cicchino Award for Outstanding Advocacy in the Public Interest and the 2007 Fannie Lou Hamer Award. Bedi received her LLM from Georgetown University Law Center and her JD, cum laude, from American University.

Alexa Van Brunt has served since 2010 as an attorney at the MacArthur Justice Center working on cases including litigating on behalf of victims of the Jon Burge police torture scandal, and bringing suits to address such issues as conflicts of interest within the Cook County State's Attorney's Office and the violation of prisoners' rights in Illinois correctional facilities. Van Brunt clerked for the Hon. Myron Thompson, U.S. District Court for the Middle District of Alabama and received her JD, with distinction, from Stanford Law School.

The Civil Rights and Police Accountability Project (PAP) of the Mandel Legal Aid Clinic University of Chicago Law School is one of the nation's leading law civil rights clinics focusing on issues of criminal justice. Through the lens of live-client work, students examine how and

19

where litigation fits into broader efforts to improve police accountability and ultimately the criminal justice system.

Craig Futterman is the founder and director of PAP. He has significant expertise in Chicago Police operations and has litigated a number of federal civil rights cases against the Chicago Police Department. Prior to his 2000 appointment to the Law School faculty, Craig Futterman was the Director of Public Interest Programs and Lecturer in Law at Stanford Law School. He graduated with the highest distinction from Northwestern University in 1988, where he received a Bachelor of Arts in sociology and economics. He then graduated from Stanford Law School in 1991. Following law school, he was a trial attorney in the Juvenile Division of the Cook County Public Defender's Office. In 1994, he joined Futterman & Howard, Chtd., a boutique Chicago law firm concentrating on complex federal litigation. There, Mr. Futterman specialized in civil rights lawsuits, focusing on matters involving police brutality and racial discrimination. He has litigated a number of noteworthy cases, including *Jaffee v. Redmond*, 116 S.Ct. 1923, a federal civil rights suit, where Mr. Futterman successfully represented the family of an African American father shot and killed by a suburban police officer. The case also created a federal evidentiary privilege for psychotherapists and their patients. He additionally litigated *People Who Care v. Rockford Board of Education*, 851 F.Supp. 905 (N.D.Ill. 1994); 90 F.3d 1307 (7th Cir. 1996), 171 F.3d 1083 (7th Cir. 1999), a class action Constitutional lawsuit that demonstrated a decades-long pattern of educational discrimination and segregation which permeated almost every aspect of Rockford's school system.

Cleary Gottlieb is an international law firm with deep experience in complex federal litigation and class actions, including civil rights work, at all levels, including before the U.S. Supreme Court. Cleary Gottlieb has served as counsel, on a *pro bono* basis, in a number of

successful complex federal litigations, including a civil rights class action brought on behalf of individuals held at a prison psychiatric ward, a class action on behalf of homeless individuals, and, most recently, an action on behalf of prisoners alleging widespread civil rights violations at a prison. Some of Cleary Gottlieb's honors include Law360's *Pro Bono* Firm of the Year in 2012, 2013, 2015, and 2016, and the American Bar Association's *Pro Bono* Publico Award in 2016. Cleary Gottlieb attorneys, who are serving as counsel on a *pro bono* basis, have already invested hundreds of hours into this representation, identifying and investigating potential claims. Cleary Gottlieb is knowledgeable of the facts and applicable law and will commit substantial resources to diligently and vigorously pursuing all rights and interests of the class.

Additional class counsel also have significant experience litigating federal civil claims, including Brendan Shiller (see Ex. 2 Shiller Dec.); Andrew Stroth; (See Ex. 3 Stroth Dec.) and Carlton Odim (See Ex. 4 Odim Dec).

**5. Plaintiffs Satisfy Fed. R. Civ. P. 23(b)(2): This Case Seeks Declaratory and Injunctive Relief from Policies and Practices that Place the Entire Proposed Class at Risk of Brutal Violence.**

The final requirement for class certification is satisfaction of at least one of the subsections of Rule 23(b). Subsection (b)(2) requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Courts have repeatedly held that civil rights class actions are the paradigmatic 23(b)(2) suits, "for they seek classwide structural relief that would clearly redound equally to the benefit of each class member." *Marcera v. Chinlund*, 595 F.2d 1231,

21

1240 (2d Cir.), *vacated on other grounds*, 442 U.S. 915 (1979); *see also Johnson v. Gen. Motors Corp.*, 598 F.2d 432, 435 (5th Cir. 1979).[1]  As stated in the leading treatise on class actions:

> Rule 23(b)(2) was drafted specifically to facilitate relief in civil rights suits. Most class actions in the constitutional and civil rights areas seek primarily declaratory and injunctive relief on behalf of the class and therefore readily satisfy Rule 23(b)(2) class action criteria.

