# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IMMANUEL CAMPBELL, RUBIN CARTER, MARKEES SHARKEY, DEONTE BECKWITH, CHANTE LINWOOD, RACHEL JACKSON, on behalf ) of themselves and a class of similarly situated persons, as well as BLACK LIVES MATTER CHICAGO, BLOCKS TOGETHER, BRIGHTON PARK NEIGHBORHOOD COUNCIL, CHICAGO URBAN LEAGUE, JUSTICE FOR FAMILIES - BLACK LIVES MATTER CHICAGO, NAACP, NETWORK 49, WOMEN'S ALL POINTS BULLETIN, and 411 MOVEMENT FOR PIERRE LOURY, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF CHICAGO, and CHICAGO POLICE OFFICERS MIGUEL VILLANUEVA (#17423), JOSUE A. ORTIZ (#15448), DOROTHY CADE (#7814), RICHARD BOLIN (#14590), PETER JONAS (#5069), BRETT POLSON (#5612), ANGEL PENA (#7135), WAUKEESHA MORRIS (#8255), JESUS ROMAN (#6676), JAEHO JUNG (#13387), JOHN CORIELL (#14274), CHAD BOYLAN (#8200), THOMAS MCGUIRE (#1337), ANTHONY OSTROWSKI (#15324), TODD STANLEY (#16662), LAWRENCE GADE JR. (#1841), and JOHN LAVORATA (#8464), in their individual capacities, <br><br> Defendants. | Case No. 17cv4467 <br> (Class Action) <br> Hon. John Z. Lee |

**DEFENDANT CITY OF CHICAGO MOTION TO DISMISS THE FIRST AMENDED**
**CLASS ACTION COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL**
<u>**PROCEDURE 12(B)(1) AND (B)(6)**</u>

**TAFT STETTINIUS & HOLLISTER LLP**
Allan T. Slagel (ARDC #6198470) (aslagel@taftlaw.com)
Heather A. Jackson (ARDC #6243164) (hjackson@taftlaw.com)
Jeffrey Schieber (ARDC #6300779) (jschieber@taftlaw.com)
Zachary J. Sehy (ARDC #6310142) (zsehy@taftlaw.com)
111 East Wacker, Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000 | Facsimile: (312) 527-4011

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

BACKGROUND ................................................................................................................... 1

I. The individual plaintiffs ......................................................................................... 2

II. The organizational plaintiffs ................................................................................... 3

III. Plaintiffs' legal theories ......................................................................................... 4

    1. Class and organizational counts ................................................................... 4

    2. The individual counts ................................................................................... 5

IV. The policies and practices at issue in the complaint ................................................ 5

    A. Plaintiffs raise allegations and seek relief that is not relevant to their claims. .................................................................................................. 5

    B. Plaintiffs' allegations regarding the use of less-than-lethal excessive force are based on the PATF and DOJ Reports. ..................................... 7

    C. The City's policies and practices regarding the use of force have changed. .......... 8

        1. The City has revised its policies regarding the use of force. ...................... 8

        2. The City has developed and implemented training regarding its new use of force policies. .............................................................. 11

LEGAL STANDARDS .......................................................................................................... 14

ARGUMENT ..................................................................................................................... 15

I. Plaintiffs lack standing to pursue equitable relief because they have not alleged facts establishing that they will be subjected to excessive force by CPD officers in the future. ............................................................................................................ 16

    A. The Supreme Court's decision in *Lyons* requires dismissal of the equitable relief claims. ................................................................................ 17

    B. *Lyons* is binding precedent. ......................................................................... 19

II. Plaintiffs' equitable relief claims are moot in light of significant reforms to CPD that have been and are being implemented. ............................................................ 22

III. The organizations have not alleged sufficient facts to establish their standing to seek equitable relief. ............................................................................................... 24

IV. The Illinois Civil Rights Act claim should be dismissed .......................................... 26

    A. Disparate impact liability does not apply to policing strategies. ....................... 26

    B. If disparate impact liability applies, plaintiffs have not alleged a prima facie case. ................................................................................................. 28

V. Plaintiffs' failure to train and screen claims should be dismissed because they do not allege a causal nexus between the alleged failures and their claimed injuries. .......... 29

VI.     Plaintiffs' constitutional conspiracy claims should be dismissed because they have not alleged facts suggesting an agreement and because the purported conspiracies are not adequately defined. ............................................................................................ 30

CONCLUSION ................................................................................................................................ 31

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 15

*Aslin v. Fin. Indus. Reg. Auth., Inc.*,
    704 F.3d 475 (7th Cir. 2013) .................................................................................. 14

*Barnes v. Shalala*,
    865 F. Supp. 550 (W.D. Wisc. 1994) ..................................................................... 25

*Bd. of County Commrs. of Bryan County, Okla. v. Brown*,
    520 U.S. 397 (1997) ................................................................................................. 30

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 15

*Berger v. Nat'l Coll. Athletic Ass'n*,
    843 F.3d 285 (7th Cir. 2016) .................................................................................. 14

*Boston v. City of Chi.*, No. 86-C-5534,
    1988 WL 31532 (N.D. Ill. Mar. 28, 1988 ............................................................. 21

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) .................................................................................. 15

*Calvin v. Conlisk*,
    534 F.2d 1251 (7th Cir. 1976) ............................................................................... 25

*Cent. Austin Neighborhood Ass'n v. City of Chi.*,
    2013 IL App (1st) 123041, ¶ 10 ....................................................................... 26, 27

*City of Canton v. Harris*,
    489 U.S. 378 (1989) ................................................................................................. 29

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................... 17, 18, 19, 20, 21, 25

*Copeland v. Northwestern Memorial Hosp.*,
    964 F. Supp. 1225 (N.D. Ill. 1997) ....................................................................... 31

*De Gonzalez v. City of Richmond*, No. C-13-00386,
    2014 WL 2194816 (N.D. Cal. May 23, 2014) ..................................................... 21

*Disability Rights Wisc., Inc. v. Walworth County Bd. of Supervisors*,
    522 F.3d 796 (7th Cir. 2008) .................................................................................. 24

*Doe v. Elmbrook School Dist.*,
    658 F.3d 710 (7th Cir. 2011) .................................................................................. 23

*Dunnet Bay Cosntr. Co. v. Borggren*,
    700 F.3d 676 (7th Cir. 2015) .................................................................................. 26

*Evers v. Astrue*,
    536 F.3d 651 (7th Cir. 2008) .................................................................................. 15

*Fed. of Advertising Indus. Reps., Inc. v. City of Chi.*,
  326 F.3d 924 (7th Cir. 2003) .................................................................. 22

*Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC) Inc.*,
  528 U.S. 167 (2000) ................................................................... 14, 17

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971) ........................................................................... 26

*Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*,
  570 F.3d 811 (7th Cir. 2009) ............................................................. 15

*Hegwood v. City of Berwyn*, No. 09 C 7344,
  2010 WL 5232281 (N.D. Ill. Dec. 16, 2010) ................................... 31

*Ill. Native Am. Bar Ass'n v. Univ. of Ill.*,
  368 Ill. App. 3d 321 (1st Dist. 2006) ................................................ 26

*Jackson v. Cerpa*,
  696 F. Supp. 2d 962 (N.D. Ill. 2010) ............................................... 26

*Linda Constr. Inc. v. City of Chi.*, No. 15 C 8714,
  2016 WL 1020747 (N.D. Ill. Mar. 15, 2016) ................................... 31

*Long v. Shorebank Dev. Corp.*,
  182 F.3d 548 (7th Cir. 1999) ............................................................. 15

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................................... 17

*MacIssac v. Town of Poughkeepsie*,
  770 F. Supp. 3d 587 (S.D.N.Y. 2011) ............................................. 20

*McFadden v. Bd. of Educ. for Ill. School Dist. U-46*,
  984 F. Supp. 2d 882 (N.D. Ill. 2013) ............................................... 26

*Milw. Police Ass'n v. Bd. of Fire and Police Comm'rs of Milw.*,
  708 F.3d 921 (7th Cir. 2013) ............................................................. 24

*Otero v. Dart*, No. 12 C 3148,
  2012 WL 5077727 (N.D. Ill. Oct. 18, 2012) ................................... 21

*Palmquist v. Selvik*,
  111 F.3d 1332 (7th Cir. 1997) ........................................................... 29

*Polk v. Dent*, No. 13 CV 9321,
  2015 WL 2384601 (N.D. Ill. May 19, 2015) .............................. 19, 20

*Portis v. City of Chicago*,
  347 F. Supp. 2d 573 (N.D. Ill. 2004) ............................................... 21

*Ricci v. DeStefano*,
  557 U.S. 557 (2009) ........................................................................... 27

*Robinson v. City of Chicago*,
  868 F.2d 959 (7th Cir. 1989) ....................................................... 17, 20

*Shepard v. Madigan*,
    734 F.3d 748 (7th Cir. 2013) ................................................................................ 24

*Silha v. ACT, Inc.*,
    807 F.3d 169 (7th Cir. 2015) ................................................................................ 14

*Simack v. City of Chi.*, No. 02 C 3139,
    2003 WL 924335 (N.D. Ill. Mar. 6, 2003) ............................................................ 21

*Simic v. City of Chi.*,
    851 F.3d 734 (7th Cir. 2017) ................................................................................ 20

*Smith v. City of Jackson*,
    544 U.S. 228 (2005) ............................................................................................. 26

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ............................................................................................. 16

*Tex. Dept. of Housing and Comm. Affairs v. Inclusive Comm. Proj., Inc.*,
    135 S. Ct. 2507 (2015) .................................................................................. 26, 28

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ............................................................................................. 29

**Statutes**

740 ILCS 23/5(a)(2) ....................................................................................................... 28

Chi. Mun. Ord. § 2-78-105 .............................................................................. 12, 25, 26

Chi. Mun. Ord. § 2-78-120 ........................................................................................... 13

Chi. Mun. Ord. § 2-78-200 ........................................................................................... 12

Chi. Mun. Ord. §§ 2-56-205, 2-56-210, 2-56-230 ....................................................... 13

Plaintiffs allege that Chicago Police Department ("CPD") officers regularly violate the Fourth Amendment rights of people in Chicago by using excessive force, and that this practice disproportionately affects Black and Latinx individuals in violation of the Fourteenth Amendment's equal protection clause and state law. Without any evidence establishing that they will be subject to constitutional violations going forward as a result of CPD's practices, plaintiffs seek a wide-ranging injunctive relief not only to end this purported practice, but also to obtain additional and wholly unrelated relief. The Court should reject plaintiffs' claim for injunctive relief because plaintiffs failed to allege facts demonstrating that they will be subjected to excessive force at the hands of a CPD officer in the future, and therefore lack standing to pursue injunctive relief. Moreover, plaintiffs' injunctive relief claims are moot because the policies and practices that they seek to enjoin are no longer in place in light of CPD's extensive, ongoing reform efforts. The complaint should thus be dismissed for these and additional reasons detailed below.[1]

## BACKGROUND

This action is brought by six individuals (collectively, the "individual plaintiffs") and nine organizations (collectively, the "organizational plaintiffs") against the City of Chicago (the "City") and seventeen CPD officers (collectively, the "officer defendants"). Plaintiffs allege that the City "has employed a pattern and practice of excessive force that adversely affects all people in Chicago, but that disproportionately and intentionally targets Black and Latinx individuals." First Amended Class Action Complaint [Dkt. 71] (the "complaint" or "Compl.") at ¶ 2.

---

[1] The City seeks dismissal of the following claims: (i) all claims for equitable and injunctive relief, (ii) all claims asserted by the organizational plaintiffs, (iii) the Illinois Civil Rights Act claim, (iv) all claims to the extent they rely on allegations that the City failed to screen or train CPD officers, and (v) the conspiracy claims.

Plaintiffs seek "a city-wide injunction prohibiting the abusive policies and practices undergirding the alleged constitutional and state law violations" alleged in their complaint, which they claim "together result[] in an overarching pattern of excessive force." *Id.* at ¶ 14. Although their claims are based on five fact-specific, historical encounters during which CPD officers allegedly used force against them, plaintiffs seek expansive relief "designed to fundamentally transform the CPD operations related to use of force policies and practices, accountability supervision, discriminatory policing, training, data collection, and transparency." *Id.* at Prayer for Relief, § (c)(iv). These reforms, in plaintiffs' view, should be managed by an independent monitoring team and this Court. *Id.* at Prayer for Relief, § (c)(iii). In addition to injunctive relief, the individual plaintiffs seek monetary damages from the City and the officer defendants. *See id.* at ¶ 15.

## I.      The individual plaintiffs

The individual plaintiffs' claims stem from five discrete incidents, each with its own unique set of factual allegations, during which they were arrested and allegedly subjected to excessive force by the defendant officers:

- Immanuel Campbell ("Campbell") alleges that on July 9, 2016, near the intersection of Roosevelt Road and Michigan Avenue, he was arrested and subjected to excessive force by defendant officers Coriell, Ostrowski, McGuire, and Boylan while engaged in a peaceful demonstration. *See id.* at ¶¶ 220-223. Campbell further alleges that his cellphone was seized and unlawfully searched by defendant officer Stanley at the behest of defendant officer Roman. *See id.* at ¶ 224. Charges against Campbell for obstruction of traffic and resisting arrest were dismissed about six months after his arrest. *See id.* at ¶¶ 225, 227.

- Rubin Carter ("Carter") alleges that on April 8, 2017, at the corner of Rockwell Street and Chicago Avenue, he was repeatedly shot with a Taser and arrested by defendant officers Villanueva and Ortiz. *See id.* at ¶¶ 234-36. Charges against Carter for aggravated assault on a peace officer remain pending. *See id.* at ¶¶ 236, 238.

- Markees Sharkey ("Sharkey") alleges that on October 6, 2015, defendant officers Cade and Morris arrived at his girlfriend's house in the West Pullman neighborhood and escorted him out. *See id.* at ¶¶ 243-44. Defendant officer Bolin arrived

subsequently and allegedly threatened and called Sharkey a racial slur before arresting him. *See id.* at ¶ 245-46. Sharkey further alleges that Bolin struck him with his baton while making racial slurs after pulling his police car over while en route to the Fifth District police station, and that Cade and Morris told Bolin to stop abusing Sharkey. *See id.* at ¶ 247-48. Charges against Sharkey for aggravated assault to a police officer remain pending. *See id.* at ¶¶ 249, 251.

- Deonte Beckwith ("Beckwith") alleges that on July 16, 2016 in the South Shore neighborhood, defendant officers Jonas, Polson, Jung, and Pena stopped him as he pulled his car into his garage and proceeded to handcuff and beat him. *See id.* at ¶¶ 257-61. Beckwith was charged with aggravated battery of a police officer and resisting arrest; the complaint is silent as to the status of these charges. *See id.* at ¶ 263.

- Chante Linwood ("Linwood") and Rachel Jackson ("Jackson") allege that on April 3, 2016 in the Gold Coast neighborhood, they were arrested and subjected to excessive force by defendant officers Gade and Lavorata. *See id.* at ¶¶ 268, 272, 281, 286. Linwood and Jackson were charged with resisting arrest and disorderly conduct. *See id.* at ¶¶ 274, 287. Charges against Jackson were eventually dismissed, *see id.* at ¶ 290; the complaint is silent as to the status of charges against Linwood.

The individual plaintiffs further allege in a conclusory and unsupported manner that they are "likely to be subjected to future unconstitutional and illegal uses of force by the CPD, under the policies and practices described herein." *Id.* at ¶¶ 19-24.

## II. The organizational plaintiffs

The complaint includes a brief description of each organizational plaintiff's purpose and mission. *See id.* at ¶¶ 25-33. Their claims are not based on specific incidents involving alleged excessive uses of force by CPD officers, but instead upon general, conclusory allegations that the organizations' members "have been or are likely to be subjected to future unconstitutional uses of force by the CPD, under the policies and practices described herein," and that "[p]olice violence forces [the organizations] to spend additional time and money addressing police abuses encountered by [their] members, diverting resources away from [each organization's] mission." *Id.* at ¶¶ 25-33. Accordingly, the organizational plaintiffs seek relief on their own behalf and on

behalf of their members.  *See id.* at ¶¶ 33, fn. 3.[2]  The organizational plaintiffs are participating in this action "only for the purposes of securing declaratory and injunctive relief."  *Id.*

## III.    Plaintiffs' legal theories

Plaintiffs group their counts as "class and organizational legal claims," which are asserted against the City by both the individual plaintiffs on behalf of the putative class and the organizational plaintiffs, and "individual named plaintiffs' legal claims," which are asserted by the individual plaintiffs only in their personal capacity against the City and/or the defendant officers.  Plaintiffs assert three counts on behalf of the class and organizations and ten counts by the individual plaintiffs.  The City discusses below only the counts applicable to this motion.

### 1.    Class and organizational counts

Count I asserts a claim pursuant to 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment, alleging that the City "has implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of using unreasonable force."  *Id.* at ¶ 306.  Count II asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the equal protection clause of the Fourteenth Amendment, alleging that the City "has implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of using unreasonable force against the named Plaintiffs and members of the Plaintiff class based solely on their race and national origin" and that the "use of unreasonable force has been and is being conducted predominantly on Black and Latinx individuals on the basis of racial profiling."  *Id.* at ¶ 312.  Count III asserts a claim for violation of the Illinois Civil Rights Act ("ICRA") on the grounds that CPD's allegedly "discriminatory law enforcement practices constitute criteria and methods of administering force that create a disparate impact on Black and Latinx people, in violation of [ICRA]."  *Id.* at ¶ 323.

---

[2]  Organizational plaintiff Women's All Points Bulletin is the exception and brings claims only on behalf of its members.  *See id.*

### 2.     The individual counts[3]

Count II asserts a claim pursuant to 42 U.S.C. § 1983 against the City and the officer defendants for conspiracy to deprive plaintiffs of their constitutional rights.  The individual plaintiffs allege that "[e]ach of the Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means."  *Id.* at ¶¶ 330.  According to the individual plaintiffs, the defendants "took concrete steps to enter into an agreement to unlawfully use force on, detain, and arrest the Plaintiffs, knowing they lacked probable cause to do so, and for the purpose of violating Plaintiffs' Fourth and Fourteenth Amendment rights."  *Id.* at ¶ 331.  As a result, the individual plaintiffs assert that "[e]ach [officer defendant] is therefore liable for the violation of Plaintiffs' rights by any other [officer defendant]."  *Id.* at ¶ 333.