A. Conte & H. Newberg, Newberg on Class Actions § 25.20 (4th ed. 2002).

Challenges to instances of police misconduct seeking injunctive or declaratory relief routinely proceed as class actions.  *See, e.g.*, *Patrykus v. Gomilla*, 121 F.R.D. 357, 362 (N.D. Ill. 1988) (class certification under 23(b)(2) was appropriate because defendant police officers and drug enforcement agents acted on "unconstitutional grounds generally applicable to all class members"); *Doulin v. City of Chicago*, No. 82 C 6771, 1984 WL 712, at *5 (N.D. Ill. June 29, 1984) (plaintiffs challenging the post-arrest detention policy of the Chicago Police sufficiently alleged a harm that was generally applicable to the whole class); *Vodak v. City of Chicago*, No. 03 C 2463, 2006 WL 1037151, at *7  (N.D. Ill. Apr. 17, 2006) (certification of class of individuals challenging their seizure and arrest by police officers during a march was appropriate under Rule 23(b)(2) where plaintiffs sought to enjoin defendants to return or destroy records concerning their activities at the march); *Floyd*, 283 F.R.D. at 177-78 (S.D.N.Y. 2012) (certifying, under Rule 23(b)(2), class of individuals who have been or will be subject to the practice of stop and frisk where there was "overwhelming evidence that there in fact exists a centralized stop and frisk program that has led to thousands of unlawful stops"); *Casale v. Kelly*, 257 F.R.D. 396, 413-14 (S.D.N.Y. 2009) (certifying class under Rule 23(b)(2) alleging

---

[1] Plaintiffs do not seek class certification for any damages claims.  While the named individual Plaintiffs seek damages for their individual injuries, they represent a class seeking purely declaratory and injunctive relief.

22

constitutional violations related to the unlawful enforcement of provisions of a state loitering law after the provisions were declared unconstitutional resulting in false arrests); *Stinson v. City of New York*, 282 F.R.D. 360, 379-382 (S.D.N.Y. 2012) (certifying class under Rule 23(b)(2) alleging that defendant city, police commissioner, and unnamed police officers engaged in a pattern and practice of issuing unconstitutional summonses without probable cause).

## II.   THE COURT SHOULD DESIGNATE PLAINTIFFS' COUNSEL AS CLASS COUNSEL UNDER RULE 23(g)(1).

Federal Rule of Civil Procedure 23(g) requires that the district court appoint class counsel for any class that is certified. Fed. R. Civ. P. 23(g)(1). The attorneys appointed to serve as class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). The appointed class counsel must be listed in the Court's class certification order. Fed. R. Civ. P. 23(c)(1)(B).

The Rule identifies four factors that the Court must consider in appointing class counsel: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The undersigned attorneys satisfy each of these requirements. First, Plaintiffs' counsel have worked for many months in identifying and investigating the claims in the action, through interviews with the named Plaintiffs, with scores of other putative class members and with other potential fact witnesses, consultation with potential experts, review of court records, and other extensive factual and legal research. *See* [Bedi] Declaration ¶ [7]. With regard to the second and third factors, and as is set forth in the Declaration, Plaintiffs' counsel have significant experience in handling class actions as well as other complex litigation, including the very kind of matters

asserted in this case, namely, civil rights actions; and they are knowledgeable with regard to the applicable law. *Id.* ¶¶ [2-6].

Finally, Plaintiffs' litigation team includes several highly experienced lawyers who have dedicated and will continue to commit major staffing and material resources to the representation of this class. *Id.* ¶ [8]. Plaintiffs' counsel have built a strong, effective working relationship with the named Plaintiffs and several other members of the proposed class. *Id.* ¶ [9]. Counsel are prepared to retain highly qualified experts and to undertake the other necessary litigation expenses on behalf of the Plaintiffs and the proposed class. *Id.* ¶ [10]. In sum, Plaintiffs' counsel fully satisfy the criteria for class counsel set forth in Rule 23(g) and Plaintiffs respectfully request that the Court appoint them as such.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion for class certification and appoint the undersigned attorneys as Class Counsel.

DATED: June 14, 2017

[/s/ Sheila Bedi]_____

| | |
|---|---|
| Sheila A. Bedi | Craig Futterman |
| Alexa Van Brunt | Randolph N. Stone |
| Vanessa del Valle | Mandel Legal Aid Clinic |
| MacArthur Justice Center | University of Chicago Law School |
| Northwestern Pritzker School of Law | 6020 S. University Avenue |
| 375 E. Chicago Avenue | Chicago, Illinois 60637 |
| Chicago, Illinois 60611 | (773) 702-9611 |
| (312) 503-1336 | |
| | |
| Brandon Schiller | Andrew M. Stroth |
| April Preyar | Carlton Odim |
| Shiller Preyar LLC | Action Injury Law Group |
| 601 S. California Avenue | 191 North Wacker Drive, #2300 |
| Chicago, Illinois 60612 | Chicago, Illinois 60606 |
| (312) 226-4590 | (312) 771-2444 |

24

Thomas J. Moloney
Roger A. Cooper
Jared Gerber
Nefertiti J. Alexander
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned, an attorney, certifies that she filed the foregoing document via the

Court's CM/ECF system and served a copy on the individuals in the attached service list, on

June 14, 2017.


<u>/s/ Sheila A. Bedi         </u>

**<u>SERVICE LIST</u>**