## IV.     The policies and practices at issue in the complaint

### A.     Plaintiffs raise allegations and seek relief that is not relevant to their claims.

Plaintiffs' central allegation is that the City "has employed a pattern and practice of excessive force that adversely affects all people in Chicago, but that disproportionately and intentionally targets Black and Latinx individuals."  *Id.*  at ¶ 2.  *See also id.* at ¶ 37 ("The City's policies, practices, and customs concerning the use of force are the direct and proximate cause of the constitutional violations outlined in this Complaint.").  Despite this focus, plaintiffs devote

---

[3] In addition to the counts discussed below, the individual plaintiffs assert claims for violation of the Fourth Amendment (Count I) against the City and the officer defendants, failure to intervene (Count III) against the officer defendants, First Amendment retaliation and unlawful search and seizure against certain officer defendants (Counts IV and V), civil conspiracy (Count VI) against the officer defendants, intentional infliction of emotional distress (Count VII) against the officer defendants, malicious prosecution (Count VIII) against certain officer defendants, and respondeat superior (Count IX) and indemnification (Count X) against the City.  These claims are not subject to this motion.  The City is, however, contemporaneously filing a motion for an extension of time for the officer defendants to file a motion to dismiss, and the officer defendants may move to dismiss certain of these counts.

much of the complaint to discussing matters that are not relevant to the use of force policies and practices currently in effect at CPD. In an effort to show what plaintiffs contend is the "[h]istory of [r]acialized [p]olice [v]iolence in Chicago," three pages are spent rehashing events including the 1968 Democratic National Convention and the 1972 Metcalfe hearings. *Id.* at ¶¶ 43-50. Another page and a half discusses what plaintiffs allege is the CPD's purported "history of illegally stopping and seizing Black and Latinx individuals," *see id.* at ¶¶ 51-56, while more than twelve pages are used to cover the City's "history of lawsuits filed by victims and survivors of officer violence," *see id.* at ¶¶ 57-62 (setting forth allegations regarding nine pending excessive force cases (¶ 62) and nine excessive force cases that resulted in settlements (¶ 61)). Moreover, plaintiffs seek injunctive relief that goes well beyond preventing future acts of allegedly excessive force and that would require the Court to enmesh itself in matters relating to policing strategy, police response times, data collection and transparency, and the City's provision of supportive services for victims of police misconduct. *See id.* at Prayer for Relief, § (c)(iv).[4]

Plaintiffs identify several policies or practices that, in plaintiffs' view, cause CPD officers to engage in alleged acts of excessive force, although these policies and practices have no apparent relationship to plaintiffs' claims. For instance, although there is no allegation that any individual plaintiff (or any member of one of the organizational plaintiffs) was shot by CPD officers, plaintiffs claim that CPD has a practice of "shooting at fleeing suspects who pose no immediate threat to officers or the public" that was "caused in part by the CPD's failure to institute a foot pursuit policy or take corrective action concerning such violence." *Id.* at ¶¶ 89-90. *See also id.* at ¶ 91 (alleging a practice of "firing at vehicles without justification" despite no allegations that plaintiffs were subjected to such a practice), ¶ 93 (alleging that CPD officers rely

---

[4] The City is contemporaneously filing a motion to strike certain allegations of the complaint regarding subject matters which the City believes are of little or no relation to the central allegations of the complaint.

on a "jump out" technique even though no plaintiff alleges that he or she was subjected to such a technique), ¶ 100 (although no plaintiff is a minor, alleging that "CPD officers, as a matter of policy and practice, use excessive, less-than-lethal force on Black and Latinx children and teenagers").

> **B.     Plaintiffs' allegations regarding the use of less-than-lethal excessive force are based on the PATF and DOJ Reports.**

That leaves plaintiffs' allegations that CPD has a "pattern or practice" of "unnecessary, unjustified use of excessive, less-than-lethal force, including with Tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat," *id.* at ¶ 95, and that CPD, "as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force," *id.* at ¶ 103.  Plaintiffs assert that these alleged policies and practices are allowed to flourish because CPD "maintains and promotes a 'code of silence' by which police officers are trained and required to lie or remain silent about police misconduct, including the use of excessive force and discriminatory policing." *Id.* at ¶ 114.  Plaintiffs allege that CPD "maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, thereby allowing its officers "to believe they can abuse and violate the rights of individuals without consequence." *Id.* at ¶ 124. Plaintiffs further allege that CPD, "as a matter of policy, practice and customs, fails to adequately train its officers," and that "[t]his deliberate lack of training on the use of force has resulted in the wholly foreseeable and widespread violation of people's rights, including the rights of the Plaintiff class." *Id.* at ¶ 167.

Many of these allegations originate with the Chicago Police Accountability Task Force's April 2016 report on CPD (the "PATF Report") and the Department of Justice's January 13, 2017 report on CPD (the "DOJ Report").  *See*, *e.g.*, *id.* at ¶¶ 96-98 (citing the DOJ Report's

conclusion on Taser use), ¶ 99 (citing DOJ Report's conclusion on less-than-lethal force), ¶ 106 (citing DOJ Report's conclusions on escalation), ¶ 108 (citing PATF Report's conclusion on escalation), ¶ 120 (citing PATF Report's conclusions on code of silence), ¶¶ 122-23 (citing DOJ Report's conclusion on code of silence), ¶ 127 (citing DOJ Report's conclusions on accountability), ¶ 130 (citing DOJ Report's conclusions on discipline), ¶ 131 (citing PATF Report's conclusions on discipline), ¶ 169 (citing DOJ Report's conclusions on training). However, plaintiffs fail to acknowledge that many of the policies and practices identified in the PATF and DOJ Reports have changed significantly since the reports were issued and since the five incidents alleged in the complaint occurred.

### C. The City's policies and practices regarding the use of force have changed.

#### 1. The City has revised its policies regarding the use of force.

In particular, in 2016 and 2017, CPD conducted a comprehensive review of a series of use of force policies, including its general orders detailing the Department's Use of Force Policy (G03-02), Force Options (G03-02-01), Taser Use (G03-02-04), OC Spray and Chemical Agent Use (G03-02-05), and Canine Use (G03-02-06). *See* Declaration of Karen Conway ("Conway Decl.") (attached as Exhibit A) at ¶ 3. Working with national experts, CPD analyzed and updated this group of policies, considering issues identified by the PATF and the DOJ Reports, to provide clearer direction for officers on the appropriate use of force, revise certain procedures, and make the sanctity of life the touchstone of the policies. *See* Kelly Bauer, "Chicago Police's New Use of Force Policy Focuses On 'Sanctity of Life,'" DNAInfo (May 17, 2017) (available at https://www.dnainfo.com/chicago/20170517/bronzeville/chicago-police-use-of-force-policy-cpd) (last accessed Aug. 18, 2017); Dan Hinkel, "Chicago police finalize tighter rules on when to shoot, other uses of force," Chicago Tribune (May 17, 2017) (available

8

http://www.chicagotribune.com/news/local/breaking/ct-chicago-police-use-of-force-met-20170517-story.html) (last accessed Aug. 18, 2017).[5]

In addition, for the first time, CPD incorporated a public comment process into the process of revising its policies, providing the public with an opportunity to review and comment on two separate drafts of the revised use of force policies. *See* Associated Press, "Chicago Police Department drafts new use-of-force policy," Daily Herald (Oct. 7, 2016) (available http://www.dailyherald.com/article/20161007/news/ 310079913) (last accessed Aug. 18, 2017). After each comment period, CPD, in consultation with legal and technical experts, reviewed the more than 1,000 comments received and made revisions to the draft policies based on those comments before publishing the final version of the policies. *See* Conway Decl. at ¶ 7. Among the comments submitted and considered were comments from plaintiffs' counsel Sheila Bedi and Craig Futterman, as well as from Arewa Karen Winters (who represents organizational plaintiff 411 Movement for Pierre Loury) and Crista Noel (who represents organizational plaintiff Women's All Points Bulletin). *See* Sheila A. Bedi and Craig Futterman, "Comments on the Chicago Police Department's Proposed Use of Force Guidelines," Northwestern Law (Oct. 2016) (available at http://www.law.northwestern.edu/legalclinic/macarthur/projects/police/documents/Bedi%20and%20Futterman%20Comments%20on%20CPD%20Use%20of%20 Force%20Policy%20final.pdf) (last accessed Aug. 18, 2017); City of Chicago Police Board, "Public Meeting Minutes" (Feb. 18, 2016) (available at

---

[5] The Court can take judicial notice of media reports regarding the City's reform efforts. *See Menominee Indian Tribe of Wisc.*, 161 F.3d 449, 456 (7th Cir. 1998) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper" and does not convert a motion to dismiss into one for summary judgment); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) (it is "routine" for courts to take judicial notice of newspaper articles).

https://www.cityofchicago.org/content/dam/city/depts/cpb/PubMtgMinutes/PubMtg

Transcript02182016.pdf) (last accessed Aug. 18, 2017).

CPD's revisions to its use of force policies include an increased emphasis on the sanctity

of life, ethical behavior, objective and proportional uses of force, and de-escalation and force

mitigation, as well as the imposition of appropriate limitations on the use of less-than-lethal and

lethal force. *See* Kelly Bauer, "Chicago Police's New Use of Force Policy Focuses On 'Sanctity

of Life,'" DNAInvo (May 17, 2017) (available at https://www.dnainfo.com/chicago/20170517/

bronzeville/chicago-police-use-of-force-policy-cpd) (last accessed Aug. 18, 2017); Sam Charles,

"CPD Reform Road Map: Training, transparency and accountability," Chicago Sun Times

(March 14, 2017) (available at http://chicago.suntimes.com/news/officials-to-offer-road-map-of-

police-reform-efforts/) (last accessed Aug. 18, 2017). The revised directives emphasize the

investigation of lower level uses of force, and create within CPD a Force Review Panel and

Force Review Unit, which are responsible for reviewing certain uses of force and identifying

trends and opportunities for improvement in training, tactics, and equipment. *See* Revised

Policies (Ex. 3 to Conway Decl.).[6]

In addition, the revised policies emphasize that the use of excessive force, discriminatory

force, punitive or retaliatory force, and force in response to the exercise of First Amendment

rights is prohibited. *See id.* The revised policies also emphasize that all uses of force must be

reported, and further emphasize that verbal intervention and reporting is required when officers

witness improper uses of force. *See id.*

---

[6] The revised policies are also available at https://home.chicagopolice.org/use-of-force-policy/
(last accessed Aug. 21, 2017).

### 2. The City has developed and implemented training regarding its new use of force policies.

In addition, and in connection with the promulgation in 2016 and 2017 of CPD's revised use of force policies, CPD has begun providing training on those policies. *See* Declaration of Commander Daniel Godsel ("Godsel Decl.") (attached as Exhibit B) at ¶ 5. Training is being provided in two phases. First, working with outside experts, CPD developed a four-hour course to ensure that officers are familiar with the revised use of force policies before they take effect, which is anticipated to be in September 2017. *See id.* at ¶¶ 5-6. CPD began providing the four-hour training in June 2017, and will provide that training to all CPD members by September 2017. *See id.* at ¶ 6. CPD supervisors also received training on their duties under the revised policies to investigate and review uses of force. *See id.* Second, CPD is developing an eight-hour training course on the revised policies; that course will include scenario-based training and will be provided to all CPD members in 2018. *See* Godsel Decl. at ¶¶ 5-6; Mayor's Press Office, "CPD Announces Use of Force Training Underway," City of Chicago (July 5, 2017) (available at https://www.cityofchicago.org/city/en/depts/mayor/press_room/_press_releases/2017/july/UseofForce.html) (last accessed Aug. 18, 2017); Heather Cherone, "Police Training On When Police Can Use Force Begins," DNAInfo (July 5, 2017) (available at https://www.dnainfo.com/chicago/20170705/jefferson-park/police-training-on-when-cops-can-use-force-starts-today) (last accessed Aug. 18, 2017).

Separate and apart from revising its written use of force policies, since the release of the PATF and DOJ Reports, CPD developed a new 16-hour, in-service training course focused on force mitigation principles, skills, and tactics. *See* Godsel Decl. at ¶ 3. CPD developed the course in conjunction with nationally recognized experts, including members of the Los Angeles Police Department, the Washington DC Metropolitan Police Department, and the National

Alliance on Mental Illness Chicago. *See id.*; *see also* Fran Spielman, "City bolsters mental health training after scathing DOJ report," Chicago Sun Times (Jan. 16, 2017) (available at http://chicago.suntimes.com/chicago-politics/city-bolsters-mental-health-training-after-scathing-doj-report/) (last accessed Aug. 18, 2017). Following national best practices, the course focuses on training officers to de-escalate conflicts safely, recognize the signs of mental illness, trauma and crisis situations, and respond quickly when deadly force is necessary. *See* Godsel Decl. at ¶ 4; Patrick M. O'Connell, "All Chicago police dispatchers now trained in mental health awareness," Chicago Tribune (Feb. 25, 2017) (available at http://www.chicagotribune.com/news/local/breaking/ct-911-operators-mental-health-training-met-20170225-story.html) (last accessed Aug. 18, 2017). The course emphasizes live, scenario-based training and provides the tools necessary for the wide range of situations officers face daily. *See* Godsel Decl. at ¶ 4. CPD launched the training in September 2016. *See id.*

Above and beyond revising its use of force policies, and providing training focused on proper use of force and the revised policies, the City has made the following changes to its policies and practices since the issuance of the PATF and DOJ Reports, to address the issues identified in those reports:

- The passage of an ordinance establishing, beginning on September 15, 2017, the Civilian Office of Police Accountability ("COPA"), the successor to the Independent Police Review Authority ("IPRA"). *See* Chi. Mun. Ord. § 2-78-200 *et seq.* COPA has provided its investigative and legal staff with six weeks of training through the "COPA Academy." *See* "COPA Celebrates the First Training Class of Academy Graduates," COPA (July 11, 2017) (available at http://www.chicagocopa.org/copa-celebrates-the-first-training-class-of-academy-graduates/) (last accessed Aug. 21, 2017). The ordinance requires a minimum funding level for COPA to ensure that COPA has the necessary resources to meet its mandate of providing thorough and accurate investigations into complaints of police misconduct. *See* Chi. Mun. Ord. § 2-78-105. Additionally, COPA's jurisdiction will be more expansive than IPRA's, as COPA will be directly responsible for investigating all allegations of improper search and seizure and will have the authority to investigate patterns and practices of misconduct in any form. *See* Chi. Mun. Ord. § 2-78-120.

- Even before the transition to COPA, in June 2016, IPRA implemented rules and regulations governing the investigation of police misconduct complaints. *See* IPRA Rules (effective June 28, 2016) (available at http://www.iprachicago.org/wp-content/uploads/2016/08/Final-IPRA-Rules-Regulations.pdf) (last accessed Aug. 18, 2017). Additionally, IPRA began the process of reviewing certain closed excessive force complaints to determine whether discipline is warranted. *See, e.g.,* Dan Hinkel, William Lee, and Todd Lighty, "IPRA reopens investigation into fatal 2014 shooting by Chicago Police," Chicago Tribune (Aug. 3, 2017) (last accessed Aug. 18, 2017).

- The creation and staffing of a new position of Deputy Inspector General for Public Safety to audit and review the policies, procedures, and practices of CPD, the Police Board, and COPA. *See* Chi. Mun. Ord. §§ 2-56-205, 2-56-210, 2-56-230.

- The adoption, in June 2016, of a video release policy, pursuant to which the City promptly releases video, audio, and documents relating to police-involved shootings and incidents involving death or serious bodily injury due to Taser use or while in police custody. *See* Video Release Policy for the City of Chicago (available at https://www.cityofchicago.org/content/dam/city/depts/cpd/Policies/VideoReleasePolicyfortheCityofChicago.pdf) (last accessed Aug. 18, 2017).

- The creation of a Community Policing Advisory Panel, which has engaged the community to make recommendations regarding community policing and reform efforts to rebuild trust with the City's residents. The Panel issued a report on August 10, 2017 that identified seven critical goals of community policing and provides recommendations on how CPD may achieve these goals. *See* Lauren Petty, "CPD's Community Policing Advisory Panel Releases Recommendations for Reforms," NBC Chicago (Aug. 10, 2017) (available http://www.nbcchicago.com/blogs/ward-room/chicago-police-community-policing-advisory-board-439650593.html) (last accessed Aug. 18, 2017).

- The development of an Early Intervention System ("EIS") that will use available CPD data to identify officers who may need additional training or support to avoid involvement in an excessive force or shooting incident, and to provide non-disciplinary interventions for those officers. *See* City of Chicago, "Progress Report: City of Chicago Police Reforms," at 5 (available at https://www.cityofchicago.org/content/dam/city/depts/mayor/Public%20Safety%20Reforms/ProgressReport-PoliceReforms.pdf).

- Further CPD reform efforts for 2017 are detailed in its written plan entitled Next Steps for Reform. *See* CPD, "Next Steps for Reform" (Mar. 14, 2017) (available at https://www.courthousenews.com/wp-content/uploads/2017/03/CPDReforms.pdf).

13

Through these reforms and others, the City has made substantial and meaningful changes to CPD's policies and practices regarding the use of in the past two years.

## LEGAL STANDARDS

The "*Twombly-Iqbal* facial plausibility requirement for pleading a claim is incorporated into the standard for pleading subject matter jurisdiction." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). Thus, "to survive a challenge to standing under Rule 12(b)(1), a plaintiff must plead factual allegations, taken as true, that 'plausibly suggest'" the elements of standing. *Berger v. Nat'l Coll. Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016) (quoting *Silha*, 807 F.3d at 174). Accordingly, to survive a 12(b)(1) motion, the complaint must allege facts plausibly suggesting that (1) the plaintiff "has suffered an injury in fact that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env. Servs. (TOC) Inc.*, 528 U.S. 167, 180-81 (2000).

"A case becomes moot, and the federal courts lose subject matter jurisdiction, when a justiciable controversy ceases to exist between the parties." *Aslin v. Fin. Indus. Reg. Auth., Inc.*, 704 F.3d 475, 477 (7th Cir. 2013). "This is often so where a plaintiff seeks only injunctive or declaratory relief and the defendant discontinues the conduct in dispute." *Id.* at 477-78. Put differently, mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existences (mootness)." *Friends of the Earth*, 528 U.S. at 185. Because mootness focuses on subject matter jurisdiction, it is a Rule 12(b)(1) argument, and the Court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."

*Evers v. Astrue*, 536 F.3d 651, 656-57 (7th Cir. 2008) (quoting *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]egal conclusions[, or t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" should be disregarded. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Instead, the Court must determine whether the Amended Complaint's "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

The six individual plaintiffs allege that they were subjected to excessive force by CPD officers on a single prior occasion, while the nine organizational plaintiffs claim that unidentified members have been subjected to excessive force by CPD officers in the past. These allegations of past injury are insufficient to establish standing to pursue equitable relief; plaintiffs' threadbare allegations that they (or their members) are likely to be subjected to excessive force by CPD officers in the future are insufficient to save their equitable relief claims. Plaintiffs also invite the Court to develop and enforce an order overhauling a broad, yet undefined, set of CPD's policies and practices regarding not only the use of force, but also issues ranging from accountability and supervision, to policing tactics, data collection, and transparency that are unconnected to their alleged injuries. The Court should decline plaintiffs' invitation.

15

Plaintiffs' equitable relief claims suffer from another fatal deficiency. Plaintiffs assert that the root causes of the allegedly excessive uses of force against them are shortcomings in CPD's policies and practices. Yet CPD has made—and will continue to make—substantial reforms to its policies and practices regarding use of force. Importantly, many of these reforms post-date the underlying incidents upon which plaintiffs base their claims. Thus, the injunctive relief claims are moot to the extent they seek to change policies and practices which are no longer in effect.

Certain aspects of the complaint are also subject to dismissal for more discrete reasons. *First*, the organizational plaintiffs have not alleged facts sufficient to establish their standing to participate in this action. *Second*, the Illinois Civil Rights Act claim should be dismissed because the disparate impact theory advanced by plaintiffs does not apply to challenges to policing strategies and, even if it did, plaintiffs reliance on statistical disparities, without allegations of a causal connection between the City's policies and the alleged disparities, is insufficient to make out a prima facie case of disparate impact under controlling United States Supreme Court precedent. *Third*, and similarly, plaintiffs' claims that the City failed to properly screen and train its officers should be dismissed because plaintiffs have not alleged a causal nexus between these alleged failures and their injuries. *Fourth*, plaintiffs' conspiracy claims should be dismissed because they have not alleged facts suggesting an agreement or any other details regarding the purported conspiracy.

## I. Plaintiffs lack standing to pursue equitable relief because they have not alleged facts establishing that they will be subjected to excessive force by CPD officers in the future.

A plaintiff has standing to seek equitable relief only if he or she is "under threat of suffering 'injury in fact' that is concrete and particularized." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). To meet this requirement, the threat "must be actual and imminent, not

16

conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Id.* Plaintiffs do not—and cannot—meet this "irreducible constitutional minimum" with respect to their equitable relief claims. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Accordingly, their requests for (i) class certification,[7] (ii) declaratory judgment, and (iii) an order of injunctive relief should be dismissed with prejudice. *See Friends of the Earth*, 528 U.S. at 185 (plaintiffs must have standing for each form of relief sought).

A. **The Supreme Court's decision in *Lyons* requires dismissal of the equitable relief claims.**

Each individual plaintiff alleges that he or she was subjected to excessive force once, while the organizational plaintiffs make the conclusory allegation—without further factual embellishment—that their members "have been" subjected to excessive force. Compl. at ¶¶ 19-33. "[W]hile presumably affording [plaintiffs] standing to claim damages against the individual officers and perhaps the City," these allegations "do[] nothing to establish a real and immediate threat that" plaintiffs (or their members) will again be subjected to excessive force by a CPD officer. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). The distinction is critical because plaintiffs' "standing to seek the injunction requested depend[s] on whether [they are] likely to suffer future injury from the use of" excessive force by CPD officers. *Id.*[8]

*Lyons*, which is notable for its similarities to this action, governs and mandates dismissal of plaintiffs' claims for equitable relief. The *Lyons* plaintiff sought an injunction prohibiting Los

---

[7] Plaintiffs seek certification pursuant to Rules 23(a) and 23(b)(2) solely for the purposes of obtaining "declaratory and injunctive relief." Compl. at ¶ 294. Because plaintiffs lack standing to seek such relief, the request for class certification should be dismissed. In the event this motion is denied, the City reserves its right to oppose plaintiffs' request for class certification at the appropriate time.

[8] "[T]he same standard and reasoning applies to plaintiff[s]' claim for declaratory relief" because "[t]he declaratory relief statute is not an independent basis for jurisdiction and requires an 'actual controversy.'" *Robinson v. City of Chicago*, 868 F.2d 959, 966 n.5 (7th Cir. 1989)

17

Angeles Police Department ("LAPD") officers from using chokeholds. *See id.* at 98. Like the plaintiffs here, the *Lyons* plaintiff alleged that "pursuant to the authorization, instruction and encouragement" of the city of Los Angeles, LAPD officers "regularly and routinely apply . . . choke holds in innumerable situations where they are not threatened by the use of any deadly force whatsoever." *Id.*; *compare* Compl. at ¶ 37 ("The City's policies, practices, and customs concerning the use of force are the direct and proximate cause of the constitutional violations outlined in this Complaint."). The *Lyons* plaintiff also alleged, like plaintiffs here, that he "justifiably fears that any contact he has with [LAPD] officers may result in his being choked and strangled to death without provocation, justification, or other legal excuse." *Lyons*, 461 U.S. at 98; *compare* Compl. at ¶¶ 19-24 (alleging that the individual plaintiffs are "likely to be subjected to future unconstitutional and illegal uses of force by the CPD"), ¶¶ 25-33 (same for members of the organizational plaintiffs).

The allegations in *Lyons* were insufficient to establish standing to pursue equitable relief, as are the allegations at hand. The Supreme Court was clear about the standing requirements in an action like this one:

> [T]o establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner.

*Lyons*, 461 U.S. at 105-06 (emphasis original). The plaintiffs do not—and cannot—allege that every CPD officer always employs excessive force on any citizen (or all Black or Latinx citizens) whom they encounter or that the City affirmatively orders or directs officers to do so. In fact, plaintiffs concede that the opposite is the case by alleging that a small percentage of CPD

18

officers are responsible for a disproportionate share of excessive force incidents. *See* Compl. at ¶ 62. Accordingly, plaintiffs' claims for equitable relief must fail.

Indeed, in *Lyons*, and despite the allegation that LAPD officers used chokeholds "pursuant to the authorization, instruction, and encouragement" of the city, the Court held that "it is no more than conjecture to suggest that in every . . . encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse." *Lyons*, 461 U.S. at 108. *See also id.* at 105 (explaining that the "additional allegation . . . that the police . . . routinely apply chokeholds . . . falls far short of the allegations that would be necessary to establish a case or controversy between these parties"). As such, "it is surely no more than speculation to assert that Lyons himself will . . . be involved in one of those unfortunate instances." *Id.* at 108. "Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons"—like plaintiffs here—"is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." *Id.* at 111.

**B.** ***Lyons* is binding precedent.**

Courts within the Seventh Circuit and elsewhere have relied on *Lyons* to dismiss claims for equitable relief similar to those asserted by plaintiffs. In *Polk v. Dent*, for example, the plaintiffs claimed that CPD officers used excessive force against them and illegally searched their vehicle. *See* No. 13 CV 9321, 2015 WL 2384601, at *1 (N.D. Ill. May 19, 2015)[9]. Like plaintiffs here, the *Polk* plaintiffs sought an injunction barring the City from continuing to employ the alleged policies and practices described in the complaint, as well as a declaratory judgment that those policies and practices were unconstitutional. *See id.* But the incidents of

---

[9] All unpublished cases cited herein are included for the Court's reference in Exhibit C.

past misconduct alleged in *Polk* did not "establish a real and immediate threat warranting injunctive or declaratory relief for future conduct." *Id.* at *3. Rather, to make out a claim for injunctive relief, the plaintiffs "would have to allege, at a minimum, that they face a real and immediate threat of being stopped by the police *again* and subjected to excessive force and/or an unlawful search. Not only do Plaintiffs fail to allege the likelihood of these future events, but even if they did, such allegations would be purely speculative and too attenuated to confer standing." *Id.* (emphasis in original). The same is true with respect to plaintiffs' threadbare allegations that they or their members will be subjected to excessive force in the future. *See* Compl. at ¶¶ 19-33. "Since Plaintiffs have not alleged a real and imminent threat of future injury to themselves, they do not have standing to seek equitable relief as to the City's future conduct." *Polk*, 2015 WL 2384601, at *3.

Other decisions are in accord and foreclose plaintiffs' claims for equitable relief. *See Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017) (affirming dismissal of injunction because plaintiff's "claimed threat of future injury is conjectural. The threat is contingent upon her once again driving while using her cell phone and receiving a citation under the Chicago ordinance."); *Robinson v. City of Chi.*, 868 F.2d 959, 966 (7th Cir. 1989) (plaintiff lacked standing to seek injunction forbidding detention of arrestees pending search of fingerprint database because "even if the police were to detain others for investigation[,] . . . the possibility that [plaintiff] would suffer any injury as a result of that practice is too speculative"); *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 3d 587, 601 (S.D.N.Y. 2011) ("The alleged failures to train, supervise, and discipline fall short of what *Lyons* requires for equitable standing in this case: that is, an official policy that Taser stun guns were to be used in every stop and arrest, without regard to whether the suspect resisted arrest or otherwise provoked the use of force. Moreover, even such a policy might not suffice here, given how speculative it is that MacIssac

will be stopped, arrested, and subjected to the use of a Taser stun gun yet again."); *Portis v. City of Chicago*, 347 F. Supp. 2d 573, 576 (N.D. Ill. 2004) (plaintiffs lacked standing to seek equitable relief challenging alleged City practice of prolonged detentions because "[t]he argument that they would again fall victim to wrongful incarceration . . . for some misdemeanor in the future amounted to speculation"); *De Gonzalez v. City of Richmond*, No. C-13-00386, 2014 WL 2194816, at *3 (N.D. Cal. May 23, 2014) ("although Plaintiffs allege a pattern or practice of conduct . . . they have not alleged that they have been personally injured by the alleged pattern, other than during [the underlying incident]. . . . Further, even if Plaintiffs have another encounter with Richmond police officers, Plaintiffs have alleged no facts indicating that excessive force would likely be used."); *Otero v. Dart*, No. 12 C 3148, 2012 WL 5077727, at *5 (N.D. Ill. Oct. 18, 2012) ("Even if Otero had alleged that he may personally be subjected to the Unlawful Detention Policy in the future[,] . . . such allegations would be highly speculative and too attenuated to establish standing. . . . Speculation about a possible chain of future events does not establish standing."); *Simack v. City of Chi.*, No. 02 C 3139, 2003 WL 924335, at *4 (N.D. Ill. Mar. 6, 2003) (plaintiffs lacked standing to challenge CPD bonding procedures because "[t]hese possibilities are . . . speculative rather than real or immediate"); *Boston v. City of Chi.*, No. 86-C-5534, 1988 WL 31532, at *8 (N.D. Ill. Mar. 28, 1988 ("the fact that [Plaintiffs have] alleged the existence of an official municipal policy—which would imply that the violation is systemic, not isolated, in nature—is of no consequence: the existence of a municipal policy, in and of itself, is no indication that the named plaintiff[s] will be harmed by it").

Plaintiffs may argue that allegations in their complaint that they were acting lawfully at the time they allegedly were subjected to excessive force require a different result, *see* Compl. at ¶¶ 222, 235, 249, 263, 274, 287, but this is a distinction without difference. *Lyons* does not depend on the lawfulness or unlawfulness of the plaintiff's conduct; to the contrary, the Supreme

21

Court was careful to explain that "it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, *or other encounter* between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse." 461 U.S. at 108 (emphasis added).

*        *        *

In sum, plaintiffs lack standing to pursue equitable relief because they have not—and cannot—alleged facts plausibly suggesting that they will again be subjected to excessive force by CPD officers. Their claims for class certification, injunctive relief, and declaratory judgment should therefore be dismissed with prejudice.

## II. Plaintiffs' equitable relief claims are moot in light of significant reforms to CPD that have been and are being implemented.

The Seventh Circuit "has upheld the general rule that repeal, expiration, or significant amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's request for injunctive relief." *Fed. of Advertising Indus. Reps., Inc. v. City of Chi.*, 326 F.3d 924, 930 (7th Cir. 2003).

Here, CPD has undertaken extensive reforms since the incidents alleged in the complaint, and many of the policies and practices about which plaintiffs complain no longer exist. *See supra* at 8-13. This is especially true of the alleged policy or practice that is central to each of plaintiffs' requests for equitable relief—that is, the allegation that CPD "relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force." Compl. at ¶ 103; *see also id.* at ¶¶ 104-11 (setting forth additional allegations regarding a policy or practice of escalation); ¶¶ 220-92 (alleging that the officer defendants unnecessarily used excessive force on the plaintiffs). The de-escalation and use of force training that CPD provided after the incidents alleged in plaintiffs' complaint, in

22

combination with the revised use of force policies, amount to "an express disavowal of" any policy or practice that authorizes escalatory tactics and excessive uses of force and is therefore "sufficient to moot" plaintiffs' equitable relief claims to the extent they are based on the existence of a policy or practice of escalating encounters with citizens or using excessive force. *Doe v. Elmbrook School Dist.*, 658 F.3d 710, 720 (7th Cir. 2011) (overruled on other ground *en banc*, 687 F.3d 840, 842-43 (7th Cir. 2012)).[10]

A similar analysis applies to plaintiffs' assertion that CPD has "a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers." Compl. at ¶ 124. Plaintiffs allege that the reporting and review requirements for uses of force are generally insufficient, *see id.* at ¶¶ 134-39, and that "the boilerplate reports and omissions in required paperwork and utter lack of supervisor investigation pertaining to officer uses of force result from the City's failure to provide adequate discipline, supervision, and oversight within the CPD," *id.* at ¶ 140. While the City disputes that this was ever the case, it is critical for present purposes that plaintiffs' allegations do not describe CPD's current policies and practices. To the contrary, CPD has issued revised directives that increase the investigatory obligations for lower level uses of force (like those alleged in the complaint) and has created not one but two entities (the Force Review Panel and the Force Review Unit) charged with reviewing certain uses of force, identifying trends, and spotting opportunities to improve training, tactics, and equipment. *See* Revised Policies (Ex. 3 to Conway Decl (Ex. A)).

Further, while plaintiffs criticize IPRA, even they acknowledge that Chicago's Municipal Code was amended to replace IPRA with COPA, a new agency with expanded authority and resources. *See id.* at ¶ 153; *see also* Chi. Mun. Ord. § 2-78-105. Equitable claims based on

---

[10] This is not to suggest that plaintiffs have alleged a causal nexus between any purported failure to provide training and their injuries. *See* Section V, *infra.*

perceived shortcomings at IPRA should therefore be dismissed, as "[a] case challenging a statute's validity normally becomes moot if the statute is repealed or invalidated." *Shepard v. Madigan*, 734 F.3d 748, 750 (7th Cir. 2013). Plaintiffs then proceed to offer numerous complaints about COPA, *see id.* at ¶¶ 153-56, but plaintiffs' complaints fail to account both for the changes that IPRA has already made (*e.g.*, its review of certain closed files to determine whether discipline is warranted) and the changes that will soon go into effect with the transition to COPA (*e.g.*, COPA's significantly increased and independent funding and expanded authority to investigate patterns and practices of misconduct in any form). *See* Chi. Mun. Ord. §§ 2-78-105, 2-78-110, 2-78-120.

### III. The organizations have not alleged sufficient facts to establish their standing to seek equitable relief.

An organization has standing to sue on behalf of its members (associational standing) if "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Milw. Police Ass'n v. Bd. of Fire and Police Comm'rs of Milw.*, 708 F.3d 921, 928 (7th Cir. 2013). Additionally, an organization can sue on its own behalf (organizational standing) if it meets Article III's requirements of "injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision." *Disability Rights Wisc., Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008). Here, the allegations establish neither associational nor organizational standing.

The organizational plaintiffs seek only declaratory and injunctive relief. *See* Compl. at ¶¶ 25-33. For the reasons explained in Section I, "it is surely no more than speculation to assert" that a member of an organization is "likely to be subjected to future unconstitutional and illegal

uses of force by" CPD. *Lyons*, 461 U.S. at 108; Compl. at ¶¶ 25-33. Consequently, the organizations lack associational standing.

With respect to organizational standing, allegations that an organization "will incur expenses in processing claims of police misconduct unless the federal equity court intervenes, assuming this amounts to injury in fact, is not within the zone of interests protected by the Fourteenth Amendment or 42 U.S.C. § 1983." *Calvin v. Conlisk*, 534 F.2d 1251, 1253 (7th Cir. 1976).[11] Here, the organizations allege that "[p]olice violence forces [them] to spend additional time and money addressing police abuses encountered by [their] members, diverting resources away from [their] focus." Compl. at ¶¶ 25-31, 33. *Calvin* held that finding standing based on such allegations would improperly "give any organization with a particularized interest the right to bring suit in order to spare itself the expense of continued efforts to further that interest." 534 F.2d at 1253. "The effect would be to undermine the prudential rules of standing." *Id. See also Barnes v. Shalala*, 865 F. Supp. 550, 561 (W.D. Wisc. 1994) (finding standing based on allegations that organization's "resources are being sapped by this litigation and by the activities the foundation has engaged in to oppose approval of [veterinary drug] . . . would eviscerate the constitutional requirement of the standing doctrine: any plaintiff with a disagreement with the government could manufacture an injury to establish standing simply by filing a lawsuit"). The organizational plaintiffs accordingly have not alleged facts sufficient to establish organizational standing.

---

[11] The *Calvin* court also noted, in the alternative, that the organizations' "voluntary decision to assume the burden of processing these claims arguably breaks the causal chain between the defendants' conduct and the expenses incurred by the organizations in processing the claims." 534 F.2d at 1253 n.3.

IV.     **The Illinois Civil Rights Act claim should be dismissed.**

Plaintiffs allege that the City's "discriminatory law enforcement practices constitute criteria and methods of administering force that create a disparate impact on Black and Latinx people, in violation of the Illinois Civil Rights Act [("ICRA")]." Compl. at ¶ 323. ICRA prohibits local governments from utilizing "criteria or methods of administration that have the effect of subjecting individuals to discrimination because of their race, color, national origin, or gender." 740 ILCS 23/5(a)(2). A claim "under . . . ICRA requires only a disparate impact regardless of intent." *McFadden v. Bd. of Educ. for Ill. School Dist. U-46*, 984 F. Supp. 2d 882, 890 (N.D. Ill. 2013).

A.     **Disparate impact liability does not apply to policing strategies.**

ICRA "was expressly intended to provide a state law remedy that was *identical* to the federal disparate impact canon." *Jackson v. Cerpa*, 696 F. Supp. 2d 962, 964 (N.D. Ill. 2010) (emphasis in original) (citing *Ill. Native Am. Bar Ass'n v. Univ. of Ill.*, 368 Ill. App. 3d 321, 327 (1st Dist. 2006)). Thus, ICRA "was not intended to create new rights but merely created a new venue—state court—for discrimination claims under federal law." *Dunnet Bay Cosntr. Co. v. Borggren*, 700 F.3d 676, 697 (7th Cir. 2015). Accordingly, Illinois courts "look to cases concerning alleged violations of federal civil rights statutes to guide our interpretation of" ICRA. *Cent. Austin Neighborhood Ass'n v. City of Chi.*, 2013 IL App (1st) 123041, ¶ 10 ("*CANA*").

Disparate impact liability has traditionally been associated with employment and housing discrimination. *See Tex. Dept. of Housing and Comm. Affairs v. Inclusive Comm. Proj., Inc.*, 135 S. Ct. 2507, 2525 (2015) (recognizing disparate-impact claims under federal Fair Housing Act); *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (same under federal Age Discrimination in Employment Act); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971) (same under Title VII of the Civil Rights Act of 1964). In order to asset a prima facie case, a plaintiff "that relies on a

statistical disparity" must allege that offer "statistical evidence demonstrating a causal connection." *Inclusive Comm.*, 135 S. Ct. at 2523. Once that threshold is met, the burden shifts to the defendant to identify a public interest justifying the challenged policy or practice. *See id.* at 2518. Before rejecting such a justification, "a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)).

The City has been unable to locate any decision in which a court sustained a challenge to a policing strategy using a disparate impact analysis, thereby contemplating judicial intrusion into core policing policy decisions absent evidence of intentional discrimination.[12] This distinction is critical. Intruding on core police policy decisions is justified when discrimination is intentional; moreover, intentional discrimination is easily cured, as the agency need merely stop using race as the basis for law enforcement actions and remains otherwise free to pursue its law enforcement goals as it sees fit.

By contrast, a disparate impact arises not from illicit intent but from the application of a neutral system that happens to produce the disparate impact as an unfortunate byproduct. Accordingly, applying disparate impact liability here would require the Court (assuming for the sake of argument that plaintiffs established a prima facie case for disparate impact) to assess whether CPD's use of force policies and practices serve CPD's undeniably legitimate interests in public safety and, if so, whether plaintiffs' can identify other reasonably available policing

---

[12] The plaintiffs in *CANA* alleged that persons in predominantly African-American and Hispanic neighborhoods waited longer for police to arrive in response to 911 calls than those in predominantly white neighborhoods. *See* 2013 IL App (1st) 123041, ¶ 1. The court held that the political question doctrine did not divest the trial court of jurisdiction and that the trial court should not have dismissed the complaint for failure to state a justiciable claim. *Id. See also id.* at ¶ 28 ("because the complaint does not present a nonjusticiable political question, we reverse the trial court's judgment and remand for further proceedings in accord with this order"). Accordingly, the *CANA* court did not hold that the plaintiffs had, in fact, stated a claim under ICRA.

strategies that would serve CPD's public safety goals with less disparate impact. Doing so would enmesh the Court in policing strategy questions outside the scope of its expertise. Thus, absent evidence of intentional discrimination, decisions regarding CPD's policing strategies properly lie with CPD.

**B. If disparate impact liability applies, plaintiffs have not alleged a prima facie case.**

If the Court elects to create new law by holding that a disparate impact challenge to CPD's policing strategies is at least theoretically cognizable—which it should not for the reasons explained above—the Court should dismiss plaintiffs' ICRA claim for the alternate reason that the plaintiffs' allegations do not establish a prima facie case of disparate impact because plaintiffs have not—and cannot—allege a causal connection between CPD's policies and practices and any racial disparities. In *Inclusive Communities*, the plaintiffs challenged a state agency's selection criteria for allocating the low-income housing tax credits it distributed to developers because those credits went disproportionately toward low-income housing in majority African-American urban areas as opposed to majority white suburban neighborhoods. *See* 135 S. Ct. at 2513-14. Relying on a disparate impact theory, the plaintiffs sought a court order requiring the agency to modify its criteria to encourage the construction of low-income housing in the suburbs. *See id.* at 2514.

Although the Supreme Court recognized the possibility of disparate impact liability under the FHA, it declined to hold that plaintiffs had established a prima facie case based solely on a statistical disparity in the allocation of the housing credits. *See id.* at 2522. Rather, to make out a prima facie case for disparate impact liability, the Court held that the plaintiffs must draw an explicit, causal connection between the challenged policy and the statistical disparity.

As the Court explained, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 2523. Moreover, "[i]t may be difficult to establish causation because of the multiple factors that go into [policymaking decisions]." *Id.* at 2523-24. This "robust causality requirement ensures that 'racial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). Thus, "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.*

Plaintiffs here cannot satisfy the "robust causality requirement" mandated by the Supreme Court. Although plaintiffs allege that Black and Latinx people are subjected to excessive force more frequently than white people, they do not allege or identify evidence of a causal connection between CPD's policies and these purported disparities. Indeed, plaintiffs make no attempt to address other plausible explanations for the alleged disparities, such as the demographics of areas where crime occurs most frequently or the demographics of arrestees. Because "racial imbalance . . . does not, without more, establish a prima facie case of disparate impact," plaintiffs' ICRA claim should be dismissed. *Id.*

## V. Plaintiffs' failure to train and screen claims should be dismissed because they do not allege a causal nexus between the alleged failures and their claimed injuries.

To state a claim for failure to train, plaintiffs must allege "how the failure to provide specific training had a causal nexus to their injury." *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997). *See also City of Canton v. Harris*, 489 U.S. 378, 391 (1989) ("the identified deficiency in a city's training program must be closely related to the ultimate injury"). While plaintiffs offer broad criticisms of CPD's training efforts and assert that CPD "fails to adequately

29

train its officers," Compl. at ¶¶ 167-83, they do not identify (i) a failure to provide specific training that (ii) has a causal nexus to their alleged injuries. Plaintiffs' claims should thus be dismissed to the extent they rely on allegations of a failure to train.

Plaintiffs' failure to screen claims are also deficient. To begin with, the complaint does not allege any facts about CPD's screening and hiring processes. This is fatal on its own, as liability for failure to screen arises "[o]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right." *Bd. of County Commrs. of Bryan County, Okla. v. Brown*, 520 U.S. 397, 411 (1997). Moreover, because they do not allege facts regarding screening or hiring, plaintiffs have not alleged a causal nexus between the alleged failure to screen and their claimed injuries. This deficiency also requires dismissal of plaintiffs' claims to the extent they rely on allegations of a failure to screen because municipal culpability "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412 (emphasis original).

**VI.    Plaintiffs' constitutional conspiracy claims should be dismissed because they have not alleged facts suggesting an agreement and because the purported conspiracies are not adequately defined.**

Plaintiffs allege that "[e]ach of the defendants . . . conspired by concerted action to accomplish an unlawful purpose by unlawful means" and that "[e]ach of the defendants took concrete steps to enter into an agreement to unlawfully use force on, detain, and arrest the Plaintiffs, knowing they lacked probable cause to do so, and for the purpose of violating Plaintiffs' Fourth and Fourteenth Amendment rights." Compl. at ¶¶ 330-31. As a result, plaintiffs maintain that "[e]ach individual Defendant is therefore liable for the violation of Plaintiffs' rights by any other individual Defendant." *Id.* at ¶¶ 331.

Plaintiffs allege no facts about this purported conspiracy or the alleged agreement, much less facts suggesting that officer defendants who were involved in one of the five underlying incidents even had knowledge of the other four underlying incidents. Their conspiracy claims should therefore be dismissed. *See Copeland v. Northwestern Memorial Hosp.*, 964 F. Supp. 1225, 1235 (N.D. Ill. 1997) (dismissing conspiracy claims where plaintiff "failed to allege facts showing that the City had an agreement with any other person to deprive Copeland of his constitutional rights"); *Linda Constr. Inc. v. City of Chi.*, No. 15 C 8714, 2016 WL 1020747, at *6 (N.D. Ill. Mar. 15, 2016) (dismissing conspiracy claim where plaintiff "have not alleged any facts indicating that the City . . . entered into an agreement with any of the other Defendants with the goal of depriving Plaintiffs of their constitutional rights because of their race" and explaining that the "contention that a conspiracy existed is a legal conclusion that the Court need not accept as true"); *Hegwood v. City of Berwyn*, No. 09 C 7344, 2010 WL 5232281, at *2 (N.D. Ill. Dec. 16, 2010) (allegation that police officer and store manager "reached an agreement amongst themselves to unlawfully search and seize Plaintiff, and to thereby deprive Plaintiff of his Constitutional rights" insufficient to state conspiracy claim because plaintiff "fails to allege the reasons for this alleged agreement, when it was entered into, the specific role of each conspirator, or even the end goal of the agreement;" "[w]ithout these facts alleged, Hegwood fails to allege a conspiracy").

## CONCLUSION

Plaintiffs' claims for equitable relief should be dismissed because both the individual and organizational plaintiffs lack standing to bring them and, in any event, plaintiffs seek to change policies and practices that are the subject of substantial and ongoing reforms. Plaintiffs' disparate-impact claim under ICRA should also be dismissed because disparate-impact liability does not and should not apply to policing strategies and, even if it does, plaintiffs' have failed to

allege a prima facie case. Further, plaintiffs' claims should be dismissed to the extent they rely on allegations that the City failed to adequately screen and train CPD officers because plaintiffs have not alleged an adequate causal nexus. Lastly, plaintiffs' conspiracy claims are inadequately pled and should therefore be dismissed as well.

Dated: August 21, 2017          Respectfully submitted,

                                      **CITY OF CHICAGO**

                         By: /s/ Allan T. Slagel
                         One of its Attorneys

Allan T. Slagel (ARDC #6198470)
aslagel@taftlaw.com
Heather A. Jackson (ARDC #6243164)
hjackson@taftlaw.com
Jeffrey Schieber (ARDC #6300779)
jschieber@taftlaw.com
Zachary J. Sehy (ARDC #6310142)
zsehy@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker
Suite 2800
Chicago, Illinois 60601
Telephone: (312) 527-4000
Facsimile: (312) 527-4011

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IMMANUEL CAMPBELL, et al.,

           Plaintiffs,

     v.

CITY OF CHICAGO, et al.

           Defendants.

Case No. 17cv4467
(Class Action)
Hon. John Z. Lee

### DECLARATION OF KAREN CONWAY

Pursuant to 28 U.S.C. § 1746, I, Karen Conway, state and affirm as follows:

1.   I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could competently testify thereto.

2.   I am the Director of the Division of Research and Development of the Chicago Police Department ("CPD"). In that capacity, I have been involved in the process of revising CPD's use of force policies.

3.   Beginning in 2016, CPD began a comprehensive review of its use of force policies, including the main Use of Force Policy (G03-02), Force Options (G03-02-01), Taser Use (G03-02-04), OC Spray and Chemical Agent Use (G03-02-05), and Canine Use (G03-02-06). True and correct copies of the prior policies (as they existed before the revisions) are attached as Exhibit 1.

4.   CPD analyzed and revised these policies in response to feedback provided by the Police Accountability Task Force and the United States Department of Justice, and to provide clearer direction for officers on the appropriate use of force, with an emphasis on the sanctity of life.

5.      Additionally, CPD sought public feedback regarding the revised policies, inviting the public to comment on two revised versions of the use of force policies. This is the first time that the Department has sought public comment regarding a policy governing CPD operations.

6.      On October 7, 2016, CPD opened an online portal on the CPD website where Department and community members could provide feedback regarding the initial revisions into the use of force policies. CPD collected and considered public comments received through the online portal, and revised the policies. After the initial round of revisions resulting from public commentary, CPD released a second revised set of use of force policies again for public comment. CPD considered the public comments and again revised the policies to address relevant feedback.

7.      At the end of the two comment periods, CPD command staff, in consultation with legal and technical experts, had reviewed over 1,000 comments, and incorporated suggestions and improvements identified through the comment period. CPD's Research and Development Division to prepare and publish a final version of the policies.

8.      Among the feedback received by CPD were comments from Sheila Bedi and Craig Futterman, Arewa Karen Winters (on behalf of Plaintiff the 411 Movement for Pierre Loury) and Crista Noel (on behalf of the Women's All Points Bulletin). True and correct copies of the comments from attorneys Sheila Bedi and Craig Futterman, Ms. Winters, and Ms. Noel are attached to this declaration as Exhibit 2.

9.      The revised use of force policies are expected to become effective after CPD completes an initial round of four hour training for all members of the Department on the revised use of force policies in September, 2017.

10. A true and correct copy of the revised use of force policies Use of Force Policy (G03-02), Force Options (G03-02-01), Taser Use (G03-02-04), OC Spray and Chemical Agent Use (G03-02-05), Canine Use (G03-02-06), Force Review Unit (G08-06) (newly added) and Force Review Panel (G08-05) (newly added) are attached as Exhibit 3, and are publicly available on the Department's website at https://home.chicagopolice.org/use-of-force-policy.

11. I declare under penalty of perjury that the foregoing is true and correct.

Date: August 21, 2017

Karen Conway
Director
Research and Development Division
Chicago Police Department

# EXHIBIT 1

## (To Declaration of Karen Conway (Ex. A))



| Chicago Police Department | General Order   G03-02 |
|---|---|
| **USE OF FORCE GUIDELINES** | |

| ISSUE DATE: | 23 September 2002 | EFFECTIVE DATE: | 01 October 2002 |
|---|---|---|---|
| RESCINDS: | G02-08 | | |
| INDEX CATEGORY: | Field Operations | | |

## I. PURPOSE

This directive:

A.  states Department policy regarding the use of force.

B.  provides guidelines for the use of force.

Department members will refer to the Special Order titled "**Use of Force**" for procedures to be followed for Use of Force incidents.

## II. GENERAL INFORMATION

Chapter 720, Article 5, Section 7-5, of the Illinois Compiled Statutes provides in part:

"A peace officer ... need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest."

## III. DEPARTMENT POLICY

A.  When a Department member engages a member of the public, the member will do so in such a manner which affords that person the respect and dignity to which all persons are entitled. The use of excessive force or unwarranted physical force or unprofessional conduct by a Department member will not be tolerated under any circumstances, and all members will strictly adhere to the provisions of the Department directive entitled "**Prohibition Regarding Racial Profiling and Other Bias Based Policing**."

B.  Department members will use an amount of force reasonably necessary based on the totality of the circumstances to perform a lawful task, effect an arrest, overcome resistance, control a subject, or protect themselves or others from injury.

C.  As set forth by the United States Supreme Court in Graham v. Connor, 490 U.S. 386 (1989), the central inquiry in every use of force is whether the amount of force used by the officer was objectively reasonable in light of the particular circumstances faced by the officer.

   1.  Reasonableness is not capable of precise definition or mechanical application. Circumstances that may govern the reasonableness of using a particular force option include, but are not limited to:

       a.  the severity of the crime at issue,

       b.  whether the subject poses an immediate threat to the safety of officers or others,

       c.  whether the subject is actively resisting arrest or attempting to evade arrest by flight.

   2.  The reasonableness of a particular use of force will be judged under the totality of the circumstances viewed from the perspective of a reasonable officer on the scene.

D.  The Department has adopted a Use of Force Model in order to provide members guidance on the reasonableness of a particular response option.

E.      All Department members are obligated to ensure compliance with all laws and Department regulations. If a member knows that another Department member is using excessive force against a subject, the member will take appropriate action. The action required by the member will depend upon the circumstances of the incident. However, appropriate actions may include, but are not limited to, verbal or physical intervention, immediate notification to a supervisor, or a direct order by a supervisor to cease the use of excessive force.

F.      Sworn members and detention aides in the performance of their duties will complete a Tactical Response Report as specified in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

G.      The On-Call Incident Commander will be responsible for conducting the investigation into the appropriateness of any use of force that involves:

     1.      the discharge of a firearm by or at a Department member.

     2.      a member's use of force, by whatever means, that results in the death of any individual.

     3.      any lesser use of force by a Department member when that use of force stems from the same incident in which another member used force in Items III-G-1 or III-G-2.

H.      Department members will seek medical assistance for an arrestee who has injuries or illnesses consistent with the procedures outlined in the Department directives entitled "**Processing Persons Under Department Control**" and "**Hospitalized Arrestees**."

Terry G. Hillard
Superintendent of Police

00-148 LMT(PMD)

**GLOSSARY TERMS:**

1.      **Zone of Safety**

     The distance to be maintained between the subject and the responding member(s). This distance should be greater than the effective range of the weapon (other than a firearm) and it may vary with each situation (e.g., type of weapon possessed, condition of the subject, surrounding area).

2.      **Deadly Force (720 ILCS 5/7-8)**

     A.      Deadly force is force which is likely to cause death or great bodily harm and includes

         1.      The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and

         2.      The firing of a firearm at a vehicle in which the person to be arrested is riding.

     B.      A peace officer's discharge of a firearm using ammunition designed to disable or control an individual without creating the likelihood of death or great bodily harm (i.e., impact munitions) shall not be considered force likely to cause death or bodily harm

3.      **Use of Force to Prevent Escape (720 ILCS 5/7-9)**

A peace officer or other person who has an arrested person in custody is justified in the use of such force to prevent the escape of the arrested person from custody as he would be justified in using if he were arresting the person.

4.    **Forcible Felony (720 ILCS 5/2-8)**

A forcible felony means any treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnapping, kidnapping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement, and any other felony which involves the use or threat of physical force or violence against any individual.

**ADDENDA:**

1.    G03-02-01  -  The Use of Force Model
2.    G03-02-02  -  Force Options
3.    G03-02-03  -  Deadly Force
4.    G03-02-04  -  Canines as a Force Option
5.    G03-02-05  -  Incidents Requiring the Completion of a Tactical Response Report
6.    G03-02-06  -  Firearms Discharge Incidents Involving Sworn Members
7.    G03-02-07  -  Other Weapon Discharge Incidents

| Chicago Police Department | **General Order   G03-02-01** |
|---|---|
| **THE USE OF FORCE MODEL** | |

| **ISSUE DATE:** | 16 May 2012 | **EFFECTIVE DATE:** | 16 May 2012 |
|---|---|---|---|
| **RESCINDS:** | 15 August 2003 Version | | |
| **INDEX CATEGORY:** | Field Operations | | |

## I.　PURPOSE

This directive:

A.　explains the Use of Force Model.

B.　includes a graphic representation of the Use of Force Model.

## II.　DEPARTMENT POLICY

The Department utilizes a Use of Force Model to provide guidance on the appropriate amount of force to be used to effect a lawful purpose. The Use of Force Model employs the progressive and reasonable escalation and de-escalation of member-applied force in proportional response to the actions and level of resistance offered by a subject. Such response may progress from the member's actual presence at the scene to the application of deadly force.

A.　The primary objective of the use of force is to ensure control of a subject with the reasonable force necessary based on the totality of the circumstances.

B.　Whenever reasonable, members will exercise persuasion, advice, and warning prior to the use of physical force.

C.　When force is applied, a member will escalate or de-escalate to the amount of force which is reasonably necessary to overcome the subject's resistance and to gain control.

　　1.　Members are not required to start at the lowest levels of the Use of Force Model; they will select the appropriate level of force based on the subject's actions.

　　2.　Members will modify their level of force in relation to the amount of resistance offered by the subject.

　　　　a.　As the subject offers less resistance, the member will lower the amount or type of force used.

　　　　b.　As the subject increases resistance, the member may increase the amount or type of force used.

## III.　USE OF FORCE MODEL

A.　The Use of Force Model is a graphic representation of the guidelines for the appropriate use of force in relation to the actions of a subject.

B.　The Use of Force Model utilized by the Chicago Police Department is pictured in Illustration No. 1.

C.　The Use of Force Model is a guideline that cannot account for all factors constituting the "totality of circumstances" by which a specific use of force is evaluated. The Model is to be used only in conjunction with the Department directives and training regarding the use of force.

**Illustration No. 1**



# USE OF FORCE MODEL
## CHICAGO POLICE DEPARTMENT



Note:

With permission of the authors, the Use of Force Model has been modified to conform with the Chicago Police Department General Order entitled "Use of Force Guidelines."

\* See addendum entitled "Force Options" for appropriate options and specific guidelines on active resisters.

\*\* See addendum entitled "Force Options" for specific conditions on the use of tasers.

\*\*\* See addendum entitled "Canines as a Force Option" for specific conditions on the use of canines.

© 1983-2002, John C. Desmedt. All rights reserved.
(Rev. MAY 2012)

Garry F. McCarthy
Superintendent of Police

11-205 TRH



| Chicago Police Department | | General Order  G03-02-02 |
|---|---|---|
| **FORCE OPTIONS** | | |

| ISSUE DATE: | 01 January 2016 | EFFECTIVE DATE: | 01 January 2016 |
|---|---|---|---|
| RESCINDS: | 11 March 2015 version | | |
| INDEX CATEGORY: | Field Operations | | |

**I.       PURPOSE**

This directive:

A.       explains the various levels of force options in the Use of Force Model that are appropriate for Department members' use when interacting with cooperative subjects, resistive subjects ("resisters"), and assailants.

B.       *introduces the concept of Force Mitigation as a component of the Department's response to all incidents.*

C.       continues the prohibition of chokeholds to subdue a subject unless deadly force is justified, consistent with Item IV-C-3 of this directive.

**II.      POLICY**

A.       *The goal of a Department member's response to all incidents is to resolve the incident with the foremost regard for the preservation of human life and the safety of all persons involved.*

B.       *The Department expects members to develop and display the skills and abilities that allow them to regularly resolve confrontations without resorting to force (i.e. anything other than an officer's physical presence or use of verbal commands) or by using the least amount of appropriate force.*

C.       *Officers will de-escalate and use Force Mitigation principles whenever possible and appropriate, before resorting to force and to reduce the need for force.*

D.       Members will maintain a courteous and professional demeanor when dealing with the public.

E.       Before taking any police action, sworn members will identify themselves as police officers unless identification would jeopardize the safety of the member or others or compromise the integrity of an investigation.

F.       *Members will continually assess the situation to determine:*

1.       *if any use of force option is necessary;*

2.       *the appropriate level of force option based on the totality of the circumstances; and*

3.       *if the level of force employed should be modified based upon the subject's actions or other changes in the circumstances. The level of force shall be de-escalated immediately as resistance decreases, while staying in control and as safety permits, and in accordance with the Department directive entitled "***The Use of Force Model***."*

**III.     FORCE MITIGATION**

*During all use of force incidents, Department members will strive to use the principles of Force Mitigation to ensure effective police-public encounters based on the totality of the circumstances. The concepts of Force Mitigation include:*

A.       *When involved in a potential use of force incident or taking police action requiring the use of force, Department members will determine if the seriousness of the situation requires an immediate response or whether the member can employ other force options, including creating more time and distance between the subject and others.*

B.     *Department members shall de-escalate and use Force Mitigation principles at the earliest possible moment.*

C.     *If the Department member is responding to an incident involving persons in need of mental health treatment, the member will act in accordance with the Department directive entitled "***Responding to Incidents Involving Persons In Need Of Mental Health Treatment,***" including using every possible means to verbally de-escalate the situation before resorting to the use of equipment, physical restraints, or other use of force options.*

D.     *Continual Communication*

    1.     *Members will use de-escalation and verbal control techniques in an attempt to reduce confrontations prior to, during, and after the use of physical force.*

    2.     *Whenever reasonable, members will exercise persuasion, advice, and warning prior to the use of physical force.*

    3.     *The goal of continual communication is to establish and maintain verbal communication in all police-public encounters where the member continually evaluates the effectiveness of that communication. Members will:*

        a.     *when practical, establish and maintain one-on-one communication where only one member speaks at a time.*

        b.     *vary the level of assertiveness of their communication depending on the type of police-public encounter. This may range from:*

            (1)     *respectful queries in a preliminary investigation where there is not yet a determination a crime has occurred; through*

            (2)     *forceful commands where a serious crime has been committed or life or property is at risk.*

    4.     *When encountering non-compliance to lawful verbal direction, members are not compelled to take immediate police action through the use of force. Except in the case of preservation of life or property, members will consider:*

        a.     *changing their verbal communication techniques to discover a more effective method.*

        b.     *requesting additional personnel to respond or making use of the specialized units and equipment available through a notification to OEMC.*

            **NOTE:**     *Members will, when practical, request assistance from specialized units, including a Crisis Intervention Team (CIT) trained officer in accordance with the Department directive entitled "***Responding to Incidents Involving Persons In Need Of Mental Health Treatment.***"*

        c.     *if available, allowing a different member to initiate verbal communications.*

            **NOTE:**     *If a different member initiates verbal communications, then that member will seek to establish their own independent one-on-one communication. Members should refrain from giving simultaneous directions to avoid potential conflicts.*

E.     *Time as a Tactic*

    1.     *Members may use time as a tactic, making advantageous use of time, distance, and cover by isolating and containing a subject and continuously evaluating the member's positioning and force options.*

2. *In order to use time as a tactic, a zone of safety should be established for the security of responding officers and members of the public. The zone of safety is where:*

    a. *the incident scene has been secured;*

    b. *the subject does not pose a continuing threat to Department members or the public; and*

    c. *the scene and subject can be continually monitored, secured, and contained through the resolution of the incident.*

3. *Using time as a tactic may permit the de-escalation of emotions, as well as the arrival of additional Department members and tactical resources.*

## IV. LEVEL OF FORCE RESPONSE OPTIONS GUIDELINES

A. Cooperative Subject: a person who is compliant without the need for physical force. The following response options are appropriate when dealing with a cooperative subject:

    1. Social Control/Police Presence

        a. Social control/police presence is established through identification of authority and proximity to the subject. Police presence may result in conforming behavior.

        b. Social control/police presence, used alone, is the only force option which is appropriate for use with subjects who are cooperative without the need for direction from law enforcement personnel.

    2. Verbal Control

        a. Verbal control consists of persuasion, advice, and warning. It includes instruction or direction from a member in the form of verbal statements or commands. Verbal control may result in conforming behavior.

        b. Whenever practical, members will attempt to de-escalate confrontations by utilizing verbal control techniques prior to, during, and after the use of physical force.

B. Resister: a person who is uncooperative. Resisters are further subdivided into two categories:

    1. Passive Resister: a person who fails to comply (non-movement) with verbal or other direction. In addition to the response options listed in Item IV-A, the following response options are appropriate when dealing with a passive resister:

        a. Holding Techniques

           Holding consists of techniques such as a firm grip, grabbing an arm, wristlocks, and come-along holds (i.e., escort holds that are not elevated to pain compliance techniques), as well as any combination of the above. Holding may result in conforming behavior.

        b. Pain Compliance Techniques

           Pain compliance consists of techniques designed to amplify nonimpact pressure and pain in order to increase the potential for controlling a subject. These techniques consist of:

           (1) applying pressure to pain sensors in the skin covering bone and joints (i.e., armbars and amplified wristlocks) to amplify pain; and

(2) using a Long Range Acoustic Device (LRAD) to emit high decibel focused sound waves to cause pain and discomfort; any use of the LRAD requires authorization from the Superintendent or the designee of the Superintendent.

  NOTE: The LRAD is not considered a pain compliance technique when used to deliver verbal messages or warnings at a decibel level not intended to cause pain and discomfort.

c. Control Instruments

 Control instruments are designed to amplify nonimpact pressure and pain in order to increase the potential for controlling a subject. These instruments are placed mainly on the pain sensors of the skin covering bone.

d. Oleoresin Capsicum (OC) Spray and Capsaicin II Powder Agent Deployment

 Oleoresin capsicum and Capsaicin II powder are highly inflammatory agents that occur naturally in cayenne peppers. The use of OC spray and Capsaicin II powder agent is intended to increase control by disorienting the subject and interfering with the subject's ability to resist arrest.

(1) **Oleoresin capsicum is only appropriate to use against the below two types of passive resisters AND only after the required authorization is received. No other use of oleoresin capsicum is authorized against passive resisters.**

  (a) occupant(s) of a motor vehicle who is engaging in passively resisting arrest, only after obtaining authorization from an on-scene supervisor of the rank of sergeant or above.

  (b) unresponsive groups, crowds, or an individual taking part in a group or crowd (e.g., demonstrators, sports championship celebrations, New Year's Eve, etc.), only after obtaining authorization from the Superintendent or the designee of the Superintendent.

(2) Capsaicin II powder agent deployment is an appropriate force option against passive resistors and unresponsive groups or crowds **only** when used for area saturation and **only** after obtaining authorization from the Superintendent or the designee of the Superintendent.

  NOTE: Only Department-issued Capsaicin II powder agent projectiles and launchers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

2. Active Resister: a person whose actions attempt to create distance between that person and the member's reach with the intent to avoid physical control and/or defeat the arrest. This type of resistance includes gestures ranging from evasive movement of the arm, through flailing arms, to full flight by running. In addition to the response options in Items IV-A and IV-B-1, the following response options are appropriate when dealing with an active resister:

a. Stunning

 Stunning is diffused-pressure striking or slapping and is an attempt to increase control by disorienting the subject and interfering with the subject's ability to resist.

b. Oleoresin Capsicum (OC) Spray

 Oleoresin capsicum is an appropriate force option against active resisters **only** under the following guidelines:

      (1)     If the only resistance is the act of walking or running away, and the resister is:

            (a)    part of a group or crowd, OC spray can be used only after obtaining authorization from the Superintendent or the designee of the Superintendent.

            (b)    **not** part of a group or crowd, the use of OC spray is not authorized.

      (2)     If the resistance includes evasive maneuvers of the limbs and body, including the flailing of arms and legs, and the resister is:

            (a)    part of a group or crowd, OC spray can be used only after obtaining authorization from the Superintendent or the designee of the Superintendent.

            (b)    **not** part of a group or crowd, the use of OC spray is authorized without supervisory approval.

c.    Capsaicin II Powder Agent Deployment

Capsaicin II powder agent deployment is an appropriate force option against active resistors **only** when used for area saturation and only after obtaining authorization from the Superintendent or the designee of the Superintendent.

d.    LRAD

The LRAD is an appropriate force option against active resisters only after obtaining authorization from the Superintendent or the designee of the Superintendent.

e.    Canines Used by Canine Handlers

A canine under the control of a canine handler is an appropriate force option when used consistent with the provisions of the Department directive entitled "**Canines as a Force Option**."

f.    Taser

      (1)     The Taser is a device used to control and subdue a subject through the application of electrical impulses that override the central nervous system and cause uncontrollable muscle contractions. Two darts attached by thin wires are fired from a cartridge attached to the hand-held device. When both darts attach to the subject, a timed electrical impulse is applied to the subject at the control of the operator, the electrical impulse immobilizes the subject long enough for restraints to be applied.

      (2)     Only Department-issued Tasers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

C.    Assailant: a subject who is using or threatening the imminent use of force against himself/herself or another person. The Use of Force Model categorizes assailants into three categories.

    1.    Actions are aggressively offensive without weapons. This type of assailant is one who places a member in fear of a battery and includes advancing on the member in a threatening manner or closing the distance between the assailant and the member, thereby reducing the member's reaction time. In addition to the response options in Items IV-A and IV-B, the following response options are appropriate when dealing with this type of assailant:

      a.    Direct Mechanical

Direct mechanical techniques are hard, concentrating, striking movements such as punching and kicking, or powerful locks and pressures. These techniques can be combined with take-downs or pins against the ground or other objects.

    b.    Impact Weapons

The baton is the member's primary impact weapon, which is used for striking. Impact weapons are designed to establish control by means of applying mechanical impact to a subject in order to disable elements of his or her skeletal structure. Members will avoid the use of flashlights, radios, or any item not specifically designed as a defensive weapon if the baton is reasonably available.

    c.    Impact Munitions

    (1)    Impact munitions are projectiles such as Capsaicin II powder agent projectiles fired from a powder agent deployment system, "drag stabilized sock rounds" fired from shotguns with specially colored yellow or orange stocks, or batons fired from 37mm or 40mm launchers. These projectiles are intended to impact and incapacitate a potentially dangerous subject from a safe distance, thereby reducing resistance and gaining compliance while reducing the probability of serious injury or death.

    (2)    Only Department-issued impact munitions may be used and only after the member has received Department-authorized training in their safe handling and deployment.

    (3)    The use of Capsaicin II powder agent projectiles as an impact munition requires authorization from the Superintendent or the designee of the Superintendent.

2.    Actions will likely cause physical injury. Included in this category of assailant may be a subject who is armed with a deadly weapon and the subject fails to disarm, thereby making the subject's actions likely to cause physical injury. The appropriate response options when dealing with this category of assailant are those listed in Items IV-A, IV-B, and IV-C-1.

3.    Actions will likely cause death or serious physical injury.

    a.    An assailant in this category is one whose actions will likely cause death or serious physical injury to another person. In addition to the response options in Items IV-A, IV-B, and IV-C-1, firearms and other deadly force are appropriate when dealing with an assailant whose actions will likely cause death or serious physical injury to another.

    b.    Chokeholds are only justified as a use of deadly force.

    (1)    A chokehold is defined as applying direct pressure to a person's trachea (windpipe) or airway (the front of the neck) with the intention of reducing the intake of air.

    (2)    Holding and control techniques involving contact with the neck, but which are not intended to reduce the intake of air, are not defined as chokeholds.

    (3)    Under no circumstances will a member use a chokehold, or any lesser contact with the neck area, to prevent the destruction of evidence by ingestion.

## V.    POST-USE OF FORCE POSITIONING AND MONITORING

After gaining control of a subject, members will:

A.    avoid sitting, kneeling, or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe.

B.    position the subject in a manner to allow free breathing. Whenever feasible, the subject will not be placed on the subject's stomach.

C.    monitor an arrestee until transported to a secure location.

      D.     seek medical attention for an arrestee who has injuries or illnesses consistent with the procedures outlined in the Department directives entitled "**Processing Persons Under Department Control**" and "**Hospitalized Arrestees**."

## VI.    AFFIRMATION OF PROTECTION OF LIFE POLICY

Sworn members will not unreasonably endanger themselves or another person to conform to the restrictions of this directive.

(Items indicated by *italic/double underline* were added or revised)

Authenticated by: KC

John J. Escalante
Interim Superintendent of Police

15-212 PJE/MWK

**GLOSSARY TERMS:**

1.      **Zone of Safety**

The distance to be maintained between the subject and the responding member(s). This distance should be greater than the effective range of the weapon (other than a firearm) and it may vary with each situation (e.g., type of weapon possessed, condition of the subject, surrounding area).



| | |
|---|---|
| Chicago Police Department | **General Order   G03-02-03** |
| **DEADLY FORCE** | |

| ISSUE DATE: | 10 February 2015 | EFFECTIVE DATE: | 10 February 2015 |
|---|---|---|---|
| RESCINDS: | 1 October 2002 Version | | |
| INDEX CATEGORY: | Field Operations | | |

## I.      PURPOSE

This directive:

A.      sets forth Department policy regarding a sworn member's use of <u>deadly force</u>.

B.      establishes guidelines controlling the use of deadly force by sworn members.

## II.      DEPARTMENT POLICY

A.      A sworn member is justified in using force likely to cause death or great bodily harm only when he or she reasonably believes that such force is necessary:

    1.      to prevent death or great bodily harm to the sworn member or to another person, or:

    2.      to <u>prevent an arrest from being defeated by resistance or escape</u> and the sworn member reasonably believes that the person to be arrested:

        a.      has committed or has attempted to commit a <u>forcible felony</u> which involves the infliction, threatened infliction, or threatened use of physical force likely to cause death or great bodily harm or;

        b.      is attempting to escape by use of a deadly weapon or;

        c.      otherwise indicates that he or she will endanger human life or inflict great bodily harm unless arrested without delay.

B.      Sworn members who discharge a firearm will comply with the procedures detailed in the Department directive entitled "**Firearms Discharge Incidents Involving Sworn Members**."

## III.      DEPARTMENT PROHIBITIONS FOR USE OF DEADLY FORCE

Use of firearms in the following ways is prohibited:

A.      Firing into crowds.

B.      Firing warning shots.

C.      Firing into buildings or through doors, windows, or other openings when the person lawfully fired at is not clearly visible.

D.      Firing at a subject whose action is only a threat to the subject himself (e.g., attempted suicide).

E.      *Firing at or into a moving vehicle when the vehicle is the only force used against the sworn member or another person.*

## IV.      AFFIRMATION OF PROTECTION OF LIFE POLICY

Sworn members will not unreasonably endanger themselves or another person to conform to the restrictions of this directive.

(Items indicated by *italics/double underline* have been added or revised)

Garry F. McCarthy
Superintendent of Police

15-025 MWK

**GLOSSARY TERMS:**

1.  **Deadly Force (720 ILCS 5/7-8)**

    A.   Deadly force is force which is likely to cause death or great bodily harm and includes

    1.   The firing of a firearm in the direction of the person to be arrested, even though no intent exists to kill or inflict great bodily harm; and

    2.   The firing of a firearm at a vehicle in which the person to be arrested is riding.

    B.   A peace officer's discharge of a firearm using ammunition designed to disable or control an individual without creating the likelihood of death or great bodily harm (i.e., impact munitions) shall not be considered force likely to cause death or bodily harm

2.  **Use of Force to Prevent Escape (720 ILCS 5/7-9)**

    A peace officer or other person who has an arrested person in custody is justified in the use of such force to prevent the escape of the arrested person from custody as he would be justified in using if he were arresting the person.

3.  **Forcible Felony (720 ILCS 5/2-8)**

    A forcible felony means any treason, first degree murder, second degree murder, predatory criminal sexual assault of a child, aggravated criminal sexual assault, criminal sexual assault, robbery, burglary, residential burglary, aggravated arson, arson, aggravated kidnapping, kidnapping, aggravated battery resulting in great bodily harm or permanent disability or disfigurement, and any other felony which involves the use or threat of physical force or violence against any individual.



| Chicago Police Department | General Order   G03-02-04 |
| --- | --- |
| **CANINES AS A FORCE OPTION** | |

| ISSUE DATE: | 24 July 2014 | EFFECTIVE DATE: | 24 July 2014 |
| --- | --- | --- | --- |
| RESCINDS: | 01 October 2002 version | | |
| INDEX CATEGORY: | Field Operations | | |

## I.  PURPOSE

This directive outlines the conditions which govern the use of a Department-owned canine within the parameters of the Use of Force Model.

## II.  POLICY

A.  Department-owned canines will be trained in the "find and bark" method of finding persons. This method of training requires the canine to bark or otherwise alert its handler upon discovering a person and to remain in the immediate area of the person until relieved by the handler.

B.  A canine used to search and apprehend a subject who is defined as an active resister or assailant is a reportable use of force incident that will be documented on a Tactical Response Report (TRR).

## III.  DEFINITION

For the purposes of this directive, the definition of an active resister will include subjects who secret themselves and fail to comply with sworn members orders to reveal themselves.

## IV.  CONDITIONS ON THE USE OF CANINES AS A FORCE OPTION

A.  Against an Assailant

1.  A canine is an appropriate force option against a subject who fits the definition of an assailant, as defined in the directive entitled "**Force Options**." In the case of an incident involving a canine, an assailant will also include a person who is using or threatening the imminent use of force against the canine.

2.  Use of a canine in such a situation will require the completion of a Tactical Response Report (TRR).

B.  Against an Active Resister

1.  The use of a canine to physically apprehend an active-resister subject is limited to a subject who is alleged to have committed either a felony or a violent misdemeanor.

2.  Prior to the use of the canine, the handler will announce his or her police authority and state that the canine will be released if the subject does not comply with the handler's orders.

a.  The verbal warning will be given in a manner to be capable of being heard by the subject and any witnesses or other parties within the targeted area.

b.  The verbal warning will be given again upon entering subsequent floors or areas or if the size of the area is too great for a single warning.

c.  The fact that the warnings were given will be documented in the appropriate case report.

3.  Use of a canine in such a situation will require the completion of a Tactical Response Report (TRR).

C.  A canine will not be used as a force option in crowd control situations unless the handler is so instructed by an *exempt* member.

(Items indicated by *italics/double underline* were revised.)


Authenticated by: JKH/PS

Garry F. McCarthy
Superintendent of Police


13-152 AMR/RDR



| Chicago Police Department | General Order G03-02-05 |
|---|---|
| **INCIDENTS REQUIRING THE COMPLETION OF A TACTICAL RESPONSE REPORT** | |

| ISSUE DATE: | 18 August 2016 | EFFECTIVE DATE: | 18 August 2016 |
|---|---|---|---|
| RESCINDS: | 30 October 2014 Version | | |
| INDEX CATEGORY: | Field Operations | | |

## I. PURPOSE

This directive:

    A.    identifies incidents that require the completion of a Tactical Response Report (CPD-11.377).

    B.    outlines the investigatory steps, reporting, and reviewing responsibilities of Department members.

## II. POLICY

    A.    **Accuracy.** Department members are responsible, at all times, for clearly, reliably, and truthfully describing the facts and circumstances concerning any incident involving the use of force by Department members. Department members will report and thoroughly document each reportable use of force incident outlined in Item III of this directive.

    B.    **Accountability.** Department members will be responsible for articulating the specific facts that support the member's determination of the reasonableness, necessity, and proportionality of the particular use of force.

    C.    **Transparency.** The Department will provide for transparency and the appropriate dissemination of information concerning the use of force by Department members.

## III. INCIDENTS REQUIRING THE COMPLETION OF A TACTICAL RESPONSE REPORT

    A.    A Tactical Response Report is required to be completed for the following reportable use of force incidents:

        1.    All incidents involving:

            a.    cooperative actions or passive resistance by a subject when the subject is injured or alleges injury resulting from the member's use of a force option.

            b.    active resistance of a subject.

                **EXCEPTION:**    A Tactical Response Report is NOT required when:

                    (1)    the subject's only action of resisting is fleeing; and

                    (2)    the member's actions did not extend beyond verbal commands and/or control holds utilized in conjunction with handcuffing and searching techniques which do not result in injury or allegation of injury.

            c.    an assailant whose actions are aggressively offensive with or without weapons who is using or threatening the imminent use of force against the member that will likely cause physical injury.

            d.    obstructing a police officer when the obstructing is a physical act directed at the officer.

    2.      All incidents involving a Department member's:

        a.      discharge of a firearm, impact munitions, Taser, OC spray, or other chemical weapons.

        b.      use of canines as a force option.

        c.      use of a Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique.

        d.      use of strikes with an impact weapon, kicks, knee strikes, elbow strikes, closed-hand strikes or punches, takedowns, emergency handcuffing, and other direct mechanical techniques.

> **NOTE:** Emergency handcuffing is only applied after the active resister or assailant has been controlled from actively resisting or attacking and is on the ground in a position resembling a prone or supine position. The subject must be prevented from moving while being handcuffed from the front or rear to prevent any attempts to resist or attack.

B.      A Tactical Response Report is NOT required to be completed for the following incidents:

    1.      The use of escort holds, pressure-compliance techniques, and firm grips which do not result in an injury or allegation of injury.

    2.      Control holds, wristlocks, and armbars utilized in conjunction with handcuffing and searching techniques which do not result in injury or allegation of injury.

    3.      That force necessary to overcome passive resistance due to physical disability or intoxication which does not result in injury or allegation of injury.

    4.      The use of force in an approved training exercise.

C.      If the most serious use of force requires an investigation by a certain level of supervisor, then the approval of all Tactical Response Reports resulting from the use of force by any member in that incident will be the responsibility of that level of supervisor.

## IV.    PROCEDURES

A.    **Immediate Notifications**

Each sworn member or detention aide in the performance of his or her duties who is involved in a reportable use of force incident, as described in Item III-A of this directive, will immediately notify:

    1.      his or her immediate supervisor and the station supervisor in the district of occurrence that he or she has been involved in a reportable use of force incident.

> **NOTE:** The involved member will record the name of the person receiving the notification in the appropriate case report.

    2.      the Office of Emergency Management and Communications (OEMC) for all incidents involving the:

        a.      use of deadly force;

        b.      discharge of a firearm, impact munitions, Taser, OC spray, or other chemical weapons;

        c.      use of canines as a response option; and

        d.      use of a Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique.

NOTE: The Office of Emergency Management and Communications (OEMC) will notify the Crime Prevention and Information Center (CPIC) of the incident.

B. **Completing the Tactical Response Report (TRR)**

Each sworn member or detention aide in the performance of his or her duties who is involved in a reportable use of force incident, as described in Item III-A of this directive, will:

1. complete a Tactical Response Report, detailing the information as requested on the report.

    a. If more than one member is involved in a reportable use of force incident, each sworn member or detention aide who uses force will complete a TRR. Therefore, there may be multiple reports completed for a single incident.

    b. If an object is perceived by the member as a weapon that could cause great bodily harm or death and is not actually a weapon or the object recovered is different than the perceived weapon:

        (1) indicate the weapon in the "weapon" field of the TRR, if the item was actually a weapon,

        (2) indicate the object in the "other" field of the TRR, when the item was not actually a weapon,

        (3) if the item was different than perceived, indicate in the "Perceived As" field what the object was perceived to be.

            EXAMPLE: If a member uses force against an assailant holding an object that the involved member perceives to be a handgun, but upon recovery, the object was determined to be a BB gun, the member will indicate "BB gun" in the "Weapon" field and "Handgun" in the "Perceived As" field.

    c. Specific instructions for the completion of the form can be found in the Tactical Response Report Form Preparation Instructions (CPD-63.467) or the Automated TRR Application Help Documentation.

2. submit the completed TRR to his or her immediate supervisor for review before the end of the involved member's tour of duty.

3. submit other required reports as indicated in the Department directive entitled "**Processing Persons Under Department Control**" to the station supervisor in the district of occurrence.

## V. SUPERVISOR RESPONSIBILITIES

A. **Reviewing Supervisor.** A supervisor who has been notified of a reportable use of force incident as described in Item III-A of this directive will:

1. respond to the scene when the injury to a subject or member requires medical attention.

2. ensure that all witnesses are identified and interviewed and that required information is recorded in the appropriate reports.

3. request the assignment of an evidence technician to take photographs of subjects who have been involved in a use of force incident and are injured, allege injury, or when otherwise deemed appropriate by the supervisor.

4. ensure that other evidence is handled and processed according to existing Department procedures.

5. review the portion of the TRR completed by the involved member and:

    a. if the TRR is incomplete or insufficient, return the TRR to the member.

      b.     if appropriate, attest to the completeness of the report.

6.     complete the TRR for a member who is unable to complete the report.

> **NOTE:**     The TRR will not substitute for an Officer's Battery Report. Whenever a member is the victim of a murder or any type of a battery or an assault, whether such charges are placed against an offender or not, the supervisor will ensure an Officer's Battery Report is completed.

7.     ensure the appropriate case report is completed for the incident, consistent with the guidelines established in the Incident Reporting Guide (IRG) (CPD-63.451).

> **NOTE:**     A case report is required even if the TRR resulted from an incident that would not otherwise require a report (e.g., warrant arrests). Members will refer to the IRG section entitled "Special Case Reporting Index for Use of Force Incidents" for specific reporting instructions.

8.     ensure immediate notifications in Item IV-A are completed.

9.     ensure additional notifications are made consistent with the Department directives entitled:

      a.     "**Firearms Discharge Incidents Involving Sworn Members**;" and

      b.     "**Other Weapons Discharge Incidents**."

10.     notify the Independent Police Review Authority (IPRA) to obtain a complaint log (CL) number for the following incidents:

      a.     the use of deadly force,

      b.     the discharge of a firearm,

      c.     the discharge of a Taser,

      d.     the discharge of a personal Oleoresin Capsicum (OC) device or other chemical agent,

      e.     the use of excessive force or an allegation of excessive force, and

      f.     the death or life-threatening injury to a member of the public that resulted directly from an action or intentional omission of a Department member.

B.     For reportable use of force incidents, the following ranked supervisor will be responsible for the approval of all TRRs from the same incident:

1.     The exempt-level incident commander will review and approve the following types of incidents:

      a.     the discharge of impact munitions or a firearm by a Department member, excluding discharges to destroy an animal;

      b.     a member's use of force, by whatever means, that results in serious injury or death of any individual; and

      c.     any lesser use of force by a Department member when that use of force stems from the same incident in which another member used force described in Items V-B-1-a or V-B-1-b of this directive.

2.     A member the rank of captain or above assigned to the district of occurrence will review and approve TRRs for the following incidents:

      a.     the discharge of a firearm for the destruction of an animal with no human injury, and

      b.     any incident normally investigated under Item V-B-3 of this directive when a lieutenant in the district of occurrence is not available.

3.    A member the rank of lieutenant or above assigned to the district of occurrence will investigate all other incidents.

> **NOTE:**    If a district supervisor the rank of lieutenant or above is unavailable, the district station supervisor will follow the appropriate procedures established by the Bureau of Patrol to ensure the TRR is completed and approved.

C.    **Approving Supervisor.** The assigned supervisor described in Item V-B will:

1.    review the TRR and complete the section of the TRR entitled "Lieutenant or Above/Incident Commander Review."

2.    when reviewing a TRR for a use of force incident, indicate the review and compliance with this directive after conducting an investigation by:

    a.    attempting to interview the subject of any use of force and record the subject's statement regarding the use of force in the space provided on the TRR.

        (1)    When interviewing a juvenile arrestee, the reviewing supervisor will follow restrictions outlined in the Department directive entitled "**Processing of Juveniles and Minors Under Department Control**."

        (2)    The approving supervisor will check "DNA" when the incident involves only an animal destruction or unintentional discharge.

    b.    documenting other investigatory information in the "Lieutenant or Above/Incident Commander: Comments" section, including but not limited to:

        (1)    the identification and interview of witnesses, including other Department members regarding the use of force incident;

        (2)    a review of all available reports;

        (3)    a review of all Department-recorded video (e.g., In Car Video System, lockup facility cameras, body worn cameras), if available; and

        (4)    any allegations of excessive force.

3.    ensure a notification to IPRA was made pursuant to Item V-A-10 of this directive.

> **NOTE:**    The approving supervisor will indicate if a notification to IPRA was made and include the Complaint Log (CL) number on the TRR.

4.    **use the "Attachment" section located under the "Involved Member Information" section of the TRR to attach copies of the following Department reports that are related to the incident involving the completion of the TRR:**

    a.    case reports,

    b.    Supplementary Report,

    c.    Arrest Reports,

    d.    Inventory Reports,

    e.    Injury on Duty reports, and

    f.    any other pertinent Department report.

5. if appropriate, approve the report.


Eddie T. Johnson
Superintendent of Police

15-211 MWK/TSS

| | Chicago Police Department | **General Order  G03-02-06** |
|---|---|---|
| | **FIREARMS DISCHARGE INCIDENTS INVOLVING SWORN MEMBERS** | |

| **ISSUE DATE:** | 30 October 2014 | **EFFECTIVE DATE:** | 30 October 2014 |
|---|---|---|---|
| **RESCINDS:** | 01 October 2002 Version; 01 October 2002 Version of S03-02-01 | | |
| **INDEX CATEGORY:** | Field Operations | | |

## I.   PURPOSE

This directive outlines Department investigative and reporting procedures in firearm discharge incidents.

## II.   SCOPE

Under normal circumstances, the provisions of this directive will not apply to the discharge of a firearm during:

A.   Department-sponsored firearms training or practice.

B.   firearms practice at a recognized range facility.

C.   Department authorized ballistic examination or testing.

D.   a licensed hunting activity.

## III.   FIREARMS DISCHARGE INCIDENT NOTIFICATIONS

In addition to other notifications outlined in this directive, for **ANY** firearms discharge incidents, including unintentional discharges and those involving the destruction of an animal:

A.   the _station supervisor_ in the district of occurrence will ensure the _Crime Prevention and Information Center (CPIC)_ is notified.

B.   _CPIC_ will notify the _Bureau of Internal Affairs (BIA)_ call-out supervisor of any firearms discharge incident notification.

## IV.   MANDATORY ALCOHOL AND DRUG TESTING

A.   Any sworn Department member involved in a firearms discharge incident, whether on or off duty, is required to submit to the mandatory alcohol and drug testing, in compliance with this directive and any applicable collective bargaining agreement.

   **NOTE:**   This requirement does not apply to the circumstances delineated in Item II of this directive.

B.   The _BIA_ call-out supervisor will:

   1.   contact the On-Call Incident Commander (OCIC) or _supervisor responsible for the investigation_, as appropriate, and respond to the designated location to conduct the alcohol and drug testing.

   2.   complete and submit a "Notice of Alcohol and Drug Testing Following a Firearms Discharge Incident" (CPD-44.252).

C.   The _BIA_ call-out supervisor will ensure:

   1.   the involved member submits to the alcohol breath test and will conduct the test according to Department policy.

   2.   the alcohol breath test result is provided to the OCIC or _supervisor responsible for the investigation_, as appropriate.

3. the involved member submits to the drug test and ensure the urine specimen is:

    a. collected in a manner that will preserve the dignity of the involved member and ensure the integrity of the sample.

    b. collected in the presence of a supervisor of the same sex as the involved member.

    c. retained by the *BIA* call-out supervisor who will assume the responsibility for ensuring that the urine specimen is properly secured in accordance with established *bureau-level* standard operation procedures, pending processing by a medical laboratory.

4. the alcohol and drug testing occurs as soon as practicable after the firearms discharge incident given the overall demands of the investigation.

    **NOTE:** The member with overall command responsibility, (e.g., OCIC or *supervisor responsible for the investigation*), will ensure testing is initiated no later than six hours following the firearms discharge incident.

5. that copies of any associated reports, including the testing and results documentation, are forwarded to the Chief Administrator, Independent Police Review Authority (IPRA) once the testing is completed.

D. If the involved member refuses to provide a breath test or urine specimen pursuant to this process, it is a violation of the Department Rules and Regulations, (e.g., disobedience of an order or directive whether written or oral), and will result in administrative charges against the member, which may include discipline up to and including separation.

E. No discipline shall occur based solely on the results of the alcohol test when the member's actions are consistent with the Department's Use of Force guidelines and the member discharged their weapon off-duty.

**V. FIREARM DISCHARGE INCIDENTS OTHER THAN UNINTENTIONAL AND DESTRUCTION OF AN ANIMAL**

A. Members who unintentionally discharge a firearm or discharge a firearm in the destruction of an animal will follow the procedures described in *Item X of this directive so long as there were no personal injuries via that firearm.*

B. *In any other instance where a member has discharged a firearm, the member, if physically capable, will*:

1. notify the Office of Emergency Management and Communications (OEMC) immediately and provide all relevant information.

2. attend to all required emergency and security duties arising from the incident.

3. provide Department members conducting the investigation with information required to effect arrests and fulfill immediate law enforcement necessities.

4. inform the *station supervisor* of the district of occurrence.

5. remain on the scene, if not injured, and report to a *field supervisor* from the district of occurrence upon his or her arrival.

6. ensure that his or her firearm remains holstered and secured until it is submitted to Forensic Services *Division* personnel.

    **NOTE:** If the involved member is injured and needs to be relieved of his or her firearm prior to receiving medical treatment, the securing member will take possession of the firearm and duty belt and will ensure that the firearm remains holstered and secured.

7.    if disarmed during the firearm discharge incident, preserve the firearm as evidence, as it will be processed in compliance with the Department directive entitled "**Crime Scene Processing**."

8.    complete a Tactical Response Report (TRR) (CPD-11.377) and any other reports at the location designated by the *supervisor responsible for the investigation.*

> **NOTE:**    When a member who has discharged a firearm is unable to complete the TRR for any reason, it will become the responsibility of a supervisor designated by the *supervisor responsible for the investigation* to prepare this report.

9.    contact the Professional Counseling *Division* via telephone within twenty-four hours of the incident to schedule a **mandatory** debriefing.

    a.    *Upon arrival at the subsequently scheduled Professional Counseling Session, members will present the original (white) Traumatic Incident Stress Management Program Notification form to the Professional Counseling Division employee.*

    b.    Members who are hospitalized as a result of their involvement in a firearm discharge incident will be contacted by a counselor pursuant to the Department directive entitled **Traumatic Incident Stress Management Program**.

10.    *attend the firearms training overview as described in Item IX of this directive.*

C.    In any instance where a member has discharged a firearm outside the City of Chicago, the member will:

1.    notify the local police agency and this Department's *Crime Prevention and Information Center (CPIC).*

2.    ensure the submission of all reports connected with the incident, including a TRR and a To-From-Subject report, without unnecessary delay.

D.    Any member, whether on or off duty, having knowledge of circumstances surrounding a firearm discharge incident or who has been fired upon will:

1.    remain on the scene until released by those Department members conducting the investigation.

2.    provide those Department members conducting the investigation with required information, assistance, and when requested, oral and written statements.

3.    report to the *supervisor responsible for the investigation* in the district of occurrence.

E.    Member's Statements and Interviews.

1.    A member who is involved in a firearm discharge incident will provide an oral report to the *supervisor responsible for the investigation* without delay and outside the presence of any other individuals.

2.    When a member who has discharged a firearm is notified that he or she must give a written statement or an oral statement in the presence of an observer, the interview may be postponed by the officer for a period of time not to exceed two hours.

> **NOTE:**    *Statements pursuant to an administrative investigation conducted by IPRA into the firearm discharge incident will conform to the guidelines outlined in the Department directive entitled "***Department Member's Bill of Rights**.*"*

F.    OEMC will:

1.    dispatch sufficient patrol units to the scene.

2.  determine if a medical emergency exists and when appropriate:

    a.  notify the Chicago Fire Department to dispatch emergency medical service units to the scene.

    b.  inform the emergency room of the receiving hospital.

3.  assign a *field supervisor* from the district of occurrence to the scene. In the event that a member has been injured, OEMC will assign a supervisor to respond to the medical facility treating the injured member.

4.  immediately notify the following in the listed order of priority:

    a.  the *station supervisor* in the district of occurrence;

    b.  *CPIC*;

    c.  *any other units or agencies as appropriate or as requested.*

5.  not broadcast the name of a Department member who has been involved in a firearm discharge incident over the police radio.

G.  The assigned *field supervisor* will:

1.  proceed immediately to the scene *and assume command and oversight of the scene until relieved by the appropriate responding supervisor.*

> **NOTE:**  *Either the field sergeant or the relieving supervisor will remain on scene with sufficient information to fully brief the responding OCIC, if applicable.*

2.  ensure that medical attention is provided and that adequate manpower and equipment are available.

3.  establish an inner and outer perimeter at the scene of the incident.

    a.  The inner perimeter(s) is the area or areas at the scene of the incident where physical evidence is likely to be recovered.

    b.  The outer perimeter(s) is the area surrounding and encompassing the inner perimeter(s) where assigned personnel can be briefed and deployed.

4.  ensure that:

    a.  no sworn member of any rank handles, inspects, unloads, or otherwise tampers with the involved member's firearm prior to the arrival of Forensic Services *Division* personnel.

    b.  unless the member was disarmed, the firearm remains holstered and secured pending the arrival Forensic Services *Division* personnel.

    c.  in instances when the Department member was disarmed during the firearm discharge incident, the firearm is preserved as evidence and processed in compliance with the Department directive entitled "**Crime Scene Protection and Processing**."

    d.  all fired projectiles have been accounted for without contaminating or interfering with the collection and maintenance of evidence.

    e.  witnesses and other persons (Department member or non-Department member) who may have relevant information are available for on scene interviews.

    f.  an officer other than the involved member has been assigned to conduct the preliminary investigation, prepare the original case report, and relay additional information to investigating units.

5.  *confirm that the notifications listed in Item V-F-4 have been made.*

6.   *if circumstances necessitate the relocation of the investigation from the site of the occurrence, contact the OCIC for authorization and notify CPIC.*

7.   ensure that Forensic Services *Division* personnel conduct the firearm inspection on-scene in his or her presence. If the *supervisor responsible for the investigation* determines that safety concerns or weather conditions preclude the on-scene inspection, the involved member will remain in the continual presence of a higher-ranking Department member until the inspection is conducted by Forensic Services *Division* personnel in the affected *Bureau of Detectives area*.

8.   assign transportation for the involved member.

9.   verify the submission of written reports from involved members in conformance with the provisions of this directive.

10.  review all written reports generated by Bureau of Patrol personnel submitted during the preliminary investigation.

11.  complete the supervisor's section of the Tactical Response Report.

   **NOTE:**   If the involved member is of the rank of sergeant or higher, the *supervisor responsible for the investigation* will complete the supervisor's section of the TRR.

12.  *in situations requiring an Officer's Battery Report, ensure the report is completed in accordance with the Department directive entitled* "**Officer's Battery Reporting Procedures**."

13.  remain on duty until dismissed by the *supervisor responsible for the investigation*.

H.   *CPIC will notify:*

1.   *the district commander of the district of occurrence.*

2.   *the commander of affected Bureau of Detectives area.*

3.   *the area deputy chief, Bureau of Patrol.*

4.   *any additional communications as consistent with CPIC procedures.*

I.   The station supervisor will:

1.   notify the Professional Counseling Service via telephone, providing them with the name, star number, and unit of assignment of the involved member and the date the member was instructed to contact the Professional Counseling Service for a mandatory appointment.

2.   obtain a Universal (U) Number from the Independent Police Review Authority in all cases in which:

   a.   a Department member has injured or killed a person by use of a firearm.

   b.   a Department member has suffered a self-inflicted gunshot wound.

3.   if an individual has been injured or killed by a firearm discharged by a Department member, inform the States Attorney's Office, in accordance with the Department directive entitled "**Felony Review by Cook County State's Attorney**."

4.   *if a Department member has been injured or killed by gunfire, follow the procedures in* "**Notification of Death or Serious Injury to a Member: Duty Related**."

**VI.    INVESTIGATING COMMAND PERSONNEL RESPONSIBILITIES**

A.    Investigating command personnel will be assigned according to the Department directive entitled "<u>**On-Call Incident Commander**</u>."

NOTE:    *No member below the rank of captain will direct an investigation into an incident involving the discharge of a firearm by a Department member. However, the on-scene supervisor is responsible for maintaining command and oversight of the scene until relieved by the appropriate responding supervisor.*

B.    *The OCIC or supervisor responsible for the investigation, will:*

1.    proceed to the scene, assume command of the scene, and ensure that a complete and thorough investigation is conducted of the incident.

2.    ensure that all tasks delineated for lesser-ranking personnel have been or are being performed.

3.    designate a *field supervisor* responsible for directing the preliminary investigation whenever the incident has occurred in more than one district.

4.    personally conduct an investigation into the circumstances surrounding the incident and make a preliminary determination as to whether the conduct of the member conformed to Department guidelines.

NOTE:    The occurrence of less serious transgressions may be addressed by the procedures described in the Department directive entitled "**Summary Punishment**."

5.    *fulfill the obligations outlined in the Department directive entitled "*<u>**Traumatic Incident Stress Management Program**</u>*," including:*

a.    *determining whether an incident should be classified as a traumatic incident in situations other than those specifically defined as a traumatic incident.*

b.    *completing a Traumatic Incident Stress Management Program Notification form (CPD-62.480) and providing the affected member with the original (white) and the officer's copy (yellow copy) of the Traumatic Incident Stress Management Program Notification Form.*

c.    *ensuring the affected member calls the Professional Counseling Service within twenty-fours hours of the incident.*

6.    prior to the end of his or her tour of duty, complete the review process for the submitted Tactical Response Reports following the procedures outlined in the Department directive entitled "<u>**Incidents Requiring the Completion of a Tactical Response Report**</u>."

7.    prior to the termination of the tour of duty, review the *Major Incident Notification Report and ensure its completion*

C.    For all weapon discharge incidents described in this directive, when the involved member is the same rank or higher than the *supervisor responsible for the investigation, the Chief, Bureau of Patrol will assume the investigating command personnel responsibilities.*

**VII.    BUREAU OF DETECTIVES COMMAND RESPONSIBILITIES**

A.    In all cases in which a member has been injured or killed by gunfire or has injured or killed a person by use of a firearm, the *Bureau of Detectives* area commander will designate a *Bureau of Detectives* supervisor to serve as the police shooting coordinator for that incident.

B.    The police shooting coordinator will:

1.    personally respond to the scene of the investigation.

2.      ensure the preservation of evidence and identification of witnesses.

3.      assume responsibility for the follow-up investigation under the direction of the *Bureau of Detectives* area commander.

## VIII.   POST-FIREARM DISCHARGE FIREARM PROCESSING PROCEDURES

A.      No member of any rank will handle, inspect, unload, or otherwise tamper with the involved member's firearm prior to the arrival of Forensic Services *Division* personnel. Unless the member was disarmed, the firearm will remain holstered and secured pending the arrival of the *supervisor responsible for the investigation* and Forensic Services *Division* personnel.

B.      Forensic Services *Division* personnel will:

1.      conduct the firearm inspection in the presence of the *supervisor designated in section V-G-7 of this directive.*

2.      identify the firearm discharged by the Department member by its make, model, serial number, and other identifiers.

3.      examine the firearm discharged by the Department member to determine the type of cartridges used.

4.      examine the surrounding area to identify the number and location of cartridge casings.

5.      inventory all firearms discharged by the Department member in accordance with established inventory procedures in cases in which:

a.      an individual has been injured or killed.

b.      identifiable property damage occurs.

c.      potential property damage may have occurred. In potential property damage cases, the *supervisor responsible for the investigation* may authorize the responsible member to retain his or her firearm for subsequent personal transport to the Forensic Services *Division* within ninety-six hours of the incident. The authorization will be noted in the "Comments" field of the "eTrack inventory application or in the "Description of Property" section of the Property Inventory formset, as appropriate.

C.      If the Department member was disarmed during the firearm discharge incident, the firearm will be preserved as evidence and processed in compliance with the Department directive entitled "**Crime Scene Protection and Processing**."

## IX.   POST-FIREARM DISCHARGE FIREARMS TRAINING OVERVIEW

A.      All Department members who have discharged a firearm as described in this *directive* will attend a firearms training overview scheduled by the Education and Training Division. Held monthly, the eight-hour training overview will be tailored to the situation and may include, but is not limited to, the topics of the use of deadly force, alternative force response options, tactics for aggressive patrol, and ethics.

B.      Attendance at this training overview is mandatory and is not dependent upon the determination by any investigative body responsible for a review of the firearm discharge incident. No connotation as to the appropriateness of the member's actions will attach to a member attending the training overview.

C.      The training overview will be considered a tour of duty. Participants will wear the field uniform of the day.

D.      Notification Procedure

1.      The *Deputy Chief*, Education and Training Division will notify *unit commanding officers* of the existence of members *under their command* who are required to attend a scheduled firearms training overview.

2.      Upon receipt of the list of members who are required to attend a scheduled firearms training overview, the *unit commanding officer* will determine which of the listed members are

scheduled for a regular work day on the designated training date. Members will attend the training overview only when it is on their regularly-scheduled work day.

a.  The *unit commanding officer* will supply these members with the name and telephone number of the contact person at the Education and Training Division.

b.  The *unit commanding officer* will inform these members that they are required to attend the scheduled training.

c.  Members who have been scheduled to attend a firearms training overview but are unable to due to unknown circumstances at the time of the scheduling (i.e., medical roll, court date) will notify their unit *commanding officer* and the designated contact person at the Education and Training Division as soon as these circumstances are known.

d.  The *unit commanding officer* will inform the Education and Training Division of members who are on the medical roll or scheduled for a regular day off on the date of the training. Those members will be rescheduled for the next session of the training overview.

X.  **UNINTENTIONAL FIREARM DISCHARGE INCIDENTS AND THE DISCHARGE OF A FIREARM TO DESTROY AN ANIMAL**

A.  *An unintentional firearm discharge is defined as the unintended or accidental firing of a firearm in circumstances which did not occur during a training exercise and do not involve injury via the firearm.*

B.  *When a member unintentionally discharges a firearm or discharges a firearm to destroy an animal, the member will:*

1.  notify OEMC, *their immediate* supervisor, and the station supervisor in the district of occurrence.

2.  complete a TRR, a *case report*, and any other appropriate report.

    a.  *Destruction of an animal by a Department member, where no other case report applies, will be documented under* **I-UCR 5061, "Non-Criminal, Destruction of Animal by Police."**

    b.  *An unintentional firearm discharge by a Department member, where no other case report applies, will be documented under* **I-UCR 5060, "Non-Criminal, Unintentional Discharge of a Firearm by Police."**

    c.  *If there is other property damage or personal injury, members will consult the Incident Reporting Guide for appropriate classification.*

    d.  If a TRR is completed to document an *unintentional* firearm discharge, members will follow the procedures described in the Department directive entitled "**Complaint and Disciplinary Procedures**."

3.  submit all reports to his or her immediate supervisor for review and approval.

4.  comply with all applicable provisions of the Department directive entitled "**Incidents Involving Animals**."

    **EXCEPTION:**  *If the incident occurred outside the City of Chicago, then the procedures in item V-C of this directive will be followed.*

C.  The OEMC will:

1.  assign a supervisor from the district of occurrence to the scene of the incident.

2.  notify CPIC.

D.  *The assigned field supervisor in the district of occurrence will:*

    1.  determine if there is any related personal injury or property damage other than the destruction of the animal and, if necessary, ensure that any required report is completed.

    2.  *remain on scene and maintain command and oversight of the investigation until relieved by the appropriate responding supervisor.*

    3.  *ensure CPIC has been notified.*

    4.  complete the supervisor's section of the Tactical Response Report.

        **NOTE:**    If the involved member is of the rank of sergeant or higher, the *supervisor responsible for the investigation* will complete the supervisor's section of the TRR.

E.  Investigating command personnel will be assigned according to the Department directive entitled "**On-Call Incident Commander**."

    **NOTE:**    *No member below the rank of captain will direct an investigation into an incident involving the discharge of a firearm by a Department member. However, the on-scene supervisor is responsible for maintaining command and oversight of the scene until relieved by the appropriate responding supervisor.*

F.  *The command personnel responsible for the investigation will:*

    1.  *proceed to the scene, assume command of the scene, and ensure that a complete and thorough investigation is conducted of the incident.*

    2.  *ensure that all tasks delineated for subordinate personnel are performed.*

        **NOTE:**    *The supervisor responsible for the investigation may waive firearm inventory and ballistic examination and may authorize the member to retain his or her firearm in instances in which there is no likelihood of death or injury to a person or identifiable property damage other than the destruction of the animal.*

    3.  *personally conduct an investigation into the circumstances surrounding the incident and make a preliminary determination as to whether the conduct of the member conformed to Department guidelines.*

    4.  *prepare the "Lieutenant or above / OCIC Review" section of the TRR and review, approve, and process the TRR in accordance with the procedures outlined in the Department directive entitled "***Incidents Requiring the Completion of a Tactical Response Report***."

    5.  *for an unintentional discharge incident:*

        a.  check the selection that indicates that further investigation is required in the "*Lieutenant or above/OCIC* Finding" section of the TRR.

        b.  obtain a log number and ensure that an initiation report is completed.

(Items indicated by *italics/double underline* were added or revised.)


Garry F. McCarthy
Superintendent of Police

13-056 MWK/CMW

| Chicago Police Department | **General Order   G03-02-07** |
|---|---|
| **OTHER WEAPON DISCHARGE INCIDENTS** | |

| **ISSUE DATE:** | 30 October 2014 | **EFFECTIVE DATE:** | 30 October 2014 |
|---|---|---|---|
| **RESCINDS:** | 14 June 2012 Version of S03-02-02 | | |
| **INDEX CATEGORY:** | Preliminary Investigations | | |

## I.   PURPOSE

This directive outlines Department investigative and reporting procedures in which a member has discharged a chemical agent or Taser.

## II.   SCOPE

Under normal circumstances, the provisions of this directive will not apply to the discharge of a chemical agent or Taser during a Department-authorized training program.

## III.   DISCHARGE OF CHEMICAL AGENT

A.   A chemical agent includes the personal Oleoresin Capsicum (OC) devices carried by sworn members and Department-owned special weapons which dispense *Capsaicin II Powder Agent (PepperBall)* or larger volumes of chemical agents.

B.   When a member discharges a chemical agent, the member will:

　1.   notify the Office of Emergency Management and Communications (OEMC), his or her supervisor, and the station supervisor in the district of occurrence.

　2.   complete a Tactical Response Report (TRR) (CPD-11.377), the appropriate case report, and/or other required reports.

　3.   submit all reports to his or her supervisor for review and approval.

C.   *When notified that a member under their command discharged a chemical agent, the assigned field supervisor will:*

　1.   *if appropriate, respond to the scene of the chemical agent discharge when the injury to a subject or member is of the severity to require immediate medical attention.*

　2.   *ensure the procedures outlined in the Department directive entitled* **"Incidents Requiring the Completion of a Tactical Response Report"** *are followed.*

　3.   notify the Independent Police Review Authority when an OC device has been discharged.

D.   *The assigned investigating supervisor the rank of lieutenant or above from the district of occurrence will:*

　1.   investigate the incident and document the investigation in the "*Lieutenant or Above / OCIC Review*" section of the Tactical Response Report (TRR). The supervisor will indicate that the findings of the investigation of the member's use of force revealed that the conduct conformed to Department policy and guidelines or that further investigation is required. If the supervisor determines that further investigation is required or that the member's conduct other than the use of force failed to conform to Department guidelines, the supervisor will initiate that investigation consistent with the Department directive entitled "**Complaint and Disciplinary Procedures**."

　2.   *review, approve, and process the TRR in accordance with the procedures outlined in the Department directive entitled* **"Incidents Requiring the Completion of a Tactical Response Report**."

3.    receive the discharged personal OC device from the sworn member, provide a replacement device to the member, and notify the individual designated by the district commander that a replacement device has been issued. When needed, additional OC devices may be requested from the Taser Repair Center, located at the Education and Training Division, through normal requisition procedures.

> **NOTE:**    A copy of the TRR will be presented to the Taser Repair Center for replacement OC devices.

E.    Whenever possible, the ranking officer on the scene of an incident will notify the Chicago Fire Department prior to the anticipated use of a device that dispenses a chemical agent through use of pyrotechnics.

F.    If a member discharges a chemical agent outside the City of Chicago, the member will:

1.    notify:

    a.    the law enforcement agency having jurisdiction;

    b.    OEMC and the Crime Prevention and Information Center (CPIC); and

    c.    *his or her immediate supervisor.*

2.    complete a TRR and submit it to *his or her immediate supervisor* for review and approval.

## IV.    DISCHARGE OF A TASER

A.    A member who is about to discharge a Taser device will, when possible:

1.    inform all other Department members on the scene of the imminent deployment of the device.

2.    give verbal commands to the subject prior to, during, and after deployment of the Taser.

3.    for back shots, aim for the subject's back below the neck area; for frontal shots, aim for lower center mass.

> **NOTE:**    It is recommended that Department members deploy the Taser to the subject's back whenever possible.

4.    after deployment of the initial Taser five-second cycle, members will:

    a.    give the subject an opportunity to comply with his or her demands.

    b.    assess the situation and if the subject is still not under control, consider the following:

        (1)    performing a drive stun,

> **NOTE:**    A drive stun is utilized when a Taser, with or without a cartridge attached, is held against the subject and energy is applied.

        (2)    initiating additional five-second cycles,

        (3)    reloading and redeploying another cartridge, or

        (4)    using another use of force option.

> **NOTE:**    It is advisable to minimize the stress to the subject as much as possible. Multiple five-second cycles, cycles continuing longer than five seconds, and discharges by multiple Tasers will increase stress on the subject.

B. A member who deploys or anticipates the deployment of a Taser will request that a supervisor respond to the scene.

 **NOTE:** For all field deployments of a Taser, a supervisor assigned to the district of occurrence at least one rank higher than the deploying member will respond to the scene of the Taser deployment.

C. The member who field-deployed the Taser will:

 1. immediately, upon gaining control and restraining the subject:

  a. notify OEMC of the deployment and request assignment of emergency medical personnel when:

   (1) the Taser probes were discharged and penetrated a subject's skin.

   (2) an electrical current from the Taser was applied to the subject's body.

   (3) the subject appears to be in any sort of physical distress.

  b. notify their supervisor, the station supervisor assigned to the district of occurrence, and CPIC.

  c. if emergency medical personnel determine that the subject requires treatment at a medical facility, follow procedures listed in the directive entitled:

   (1) "**Field Arrest Procedures**" for secured transportation and processing of injured arrestees.

   (2) "**Assisting Chicago Fire Department Paramedics**" for non-arrestees.

   **NOTE:** Subjects will be transported to a medical facility via a Chicago Fire Department vehicle.

 2. complete a Tactical Response Report (TRR) (CPD-11.377), *the appropriate case report, and/ or other required reports.*

D. Responding supervisors will:

 1. ensure that the scene of the Taser deployment is protected and processed in accordance with the Department directive entitled "**Crime Scene Protection and Processing**."

  a. If the Taser deployment occurred in a residence, an evidence technician will be requested to process the scene.

  b. If the Taser deployment occurred in an area other than a residence, whether indoors or outdoors, *the responding supervisor will* determine if an evidence technician is required.

  c. *An evidence technician will be requested* to photograph the locations where the probes penetrated the subject's skin and/or any other injuries incurred as a result of the TASER deployment.

 2. take control of the Taser device and deliver it to the *assigned investigating supervisor the rank of lieutenant or above from the district of occurrence.*

 3. request *the On-Call Incident Commander (OCIC) or appropriate area deputy chief, Bureau of Patrol* respond to all Taser deployments that result in serious injury or death. When the *OCIC or appropriate area deputy chief, Bureau of Patrol* responds to the scene of a Taser deployment, that member will be responsible for completing the "*Lieutenant or Above / OCIC* Review" section of the TRR.

 4. ensure the Mobile Crime Lab and Bureau of Detectives personnel *are requested when a death has occurred as a result of the Taser deployment.*

5. *notify IPRA and obtain a log number. During the hours when IPRA is not available, CPIC will be notified to obtain a log number.*

6. review the deploying member's TRR and, if appropriate, *approve it.*

E. *The assigned investigating supervisor the rank of lieutenant or above from the district of occurrence will:*

1. prepare the "*Lieutenant or Above / OCIC* Review" section of the TRR for those cases which do not require the presence of the OCIC or an area deputy chief, Bureau of Patrol, consistent with the directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

   NOTE: *The assigned investigating supervisor will not approve the involved member's TRR until the Taser device deployment data sheet has been received and reviewed.*

2. ensure that IPRA is notified and a log number is obtained.

3. download the deployment data consistent with the equipment and software procedures and print a copy of the deployment information. In districts which do not have the necessary equipment to perform the download of deployment data, the *assigned investigating supervisor* will follow the alternate procedures outlined in Item IV-E-4 of this directive.

   a. When printing a Taser deployment data sheet, only the date range containing the actual deployment information needs be printed. If the specific date range is not manually selected, all 2000 lines of possible deployment data will be printed.

   b. The data sheet will be reviewed for time discrepancies. A full download of the device is required if a 254 or a 257 discharge is indicated or the clock is off by several hours, days, months, or years. For additional information, refer to the Department's eLearning website and search keywords "Taser Download."

4. when unable to download the Taser deployment data (required equipment is inoperable or not installed), designate a Department member, preferably a supervisor, to report to an adjacent district with the involved Taser device for the purpose of downloading and printing the Taser deployment data sheet. The designated Department member will:

   a. transport the involved Taser device as directed and ensure that the device is not tampered with during transport.

   b. turn over the Taser device to the appropriate personnel and await the return of the device once the appropriate personnel download the Taser deployment data.

   c. upon return of the Taser device and receipt of the deployment data, immediately transport the Taser device and data sheet to the *assigned investigating supervisor*.

      NOTE: If alternate locations are unable to download the Taser deployment data, the *assigned investigating supervisor* will ensure that 2nd watch personnel hand-carry the Taser device to the Taser Repair Center.

5. ensure all evidence from the scene of the Taser deployment is inventoried consistent with the Department directive entitled "**Processing Property Under Department Control**," including:

   a. the discharged probes, which will be detached from the wires and inserted, pointed ends first, back into the cartridge.

   b. the used cartridge(s), which will be wrapped with tape to secure the probes inside the cartridge.

   c. *a copy of the Taser deployment data sheet.*

6.  *forward the Taser deployment data sheet, a copy of the TRR, and a copy of the original case report to IPRA.*

7.  *ensure the expended cartridge is replaced from the district/unit supply. When needed, additional cartridges may be requested from the Taser Repair Center, located at the Education and Training Division, through normal requisition procedures.*

    **NOTE:**     *A copy of the TRR will be presented to the Taser Repair Center for replacement cartridges.*

F.  In all cases in which a subject has been seriously injured or a death has occurred in conjunction with a Taser deployment, *the OCIC or appropriate area deputy chief, Bureau of Patrol* will:

1.  proceed to the scene, assume command of the scene, and ensure that a complete and thorough investigation is conducted of the incident.

2.  ensure that all tasks delineated for subordinate personnel are performed.

3.  personally conduct an investigation into the circumstances surrounding the incident and make a preliminary determination as to whether the conduct of the member conformed to Department guidelines.

4.  *review, approve, and process the TRR in accordance with the procedures outlined in the Department directive entitled "***Incidents Requiring the Completion of a Tactical Response Report***."*

(Items indicated by *italics/double underline* were added or revised.)


Garry F. McCarthy
Superintendent of Police


13-056 MWK/CMW

# EXHIBIT 2

## (To Declaration of Karen Conway (Ex. A))

## CPD DRAFT USE OF FORCE POLICIES
### Selected Public Commentary

**Sheila Bedi & Craig Futterman**

In April 2016, the Mayor's Task Force released its findings and concluded that the Chicago Police Department (CPD) has no regard for the sanctity of life when it comes to people of color and that CPD has long targeted communities of color with excessive force. Given the prevalence of unlawful force resulting in the death and injury to thousands of Chicagoans, there is an immediate, urgent need for the CPD to overhaul its policies and practices related to the use of force. Unfortunately, the proposed use of force revisions fall far short of remedying the systemic deficiencies that have long plagued the CPD. A summary of the most critical deficiencies follows:

Fails to set forth the legal limitations on physical interactions between police and civilians.

The proposed policy reads as if officers should assume that some use of force will be warranted in almost every police-civilian interaction and that the officer's task is merely to determine the appropriate level of force. This is wrong as a matter of law. The policy's framing principle must be that absent a public safety emergency or probable cause to make an arrest, police officers should not—under any circumstances— physically engage with or use any sort of force against civilians. In the event that a physical interaction between an officer and a civilian is warranted, the policy must state clearly and unequivocally that the officer is obligated to use the minimum amount of force necessary to achieve a legitimate public safety-related goal.

Sanctions the use of deadly force in questionable circumstances.

In multiple places the policy states that the sanctity of human life is CPD's highest priority. But the policy itself belies this claim because it fails to state in clear, simple language that the use of deadly force should be a measure of last resort and is to be used only when necessary to protect imminent threat to life or great bodily harm. The policy should delete terms such as "reasonably believes" or "reasonably necessary" because they are confusing and fail to provide clear guidance to officers. The policy should instead read: "The use of deadly force is a measure of last resort that is permissible only when necessary to protect against an imminent threat to life or great bodily injury. As such, an officer may use deadly force only when such force is necessary to prevent: (a) death or great bodily harm from an immediate threat posed to the sworn member or another person, or (b) an arrest from being defeated by resistance or escape, and the person poses an immediate threat of death or great bodily harm to a sworn member or another person unless arrested without delay."

Lacks transparency, fails to prioritize accountability and defeats the public's right to know about police shootings. The revised policy fails to establish concrete timeframes regarding releasing information to the public and to the Civilian Office of Police Accountability ("COPA") regarding police shootings. The policy must prioritize transparency and make as a default practice the public release of any video and other relevant information within 48 hours, unless the release would seriously compromise an ongoing investigation. In all cases, any video and other relevant information should be released within 14 days of the incident.

In addition, the proposed policy fails to adequately address delays in notifying COPA whenever an officer discharges a weapon or uses a taser—delays that have hampered independent investigations and betrayed public confidence in those investigations. The policy must be rewritten to ensure that COPA will be notified immediately after an officer discharges a weapon or uses a taser, and that the failure to immediately notify COPA shall result in discipline.

Finally, the policy gives the CPD—and not COPA—control over the scene of a police shooting, taser discharge, or other significant use of force. This is in fundamental tension with the notion that these investigations should be controlled by an agency that is independent from the CPD. The policy should give COPA, and not CPD, primary control over the scene. If COPA is dependent upon CPD supervisors for access to the scene and the evidence, the public has every right to continue to question the independence of these investigations.

Fails to adequately protect the right to protest.

The policy fails to make clear that force cannot be used solely because people are exercising their first amendment rights to speech, protest and dissent. To the contrary, the policy authorizes the use of devices that inflict excruciating pain on protesters—including OC spray and long range acoustic devices. The policy should ban the use of long range acoustic devices because of the threat these devices pose to the right to protest, ensure that no protester is subject to any use of force in the absence of an imminent threat to public safety and explicitly prohibit the use of batons, OC spray, and tasers on passively resisting protesters.

Empowers officers to use tasers and OC spray without sufficient justification and in dangerous circumstances.

The proposed taser policy fails to state clearly that tasers should only be used against a violent individual and when other methods of controlling that individual have failed. Indeed, the proposed policy as written wrongfully allows officers to use tasers on: 1) unarmed people when they are simply walking away from a police officer; 2) people who pose a potential harm only to themselves, and 3) people who are not actively threatening anyone with violence. The taser policy should also state affirmatively that the use of tasers on people who are unarmed but uncooperative is strictly prohibited. The proposed policy allows officers to use OC spray on people who resist an officer's command— even when there is no immediate threat to public safety. The policy should be re-written to restrict the use of OC spray only to situations where there is such a threat. Further, the use of OC spray should be explicitly prohibited in the following situations: 1) inside a vehicle or any enclosed area; 2) on protestors who are passively resisting; and 3) on a handcuffed individual.

Fails to accommodate the special circumstances of pregnant women, people with disabilities (including mental illness) and the very old and the very young.

## CPD DRAFT USE OF FORCE POLICIES
### Selected Public Commentary

According to the proposed policies, an officer could use a taser, OC spray and other control techniques on people who are particularly vulnerable to suffering great harm or even death as a result of the control technique. The policy must ensure that before using any less than lethal force, an officer must first calculate whether the individual presents as someone who may be particularly vulnerable to harm as a result of the contemplated force. The policy should prohibit the use of tasers and OC spray on people who are over 60 or under 18 and on pregnant women. Additionally, CPD should be required to secure a medical evaluation for every individual who has been tased— regardless of age or circumstances.

The proposed "Level of Force Guidelines" import CPD's old use of force matrix which has proved confusing, impractical and ineffective, and the guidelines are inconsistent with the use of force policies outlined above. Experience and best practice have called matrices like the CPD's into question, because they have not served officers well in practice. CPD's reliance on training its officers on a matrix that is confusing and in tension with the force principles described in the proposed policy has contributed to a pattern and practice of excessive force. Resurrecting the old matrix in the form of "guidelines" will lead to similar results. Because these "guidelines" are confusing, and duplicative or contradictory of the force guidelines specified above, they should be scrapped in their entirety.

**Arewa Karen Winters**

(The 411 Movement for Pierre Loury)

*I think the old policy should have been accessible so it could have been cross referenced. The policy changes could have been highlighted so we could have been clear about the changes and revisions.

*Lack of community input could have been due to poor marketing strategies, accessibility and understanding of what was actually taking place.

*There should have been public information session held at Chicago Community Colleges with accessibility to computers, so after a workshop of sorts, persons could have immediately made responses.

*How will the "Sanctity of Life" be measured and implemented, especially with officers that suffer from racist/psychopathic behavior?

*Aggressive/excessive use of force seems to be the measure in African American Communities opposed to de-escalation, especially when dealing with our youth and males.

*There is an overwhelming sense of nothing matters because nothing will change due to the powers that be and due to the escalated mistrust/distrust of CPD.

*It states that the use of excessive and unwarranted force is prohibited and will not be tolerated under any circumstances. Unless officers who kill people are charged with crimes and imprisoned like the criminals that they are...this will be a fallacy.

*The guidelines on the use of deadly force...4b should not be reasonably but justifiably. They are always shooting young men in the back claiming "they had a gun" or they were in fear of their lives and that just creates an escapism for racist officers. The language in my opinion is vague. There seems to be more of an emphasis placed on the use of tasers than that of firing handguns.

*The language also appears redundant and repetitious.

*Under accuracy and candor 3a it states that "at all times for truthfully describing the facts"...we know this is not always the case and officers should be suspended opposed to administrative leave.

*In meetings we have had around police accountability...some folks think white officers are killing African Americans intentionally to get administrative leave because they do not want to work in the inner city-high crime areas and because of systemic white supremacist attitudes, they have no regard for the lives of people of color nor our youth.

*I have highlighted far to many things to go into without someone actually processing the items with me, so that will be all for me. I myself and optimistic with genuine prejudice.

**Crista Noel**

Please review the International Use of Force Guidelines and implement accordingly

## CPD DRAFT USE OF FORCE POLICIES
Selected Public Commentary

**Gordon Waldron**

Civil Liberties Committee

Chicago Council of Lawyers

Comments of the Civil Liberties Committee of the Chicago Council of Lawyers on theDraft Use of Force Policy issued by the Chicago Police Department11-23-2016The Civil Liberties Committee of the Chicago Council of Lawyers applauds the Chicago Police Department (CPD) for announcing that it is soliciting public comments on the Draft Use of Force Policy Guidelines, General Order G03-02, issued on October 7, 2016. Soliciting comments should increase the community's trust in the CPD. That in turn should improve the CPD's ability to deter and prosecute crime.We also applaud the content of that draft. It is comprehensive, well organized and written,  and should give useful guidance to police officers, provided they are trained as to its contents.  In particular we applaud the following provisions:1.  The directive that police officers ?will use the least amount of force reasonably necessary? to perform their duties. (Section II. E. 1.)2.  The statement that an officer ?is justified in using force likely to cause death or great bodily harm only when, taking into account the totality of the circumstances, he or she reasonably believes that such force is necessary to prevent:a. death or great bodily harm from an immediate threat posed to the [officer] or to another person.b. an arrest from being defeated by resistance or escape and the [officer] reasonably believes that the person to be arrested poses an immediate threat of death or great bodily harm to [an officer] or another person unless arrested without delay.? (Section II F. 4.)3.  The specific prohibitions on use of firearms, such as  ?firing warning shots,? and ?firing at or into a moving vehicle when [it] is the only force used against the [officer] or another person, unless such force is reasonably necessary to prevent death or great bodily harm to the [officer] or to another person.? (Section II. F. 6. a. and f.)4.  The directive that once ?control of the subject has been obtained and the threat or resistance no longer exists, Department members will:a. de-escalate immediately.b. avoid the continued use of force.? (Section II. G. 2.)5.  The directive that ?Department members will not resort to? force unless other reasonable alternatives have been exhausted, or would clearly be ineffective under the particular circumstances involved.? (Section II. G  3.)6.  The directive that ?after any use of force incident involving injury to Department members, bystanders or subjects, Department members will . . . request appropriate medical aid for the injured persons, including contacting the emergency medical services (EMS)  from the Chicago Fire Department . . .? (Section II. H. 1. a.)We also strongly support  the enforcement section that states:Any Department member observing the use of force in violation of this directive will be responsible for intervening on the subject's behalf. Appropriate actions may include . . . verbal or physical intervention, immediate notification to a supervisor, or a direct order by a supervisor to cease the use of excessive force. (Section II. I. 1. a.)Finally,  we strongly support the following reporting requirement: Department members who have knowledge of circumstances relating to the use of force against a subject in violation of this directive will submit an individual written report to a supervisor before reporting  off duty on the day the member become aware of the misconduct . . . (Section II. I. 2.)