# EXHIBIT 3

## (To Declaration of Karen Conway (Ex. A))

| Chicago Police Department | General Order G03-02 |
|---|---|
| **USE OF FORCE** | |

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Field Operations | | |

## I.  PURPOSE

This directive sets forth Department policy regarding sworn members' and detention aides' use of force.

## II.  DEPARTMENT POLICY

A.  **Sanctity of Human Life.** The Department's highest priority is the sanctity of human life. In all aspects of their conduct, Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.

B.  **Public Cooperation.** A strong partnership with the public is essential for effective law enforcement. Inappropriate or excessive uses of force damage that partnership and diminish the public trust that is a cornerstone of policing in a free society.

C.  **Core Principle.** The Chicago Police Department seeks to gain the voluntary compliance of subjects, when consistent with personal safety, to eliminate the need to use force or reduce the force that is needed.

D.  **Assessing Uses of Force.** The Chicago Police Department recognizes that Department members are often forced to make split-second decisions—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. These decisions must therefore be judged based on the totality of the circumstances known by the member at the time and from the perspective of a reasonable Department member on the scene, in the same or similar circumstances, and not with the benefit of 20/20 hindsight. Nothing in this policy requires members to take actions, or fail to take actions, that unreasonably endanger themselves or others.

   **NOTE:**  Nothing in this policy precludes the legally mandated oversight or assessment of a Department member's use of force consistent with the procedures established in this policy.

## III.  USE OF FORCE - WHEN AUTHORIZED

A.  **Definition of Force.** Force is defined as any physical contact by a Department member, either directly or through the use of equipment, to compel a subject's compliance.

B.  **Use of Force: Objectively Reasonable, Necessary, and Proportional.** Department members may only use force that is objectively reasonable, necessary, and proportional in order to ensure the safety of a member or third person, stop an attack, make an arrest, control a subject, or prevent escape.

   1.  <u>Objectively reasonable.</u> The main issue in evaluating every use of force is whether the amount of force used by the officer was objectively reasonable in light of the totality of the circumstances faced by the officer on the scene. Reasonableness is not capable of precise definition or mechanical application. Factors to be considered by the officer include but are not limited to:

      a.  whether the subject is posing an imminent threat to the officer or others.

      b.  the risk of harm, level of threat or resistance presented by the subject.

      c.  the subject's proximity or access to weapons.

2. <u>Necessary.</u> Department members will use only the amount of force required under the circumstances to serve a lawful purpose.

3. <u>Proportional.</u> Department members will use only the force that is proportional to the threat, actions, and level of resistance offered by a subject. This may include using greater force or a different type of force than that used by the subject. The greater the threat and the more likely that the threat will result in death or serious physical injury, the greater the level of force that may be necessary to overcome it. When or if the subject offers less resistance, however, the member will decrease the amount or type of force accordingly.

4. <u>De-escalation.</u> Members will use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. This includes continually assessing the situation and modifying the use of force as circumstances change and in ways that are consistent with officer safety. Examples of de-escalation techniques include but are not limited to:

   a. exercising persuasion and advice, and providing a warning prior to the use of force.

   b. determining whether the member may be able to stabilize the situation through the use of time, distance, or positioning to isolate and contain a subject.

   c. requesting additional personnel to respond or make use of specialized units or equipment including crisis-intervention-team trained officers.

5. <u>Prohibitions.</u>

   a. The use of excessive force, unwarranted physical force, or unprofessional conduct by a Department member is prohibited and will not be tolerated.

   b. Department members are prohibited from using force based on bias against a person's race, ethnicity, nationality, religion, disability, gender, gender identity, sexual orientation, or any other protected characteristic as outlined in the Department directive entitled "**Prohibition Regarding Racial Profiling and Other Bias Based Policing**."

   c. Force used as punishment or retaliation is prohibited.

   d. Force used in response to a person's lawful exercise of First Amendment rights (e.g., protected speech, lawful demonstrations, and filming police activity) is prohibited.

      **NOTE:** First Amendment rights are not absolute and are subject to reasonable time, place, manner restrictions. Further guidance may be found in the Department directive entitled "**The First Amendment and Police Actions.**"

6. <u>Additional procedures.</u> For further procedures on de-escalation, the principles of Force Mitigation, and when force is authorized, Department members will refer to the Department directive entitled "**Force Options**."

C. **Use of Deadly Force: Necessary to Prevent Death or Great Bodily Harm.** The following additional policies apply to the use of deadly force:

1. <u>Definition of Deadly Force.</u> Deadly force is force by any means that is likely to cause death or great bodily harm. It includes but is not limited to:

   a. firing of a firearm in the direction of the person to be arrested.

   b. firing of a firearm at a vehicle in which the person to be arrested is riding.

   c. intentional striking of a subject's head with an impact weapon.

   d. application of a chokehold, defined as applying direct pressure to a person's trachea (windpipe) or airway (front of the neck) with the intention of reducing the intake of air.

2.   <u>Definition of Imminent Threat.</u> A threat is imminent when it is objectively reasonable to believe that:

    a.   the subject's actions are immediately likely to cause death or great bodily harm to the member or others unless action is taken; and

    b.   the subject has the means or instruments to cause death or great bodily harm; and

    c.   the subject has the opportunity and ability to cause death or great bodily harm.

3.   <u>Last Resort.</u> The use of deadly force is a last resort that is permissible only when necessary to protect against an imminent threat to life or to prevent great bodily harm to the member or another person. Consistent with this requirement, a sworn Department member may use deadly force only when such force is necessary to prevent:

    a.   death or great bodily harm from an imminent threat posed to the sworn member or to another person.

    b.   an arrest from being defeated by resistance or escape, where the person to be arrested poses an imminent threat of death or great bodily harm to a sworn member or another person unless arrested without delay.

4.   <u>Fleeing Persons.</u> Deadly force may not be used on a fleeing person unless the subject poses an imminent threat, as defined above.

5.   Sworn members will, whenever possible, identify themselves as police officers prior to using deadly force, unless identification would jeopardize the safety of the member or others or compromise the integrity of an investigation.

6.   A sworn member is justified in using deadly force to stop a dangerous animal only when the animal reasonably appears to pose an imminent threat to the safety of the sworn member, another person, or another animal and no reasonably effective alternatives appear to exist.

D.   **Prohibitions on the use of firearms.** The use of firearms in the following ways is prohibited:

1.   Firing warning shots.

2.   Firing at subjects whose actions are only a threat to themselves (e.g., attempted suicide).

3.   Firing solely in defense or protection of property.

4.   Firing into crowds. However, this prohibition does not preclude the use of deadly force directed at a specific person who is near or among other people, but the use of deadly force in such circumstances is only permitted in the limited circumstances when such force is reasonably necessary to prevent death or great bodily harm to the sworn member or to another person, and no reasonable alternative exists. In such circumstances, the use of deadly force is permissible only if the member has identified the appropriate target prior to discharging the firearm and has taken reasonable precautions to ensure that people other than the target will not be struck.

5.   Firing into buildings or through doors, windows, or other openings when the person lawfully fired at is not clearly visible, unless directed at a specific location and such force is reasonably necessary to prevent death or great bodily harm to the sworn member or to another person. In such circumstances, the use of deadly force is permissible only if the member has identified the appropriate target prior to discharging the firearm and has taken reasonable precautions to ensure that people other than the target will not be struck.

6.   Firing at or into a moving vehicle when the vehicle is the only force used against the sworn member or another person, unless such force is reasonably necessary to prevent death or great bodily harm to the sworn member or to another person.

    **NOTE:**    When a vehicle is the only force used against a member, the member will not place themselves in the path of the moving vehicle and will make every effort to move out of the path of the vehicle.

IV.   **MEDICAL ATTENTION**

    A.    Once the scene is safe and as soon as practical, whenever an individual is injured, complains of injury, or requests medical attention, Department members:

        1.    will immediately request appropriate medical aid for the injured person, including contacting emergency medical services (EMS) from the Chicago Fire Department via the Office of Emergency Management and Communications (OEMC).

        2.    may provide appropriate medical care consistent with their training to any individual who has visible injuries, complains of being injured, or requests medical attention. This may include providing first aid and/or arranging for transportation to an emergency medical facility.

    B.    Members will treat injured persons, whether another officer, a member of the public, or a subject, with dignity and respect.

V.   **DUTY TO INTERVENE AND REPORT**

    A.    **Ensure Compliance.** All Department members are obligated to ensure compliance by themselves and other members with Department regulations, policies, and the law.

    B.    **Intervention, Notifying Superiors, Supervisory Intervention.** A Department member who directly observes a use of force that is excessive or otherwise in violation of this directive will contact a supervisor as soon as practicable. Except in extraordinary circumstances, the member will act to intervene on the subject's behalf. Such action will include, but is not limited to, verbally intervening to try to stop the violation. If the member is a supervisor, he or she will issue a direct order to stop the violation.

    C.    **Written Reporting Obligation.** Consistent with the Department directive entitled "**Complaint and Disciplinary Procedures**," Department members who have knowledge of the use of force against a subject in violation of this directive will submit an individual written report to a supervisor before reporting off duty on the day the member becomes aware of the misconduct.

    D.    **Retaliation Prohibited.** The Department prohibits any form of retaliation against a Department member for :

        1.    reporting a use of force that is allegedly in violation of this directive, or

        2.    cooperating with any internal investigation of the complaint.

    E.    **Accuracy and Candor.** Department members will be responsible at all times:

        1.    for truthfully and completely describing the facts and circumstances concerning any incident involving the use of force by Department members.

        2.    for articulating the specific facts to explain the member's own decision to employ a particular use of force.

Eddie T. Johnson
Superintendent of Police

16-021 MWK

**GLOSSARY TERMS:**

    1.    **Zone of Safety**

The distance to be maintained between the subject and the responding member(s). This distance should be greater than the effective range of the weapon (other than a firearm) and it may vary with each situation (e.g., type of weapon possessed, condition of the subject, surrounding area).

**ADDENDA:**

1. G03-02-01 - Force Options
2. G03-02-02 - Incidents Requiring the Completion of a Tactical Response Report
3. G03-02-04 - Taser Use Incidents
4. G03-02-05 - Oleoresin Capsicum (OC) Devices And Other Chemical Agent Use Incidents
5. G03-02-06 - Canine Use Incidents

| Chicago Police Department | General Order  G03-02-01 |
|---|---|
| **FORCE OPTIONS** | |

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Field Operations | | |

## I. PURPOSE

This directive:

A.  outlines the various force options and the circumstances in which they are authorized when Department members are met with resistance or threats.

B.  describes Force Mitigation and its role in the Department's response to all incidents.

## II. POLICY

A.  **Sanctity of Human Life.** All incidents will be resolved with the foremost regard for the preservation of human life and the safety of all persons involved. A member's decision to use force will be made in accordance with **G03-02, "Use of Force."**

B.  **De-Escalation.** Department members will use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. This includes continually assessing the situation and modifying the use of force as circumstances change and in ways that are consistent with officer safety.

C.  **When Force is Authorized.** Department members' use of force must be objectively reasonable, necessary under the circumstances, and proportional to the threat, actions, and level of resistance offered by a subject.

D.  The Department expects members to develop and display the skills and abilities that allow them to regularly resolve confrontations without resorting to force, or by using only the amount of force required under the circumstances.

E.  Sworn members will, whenever possible, identify themselves as police officers prior to taking any police action, unless identification would jeopardize the safety of the member or others or compromise the integrity of an investigation.

F.  Members will continually assess situations and determine:

1.  if any use of force is necessary;

2.  the authorized force option based on the totality of the circumstances;

3.  if the seriousness of the situation requires an immediate response or whether the member can employ other force options or the Force Mitigation Principles; and

4.  if the level of force employed should be modified based upon the subject's actions or other changes in the circumstances. The level of force shall be de-escalated immediately as resistance decreases, provided that the member remains in control and as safety permits.

G.  Members will modify their force in relation to the amount of continued resistance offered by the subject.

1.  As the subject offers less resistance, the member will immediately lower the amount or type of force used.

2.  As the subject increases resistance, the member may increase the amount or type of force used.

H.      If the Department member is responding to an incident involving persons in need of mental health treatment, the member will act in accordance with the Department directive entitled "**Responding to Incidents Involving Persons In Need Of Mental Health Treatment.**"

## III.    PRINCIPLES OF FORCE MITIGATION

During all use of force incidents, when it is safe and feasible to do so, Department members will use the principles of Force Mitigation to ensure effective police-public encounters. The concepts of Force Mitigation include:

A.      **Continual Communication**

   1.   Members will attempt to use verbal control techniques to avoid or minimize confrontations prior to, during, and after the use of physical force.

   2.   When it is safe and feasible, members will exercise persuasion, advice, instruction, and warning prior to the use of physical force.

   3.   Members should attempt to establish and maintain verbal communication in all police-public encounters and to continually evaluate the effectiveness of that communication. Members will:

      a.   when practical, establish and maintain one-on-one communication where only one member speaks at a time.

      b.   vary the level of assertiveness of their communication depending on the type of police-public encounter and whether a serious crime has been committed or life or property is at risk.

   4.   When encountering noncompliance to lawful verbal direction, members are not required to immediately use force. When it is safe and feasible to do so, members will consider:

      a.   adjusting their verbal communication.

      b.   if feasible, allowing a different member to initiate verbal communications.

         **NOTE:**   Members should refrain from giving simultaneous directions to avoid any potential conflicts.

      c.   requesting additional personnel to respond or making use of the specialized units and equipment available through a notification to OEMC.

         **NOTE:**   Members will, when practical, request assistance from specialized units, including a Crisis Intervention Team (CIT) trained officer.

B.      **Tactical Positioning**

   1.   When it is safe and reasonable to do so, members should make advantageous use of positioning, distance, and cover by isolating and containing a subject and continuously evaluating the member's positioning, subject's actions, and available force options.

   2.   Members should attempt to establish a zone of safety for the security of the responding members and the public. The zone of safety is where:

      a.   the incident scene has been secured;

      b.   the scene can be continually monitored or adjusted to maintain safety;

      c.   the subject does not pose a continuing threat to Department members or the public;

      d.   the subject can be continually monitored; and

      e.   the subject can be contained throughout the incident.

       3.     Members should provide for a safe and effective route for additional requested resources to approach the incident scene.

C.    **Time as a Tactic**

       1.     When it is safe and reasonable to do so, members should use time as a tactic.

       2.     In order to use time as a tactic, a zone of safety should be established for the security of responding members and the public.

       3.     Using time as a tactic may:

           a.     permit the de-escalation of the subject's emotions and allow the subject an opportunity to comply with the lawful verbal direction;

           b.     allow for continued communication with the subject and the adjustment of the verbal control techniques employed by the members; and

           c.     allow for the arrival of additional members, special units and equipment, and other tactical resources.

## IV.    LEVEL OF FORCE

A.    **Cooperative Subject:** a person who is compliant without the need for physical force. The following force options are authorized when dealing with a cooperative subject:

       1.     Police Presence

           a.     Police presence is established through identification of authority and proximity to the subject. Mere police presence may result in compliant behavior by the subject.

           b.     Police presence alone is the only force option authorized for use with subjects who are fully cooperative.

       2.     Verbal Response

           a.     Verbal response consists of persuasion, advice, instruction, and warning in the form of verbal statements or commands that may result in compliant behavior.

           b.     Whenever it is safe and feasible, members will attempt to de-escalate confrontations by utilizing verbal control techniques prior to, during, and after the use of physical force.

B.    **Resister:** a person who is uncooperative. Resisters are further subdivided into two categories (1) passive resister; and (2) active resister.

       1.     **Passive Resister:** a person who fails to comply (non-movement) with verbal or other direction. In addition to the force options listed in Item IV-A for Cooperative Subjects, the following force options are authorized when dealing with a passive resister:

           a.     Holding Techniques

               Holding techniques include a firm grip, grabbing an arm, wristlocks, and come-along holds (i.e., escort holds that are not elevated to compliance techniques), as well as any combination of the above.

           b.     Compliance Techniques

               Compliance techniques are designed to amplify nonimpact pressure and increase the potential for controlling a subject.

(1)     The goal of applying joint manipulation and pressure point techniques to pressure sensitive areas of the body is to elicit and maintain established control through non-impact pain compliance.

> **NOTE:**     Members **will not** use a compliance technique that restricts blood flow to carotid arteries, causing the subject to lose oxygen to the brain.

(2)     Using a Long Range Acoustic Device (LRAD) to emit high-decibel focused sound waves to cause discomfort. Any use of the LRAD requires authorization from the Superintendent or his or her designee.

> **NOTE:**     The LRAD is not considered a use of force when used to deliver verbal messages or warnings at a decibel level not intended to cause discomfort.

c.     Control Instruments

Control instruments are designed to amplify nonimpact pressure in order to increase the potential for controlling a subject. These instruments are placed mainly on the sensors of the skin covering bone. Control instruments are tools (e.g., baton) applied to joints and pressure sensitive areas of the body with non-impact pressure.

d.     Oleoresin Capsicum (OC) Spray and Capsaicin II Powder Agent Deployment

Oleoresin capsicum and Capsaicin II powder are highly inflammatory agents that occur naturally in cayenne peppers. The use of OC spray and Capsaicin II powder agent is intended to increase control by disorienting the subject and interfering with the subject's ability to resist arrest.

(1)     Oleoresin capsicum is only authorized to use against the two types of passive resisters described below AND only after the required authorization is received. No other use of oleoresin capsicum is authorized against passive resisters.

(a)     Occupant(s) of a motor vehicle who is passively resisting arrest and only after obtaining authorization from an on-scene supervisor of the rank of sergeant or above.

(b)     Noncompliant groups, crowds, or an individual taking part in a group or crowd (e.g., demonstrations, celebrations), only after obtaining authorization from the Superintendent or his or her designee.

(2)     Capsaicin II powder agent deployment is an authorized force option against passive resisters who are part of noncompliant groups or crowds **only** when used for area saturation and **only** after obtaining authorization from the Superintendent or his or her designee.

> **NOTE:**     Only Department-issued Capsaicin II powder agent projectiles and launchers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

(3)     For further guidance on the use of OC spray, members will refer to the Department directive entitled **"Oleoresin Capsicum (OC) Devices and Other Chemical Agent Use Incidents."**

2. **Active Resister:** a person who attempts to create distance between himself or herself and the member's reach with the intent to avoid physical control and/or defeat the arrest.

    a. This type of resistance includes but is not limited to evasive movement of the arm, flailing arms, and full flight by running.

    b. A subject who is attempting to avoid apprehension and who fails to comply with a sworn member's orders to reveal themselves is considered an Active Resister.

    c. In addition to the force options authorized in Items IV-A and IV-B-1 for Cooperative Subjects and Passive Resisters, the following force options are authorized when dealing with an active resister:

        (1) Stunning

            Stunning is diffused-pressure striking or slapping the subject to increase control by disorienting the subject and interfering with his or her ability to resist.

        (2) Oleoresin Capsicum (OC) Spray

            Oleoresin capsicum is an authorized force option against active resisters. If the active resister is part of a group or crowd, OC is authorized only after obtaining approval from the Superintendent or his or her designee.

        (3) Canines Used by Canine Handlers

            A canine under the control of a canine handler is an authorized force option when used consistent with the provisions of the Department directive entitled "**Canine Use Incidents**."

        (4) Taser

            (a) The Taser is a device used to control and subdue a subject through the application of electrical impulses that override the central nervous system and cause uncontrollable muscle contractions.

            (b) Only Department-issued Tasers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

            (c) For further guidance on the use of a Taser, members will refer to the Department directive entitled **"Taser Use Incidents."**

            (d) Using the Taser to drive stun an active resister is prohibited.

C. **Assailant:** a subject who is using or imminently threatening the use of force against another person. Assailants are further subdivided into two categories.

    1. The subject's actions are aggressively offensive with or without weapons and may cause physical injury.

        a. This type of assailant is one who places a member in fear of a battery and includes advancing on the member in a threatening manner or closing the distance between the assailant and the member, thereby reducing the member's reaction time.

        b. Included in this category of assailant may be a subject who is armed with a deadly weapon and the subject fails to disarm, thereby increasing the likelihood the subject's actions likely to cause physical injury.

    c.    In addition to the force options authorized in Items IV-A and IV-B for Cooperative Subjects and Resisters, the following force options are authorized when dealing with this type of assailant:

        (1)    Direct Mechanical

                Direct mechanical techniques are forceful, concentrated striking movements such as punching and kicking, or focused pressure strikes and pressures. These techniques can be combined with take-downs or pins against the ground or other objects.

        (2)    Impact Weapons

                Impact weapons are designed to establish control by means of applying mechanical impact to a subject in order to disable elements of his or her musculoskeletal structure. Members will avoid the use of flashlights, radios, firearms, or any item not specifically designed as an impact weapon, unless reasonably necessary and no other practical options are available.

        (3)    Impact Munitions

            (a)    Impact munitions are projectiles intended to impact and incapacitate a potentially dangerous subject from a safe distance, thereby reducing resistance and gaining compliance while reducing the probability of serious injury or death.

                i)    Capsaicin II powder agent projectiles fired from a powder agent deployment system is considered an impact munition.

                ii)    The use of Capsaicin II powder agent projectiles as an impact munition requires authorization from the Superintendent or his or her designee.

            (b)    Only Department-issued impact munitions may be used and only after the member has received Department-authorized training in their safe handling and deployment.

  2.    The subject's actions will likely cause death or serious physical injury to the Department members or to another person. In addition to the force options authorized in Items IV-A, IV-B, and IV-C-1 for Cooperative Subjects, Resisters, and Assailants, firearms and other deadly force responses are authorized when dealing with this type of assailant.

    a.    For further guidance on when the use of deadly force is authorized, members will refer to Department directive **"Use of Force."**

    b.    For further guidance on the use of firearms, members will refer to Department directive **"Firearms Discharge Incidents Involving Sworn Members."**

    c.    Chokeholds are only justified as a use of deadly force.

        (1)    A chokehold is defined as applying direct pressure to a person's trachea (windpipe) or airway (the front of the neck) with the intention of reducing the intake of air.

        (2)    Holding and control techniques involving contact with the neck, but which are not intended to reduce the intake of air, are not defined as chokeholds.

        (3)    Under no circumstances will a member use a chokehold, or any lesser contact with the neck area, to prevent the destruction of evidence by ingestion.

**V.      POST-USE OF FORCE POSITIONING AND MONITORING**

After gaining control of a subject, members will:

A.      avoid sitting, kneeling, or standing on a subject's chest, which may reduce the subject's ability to breathe.

B.      position the subject in a manner to allow free breathing. Whenever feasible, the subject will not be forced to lie on his or her stomach.

C.      monitor a subject until transported to a secure location.

D.      request and offer medical aid to any injured Department member, bystander, or subjects consistent with the procedures outlined in the Department directive entitled "**Use of Force**."

Eddie T. Johnson
Superintendent of Police

16-021 MWK/TSS


**GLOSSARY TERMS:**

1.      **Zone of Safety**

The distance to be maintained between the subject and the responding member(s). This distance should be greater than the effective range of the weapon (other than a firearm) and it may vary with each situation (e.g., type of weapon possessed, condition of the subject, surrounding area).

| Chicago Police Department | General Order   G03-02-02 |
|---|---|
| **INCIDENTS REQUIRING THE COMPLETION OF A TACTICAL RESPONSE REPORT** | |

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Field Operations | | |

## I.   PURPOSE

This directive:

   A.   introduces a newly revised Tactical Response Report (CPD-11.377).

   B.   introduces a new Tactical Response Report - Investigation form (CPD-11.377-I).

   C.   discontinues the Officer's Battery Report (CPD-11.451).

   D.   identifies incidents that require the completion of a Tactical Response Report (TRR).

   E.   outlines the reporting, reviewing, and investigatory responsibilities of Department members for reportable use of force incidents.

## II.   POLICY

   A.   **Accuracy.** Department members are responsible, at all times, for truthfully and completely describing the facts and circumstances concerning any incident involving the use of force by Department members. Department members will report and thoroughly document each reportable use of force incident outlined in Item III of this directive.

   B.   **Accountability.** Department members will be responsible for articulating the specific facts to explain the member's own decision to employ a particular use of force and the reasonableness, necessity, and proportionality of the force used.

   C.   Any Department member completing or reviewing a Tactical Response Report (TRR) will comply with the procedures outlined in the Department directives entitled "**Body Worn Cameras**" and "**In-Car Video Systems**" for viewing, flagging, and retaining video and audio recorded with Department-issued recording devices.

## III.   INCIDENTS REQUIRING THE COMPLETION OF A TACTICAL RESPONSE REPORT

   A.   A Tactical Response Report is required to be completed for the following reportable use of force incidents involving a sworn member or detention aide in the performance of his or her duties:

      1.   All use of force incidents involving:

         a.   a subject who is injured or alleges injury resulting from the member's use of a force option.

         b.   the active resistance of a subject.

         **EXCEPTION:**   A Tactical Response Report is **NOT** required when:

           (1)   the subject's only action of resisting is fleeing; and

           (2)   the member's actions did not extend beyond verbal commands and/or control holds utilized in conjunction with handcuffing and searching techniques which do not result in injury or allegation of injury.

c. an act of obstructing a police officer when the obstructing is a physical act directed at the Department member.

d. a subject whose actions are aggressively offensive, with or without weapons, or who is using or threatening the imminent use of force against the member that will likely cause physical injury.

e. an assault, threat of physical attack, or physical attack against a Department member, including a murder, aggravated battery, battery, aggravated assault, or assault, regardless of whether or not the member has sustained a physical injury.

> **NOTE:** The Federal Bureau of Investigation and the State of Illinois Uniform Crime Reporting Systems require data from the Department when the offense of murder, aggravated battery, battery, aggravated assault, or assault is committed against a police officer or a detention aide in the performance of their duties. This documentation will be completed using the TRR.

2. All incidents involving a Department member's:

a. discharge of a firearm, impact munitions, Taser, OC spray or other chemical weapons.

b. use of canines as a force option.

c. use of a Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique.

d. use of strikes with an impact weapon, kicks, knee strikes, elbow strikes, closed hand strikes or punches, takedowns, and other direct mechanical actions or techniques.

B. A Tactical Response Report is **NOT** required to be completed for the following incidents:

1. The use of escort holds, pressure compliance techniques, and firm grips which do not result in an injury or allegation of injury.

2. Control holds, wristlocks, and armbars utilized in conjunction with handcuffing and searching techniques which do not result in injury or allegation of injury.

3. That force necessary to overcome passive resistance due to physical disability or intoxication which does not result in injury or allegation of injury.

4. The use of force in an approved training exercise.

C. If the most serious use of force requires an investigation by a certain level of supervisor, then the approval of all Tactical Response Reports resulting from the use of force by any member in that incident will be the responsibility of that level of supervisor.

## IV. PROCEDURES

A. **Immediate Notifications**

1. Each sworn member or detention aide in the performance of his or her duties who is involved in a reportable use of force incident, as described in Item III-A of this directive will immediately notify the Office of Emergency Management and Communications (OEMC) that he or she has been involved in a reportable use of force incident.

2. The Office of Emergency Management and Communications (OEMC) will:

a. immediately notify the involved member's immediate supervisor and watch operations lieutenant of the district of occurrence.

b. assign a field supervisor from the district of occurrence to respond to the scene when the involved member has discharged any weapon or an injury has occurred to a subject, bystander, or any member.

c.  notify the Crime Prevention and Information Center (CPIC) for all incidents involving the:

    (1)  use of deadly force;

    (2)  discharge of a firearm, impact munitions, Taser, OC spray or other chemical weapons;

    (3)  use of canines as a force option; and

    (4)  use of a Long Range Acoustic Device (LRAD) acoustic transmission to cause discomfort as a compliance technique.

B.  **Completing the Tactical Response Report (TRR)**

Each sworn member or detention aide in the performance of his or her duties who is involved in a reportable use of force incident, as described in Item III-A of this directive, will:

1.  complete a Tactical Response Report using the Automated Tactical Response Report (A-TRR) application, documenting the information as requested on the report.

    a.  If more than one member is involved in a reportable use of force incident, each sworn member or detention aide who uses force will complete a TRR. Therefore, there may be multiple reports completed for a single incident.

    b.  If an object is perceived by the member as a weapon that could cause great bodily harm or death and is not actually a weapon or the object recovered is different than the perceived weapon:

        (1)  indicate the subject's actions and indicate the actual weapon or object on the TRR, and

        (2)  if the item was different than perceived, indicate in the "Weapon/Object Perceived As" field what the weapon or object was perceived to be.

            **EXAMPLE:**  If a member uses force against an assailant holding an object that the involved member perceives to be a handgun, but upon recovery, the object was determined to be a BB gun, the member will indicate "Other - BB gun" as the "Weapon Description" and "Handgun" in the "Perceived As" field.

    c.  The involved member will be required to complete the "Narrative" portion of the TRR, describing with specificity, the use of force incident, the subject's actions, and the involved member's response, including force mitigation efforts and specific types and amount of force used.

    **NOTE:**  Specific instructions for the completion of the form can be found in the Tactical Response Report Form Preparation Instructions or the Automated TRR Application Help Documentation. Department members will refer to the Department directive entitled "**Alternate Paper Reporting Procedures**" if the Automated TTR (A-TRR) system is unavailable.

2.  review the TRR for completeness and accuracy.

3.  submit the completed TRR to his or her immediate supervisor for review and approval before the end of the involved member's tour of duty.

4.  notify their immediate supervisor that the TRR has been submitted and is available for review.

5.  submit other required reports as indicated in the Department directive entitled "**Processing Persons Under Department Control**" to the station supervisor in the district of occurrence.

V.    **SUPERVISOR RESPONSIBILITIES**

A.    **Reviewing Supervisor.** A supervisor who has been notified of a reportable use of force incident as described in Item III-A of this directive will:

1.    respond to the scene when the involved member has discharged any weapon or an injury has occurred to a subject, bystander, or any member.

2.    ensure immediate notifications in Item IV-A are completed.

3.    ensure that known available witnesses are identified and interviewed and that the required information is recorded on the Tactical Response Report (TRR), except for deadly force and officer-involved death incidents. For deadly force and officer-involved death incidents, the reviewing supervisor will:

   a.    not interview the identified witnesses or obtain written statements.

   b.    document only the witness demographic information on the TRR.

   c.    identify the witnesses for the assigned investigative personnel who will be responsible for conducting the interviews or obtaining statements.

4.    request the assignment of an evidence technician to take photographs of subjects and Department members who have been involved in a use of force incident and are injured, allege injury, or when otherwise deemed appropriate by the supervisor.

5.    ensure that other evidence is handled and processed according to existing Department procedures.

6.    complete the TRR for a member who is unable to complete the report.

7.    ensure the appropriate case report is completed for the incident, consistent with the guidelines established in the Incident Reporting Guide (IRG) (CPD-63.451).

   **NOTE:**    A case report is required even if the TRR resulted from an incident that would not otherwise require a report (e.g., warrant arrests). Members will refer to the IRG section entitled "Special Case Reporting Index for Use of Force Incidents" for specific reporting instructions.

8.    ensure additional notifications are made consistent with the Department directives entitled:

   a.    "Firearms Discharge Incidents Involving Sworn Members;"

   b.    "Taser Use Incidents;" and

   c.    "Oleoresin Capsicum (OC) or Other Chemical Agent Use Incidents."

9.    use the "Attachment" feature of the TRR to attach copies of the appropriate approved Bureau of Patrol generated reports that are related to the incident involving the completion of the TRR, including:

   a.    the incident case report,

   b.    Arrest Reports,

   c.    Supplementary Reports,

   d.    Inventory Reports,

   e.    Injury on Duty Reports,

   f.    Taser Deployment Data Download, and

   g.    any other pertinent Department report.

10.    review the portion of the TRR completed by the involved member, including:

   a.    confirming or rejecting any addresses that result in a beat of "0" and may be inaccurate.

      b.     reviewing each instance where "Other" has been selected as the "Subject's Actions."

      c.     if the TRR is incomplete or insufficient, return the TRR to the member and discuss reasons with the involved member.

11.    complete the "Reviewing Supervisor" section of the TRR. The reviewing supervisor will:

      a.     document, if any, the type of subject injury and how the injury was sustained.

      b.     document any other incident information or observations in narrative form in the "Reviewing Supervisor: Comments" section of the TRR.

      c.     attest to his or her compliance with the responsibilities outlined in this directive.

      d.     when misconduct is observed or an allegation of misconduct is received by the reviewing supervisor, make the appropriate notifications to IPRA/COPA to obtain a complaint log (CL) number.

      e.     if appropriate, attest to the completeness and legibility of the report and inform the Approving Supervisor that it has been reviewed and is ready for review and approval.

B.    **Investigatory Responsibility.** For reportable use of force incidents, the following ranked supervisor will be responsible for the investigation of the incident and completion and approval of all TRR-Is from the same incident:

1.    The exempt-level incident commander will review and approve the following types of incidents:

      a.     the discharge of a firearm or impact munitions by a Department member, excluding discharges to destroy an animal;

      b.     a member's use of force, by whatever means, that results in serious injury or death of any individual; and

      c.     any lesser use of force by a Department member when that use of force stems from the same incident in which another member used force described in Items V-B-1-a or V-B-1-b of this directive.

2.    A member the rank of captain or above assigned to the district of occurrence will review and approve TRR-Is for the discharge of a firearm for the destruction of an animal with no human injury.

3.    A member the rank of lieutenant or above assigned to the district of occurrence will investigate all other incidents.

      **NOTE:**    If a district supervisor the rank of lieutenant or above is unavailable, the district station supervisor will follow the appropriate procedures established by the Bureau of Patrol to ensure the TRR-I is completed and approved.

C.    **Approving Supervisor.** The assigned supervisor described in Item V-B will:

1.    conduct an investigation into the use of force incident by:

      a.     attempting to interview the subject of any use of force and record the subject's statement regarding the use of force in the space provided on the TRR-I.

        (1)    When interviewing a juvenile arrestee, the reviewing supervisor will follow restrictions outlined in the Department directive entitled "**Processing of Juveniles and Minors Under Department Control**."

        (2)    The approving supervisor will check "DNA" when the incident involves only an animal destruction or unintentional discharge.

      b.     documenting other investigatory information in the "Lieutenant or Above/Incident Commander: Comments" section, including but not limited to:

         (1)     a review of all available reports;

         (2)     a review of all Department-recorded video (e.g., In Car Video System, lockup facility cameras, body worn cameras), if available.

         (3)     documentation of any allegations of excessive force.

2.     complete the "Lieutenant or Above/Incident Commander Review" section of the TRR-I. The approving supervisor will:

      a.     review the portion of the TRR completed by the involved member and the reviewing supervisor. If the TRR is incomplete or insufficient, return the TRR to the appropriate member.

      b.     document any other investigatory information or observations in the "Lieutenant or Above/Incident Commander: Comments" section of the TRR-I.

      c.     attest to his or her compliance with the responsibilities outlined in this directive.

      d.     determine if the member's use of force requires a notification to the Independent Police Review Authority (IPRA)/Civilian Office of Police Accountability (COPA) to obtain a complaint log (CL) number. A notification to IPRA/COPA is required for all incidents involving:

         (1)     the use of deadly force,

         (2)     the discharge of a firearm,

         (3)     the discharge of a Taser,

         (4)     the use of excessive force or an allegation of excessive force, and

         (5)     the death or life-threatening injury to a member of the public that resulted directly from an action or intentional omission of a Department member.

      e.     use the "Attachment" feature of the TRR-I to attach copies of any Department report related to the incident involving the completion of the TRR that is not already attached.

      f.     conduct a supervisory evaluation to determine whether the member's use of force response was in compliance with Department policy and directives.

         **NOTE:**     The approving supervisor will not make a determination for deadly force or officer-involved death incidents.

      g.     if appropriate, make recommendations for action by the involved member (e.g., individualized training, performance coaching, review of Department directives).

      h.     if appropriate, sign and approve the TRR-I.

## VI.    USE OF FORCE INCIDENT REVIEW

Consistent with the Department directive entitled "Force Review Unit," all approved Tactical Response Reports (TRR) and Tactical Response Report - Investigation (TRR-I) forms will be forwarded to the Force Review Unit (FRU) for a review. The FRU will review each approved TRR and TRR-I and will be responsible for making a determination of compliance with Department policy and recommending any required

subsequent actions, except for deadly force, officer-involved deaths incidents, and incidents already being investigated by IPRA/COPA through the complaint and disciplinary process.


Eddie T. Johnson
Superintendent of Police


16-021 MWK

# TACTICAL RESPONSE REPORT/Chicago Police Department

## INCIDENT

| DATE OF INCIDENT | TIME | ADDRESS OF OCCURRENCE | LOCATION CODE | BEAT/OCCUR. | VIDEO RECORDED INCIDENT |
|---|---|---|---|---|---|

VIDEO RECORDED INCIDENT: ☐ BWC ☐ IN-CAR VIDEO ☐ OTHER VIDEO

| BUSINESS NAME | ☐ DNA | EXACT AREA WITHIN LOCATION (E.G., BASEMENT, STAIRWAY, BEDROOM) |
|---|---|---|

| EVENT NO. | RD NO. | IR NO. | CB NO. | CHARGE | INVOLVED A MOTOR VEHICLE PURSUIT? ☐ YES ☐ NO |
|---|---|---|---|---|---|

LIGHTING: ☐ DAYLIGHT ☐ DUSK ☐ DARKNESS ☐ DAWN ☐ ARTIFICIAL

WEATHER: ☐ CLEAR ☐ CLOUDY ☐ RAIN ☐ SNOW/ICE ☐ FOG

PATROL TYPE? ☐ POLICE CAR ☐ FOOT

☐ BICYCLE ☐ MOTORCYCLE/PAPV ☐ SQUADROL ☐ VAN/BUS ☐ OTHER:

MEMBER WAS? ☐ ALONE ☐ WITH PARTNER

ASSIST UNITS ON SCENE? ☐ YES ☐ NO

INCIDENT ☐ INDOOR ☐ OUTDOOR

## INVOLVED MEMBER

| RANK | LAST NAME | FIRST NAME | EMPLOYEE NO. | SEX ☐ M ☐ F | RACE | AGE | HT. | WT. |
|---|---|---|---|---|---|---|---|---|

| DATE OF APPT. | UNIT & BEAT OF ASSIGN. | DUTY STATUS ☐ ON ☐ OFF | IN UNIFORM? ☐ YES ☐ NO | TYPE OF MEMBER INJURY ☐ None / None Apparent ☐ Minor Swelling | ☐ Minor Contusion/Laceration ☐ Complaint of Substantial Pain ☐ Significant Contusion | ☐ Laceration Requiring Sutures ☐ Broken/Fractured Bone(s) ☐ Heart Attack/Stroke/Aneurysm | ☐ Gun Shot ☐ Fatal ☐ Other (Explain) |
|---|---|---|---|---|---|---|---|

## SUBJECT INFORMATION

☐ DNA

| LAST NAME | FIRST NAME | M.I. | SEX ☐ M ☐ F | RACE | D.O.B. | HT. | WT. |
|---|---|---|---|---|---|---|---|

| ADDRESS | TELEPHONE NO. | CONDITION ☐ Apparently Normal ☐ Injured Unrelated to Force | ☐ Injured by Member ☐ Alleges Injury by Member ☐ Under Influence of Alcohol | ☐ Under Influence of Drugs ☐ Mental Illness / Emotional Disorder | OTHER (Specify) |
|---|---|---|---|---|---|

| MEDICAL TREATMENT? ☐ Refused Medical Aid ☐ Offered/EMS Requested | ☐ Performed by Member ☐ Performed by CFD EMS | ☐ Taken to Hospital (Specify) ☐ OTHER (Specify) | SUBJECT INJURY BY MEMBER'S USE OF FORCE? ☐ None/None Apparent ☐ Subject Alleged Injury | ☐ Non-Fatal - Minor Injury ☐ Non-Fatal - Major Injury | ☐ Fatal |
|---|---|---|---|---|---|

## SUBJECT'S ACTIONS (Check all that apply)

☐ DNA

☐ DID NOT FOLLOW VERBAL DIRECTION
☐ VERBAL THREATS
☐ STIFFENED (DEAD WEIGHT)
☐ PULLED AWAY
☐ FLED
☐ IMMINENT THREAT OF BATTERY - NO WEAPON
☐ OTHER (DESCRIBE)

☐ PHYSICAL ATTACK WITHOUT WEAPON. (SPECIFY)
☐ HAND/ARM/ELBOW STRIKE
☐ KNEE/LEG STRIKE
☐ MOUTH/TEETH/SPIT
☐ PUSH/SHOVE/PULL
☐ GRAB/HOLD/RESTRAIN
☐ WRESTLE/GRAPPLE
☐ OTHER (DESCRIBE)

☐ THROWN OBJECT (DESCRIBE)
☐ IMMINENT THREAT OF BATTERY WITH WEAPON
☐ PHYSICAL ATTACK WITH WEAPON
☐ USED FORCE LIKELY TO CAUSE DEATH OR GREAT BODILY HARM

WAS SUBJECT ARMED WITH WEAPON? ☐ NO ☐ YES, DESCRIBE BELOW:
☐ BLUNT OBJECT ☐ KNIFE/CUTTING INSTRUMENT ☐ EXPLOSIVE DEVICE
☐ CHEMICAL WEAPON ☐ REVOLVER ☐ OTHER (DESCRIBE)
☐ TASER/STUN GUN ☐ RIFLE
☐ VEHICLE ☐ SHOTGUN
☐ SEMI-AUTO PISTOL

WEAPON/OBJECT PERCEIVED AS:

WEAPON USE: ☐ DNA ☐ Possessed ☐ Displayed, Not Used ☐ Used - Attempt to Attack Member ☐ Used - Attacked Member ☐ Member at Gunpoint ☐ Attempt to Obtain Member's Weapon ☐ Obtained Member's Weapon

| SUBJECT ACTIVITY Drug-Related? ☐ YES ☐ NO Gang-Related? ☐ YES ☐ NO | DID THE SUBJECT COMMIT AN ASSAULT OR BATTERY AGAINST THE INVOLVED MEMBER PERFORMING A POLICE FUNCTION? ☐ NO ☐ YES, IDENTIFY MANNER OF ATTACK | MANNER OF ATTACK? ☐ Shot/Shot At ☐ Stabbed/Cut (Including Attempt) | ☐ Struck/Blunt Force (Including Attempt) ☐ Other (Including Verbal Threats) |
|---|---|---|---|

TYPE OF ACTIVITY?
☐ Ambush - No Warning ☐ Traffic Stop/Pursuit ☐ Investigatory Stop
☐ Disturbance - Domestic ☐ Man with a Gun ☐ Disturbance - Mental Health
☐ Disturbance - Riot/Mob Action/Civil Disorder ☐ Disturbance - Other ☐ Other - Describe in Narrative
☐ Pursuing/Arresting Subject Charge: _____ IUCR CODE: _____
☐ Processing/Transporting/Guarding Arrestee Charge: _____ IUCR CODE: _____

## MEMBER'S RESPONSE (Check all that apply)

☐ DNA

REASON FOR RESPONSE? ☐ Defense of Self ☐ Defense of Department Member ☐ Defense of Member of Public ☐ Overcome Resistance or Aggression ☐ Stop Self-Inflicted Harm ☐ Fleeing Subject ☐ Subject Armed with Weapon ☐ Unintentional

### FORCE MITIGATION EFFORTS

☐ MEMBER PRESENCE ☐ ZONE OF SAFETY ☐ MOVEMENT TO AVOID ATTACK ☐ TACTICAL POSITIONING ☐ OTHER
☐ VERBAL DIRECTION/ CONTROL TECHNIQUES ☐ SPECIALIZED UNITS ☐ ADDITIONAL UNIT MEMBERS

### CONTROL TACTICS

☐ ESCORT HOLDS ☐ CONTROL INSTRUMENT ☐ OTHER
☐ WRISTLOCK ☐ PRESSURE SENSITIVE AREAS
☐ ARMBAR ☐ EMERGENCY HANDCUFFING

### RESPONSE WITHOUT WEAPONS

☐ OPEN HAND STRIKE ☐ KICKS
☐ TAKE DOWN ☐ OTHER
☐ ELBOW STRIKE
☐ CLOSED HAND STRIKE / PUNCH
☐ KNEE STRIKE

### RESPONSE WITH WEAPONS

☐ OC/CHEMICAL WEAPON ☐ TASER
☐ OC/CHEMICAL WEAPON W/ AUTHORIZATION* ☐ CANINE
☐ LRAD W/ AUTHORIZATION* ☐ BATON/EXPANDABLE BATON
☐ IMPACT MUNITIONS (DESCRIBE BELOW) ☐ REVOLVER ☐ SEMI-AUTO PISTOL
☐ RIFLE ☐ SHOTGUN
☐ OTHER

| *AUTHORIZED BY (NAME) | RANK | STAR NO. | UNIT NO. |
|---|---|---|---|

## WEAPON DISCHARGE

☐ DNA

| NO. OF WEAPONS DISCHARGED BY THIS MEMBER | WEAPON TYPE: ☐ CHEMICAL WEAPON ☐ TASER ☐ SEMI-AUTO PISTOL ☐ REVOLVER ☐ RIFLE ☐ SHOTGUN ☐ OTHER | WEAPON SERIAL NO. | WEAPON CERT. NO. |
|---|---|---|---|

DID THIS WEAPON CONTRIBUTE TO A SUBJECT INJURY? ☐ YES ☐ NO

DID THE DISCHARGE RESULT IN A SELF-INFLICTED INJURY? ☐ NO ☐ YES-SUBJECT ☐ YES-MEMBER

WAS SUBJECT VEHICLE USE AS A WEAPON? ☐ NO ☐ YES - AGAINST MEMBER ☐ YES - AGAINST OTHER PERSON

WAS DISCHARGE ONLY TO DESTROY/DETER AN ANIMAL? ☐ YES ☐ NO

WAS THIS AN UNINTENTIONAL DISCHARGE DURING A NON-CRIMINAL INCIDENT? ☐ YES ☐ NO

PERSON/OBJECT(S) STRUCK BY THE DISCHARGE OF MEMBER'S WEAPON (CHECK ALL THAT APPLY):
☐ SUBJECT ☐ OTHER PERSON ☐ DEPARTMENT MEMBER ☐ ANIMAL ☐ VEHICLE ☐ NONE ☐ UNKNOWN ☐ OTHER OBJECT

**TASER DISCHARGE ONLY**
| TASER DART ID NO. | PROPERTY INVENTORY NO. | PROBE DISCHARGE ☐ 1 ☐ 2 ☐ 3 ☐ DNA | CONTACT STUN ☐ 1 ☐ 2 ☐ 3 ☐ DNA | ARC CYCLE ☐ 1 ☐ 2 ☐ 3 ☐ DNA | SPARK DISPLAY ☐ 1 ☐ 2 ☐ 3 ☐ DNA |
|---|---|---|---|---|---|

**FIREARM DISCHARGE ONLY**
| WHO FIRED FIRST SHOT? ☐ MEMBER ☐ OFFENDER ☐ OTHER (Specify) | TOTAL NO. OF SHOTS THIS MEMBER FIRED | WAS FIREARM RELOADED DURING INCIDENT? ☐ YES ☐ NO | MAKE/ MANUFACTURER | MODEL | DID MEMBER FIRE AT A VEHICLE? ☐ NO ☐ YES |
|---|---|---|---|---|---|

## NOTIFICATIONS AND NARRATIVE

**NOTIFICATIONS (ALL INCIDENTS):** ☐ IMMEDIATE SUPERVISOR ☐ DISTRICT OF OCCURRENCE | **NOTIFICATIONS (WEAPONS DISCHARGE AND DEADLY FORCE):** ☐ OEMC ☐ CPIC

**NARRATIVE** (DESCRIBE, WITH SPECIFICITY, THE USE OF FORCE INCIDENT, THE SUBJECT'S ACTIONS, AND THE DEPARTMENT MEMBER'S RESPONSE, INCLUDING FORCE MITIGATION EFFORTS AND SPECIFIC TYPES AND AMOUNT FORCE USED)

REPORTING MEMBER (Print Name) | STAR/EMPLOYEE NO. | SIGNATURE

## REVIEWING SUPERVISOR

**TYPE OF SUBJECT INJURY**
☐ None / None Apparent  ☐ Minor Contusion  ☐ Significant Contusion  ☐ Gun Shot
☐ Minor Swelling  ☐ Minor Laceration/Abrasion  ☐ Laceration Requiring Sutures  ☐ Fatal
☐ Complaint of Substantial Pain  ☐ Broken/Fractured Bone(s)  ☐ Other (Explain)

**HOW WAS INJURY SUSTAINED?**
☐ Intentional Act by Member  ☐ Intentional Act by Self  ☐ Intentional Act by Other
☐ Unintentional Act by Member  ☐ Unintentional Act by Self  ☐ Unintentional Act by Other

**WITNESSES** ☐ UNK

| LAST NAME | FIRST NAME | M.I. | SEX ☐ M ☐ F | RACE | D.O.B. |

ADDRESS | TELEPHONE NO. | WITNESS INTERVIEW ☐ INTERVIEWED ☐ NOT AVAILABLE ☐ REFUSED | ☐ OTHER (Specify)

WITNESS STATEMENT:

**REVIEWING SUPERVISOR: COMMENTS**

**ATTACHMENTS:** ☐ CASE REPORT ☐ ARREST REPORT ☐ SUPPLEMENTARY REPORT ☐ INVENTORY ☐ IOD REPORT ☐ TASER DOWNLOAD ☐ OTHER

**REVIEWING SUPERVISOR:**
☐ I HAVE COMPLIED WITH THE DUTIES OUTLINED IN G03-02-02. | COMPLAINT LOG NUMBER OBTAINED FROM THE INDEPENDENT POLICE REVIEW AUTHORITY (IPRA)/ CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA) | LOG NO. OBTAINED.

☐ I HAVE REVIEWED THIS TACTICAL RESPONSE REPORT AND AFFIRM THAT THE REPORT IS LEGIBLE AND COMPLETE.

REVIEWING SUPERVISOR NAME (Print) | STAR NO. | SIGNATURE | DATE/TIME COMPLETED

DISTRIBUTION OF TRR: IF A PAPER TRR WAS COMPLETED DUE TO AN UNAVAILABILITY OF THE AUTOMATED TACTICAL RESPONSE REPORT APPLICATION:
1. THE ORIGINAL TRR WILL BE FORWARDED TO DIRECTOR, RECORDS DIVISION - TO BE INCLUDED WITH THE CORRESPONDING CASE FILE.
2. A COPY OF THE PAPER TRR AND THE ATTACHMENTS WILL BE FORWARDED TO:
   A.  THE INVESTIGATING SUPERVISOR RESPONSIBLE FOR THE INVESTIGATION,
   B.  THE INDEPENDENT POLICE REVIEW AUTHORITY (IPRA) / CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA), AND
   C.  DIRECTOR, INFORMATION SERVICES DIVISION, TO ENSURE DATA ENTRY AND ATTACHMENT SCANNING INTO THE AUTOMATED TACTICAL RESPONSE REPORT (A-TRR) APPLICATION.

TRR _____ OF _____ TRR(S)

## TACTICAL RESPONSE REPORT - INVESTIGATION/Chicago Police Department

| INCIDENT INFORMATION | DATE OF INCIDENT | TIME | ADDRESS OF OCCURRENCE | | | EVENT NO. | | RD NO. |
|---|---|---|---|---|---|---|---|---|
| | RANK | MEMBER LAST NAME | | MEMBER FIRST NAME | EMPLOYEE NO. | CB NO. | | CHARGE |
| | SUBJECT LAST NAME | | | SUBJECT FIRST NAME | | M.I. | SEX ☐ M ☐ F | RACE | D.O.B. |

### LIEUTENANT OR ABOVE/INCIDENT COMMANDER REVIEW

SUBJECT'S STATEMENT REGARDING THE USE OF FORCE    ☐ DNA    ☐ REFUSED    ☐ INTERVIEW NOT CONDUCTED (Specify Reason)

LIEUTENANT OR ABOVE/INCIDENT COMMANDER: COMMENTS    ☐ ADDITIONAL ATTACHMENTS

**LT OR ABOVE/INCIDENT COMMANDER:**

☐ I HAVE COMPLIED WITH THE DUTIES OUTLINED IN G03-02-02.

☐ I HAVE CONCLUDED THAT THE MEMBER'S USE OF FORCE REQUIRES A NOTIFICATION TO THE INDEPENDENT POLICE REVIEW AUTHORITY (IPRA) / CIVILIAN OFFICE OF POLICE ACCOUNTABILITY (COPA). LOG NO. OBTAINED:

BASED ON THE PRELIMINARY INFORMATION THAT I HAVE REVIEWED AND THAT WAS AVAILABLE AT THE TIME OF THIS REPORT, THE MEMBER'S USE OF FORCE RESPONSE APPEARS TO BE:

☐ IN COMPLIANCE WITH DEPARTMENT POLICY AND DIRECTIVES.

☐ NOT IN COMPLIANCE WITH DEPARTMENT POLICY AND DIRECTIVES.

☐ A DEADLY FORCE OR OFFICER-INVOLVED DEATH INCIDENT.

ACTIONS RECOMMENDED?   ☐ NO    ☐ YES, DESCRIBE BELOW:    ☐ OTHER:

☐ INDIVIDUALIZED TRAINING     ☐ REVIEW DEPARTMENT DIRECTIVES

☐ PERFORMANCE COACHING     ☐ REVIEW LEGAL/TRAINING BULLETIN

☐ REVIEW STREAMING VIDEO     ☐ STRESS REDUCTION SEMINAR ENROLLMENT

| LT OR ABOVE/INCIDENT COMMANDER NAME (Print) | STAR NO. | SIGNATURE | DATE/TIME COMPLETED |
|---|---|---|---|
| | | | |

CPD-11.377- I (Rev. TBD)           **Page 1**

**TACTICAL RESPONSE REPORT - INVESTIGATION/Chicago Police Department**

| INCIDENT INFORMATION | DATE OF INCIDENT | | TIME | ADDRESS OF OCCURRENCE | | EVENT NO. | | RD NO. | |
|---|---|---|---|---|---|---|---|---|---|
| | RANK | MEMBER LAST NAME | | MEMBER FIRST NAME | | EMPLOYEE NO. | CB NO. | CHARGE | |
| | SUBJECT LAST NAME | | | SUBJECT FIRST NAME | | M.I. | SEX ☐ M ☐ F | RACE | D.O.B. |

## USE OF FORCE INCIDENT REVIEW (FOR FORCE REVIEW UNIT USE ONLY)

**REVIEW SUMMARY:**        ☐ ADDITIONAL ATTACHMENTS

| SECONDARY RD NO. GENERATED? ☐ NO ☐ YES RD NO: | U NO. OBTAINED? ☐ NO ☐ YES U NO: |
|---|---|

**BASED ON THE REVIEW OF THE INCIDENT INFORMATION, THE MEMBER'S USE OF FORCE RESPONSE WAS:**

☐ IN COMPLIANCE WITH DEPARTMENT POLICY AND DIRECTIVES.    ☐ SUBJECT TO A CURRENT IPRA/COPA COMPLAINT INVESTIGATION. CL NO.:

☐ NOT IN COMPLIANCE WITH DEPARTMENT POLICY AND DIRECTIVES.    ☐ A DEADLY FORCE OR OFFICER- INVOLVED DEATH INCIDENT.

**ACTIONS RECOMMENDED?** ☐ NO   ☐ YES, DESCRIBE BELOW:     ☐ OTHER:

☐ INDIVIDUALIZED TRAINING    ☐ REVIEW DEPARTMENT DIRECTIVES

☐ PERFORMANCE COACHING    ☐ REVIEW LEGAL/TRAINING BULLETIN

☐ REVIEW STREAMING VIDEO    ☐ STRESS REDUCTION SEMINAR ENROLLMENT

| APPROVING SUPERVISOR: (Print) | STAR NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|

## FORCE REVIEW PANEL DETERMINATION (FOR DEADLY FORCE AND OFFICER-INVOLVED DEATH INCIDENTS)

**ACTIONS RECOMMENDED?** ☐ NO   ☐ YES, DESCRIBE BELOW:     ☐ OTHER:

☐ INDIVIDUALIZED TRAINING    ☐ REVIEW DEPARTMENT DIRECTIVES

☐ PERFORMANCE COACHING    ☐ REVIEW LEGAL/TRAINING BULLETIN

☐ REVIEW STREAMING VIDEO    ☐ STRESS REDUCTION SEMINAR ENROLLMENT

| APPROVED BY: (Print) | STAR NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|

| Chicago Police Department | General Order   G03-02-04 |
|---|---|
| **TASER USE INCIDENTS** | |

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Field Operations | | |

## I. PURPOSE

This directive outlines the policy governing the field deployment of Department Taser devices.

## II. POLICY

A. **Sanctity of Human Life.** All incidents will be resolved with the foremost regard for the preservation of human life and the safety of all persons involved. A member's decision to utilize a Taser will be made in accordance with **G03-02, "Use of Force."**

B. **De-Escalation.** Members will use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. This includes continually assessing the situation and modifying the use of force as circumstances change and in ways that are consistent with officer safety.

C. **When Use is Authorized.** Department members' use of a Taser must be objectively reasonable, necessary under the circumstances, and proportional to the threat, actions, and level of resistance offered by a subject. Consistent with **G03-02-01, "Force Options,"** Department members are authorized to use a Taser only for an **active resister** or **assailant**, and only for the purpose of gaining control of and restraining the subject.

D. **Prohibitions.** Although Tasers are considered less-lethal weapons, they can cause serious injury or death. For the safety of everyone involved, the following additional restrictions apply:

   1. **Explosion Hazards.** Tasers will not be used in any environment that contains potentially flammable, volatile, or explosive material.

   2. **Removing Barbs**. Members will not remove Taser barbs embedded in the subject's flesh.

   3. **Multiple Tasers on One Subject.** Members will not use multiple Tasers against the same subject, unless a member already attempted to use a Taser against the subject but the probes did not make contact with the subject.

   4. **No Drive Stuns.** Drive stunning is prohibited unless the subject is defined as an **assailant** and other force options are not readily available or would otherwise be ineffective.

   5. **Persons Vulnerable to Injury from Tasers**. Tasers will not be used on a subject who is at a greater risk of serious injury or death from taser use, unless the subject is defined as an **assailant** and other force options are not readily available or would otherwise be ineffective. People who are at a greater risk of serious injury or death from Taser use include, but are not limited to, children, pregnant women, and the elderly.

E. **Justify Separate Uses of Force.** An initial Taser application and each subsequent application of Taser energy (either re-energizing a discharged cartridge with the ARC switch or discharging a second cartridge) must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force.

F. Department members will refer to the Department directive entitled **"Taser Devices"** for specific procedures on Taser device protocols including training, maintenance, assignment, and accountability.

III. **CONDITIONS ON THE FIELD DEPLOYMENT OF A TASER**

    A.    **Field Deployment of a Taser.** A field deployment of a Taser is:

        1.    any probe discharged, including accidental discharges;

        2.    any initiation of the ARC switch to re-energize the subject;

        3.    the use of a spark display during a use of force incident; or

        4.    the use of the device by physical contact to drive stun a subject.

        **NOTE:**    It is not considered a field deployment of a Taser if the Taser and/or laser pointers were merely displayed but no electricity was displayed (warning arc) or discharged.

    B.    **Authorized Manner of Use.** A member who is discharging a Taser device will, when possible:

        1.    give verbal commands and warnings prior to, during, and after deployment of the Taser, including informing other Department members on the scene of the deployment of the Taser.

        2.    aim for subject's back below the neck area. When frontal shots are necessary, aim for lower center mass (below chest or area of the heart) and legs.

            **NOTE:**    It is recommended that Department members deploy the Taser to the subject's back whenever possible.

        3.    discharge probes when the member is within 18 feet of the subject (and ideally when the member is within 7 to 15 feet of the subject).

        4.    use only one five-second energy cycle (the default length of an energy cycle when the Taser trigger is pressed and released) and reassess the situation before any additional cycles are given or cartridges are discharged.

        5.    if the subject is incapacitated, immediately attempt to restrain the subject while he or she is incapacitated.

        6.    if the subject has been exposed to three, five-second energy cycles (or has been exposed to a cumulative 15 total seconds of energy) and the member has not gained control of the subject, switch to other force options unless the member can reasonably justify that continued Taser use was necessary to ensure the safety of the member or another person.

    C.    **Request Supervisor.** As soon as practical, a member who has used or anticipates using a Taser will request that a supervisor respond to the scene.

IV. **POST-DISCHARGE RESPONSIBILITIES**

    A.    **Deploying Member.** Immediately upon gaining control and restraining the subject, deploying member will:

        1.    avoid placing additional stress on the subject (for instance, avoid kneeling on the subject);

        2.    notify their immediate supervisor, the watch operations lieutenant assigned to the district of occurrence, the Office of Emergency Management and Communications (OEMC), and the Crime Prevention and Information Center (CPIC) of the Taser deployment;

        3.    request the appropriate medical aid, including contacting emergency medical services (EMS) from the Chicago Fire Department, if:

            a.    the subject was exposed to electricity;

            b.    probes penetrated the subject's skin; or

            c.    the subject appears to be in any physical distress or complains of injury.

4. complete a Tactical Response Report (TRR) (CPD-11.377) for all field deployments of a Taser consistent with the procedures outlined in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

5. complete the appropriate case report and other required reports and submit the reports to their immediate supervisor for review and approval.

B. **Responding Supervisor.** The assigned responding supervisor will:

1. respond immediately to the scene and assume command and oversight of the scene unless relieved by a higher-ranked responding supervisor.

2. ensure the scene is protected and processed in accordance with the Department directive entitled "**Crime Scene Protection and Processing**."

3. determine whether to request an evidence technician to process the scene. An evidence technician will be requested if:

   a. the Taser deployment occurred in a residence;

   b. the Taser deployment occurred in an area other than a residence, whether indoors or outdoors, and the responding supervisor determines an evidence technician is required; or

   c. probes penetrated the subject's skin and any other injuries incurred as a result of the Taser deployment. In this situation, an evidence technician must be requested to photograph the location of injury or probe penetration.

4. take control of the Taser device and deliver it to the assigned investigating supervisor.

5. request the Street Deputy to respond to all Taser deployments that result in serious injury or death.

6. if a death has occurred as a result of a Taser deployment, ensure the Mobile Crime Lab and Bureau of Detectives personnel are requested.

7. review the deploying member's TRR and complete the appropriate section of the TRR consistent with the procedures outlined in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

   NOTE: The responding supervisor will attach a copy of the Taser deployment data sheet to the TRR.

C. **Investigating Supervisor.** The watch operations lieutenant, or assigned investigating supervisor the rank of lieutenant or above, from the district of occurrence, will:

1. ensure that a supervisor at least one rank higher than the deploying member responds to the scene of the Taser deployment when such a supervisor is available.

2. notify the Independent Police Review Authority (IPRA) / Civilian Office of Police Accountability (COPA) (or CPIC when IPRA/COPA is not available) and ensure that a log number is obtained.

3. investigate the incident and document the investigation on the Tactical Response Report (TRR).

4. download the deployment data from the Taser and print a copy of the deployment information.

   a. If unable to download the Taser deployment data (required equipment is inoperable or not installed), the investigating supervisor will designate a Department member, preferably a supervisor, to report to an adjacent district with the involved Taser to await the download and printing of the Taser deployment data sheet and return the untampered Taser and data sheet to the investigating supervisor.

        b.     When alternate locations are unable to download the Taser deployment data, the investigating supervisor will ensure that 2nd watch personnel hand-carry the Taser device to the Taser Repair Center to download the deployment data and print a copy of the deployment information.

5.    ensure all evidence from the scene of the Taser deployment is inventoried, including:

        a.     the discharged probes, which will be detached from the wires and inserted, pointed ends first, back into the cartridge;

        b.     the used cartridge(s), which will be wrapped with tape to secure the probes inside the cartridge; and

        c.     a copy of the Taser deployment data sheet.

6.    for incidents which do not require the presence of the Street Deputy, review the deploying member's TRR and complete the appropriate section of the TRR consistent with the procedures outlined in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

    **NOTE:**    The investigating supervisor will ensure all the attachments are included in the TRR, including the Taser deployment data.

7.    ensure the expended cartridge is replaced from the district/unit supply. When needed, replacement cartridges may be requested from the Taser Repair Center.

    **NOTE:**    A copy of the TRR will be presented to the Taser Repair Center for replacement cartridges.

D.    **Street Deputy.** In all cases in which a subject has been seriously injured or a death has occurred in conjunction with a Taser deployment, the Street Deputy will:

1.    proceed to the scene, assume command of the scene, and personally conduct a complete and thorough investigation of the incident.

2.    ensure that all tasks delineated for subordinate personnel are performed.

3.    review the deploying member's TRR and complete the appropriate section of the TRR consistent with the procedures outlined in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."


                                    Eddie T. Johnson
                                    Superintendent of Police

16-021 TSS/MWK

| Chicago Police Department | General Order   G03-02-05 |
|---|---|
| **OLEORESIN CAPSICUM (OC) DEVICES AND OTHER CHEMICAL AGENT USE INCIDENTS** | |

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Field Operations | | |

## I. PURPOSE

This directive outlines the policy governing discharges of Personal Oleoresin Capsicum (OC) devices, special weapons that dispense Capsaicin II Powder Agent (PepperBall), or larger volumes of chemical agents.

## II. POLICY

A. **Sanctity of Human Life.** All incidents will be resolved with the foremost regard for the preservation of human life and the safety of all persons involved. A member's decision to utilize Personal OC devices or other chemical agents will be made in accordance with **G03-02, "Use of Force."**

B. **De-Escalation.** Members will use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. This includes continually assessing the situation and modifying the use of force as circumstances change and in ways that are consistent with officer safety.

C. **When Use is Authorized.** Department members' use of Personal OC devices or other chemical agents must be objectively reasonable, necessary under the circumstances, and proportional to the threat, actions, and level of resistance offered by a subject. Consistent with **G03-02-01, "Force Options,"** Department members are authorized to use Personal OC devices or other chemical agents for the following subjects:

   1. OC spray, special weapons that dispense Capsaicin II powder agents, and other chemical devices are authorized force options against an **assailant**, whose actions use or threaten the use of force against a Department member or another person.

   2. OC spray is an authorized force option against **active resisters.** If an active resister is part of a group or crowd, OC is authorized only after obtaining approval from the Superintendent or his or her designee.

   3. OC spray is an authorized force option against **passive resisters** only under the following conditions:

      a. Occupants of a motor vehicle who is passively resisting arrest and only after obtaining authorization from an on-scene supervisor the rank of sergeant or above.

      b. Noncompliant groups, crowds, or an individual taking part in a group or crowd and only after obtaining authorization from the Superintendent or his or her designee.

   4. Special weapons that dispense the Capsaicin II powder agent or larger volumes of chemical agents are authorized force options against **active and passive resistors** that are part of a noncompliant groups, crowds, or an individual taking part in a group or crowd only under the following conditions:

      a. when the chemical agent is used only for area saturation, and

      b. only after obtaining authorization from the Superintendent or his or her designee.

D. **Prohibitions.** For the safety of everyone involved, the following additional restrictions apply:

   1. **Persons Vulnerable to Injury.** Personal OC devices or other chemical agents will not be used on a subject who is potentially at a greater risk of serious injury from their use, unless the subject is defined as **an assailant** and other force options are not readily available or

would otherwise be ineffective. People who are potentially at greater risk of serious injury from Personal OC device or other chemical agent use include, but are not limited to, children, pregnant women, and the elderly.

2. **Enclosed Areas.** Personal OC devices or other chemical agents will not be used in enclosed areas unless the subject is defined as an **assailant** and other force options are not readily available or would otherwise be ineffective.

E. **Justify Separate Uses of Force.** An initial application of a Personal OC device or other chemical agent and each subsequent application must be individually justified and documented on the Tactical Response Report (TRR) as a separate use of force.

F. Department members will refer to the Department directive entitled **"Personal Oleoresin Capsicum (OC) Devices"** for specific procedures on device protocols including training, maintenance, and accountability.

## III. CONDITIONS ON THE USE OF PERSONAL OC DEVICES OR OTHER CHEMICAL AGENTS

A. **Authorized Manner of Use.** A member who is discharging a Personal OC device or other chemical agent will, when possible, give verbal commands and warnings prior to, during, and after discharge, including informing other Department members on the scene of the discharge.

B. **Request Supervisor.** As soon as practical, a member who has used or anticipates using a Personal OC device or other chemical agent will request that a supervisor respond to the scene.

C. Whenever possible, the ranking member on the scene of an incident will notify the Chicago Fire Department prior to the anticipated use of a device that dispenses a chemical agent through use of special weapons deployed by the Special Weapons and Tactics team (SWAT).

## IV. POST-DISCHARGE RESPONSIBILITIES

A. **Effect Mitigation.** To assist in mitigating the effects of the discharge, Department members will:

1. if possible, relocate the individual(s) to an area of uncontaminated air and face the individual(s) into the wind.

2. provide an opportunity for the subject(s) to eliminate the effects of the agent by flushing the affected areas with cool water. This should take place as soon as feasible, to the extent that the subject can be controlled without possible injury to himself or others.

   a. Subjects wearing contact lenses should remove them, if possible, before flushing the eyes with water.

   b. Under normal circumstances all symptoms of exposure to OC should disappear within thirty to forty-five minutes.

   c. Clothing that becomes contaminated with OC can be laundered in the usual manner without fear of contaminating other laundry.

   d. Special equipment or a special washing process is not required to decontaminate an enclosed area. The opening of doors and windows will normally result in the removal of OC from the environment within forty-five minutes.

3. advise the subject to refrain from rubbing the affected area(s) or using creams, ointments, commercial eye washes, or bandages.

4. if it is practical, avoid transporting an individual who is wet with OC. Transporting a subject when dry will minimize the possibility of the member or vehicle becoming contaminated.

B.   **Discharging Member.** Immediately upon gaining control and restraining the subject, discharging member will:

1.   notify the Office of Emergency Management and Communications (OEMC), his or her supervisor, and the watch operations lieutenant in the district of occurrence.

> NOTE:   If a member discharges a chemical agent outside the City of Chicago, the member will also notify the law enforcement agency having jurisdiction and the Chicago Police Department's Crime Prevention and Information Center (CPIC).

2.   request the appropriate medical aid, including contacting emergency medical services (EMS) from the Chicago Fire Department, if the subject appears to be in any physical distress or complains of injury.

3.   complete a Tactical Response Report (TRR) (CPD-11.377) for the discharge consistent with the procedures outlined in the Department directive entitled **"Incidents Requiring the Completion of a Tactical Response Report."**

4.   complete the appropriate case report and other required reports and submit the reports to their immediate supervisor for review and approval.

C.   **Responding Supervisor.** When notified that a member under his or her command discharged a chemical agent, the assigned field supervisor will:

1.   respond immediately to the scene and assume command and oversight of the scene unless relieved by a higher-ranked responding supervisor.

2.   review the deploying member's TRR and complete the appropriate section of the TRR consistent with the procedures outlined in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

D.   **Investigating Supervisor.** The watch operations lieutenant, or assigned investigating supervisor the rank of lieutenant or above, from the district of occurrence will:

1.   ensure that a supervisor at least one rank higher than the discharging member responds to the scene of the discharge when such a supervisor is available.

2.   notify the Independent Police Review Authority (IPRA) / Civilian Office of Police Accountability (COPA) (or CPIC when IPRA/COPA is not available) and ensure that a log number is obtained.

3.   investigate the incident and document the investigation on the Tactical Response Report (TRR).

4.   for incidents which do not require the presence of the Street Deputy, review the deploying member's TRR and complete the appropriate section of the TRR consistent with the procedures outlined in the Department directive entitled "**Incidents Requiring the Completion of a Tactical Response Report**."

5.   receive the discharged personal OC device from the sworn member, provide a replacement device to the member, and notify the individual designated by the district commander that a replacement device has been issued. When needed, additional OC devices may be requested from the Taser Repair Center through normal requisition procedures.

> NOTE:   A copy of the TRR will be presented to the Taser Repair Center for replacement OC devices.

E.  **District Commander.** The district commander of the district of occurrence will ensure that the replacement canisters are available to the watch operations lieutenant on each watch.

Eddie T. Johnson
Superintendent of Police

16-021 TSS/MWK

| Chicago Police Department | General Order G03-02-06 |
|---|---|
| **CANINE USE INCIDENTS** | |

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Field Operations | | |

## I. PURPOSE

This directive outlines policy governing the use of Department canines as a force option.

## II. POLICY

A. **Sanctity of Human Life.** All incidents will be resolved with the foremost regard for the preservation of human life and the safety of all persons involved. A member's decision to utilize a Department canine as a force option will be made in accordance with **G03-02, "Use of Force."**

B. **De-Escalation.** Department members will use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so based on the totality of the circumstances. This includes continually assessing the situation and modifying the use of force as circumstances change and in ways that are consistent to officer safety.

C. **Canine Use - When Authorized.** Department members' use of a Department canine as a force option must be objectively reasonable, necessary under the circumstances, and proportional to the threat, actions, and level of resistance offered by a subject. Consistent with **G03-02-01, "Force Options,"** Department members are authorized to use a Department canine as a force option for the following subjects:

1. Active Resisters.

   The use of a canine to physically apprehend an active resister is limited to:

   a. a subject who is alleged to have committed either a felony or a violent misdemeanor.

   b. a subject who is reasonably believed to be armed.

   c. a search for a felony subject conducted in areas or buildings that contain hidden locations.

      **NOTE:** A canine may be used in this situation to locate a subject who is attempting to avoid apprehension and who fails to comply with a sworn member's orders to reveal themselves.

2. Assailants.

   A canine is an authorized force option against a subject who fits the definition of an assailant. In the case of an incident involving a canine, an assailant will also include a person who is an imminent threat to the canine.

D. **Prohibitions.** Canines will not be used as a force option for the following:

1. crowd control situations, unless a sworn exempt-rank member authorizes the use of canine teams in response to a crowd that cannot be contained by other police methods and the crowd is likely to cause personal injury or property damage.

   NOTE: Department members will refer to the Department directive entitled **"Canine Teams"** for specific procedures on crowd-control deployments.

2. subjects who are at a greater risk of serious injury or death from canine, unless the actions of the subject suggests that lesser force options will be unsuccessful. People who are potentially at a greater risk of serious injury or death from canine use include, but are not limited to, children, pregnant women, and the elderly.

   NOTE: If the Department member is responding to an incident involving persons in need of mental health treatment, the member will act in accordance with the Department directive entitled **"Responding to Incidents Involving Persons In Need Of Mental Health Treatment."**

E. Department-owned canines are trained in the **"find and bark"** method of finding persons. This method of training requires the canine to bark or otherwise alert its handler upon discovering a person and to remain in the immediate area of the person until relieved by the handler.

F. Department members will refer to the Department directive entitled **"Canine Teams"** for specific procedures on:

1. requesting a Department canine team.

2. the required training and certification for Department canines and handlers.

3. when a Department canine inflicts an injury to a subject.

III. **CONDITIONS ON THE USE OF CANINES AS A FORCE OPTION**

A. **Canine Deployment.** Any deployed canine, when circumstances permit, will be:

1. kept in visual and auditory range of the canine handler at all times, except for brief periods which make this requirement impracticable (e.g., the canine turns a corner, enters a room, is walking through tall vegetation, or is among tall objects.)

2. called off immediately once the subject is under control.

B. **Reporting.** A Tactical Response Report (TRR) is required when a canine physically apprehends a subject by making physical contact, including grasping the subject or the subject's clothing. The assigned canine handler will:

1. be responsible for the completion of the TRR to document the canine physical apprehension.

2. document on the TRR the duration of the total time the canine was deployed.

C. **Supervisory Response.** Prior to the deployment of a canine, the canine handler will notify a canine supervisor and a field supervisor from the district of occurrence. The determination of the appropriateness of the canine deployment will rest with the canine handler.

   NOTE: If a dispute regarding the deployment of a canine occurs between the canine handler and the on-scene field supervisor, the final determination of the canine deployment will rest with the canine handler's supervisor.

D. **Warnings.** Prior to the use of the canine, the handler will announce his or her police authority and provide verbal warnings stating that the canine will be released if the subject does not comply with the

handler's orders. When it is safe and feasible to do so, the canine handler will provide multiple warnings.

1. Any verbal warning will be given in a loud and clear manner, capable of being heard by the subject, any witnesses, or other parties within the targeted area.

2. The member issuing the warning will allow a reasonable amount of time for Department members and other uninvolved members of the public to respond and vacate the area.

3. For building searches, a verbal warning will be given again upon entering subsequent floors or areas or if the size of the area is too great for a single warning.

4. For open field or block searches, a verbal warning will be given again upon the canine being repositioned into an area which was not in audible range of the initial or other subsequent warnings.

5. Verbal warnings may only be omitted in situations where exigent circumstances place the handler or others in imminent danger.

6. The fact that the warnings were given or omitted will be documented in the appropriate case report.

E. **Apprehension by Canine**

1. In those circumstances when a canine finds a subject, the canine handler will:

   a. only command the canine to physically apprehend or make contact with the subject when the handler is in visual and auditory range of the canine and the subject.

   b. not permit the canine to make contact with the subject unless commanded to do so by the handler.

2. Department canines are trained and permitted to physically apprehend a subject only on the command of the handler, to apprehend a subject that flees, or when the canine or the handler is threatened with attack by the subject.

3. Once the handler determines that the incident is over and the control of the subject has been obtained, the handler must immediately order the canine to release the subject. In making the determination whether to order the canine to release the subject, the handler must carefully consider what is reasonably necessary based on the totality of the circumstances to control the subject and protect themselves and others from injury.

4. When a Department canine inflicts injury to a subject, the canine handler will immediately request appropriate medical aid for the injured person, including contacting emergency medical services (EMS) from the Chicago Fire Department via the Office of Emergency Management and Communications (OEMC).

   **NOTE:** For further guidance on medical attention for injuries caused by a Department canine, Department members will refer to the Department directives entitled **"Use of Force"** and **"Canine Teams."**

Authenticated by: KS

Eddie T. Johnson
Superintendent of Police

16-021 TSS/MWK

Chicago Police Department

**General Order   G08-05**

**FORCE REVIEW PANEL**

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Professionalism | | |

## I.   PURPOSE

This directive introduces the:

A.   Force Review Panel.

B.   Force Review Panel Report (CPD-20.004).

## II.   GENERAL INFORMATION

A.   The Force Review Panel is responsible for reviewing:

1.   incidents involving the discharge of a firearm by a Department member (except for accidental discharge and animal destruction with no injuries), whether or not a person has been injured or shot as a result of the firearm discharge;

2.   law-enforcement-related deaths that do not result in the completion of a TRR;

3.   TRR investigations involving an exempt member;

4.   other deadly force incidents; and

5.   other incidents as determined by the Superintendent.

B.   The Force Review Panel consists of the following members:

1.   Chief, Bureau of Patrol, or a designee the rank of deputy chief;

2.   Chief, Bureau of Detectives, or a designee the rank of deputy chief;

3.   Chief, Bureau of Organized Crime, or a designee the rank of deputy chief;

4.   Chief, Bureau of Organizational Development, or a designee the rank of deputy chief;

5.   Chief, Bureau of Technical Services, or a designee the rank of deputy chief;

6.   Chief, Bureau of Internal Affairs, or a designee the rank of deputy chief;

7.   Deputy Chief, Education and Training Division.

**NOTE:**   The Commanding Officer, Force Review Unit, will serve as secretary to the panel.

C.   The Superintendent will:

1.   designate a member of the committee to serve as chairperson, and

2.   determine when it is necessary for the panel to meet.

D.   The Independent Police Review Authority (IPRA)/Civilian Office of Police Accountability (COPA) will present the facts of the incident to the panel within 7 days of the date of occurrence.

III.  **FORCE REVIEW PANEL RESPONSIBILITIES AND PROCEDURES**

A.  The Force Review Panel will review incidents consistent with item II-A of this directive and:

1.  evaluate if each incident was tactically sound;

2.  if applicable, identify specific modifications to existing policy, procedures, training, tactics, or equipment that could result in minimizing the:

a.  occurrences of deadly force incidents;

b.  inherent risks involved in deadly force incidents.

**NOTE:**  The Force Review Panel will not conduct a disciplinary review of incidents investigated by IPRA/COPA.

B.  The Chairperson of the Force Review Panel will, within 96 hours after the panel has concluded, ensure a Force Review Panel Report is completed and forwarded to the First Deputy Superintendent.

C.  The First Deputy Superintendent will:

1.  review the report and determine if the recommendations should be approved, modified, or disapproved; and

2.  sign the report and ensure it is returned it to the Chairperson, Force Review Panel.

**NOTE:**  The Chairperson, Force Review Panel, will forward the original report to the Commanding Officer, Force Review Unit.

D.  The Commanding Officer, Force Review Unit, will:

1.  implement the recommendations of all approved Force Review Panel Reports; and

2.  ensure all reports are maintained consistent with existing records-retention requirements.

Eddie T. Johnson
Superintendent of Police

15-205 DK

| Chicago Police Department | General Order  G08-06 |
|---|---|
| **FORCE REVIEW UNIT** | |

| ISSUE DATE: | TBD | EFFECTIVE DATE: | TBD |
|---|---|---|---|
| RESCINDS: | | | |
| INDEX CATEGORY: | Professionalism | | |

## I.  PURPOSE

This directive introduces and outlines responsibilities for the Force Review Unit.

## II.  GENERAL INFORMATION

The Force Review Unit:

A.  is commanded by a captain or above who reports directly to the First Deputy Superintendent;

B.  functions in an after-action-review capacity for:

    1.  all incidents involving the use of force that results in the completion of a Tactical Response Report (TRR), excluding the use of deadly force or officer-involved-death incidents; and

    2.  other incidents as determined by the Superintendent.

## III.  FORCE REVIEW UNIT RESPONSIBILITIES AND PROCEDURES

A.  The Force Review Unit will:

    1.  review incidents consistent with Item II-B of this directive, and

        a.  ensure both police officers and supervisors complied with proper reporting procedures;

        b.  evaluate whether or not each reviewed incident:

            (1)  was tactically sound;

            (2)  complied with policy and procedure.

                (a)  If a policy violation requiring discipline is observed, the Commanding Officer, Force Review Unit, will ensure procedures are followed consistent with the Department directive titled "**Complaint and Disciplinary Procedures**."

                (b)  If a Log Number has already been obtained regarding an incident under review, the Force Review Unit will not make a determination concerning the specific conduct related to the Log Number.

    2.  if applicable, recommend additional training or policy review for the involved members;

    3.  if applicable, identify specific modifications to existing policy, procedures, training, tactics, or equipment that could result in minimizing the:

        a.  occurrences of use of force incidents;

        b.  inherent risks involved in use of force incidents.

    4.  identify and address emerging concerns or trends relative to use of force incidents.

B.      On a quarterly basis, the Commanding Officer, Force Review Unit, will prepare a written report of the section's findings and forward it to the First Deputy Superintendent.


Eddie T. Johnson
Superintendent of Police


15-205 DK



| Chicago Police Department | General Order   G03-02-02 |
|---|---|
| **FORCE OPTIONS** | |

| ISSUE DATE: | 01 January 2016 | EFFECTIVE DATE: | 01 January 2016 |
|---|---|---|---|
| RESCINDS: | 11 March 2015 version | | |
| INDEX CATEGORY: | Field Operations | | |

## I.   PURPOSE

This directive:

A.   explains the various levels of force options in the Use of Force Model that are appropriate for Department members' use when interacting with cooperative subjects, resistive subjects ("resisters"), and assailants.

B.   *introduces the concept of Force Mitigation as a component of the Department's response to all incidents.*

C.   continues the prohibition of chokeholds to subdue a subject unless deadly force is justified, consistent with Item IV-C-3 of this directive.

## II.   POLICY

A.   *The goal of a Department member's response to all incidents is to resolve the incident with the foremost regard for the preservation of human life and the safety of all persons involved.*

B.   *The Department expects members to develop and display the skills and abilities that allow them to regularly resolve confrontations without resorting to force (i.e. anything other than an officer's physical presence or use of verbal commands) or by using the least amount of appropriate force.*

C.   *Officers will de-escalate and use Force Mitigation principles whenever possible and appropriate, before resorting to force and to reduce the need for force.*

D.   Members will maintain a courteous and professional demeanor when dealing with the public.

E.   Before taking any police action, sworn members will identify themselves as police officers unless identification would jeopardize the safety of the member or others or compromise the integrity of an investigation.

F.   *Members will continually assess the situation to determine:*

1.   *if any use of force option is necessary;*

2.   *the appropriate level of force option based on the totality of the circumstances; and*

3.   *if the level of force employed should be modified based upon the subject's actions or other changes in the circumstances. The level of force shall be de-escalated immediately as resistance decreases, while staying in control and as safety permits, and in accordance with the Department directive entitled "***The Use of Force Model***."*

## III.   FORCE MITIGATION

*During all use of force incidents, Department members will strive to use the principles of Force Mitigation to ensure effective police-public encounters based on the totality of the circumstances. The concepts of Force Mitigation include:*

A.   *When involved in a potential use of force incident or taking police action requiring the use of force, Department members will determine if the seriousness of the situation requires an immediate response or whether the member can employ other force options, including creating more time and distance between the subject and others.*

B.   *Department members shall de-escalate and use Force Mitigation principles at the earliest possible moment.*

C.   *If the Department member is responding to an incident involving persons in need of mental health treatment, the member will act in accordance with the Department directive entitled "**Responding to Incidents Involving Persons In Need Of Mental Health Treatment**," including using every possible means to verbally de-escalate the situation before resorting to the use of equipment, physical restraints, or other use of force options.*

D.   *Continual Communication*

1.   *Members will use de-escalation and verbal control techniques in an attempt to reduce confrontations prior to, during, and after the use of physical force.*

2.   *Whenever reasonable, members will exercise persuasion, advice, and warning prior to the use of physical force.*

3.   *The goal of continual communication is to establish and maintain verbal communication in all police-public encounters where the member continually evaluates the effectiveness of that communication. Members will:*

a.   *when practical, establish and maintain one-on-one communication where only one member speaks at a time.*

b.   *vary the level of assertiveness of their communication depending on the type of police-public encounter. This may range from:*

(1)   *respectful queries in a preliminary investigation where there is not yet a determination a crime has occurred; through*

(2)   *forceful commands where a serious crime has been committed or life or property is at risk.*

4.   *When encountering non-compliance to lawful verbal direction, members are not compelled to take immediate police action through the use of force. Except in the case of preservation of life or property, members will consider:*

a.   *changing their verbal communication techniques to discover a more effective method.*

b.   *requesting additional personnel to respond or making use of the specialized units and equipment available through a notification to OEMC.*

   NOTE:   *Members will, when practical, request assistance from specialized units, including a Crisis Intervention Team (CIT) trained officer in accordance with the Department directive entitled "**Responding to Incidents Involving Persons In Need Of Mental Health Treatment.**"*

c.   *if available, allowing a different member to initiate verbal communications.*

   NOTE:   *If a different member initiates verbal communications, then that member will seek to establish their own independent one-on-one communication. Members should refrain from giving simultaneous directions to avoid potential conflicts.*

E.   *Time as a Tactic*

1.   *Members may use time as a tactic, making advantageous use of time, distance, and cover by isolating and containing a subject and continuously evaluating the member's positioning and force options.*

2. *In order to use time as a tactic, a zone of safety should be established for the security of responding officers and members of the public. The zone of safety is where:*

    a. *the incident scene has been secured;*

    b. *the subject does not pose a continuing threat to Department members or the public; and*

    c. *the scene and subject can be continually monitored, secured, and contained through the resolution of the incident.*

3. *Using time as a tactic may permit the de-escalation of emotions, as well as the arrival of additional Department members and tactical resources.*

## IV. LEVEL OF FORCE RESPONSE OPTIONS GUIDELINES

A. Cooperative Subject: a person who is compliant without the need for physical force. The following response options are appropriate when dealing with a cooperative subject:

    1. Social Control/Police Presence

        a. Social control/police presence is established through identification of authority and proximity to the subject. Police presence may result in conforming behavior.

        b. Social control/police presence, used alone, is the only force option which is appropriate for use with subjects who are cooperative without the need for direction from law enforcement personnel.

    2. Verbal Control

        a. Verbal control consists of persuasion, advice, and warning. It includes instruction or direction from a member in the form of verbal statements or commands. Verbal control may result in conforming behavior.

        b. Whenever practical, members will attempt to de-escalate confrontations by utilizing verbal control techniques prior to, during, and after the use of physical force.

B. Resister: a person who is uncooperative. Resisters are further subdivided into two categories:

    1. Passive Resister: a person who fails to comply (non-movement) with verbal or other direction. In addition to the response options listed in Item IV-A, the following response options are appropriate when dealing with a passive resister:

        a. Holding Techniques

            Holding consists of techniques such as a firm grip, grabbing an arm, wristlocks, and come-along holds (i.e., escort holds that are not elevated to pain compliance techniques), as well as any combination of the above. Holding may result in conforming behavior.

        b. Pain Compliance Techniques

            Pain compliance consists of techniques designed to amplify nonimpact pressure and pain in order to increase the potential for controlling a subject. These techniques consist of:

            (1) applying pressure to pain sensors in the skin covering bone and joints (i.e., armbars and amplified wristlocks) to amplify pain; and

(2)    using a Long Range Acoustic Device (LRAD) to emit high decibel focused sound waves to cause pain and discomfort; any use of the LRAD requires authorization from the Superintendent or the designee of the Superintendent.

> **NOTE:**    The LRAD is not considered a pain compliance technique when used to deliver verbal messages or warnings at a decibel level not intended to cause pain and discomfort.

c.    Control Instruments

Control instruments are designed to amplify nonimpact pressure and pain in order to increase the potential for controlling a subject. These instruments are placed mainly on the pain sensors of the skin covering bone.

d.    Oleoresin Capsicum (OC) Spray and Capsaicin II Powder Agent Deployment

Oleoresin capsicum and Capsaicin II powder are highly inflammatory agents that occur naturally in cayenne peppers. The use of OC spray and Capsaicin II powder agent is intended to increase control by disorienting the subject and interfering with the subject's ability to resist arrest.

(1)    **Oleoresin capsicum is only appropriate to use against the below two types of passive resisters AND only after the required authorization is received. No other use of oleoresin capsicum is authorized against passive resisters.**

(a)    occupant(s) of a motor vehicle who is engaging in passively resisting arrest, only after obtaining authorization from an on-scene supervisor of the rank of sergeant or above.

(b)    unresponsive groups, crowds, or an individual taking part in a group or crowd (e.g., demonstrators, sports championship celebrations, New Year's Eve, etc.), only after obtaining authorization from the Superintendent or the designee of the Superintendent.

(2)    Capsaicin II powder agent deployment is an appropriate force option against passive resistors and unresponsive groups or crowds **only** when used for area saturation and **only** after obtaining authorization from the Superintendent or the designee of the Superintendent.

> **NOTE:**    Only Department-issued Capsaicin II powder agent projectiles and launchers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

2.    Active Resister: a person whose actions attempt to create distance between that person and the member's reach with the intent to avoid physical control and/or defeat the arrest. This type of resistance includes gestures ranging from evasive movement of the arm, through flailing arms, to full flight by running. In addition to the response options in Items IV-A and IV-B-1, the following response options are appropriate when dealing with an active resister:

a.    Stunning

Stunning is diffused-pressure striking or slapping and is an attempt to increase control by disorienting the subject and interfering with the subject's ability to resist.

b.    Oleoresin Capsicum (OC) Spray

Oleoresin capsicum is an appropriate force option against active resisters **only** under the following guidelines:

(1)    If the only resistance is the act of walking or running away, and the resister is:

    (a)    part of a group or crowd, OC spray can be used only after obtaining authorization from the Superintendent or the designee of the Superintendent.

    (b)    **not** part of a group or crowd, the use of OC spray is not authorized.

(2)    If the resistance includes evasive maneuvers of the limbs and body, including the flailing of arms and legs, and the resister is:

    (a)    part of a group or crowd, OC spray can be used only after obtaining authorization from the Superintendent or the designee of the Superintendent.

    (b)    **not** part of a group or crowd, the use of OC spray is authorized without supervisory approval.

c.    Capsaicin II Powder Agent Deployment

Capsaicin II powder agent deployment is an appropriate force option against active resistors **only** when used for area saturation and only after obtaining authorization from the Superintendent or the designee of the Superintendent.

d.    LRAD

The LRAD is an appropriate force option against active resisters only after obtaining authorization from the Superintendent or the designee of the Superintendent.

e.    Canines Used by Canine Handlers

A canine under the control of a canine handler is an appropriate force option when used consistent with the provisions of the Department directive entitled "**Canines as a Force Option**."

f.    Taser

(1)    The Taser is a device used to control and subdue a subject through the application of electrical impulses that override the central nervous system and cause uncontrollable muscle contractions. Two darts attached by thin wires are fired from a cartridge attached to the hand-held device. When both darts attach to the subject, a timed electrical impulse is applied to the subject at the control of the operator, the electrical impulse immobilizes the subject long enough for restraints to be applied.

(2)    Only Department-issued Tasers may be used and only after the member has received Department-authorized training in their safe handling and deployment.

C.    Assailant: a subject who is using or threatening the imminent use of force against himself/herself or another person. The Use of Force Model categorizes assailants into three categories.

1.    Actions are aggressively offensive without weapons. This type of assailant is one who places a member in fear of a battery and includes advancing on the member in a threatening manner or closing the distance between the assailant and the member, thereby reducing the member's reaction time. In addition to the response options in Items IV-A and IV-B, the following response options are appropriate when dealing with this type of assailant:

a.    Direct Mechanical

Direct mechanical techniques are hard, concentrating, striking movements such as punching and kicking, or powerful locks and pressures. These techniques can be combined with take-downs or pins against the ground or other objects.

b.    Impact Weapons

The baton is the member's primary impact weapon, which is used for striking. Impact weapons are designed to establish control by means of applying mechanical impact to a subject in order to disable elements of his or her skeletal structure. Members will avoid the use of flashlights, radios, or any item not specifically designed as a defensive weapon if the baton is reasonably available.

c.    Impact Munitions

(1)    Impact munitions are projectiles such as Capsaicin II powder agent projectiles fired from a powder agent deployment system, "drag stabilized sock rounds" fired from shotguns with specially colored yellow or orange stocks, or batons fired from 37mm or 40mm launchers. These projectiles are intended to impact and incapacitate a potentially dangerous subject from a safe distance, thereby reducing resistance and gaining compliance while reducing the probability of serious injury or death.

(2)    Only Department-issued impact munitions may be used and only after the member has received Department-authorized training in their safe handling and deployment.

(3)    The use of Capsaicin II powder agent projectiles as an impact munition requires authorization from the Superintendent or the designee of the Superintendent.

2.    Actions will likely cause physical injury. Included in this category of assailant may be a subject who is armed with a deadly weapon and the subject fails to disarm, thereby making the subject's actions likely to cause physical injury. The appropriate response options when dealing with this category of assailant are those listed in Items IV-A, IV-B, and IV-C-1.

3.    Actions will likely cause death or serious physical injury.

a.    An assailant in this category is one whose actions will likely cause death or serious physical injury to another person. In addition to the response options in Items IV-A, IV-B, and IV-C-1, firearms and other deadly force are appropriate when dealing with an assailant whose actions will likely cause death or serious physical injury to another.

b.    Chokeholds are only justified as a use of deadly force.

(1)    A chokehold is defined as applying direct pressure to a person's trachea (windpipe) or airway (the front of the neck) with the intention of reducing the intake of air.

(2)    Holding and control techniques involving contact with the neck, but which are not intended to reduce the intake of air, are not defined as chokeholds.

(3)    Under no circumstances will a member use a chokehold, or any lesser contact with the neck area, to prevent the destruction of evidence by ingestion.

## V.    POST-USE OF FORCE POSITIONING AND MONITORING

After gaining control of a subject, members will:

A.    avoid sitting, kneeling, or standing on a subject's chest, which may result in chest compression, thereby reducing the subject's ability to breathe.

B.    position the subject in a manner to allow free breathing. Whenever feasible, the subject will not be placed on the subject's stomach.

C.    monitor an arrestee until transported to a secure location.

D.    seek medical attention for an arrestee who has injuries or illnesses consistent with the procedures outlined in the Department directives entitled "**Processing Persons Under Department Control**" and "**Hospitalized Arrestees**."

## VI. AFFIRMATION OF PROTECTION OF LIFE POLICY

Sworn members will not unreasonably endanger themselves or another person to conform to the restrictions of this directive.

(Items indicated by *italic/double underline* were added or revised)

Authenticated by: KC

John J. Escalante
Interim Superintendent of Police

15-212 PJE/MWK

## GLOSSARY TERMS:

1.    **Zone of Safety**

The distance to be maintained between the subject and the responding member(s). This distance should be greater than the effective range of the weapon (other than a firearm) and it may vary with each situation (e.g., type of weapon possessed, condition of the subject, surrounding area).

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IMMANUEL CAMPBELL, et al.,

Plaintiffs,

v.

CITY OF CHICAGO, et al.

Defendants.

Case No. 17cv4467
(Class Action)
Hon. John Z. Lee

## DECLARATION OF COMMANDER DANIEL GODSEL

Pursuant to 28 U.S.C. § 1746, I, Daniel Godsel, state and affirm as follows:

1.     I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could competently testify thereto.

2.     I am a Commander at the Chicago Police Department ("CPD") at the Training and Education Division.  In that capacity, I have been involved in the process of developing training for Department members on CPD's revised use of force policies.

3.     In 2016, CPD also developed a new 16-hour, in-service course focused on force mitigation principles, skills and tactics and interacting with individuals in crisis, including mental health crisis. CPD's Training Academy developed the course with input from a large group of nationally recognized experts including the Los Angeles Police Department, Washington DC Metropolitan Police Department, and the National Alliance on Mental Illness Chicago.

4.     The training is intended to equip officers with tools to de-escalate conflicts safely, recognize the signs of mental illness, trauma and crisis situations and respond quickly when deadly force is necessary.  The course emphasizes live, scenario-based training – a shift in how CPD conducts continuing education for officers away from classroom-based training – and provides the tools necessary for the wide range of situations officers face daily.  CPD launched

the training in September 2016 and is committed to training all officers, supervisors and exempt staff on these critical skills to complement and support training on the revised policies.

5.      CPD also is currently in the process of delivering training on the revised use of force policies to all Department members.  Training on the use of force policies will be provided in two phases:  a 2017 four hour course, which is currently underway; and a 2018 course, which will include scenario-based training.

6.      The 2017 training ensures that all officers are familiar with the new policies before the policies take effect.  Training on the revised policies began in June, and is scheduled to be delivered to all members by September 2017.  Supervisors received one additional hour of training on the new supervisory responsibilities in investigating and reviewing uses of force, with an additional eLearning module anticipated.  CPD is also currently developing the subsequent scenario-based training, which will be delivered to all members in 2018.

7.      I declare under penalty of perjury that the foregoing is true and correct.


Date: August 21, 2017

Commander Daniel Godsel
Education and Training Division
Chicago Police Department

# EXHIBIT C

Boston v. City of Chicago, Not Reported in F.Supp. (1988)

1988 WL 31532

1988 WL 31532
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Debra BOSTON, individually
and on behalf of a class, Plaintiff,
v.
CITY OF CHICAGO, Defendant.

No. 86–C–5534.
|
March 28, 1988.

*MEMORANDUM OPINION AND ORDER*

NORDBERG, District Judge.

### I. *Introduction*

**\*1** The plaintiff, Debra Boston, brought this action on behalf of herself and a proposed class against the City of Chicago for alleged violations of 42 U.S.C. § 1983 (1982).[1] In "Claim" I[2] of her complaint, the plaintiff claims that the Chicago Police Department, pursuant to General Order 78–1, has a custom or policy of subjecting misdemeanor arrestees to excessive periods of postarrest detention while the police compare their fingerprints with those on file. In *Doulin v. City of Chicago*, 662 F.Supp. 318 (N.D.Ill.1986), Judge Rovner held this policy unconstitutional under the fourth amendment and certified a class for declaratory and injunctive relief. The plaintiff claims that she is a member of that class and now seeks compensatory damages for herself.

In Claim II the plaintiff alleges that the defendant has a policy of authorizing warrantless custodial arrests for misdemeanor offenses that were not committed in the presence of the arresting officer. The plaintiff claims that this policy violates the common law rule prohibiting full custodial arrests under those circumstances and that this common law principle is incorporated into the fourth amendment's prohibition against unreasonable searches and seizures. The plaintiff seeks compensatory damages for herself and a declaratory judgment on behalf of herself and the putative class as to the illegality of this alleged policy.

The defendant filed a motion to dismiss, alleging that 1) the plaintiff does not have standing to seek a declaratory judgment on Claim II, either for herself or on behalf of the proposed class, and 2) in both claims the plaintiff has failed to state a claim under section 1983. This court referred the motion to a magistrate, who recommended that the court deny the motion. For the following reasons, the court declines to adopt the magistrate's Report and Recommendation. First, the court dismisses with prejudice the declaratory action of the named plaintiff —and, consequently, that of the putative class—for lack of standing. The court does not dismiss the plaintiff's individual claim for damages, however, because the complaint adequately alleges the existence of a municipal custodial arrest policy. Finally, the court stays decision on Claim I pending the Seventh Circuit's resolution of *Doulin*.

### II. *Facts*

For purposes of a motion to dismiss, the court must accept as true all well-pleaded factual allegations in the complaint and must make all reasonable inferences in the light most favorable to the plaintiff. *City of Milwaukee v. Saxbe,* 546 F.2d 693, 704 (7th Cir.1976). The court is limited to the language of the complaint and to those matters of which the court may take judicial notice. 5 C. Wright & A. Miller, *Federal Practice and Procedure* §§ 1357, 1364 (1st ed. 1969). A court can dismiss a complaint for failure to state a claim only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985) ( *quoting Conley v. Gibson,* 355 U.S. 41, 45–46 (1957)) (footnote in *Conley* omitted). When the plaintiff's claim is against a municipality for violations of section 1983, however, the plaintiff normally must allege particular facts supporting the existence of an official municipal policy, *see Monell v. Department of Social Servs.,* 436 U.S. 658, 690–91 (1978); conclusory allegations that merely track the *Monell* requirement and assert the existence of an official policy generally are insufficient to state a claim under section 1983, *see Strauss,* 760 F.2d at 767.

The facts of this case, as alleged in the plaintiff's amended complaint,[3] are as follows. In December 1985, the plaintiff entered the Joseph C. Lytton Co. department store in order to return an item she had purchased several

**Boston v. City of Chicago, Not Reported in F.Supp. (1988)**

1988 WL 31532

days earlier. A store security guard stopped her and accused her of stealing the item. The plaintiff protested that she had the receipt with her, but the guard ignored her explanations, refused to examine the receipt, and instead summoned Chicago police officers, who did not observe the plaintiff committing the alleged offense. The police, acting solely on the assertions of the security guard and without further investigating the complaint, took the plaintiff into custody, transported her to the police station, and charged her with the misdemeanor offense of shoplifting.

**\*2** Once at the station, the police began processing the paperwork for her arrest; after the paperwork had been completed, the police fingerprinted the plaintiff. She remained in custody even though she had the ability to post bond and the police had no basis to doubt her identity[4] or to believe that the fingerprint comparison would reveal that the plaintiff was sought on an outstanding warrant. The fingerprint comparison eventually revealed that the plaintiff never had been arrested and was not sought in connection with any outstanding warrant. She then was allowed to post bond and was released. In all, the plaintiff remained in custody for approximately twelve hours without a judicial determination of probable cause.

### III. *Postarrest Detention*

In *Doulin* Judge Rovner declared unconstitutional Chicago Police Department General Order 78–1, which allows the police to detain all arrestees, whether on felony or misdemeanor charges, for as long as it takes for their fingerprints to clear before releasing them on bond or presenting them to a judge or a magistrate for a probable cause hearing. 662 F.Supp. at 319. Judge Rovner held that the delays resulting from the fingerprint-clearing policy— which averaged four to six hours—exceeded the " 'brief period of detention' " allowed for the police " 'to take the administrative steps incident to arrest.' " *Id.* at 327 (*quoting Gerstein v. Pugh,* 420 U.S. 103, 114 (1975)).

The class initially requested damages in addition to declaratory and injunctive relief, *id.* at 319; Judge Rovner, however, certified the class only for declaratory and injunctive relief.[5] In addition, although the judgment did not resolve all of the claims and issues in the case, Judge Rovner entered the decree as a final judgment pursuant to

Federal Rule of Civil Procedure 54(b). *Id.* at 337. The City appealed the decision to the Seventh Circuit, which heard oral arguments in November 1987. As of the date of this opinion, the Seventh Circuit has yet to issue a decision.

The plaintiff in this case alleges that she is a member of the *Doulin* class and seeks compensatory damages for herself as a result of the alleged violation. Because the Seventh Circuit will soon issue a decision in the *Doulin* case, however, this court will stay ruling on the *Doulin* claim pending resolution of the appeal.

### IV. *Custodial Arrest Policy*

The plaintiff also brings a second fourth amendment claim. In Claim II, she asks for compensatory damages for herself and a declaratory judgment on behalf of herself and the putative class as to the illegality of the City's alleged custodial arrest policy. The defendant makes two arguments in response. First, the City claims that the plaintiff cannot ask for declaratory relief, either for herself or the proposed class, because at the time she filed her complaint she did not have standing to seek prospective relief.[6] Next, the City contends that the plaintiff has not adequately alleged the existence of a municipal policy authorizing warrantless custodial arrests for misdemeanors not committed in the presence of the arresting officer.

**\*3** A. *Standing to Seek Declaratory Relief*

1. *The Case–or–Controversy Requirement*

a. Standing

The jurisdiction of the federal courts is limited by Article III of the Constitution, which extends the judicial power of the United States only to actual "cases" and "controversies." *Flast v. Cohen,* 392 U.S. 83, 94–101 (1968). Although courts have not defined these terms with precision,[7] it is clear that a plaintiff can invoke the jurisdiction of the federal courts only if he demonstrates that he has standing to litigate the claim—that is, a "personal stake" in the outcome of the case. *Baker v. Carr,* 369 U.S. 186, 204 (1962). This personal-stake requirement serves "two complementary" purposes. *Flast,* 392 U.S. at 95. First, it assures that the federal courts are presented with disputes they are capable of resolving.

If the parties have a legally cognizable interest in the outcome of the case, the issues will be presented in an adversary context; this adverseness, in turn, "sharpens the presentation of issues," *Baker,* 369 U.S. at 204, and puts the dispute in a form "historically viewed as capable of judicial resolution," *Flast,* 392 U.S. at 101. Second, this requirement also serves to prevent the courts from issuing advisory opinions—decisions on abstract questions of public interest that more appropriately are addressed to the representative branch of government. *Warth v. Seldin,* 422 U.S. 490, 499–500 (1975). By thus limiting the role of federal courts, the personal-stake requirement ensures that the courts will not " 'intrude into areas committed to the other branches of government.' " *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 396 (1980) (*quoting Flast,* 392 U.S. at 95).

A plaintiff can demonstrate a sufficient personal stake in the outcome of the litigation by alleging either that he has sustained or is in immediate danger of sustaining a direct injury as a result of the defendant's actions. *Foster v. Center Township,* 798 F.2d 237, 244 (7th Cir.1986). The injury must be "real and immediate," not abstract or hypothetical, *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974); it must "affect one's possessions or bodily integrity or freedom of action ... and not just one's opinions, aspirations, or ideology," *People Organized for Welfare & Employment Rights v. Thompson,* 727 F.2d 167, 171 (7th Cir.1984) (citations omitted). Furthermore, the plaintiff must demonstrate that his interest in remedying the alleged illegality is more compelling than the general public interest in having "government officials comply with [their constitutional] obligations." *Foster,* 798 F.2d at 243; *see Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372 (1982) (plaintiff's injury must be "distinct and palpable").

The precise nature of the injury the plaintiff must allege also depends upon the type of relief that he seeks. If the plaintiff seeks only damages, then the existence of a past injury is sufficient to establish standing to pursue such retroactive relief. If, on the other hand, the plaintiff seeks prospective relief—either declaratory or injunctive—the existence of a past injury, without more, does not establish standing; the mere fact that the plaintiff may have a damages remedy does not entitle him to ask for prospective relief. Instead, the plaintiff must demonstrate that there is a real and immediate threat of *future* injury—a "sufficient likelihood" that he

again will be subjected to the allegedly unconstitutional conduct. *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983); *see Williams v. City of Chicago,* 609 F.Supp. 1017, 1018 (N.D.Ill.1985); *see also Murphy v. Hunt,* 455 U.S. 478, 483 (1982) (convicted criminal challenging state limitation of bail in cases involving certain offenses cannot maintain action challenging denial of pretrial bail because there is no "reasonable expectation" that he will be in same position again); *Golden v. Zwickler,* 394 U.S. 103 (1969) (plaintiff seeking declaratory relief against statute prohibiting anonymous handbills did not have standing because it was "most unlikely" that he would again be subject to statute).[8] Although past wrongs are evidence from which courts may infer a real and immediate threat of repeated injury,[9] past exposure to illegal conduct does not in itself establish a case or controversy for prospective relief unless accompanied by " 'continuing, present adverse effects.' " *Palmer v. City of Chicago,* 755 F.2d 560, 571 (7th Cir.1985) ( *quoting O'Shea,* 414 U.S. at 495–96), *cert. denied,* 107 S.Ct. 2180 (1987). Finally, in assessing the likelihood of future harm, a court must assume that the party seeking relief will conform his conduct to the rule of law and not repeat that type of misconduct that would once again place him at risk of that injury. *See id.* at 572 n. 9.

**\*4** Thus, the personal-stake requirement applies with equal force to all types of actions—those for damages as well as those for declaratory or injunctive relief. The plaintiff must allege the existence of an actual case or controversy and cannot circumvent that requirement by attempting to transform a valid claim for damages into standing for declaratory or injunctive relief.

b. Mootness and the "Capable–of–Repetition" Doctrine

The plaintiff must retain his personal stake throughout the course of the litigation, from the initial filing of the complaint up through the final stage of appellate review. *Preiser v. Newkirk,* 422 U.S. 395, 401 (1979). *But see Honig v. Doe,* 108 S.Ct. 592, 607 (1988) (Rehnquist, C.J., concurring) (presence of case or controversy necessary only up until Supreme Court decision to grant certiorari or to note probable jurisdiction). If at any point during the litigation there no longer exists an actual case or controversy, the case becomes "moot" and the federal court must then dismiss the action for lack of subject matter jurisdiction. *See North Carolina v. Rice,* 404 U.S. 224, 246 (1971) (per curiam) (Cases that no longer "

'touc[h] the legal relations of parties having adverse legal interests' " are moot because "federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them.") (*quoting Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41 (1937)).

The Supreme Court has established a two-tiered mootness test. The first question is whether the issues in the case are still "live." *See Geraghty,* 445 U.S. at 396. For example, sometimes a defendant voluntarily will cease to engage in the allegedly illegal conduct. *See, e.g., Lyons,* 461 U.S. at 100–01 (defendant issued self-imposed six-month moratorium on use by Los Angeles policemen of allegedly unconstitutional chokeholds). In such cases a court will declare the issue moot only if "[i]ntervening events have ... 'irrevocably eradicated the effects of the alleged violation.' " *Id.* at 101 (*quoting County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979)).

**\*5** The second question is whether a particular plaintiff's claim is moot. In some cases, the defendant's actions, while continuing to impose harm on others, no longer affect the plaintiff. The inquiry then becomes whether that plaintiff has enough of a "personal stake" to continue litigating the issue. To the extent that the plaintiff seeks an award of damages for past injury, mootness poses no problem. On the other hand, if the plaintiff seeks prospective relief and complains only of past conduct that presently does not affect him, his claim may be moot: "[P]ast injury cannot serve as the basis for a claim against future wrongdoing, absent continuing harm...." *Lewis v. Tully,* 99 F.R.D. 632, 636 (N.D.Ill.1983). Therefore, if a plaintiff seeking prospective relief is not currently affected by the defendant's conduct (or if he cannot establish a "real and immediate" threat of future harm), he generally loses his standing to litigate the issue, regardless of whether he had standing at the outset of the case.

If this principle were rigidly enforced, however, many cases, due to the transitory nature of the harm caused by the challenged conduct, could never be fully litigated before becoming technically moot. *Id.* The Supreme Court, therefore, has created an exception to this requirement: If the plaintiff had standing at the beginning of the litigation, but presently lacks a personal stake, he still may maintain his action if the claim if "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515 (1911); *see Geraghty,* 455 U.S. at 398. The Court has reasoned that since the plaintiff

faces some likelihood of becoming involved in the same controversy in the future, "vigorous advocacy can be expected to continue." *Id.*

The "capable-of-repetition" doctrine is limited, however, only to the "exceptional situation[]," *Lyons,* 461 U.S. at 109, in which two factors are present. First, the challenged action must be too short in duration to be fully litigated prior to its cessation or expiration. *Id. Roe v. Wade,* 410 U.S. 113 (1973), exemplifies this principle. There the plaintiff was pregnant at the time she initiated her lawsuit, but no longer was pregnant by the time the Supreme Court heard the appeal. Nevertheless, the Court held that the plaintiff still had standing to litigate the unconstitutionality of the Texas antiabortion statute, despite the fact that the statute did not presently affect her:

[W]hen, as here, pregnancy is a significant fact in the litigation, the normal 266–day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, pregnancy litigation seldom will survive much beyond the trial stage, and appellate review will be effectively denied. Our law should not be that rigid.

**\*6** *Id.* at 125.

Second, there must be a "reasonable expectation" that the same plaintiff will again be subjected to the same action. *Honig,* 108 S.Ct. at 602 (*quoting Murphy,* 455 U.S. at 482); *see Roe,* 410 U.S. at 125 ("Pregnancy often comes more than once to the same woman.... Pregnancy provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of repetition, yet evading review.' "). *But see Honig,* 108 S.Ct. at 609–14 (Scalia, J., dissenting) ("reasonable expectation" of future harm not enough; there must be a "demonstrated probability" of future harm). Although this phrase is not susceptible to precise definition, courts have held that the plaintiff satisfies this component if he demonstrates merely that the dispute is capable of repetition; the plaintiff need not establish the likelihood of future harm with "mathematical precision." *Honig,* 108 S.Ct. at 601 n.6; [10] *see, e.g., Burlington N.R. v. Brotherhood of Maintenance of Way Employees,* 107 S.Ct. 1841, 1846 n.4 (1987) (parties "reasonably likely" to find themselves in future disputes over collective bargaining agreement); *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 6 (1986) ("It can reasonably be assumed" that

Boston v. City of Chicago, Not Reported in F.Supp. (1988)
1988 WL 31532

newspaper publisher will be subjected to similar closure order in the future.). *But see Honig,* 108 S.Ct. at 609–11 (Scalia, J., dissenting) (likelihood of future injury must be "probable"). Furthermore, when considering the likelihood that the plaintiff will suffer future harm from the defendant's allegedly illegal conduct, courts must "assume that [the plaintiff] will conduct [his] activities within the law and so avoid prosecution and conviction as well as exposure to the challenged course of conduct said to be followed by [the defendant]." *O'Shea,* 414 U.S. at 497.

Thus, if the plaintiff satisfies the two requirements of the "capable-of-repetition" exception, [11] he is deemed to have standing to challenge the allegedly illegal action, "even absent a present actual controversy between the parties." *Lewis,* 99 F.R.D. at 636. [12]

c. Class Actions: Certification and the "Relation–Back" Principle

The foregoing standing principles generally apply with equal force to class actions: "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20 (1976) (*quoting Warth,* 422 U.S. at 502); *see Palmer,* 755 F.2d at 570. Because the named plaintiff must be a member of the class he seeks to represent, he cannot litigate the claims of the class if he lacks standing to bring the claim in his own right. *Foster,* 798 F.2d at 244. Consequently, the class action must be dismissed as well.

The Supreme Court, however, has carved out an exception in class action cases to the general rule that a plaintiff must have standing throughout the course of the litigation. Under this exception, if the named plaintiff's individual claim becomes moot—that is, if he is unable to invoke the "capable-of-repetition" doctrine—he still may pursue the claim on behalf of the class if the class was certified prior to the expiration of the named plaintiff's claim. *Sosna v. Iowa,* 419 U.S. 393, 399–403 (1975); *see Foster,* 798 F.2d at 245. The Court reasoned that once the class has been certified, it acquires a legal status independent of the interest of the named plaintiff: even though the named plaintiff may never again be harmed by the defendant's

conduct, the defendant will continue to harm members of the class. Therefore, a case or controversy still exists between the defendant and members of the class. *Sosna,* 419 U.S. at 402. [13]

*7 Other cases have demonstrated that the timing of class certification is not the critical factor in determining whether the named plaintiff can continue to litigate the claims of the class. For example, if the claim is of such a transitory nature that the district court cannot reasonably be expected to rule on the motion for certification before the expiration of the named plaintiff's claim, the certification may be deemed to "relate back" to the filing of the original complaint. *See Gerstein,* 420 U.S. at 110 n. 11; *see also Geraghty,* 445 U.S. at 398–99; *Sosna,* 419 U.S. at 402 n. 11. In *Gerstein,* the plaintiffs brought a class action challenging the constitutionality of a Florida law that in certain circumstances foreclosed a defendant's right to a judicial probable-cause hearing to determine the validity of the pretrial detention. The Court assumed that the named plaintiffs were no longer in custody awaiting trial at the time the district court certified the class. The Court held, nevertheless, that the action was not moot and therefore that the plaintiffs could press the claims of the class. The Court reasoned that because pretrial detention is by its nature temporary, it was uncertain whether a named plaintiff would ever be in pretrial custody long enough to allow a judge to certify a class. The Court also noted the "constant existence of a class of persons suffering the deprivation" and the fact that the named plaintiff's attorney was a public defender who almost certainly had other clients with a "continuing live interest in the case." 420 U.S. at 113 n. 11.

Nevertheless, these exceptions to the mootness doctrine, though important, are limited in scope and demonstrate the importance of distinguishing the often-interrelated mootness and standing inquiries. To qualify under either of these mootness exceptions, the named plaintiff must have had standing at *some* point in the litigation:

Our conclusion that this case is not moot in no way detracts from the firmly established requirement that the judicial power of Art. III courts extends only to "cases and controversies" specified in that Article. There must ... be a named plaintiff who has such a case or controversy *at the time the complaint is filed....*

Boston v. City of Chicago, Not Reported in F.Supp. (1988)
1988 WL 31532

*Sosna,* 419 U.S. at 402 (emphasis added); *see also* Williams, 609 F.Supp. at 1019 (in *Geraghty, Gerstein,* and *Sosna* named plaintiffs had standing to sue for prospective relief at beginning of litigation). In this manner, there always will be an actual case or controversy between the two parties—if not between the named plaintiff and the defendant, then between members of the certified class and the defendant.

*\*8 2. Application of These Principles to This Case*

It is clear that the plaintiff in this case has standing to litigate her individual claim for damages. It is equally clear, however, that she does not have standing to seek declaratory relief. And because she never had standing at any point in the litigation, she may not litigate the issue on behalf of the class.

First, she has not alleged that there is a "real and immediate" threat that in the future the Chicago Police Department will subject her to the same conduct. In this respect, her case is very much like that of the plaintiff in *Lyons.* There, the plaintiff sought declaratory and injunctive relief (in addition to damages) against the City of Los Angeles for its alleged policy of allowing policemen to apply chokeholds to citizens when the officers were not threatened by the use of deadly force. 461 U.S. at 98. Although the plaintiff himself had been subjected to a chokehold (and, in fact, had been seriously injured), the Court held that he did not have standing to seek prospective relief. To have standing, the Court reasoned, he would have to credibly allege that he would have another similar encounter with the police and that either 1) "*all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter" or 2) that the City "ordered or authorized police officers to act in such manner." *Id.* at 105–06 (emphasis in original). The Court held that not only did the plaintiff not make this assertion, but that it would be "untenable" to do so: "We cannot agree that the 'odds' ... that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal case for equitable relief." *Id.* at 108 (citations omitted).

Likewise, to have standing to seek declaratory relief the plaintiff in this case would have to allege that there was a sufficient likelihood that she again would be subjected to a full custodial arrest for a misdemeanor not committed

in the presence of the arresting officer. She has not alleged this; nor can she do so with any degree of credibility. In addition to the rarity of the occurrence, the plaintiff is further restricted by the fact that for purposes of assessing the likelihood of future harm this court must assume that the plaintiff will comport herself within the parameters of the law. Thus, the issue really becomes whether she will again be arrested for a misdemeanor she did not commit. The plaintiff's ability to allege future injury is also hindered by the fact that she admits that until the complained-of incident, she never before had been arrested. Thus, there are not a sufficient number of past incidents that, while not dispositive, would at least be evidence of a likelihood of a future encounter. Finally, the fact that she has alleged the existence of an official municipal policy—which would imply that the violation is systemic, not isolated, in nature—is of no consequence: the existence of a municipal policy, in and of itself, is no indication that the named plaintiff will be harmed by it.

In short, the plaintiff has done nothing to differentiate her interest from that of the rest of the law-abiding public in having government officials not commit unconstitutional acts: "Absent a sufficient likelihood that [she] will again be wronged in a similar way, [the plaintiff] is no more entitled to [declaratory relief] than any other citizen of [Chicago]." *Lyons,* 461 U.S. at 111. Her claim, like that in *Lyons,* involves only past exposure to an allegedly unconstitutional act, and there is no claim that the defendant's alleged practice continues to impose harm upon the plaintiff. *See Palmer,* 755 F.2d at 571. Therefore, because she herself never has had standing to seek declaratory relief, she may not seek it on behalf of the class.

*\*9 The plaintiff attempts to circumvent the fact that she never has had standing to seek declaratory relief by claiming that there still is a live controversy between members of the as-yet uncertified class and the defendant. The plaintiff fails to realize, however, that there must be a case or controversy at some point in the litigation between the *named* plaintiff and the defendant. Only then can the plaintiff press the claims of the class even if her own individual claim is moot. Thus, even though the issue in this case may not be moot (the court will assume that at this very moment, unnamed members of the putative class are being subjected to the City's alleged policy), the named plaintiff is not the appropriate party to seek declaratory relief on behalf of the class.

Boston v. City of Chicago, Not Reported in F.Supp. (1988)

1988 WL 31532

Seventh Circuit case law supports this proposition. In *Foster,* for example, the named plaintiff sought injunctive and declaratory relief as to the validity of poor-relief eligibility guidelines. The court held that the named plaintiff did not have standing to seek declaratory relief on her own behalf; because she was not an appropriate class representative, the court also dismissed the class claims. 798 F.2d at 244. The court in *Foster* stated that the exceptions to the mootness doctrine were inapplicable to the case because the named plaintiff never had standing. *Id.* at 245.[14] Like the plaintiff in *Foster,* the plaintiff here tries to characterize the issue of her standing to press the claims of the class as a question of mootness. In both cases, however, the question of mootness never arises because the named plaintiff never had standing at any point in the litigation.[15]

Finally, the plaintiff raises public policy arguments against dismissing the class claims. She argues, quite correctly, that given the foregoing standing principles very few—if any—plaintiffs would ever have standing to seek prospective relief against a similar municipal policy. *See Lyons,* 461 U.S. at 113 (Marshall, J., dissenting) ("The city is free to continue the policy indefinitely as long as it is willing to pay damages for the injuries ... that result."). Although the court sympathizes with the plaintiff's frustration, these very concerns were voiced by the dissent in *Lyons* but rejected by the majority. Given Supreme Court precedent, the plaintiff's only remedy is an individual award for money damages. *See Williams,* 609 F.Supp. at 1020 n. 7.[16]

B. *The Merits of the Case*

**\*10** 1. *Municipal Policy or Practice*

The City next claims that the plaintiff has not adequately pleaded the existence of a municipal policy or practice so as to hold the defendant liable under section 1983. A municipality can be held liable under section 1983 only if the plaintiff can prove the existence of a municipal policy or custom and a causal relationship between that policy and the alleged constitutional deprivation. *Monell,* 436 U.S. at 690–94; *Jones v. City of Chicago,* 787 F.2d 200, 203 (7th Cir.1986); *Strauss,* 760 F.2d at 766–67. Consistent with these requirements of municipal policy and causation, the Seventh Circuit has held that

a municipality cannot be held liable on a respondeat superior theory for the isolated acts of its employees, *id.* at 767: "The allegation of a single incident of unconstitutional conduct by a municipal employee usually does not establish a sufficient basis for suing the municipality." *Powe v. City of Chicago,* 664 F.2d 639, 650 (7th Cir.1981).

Furthermore, the mere conclusory assertion of the existence of a municipal policy, without allegations of specific facts that show the existence of such a policy, normally is not sufficient to survive a motion to dismiss. *Strauss,* 760 F.2d at 770; *see also Zwarton v. City of Chicago,* 625 F.Supp. 1211, 1211–12 (N.D.Ill.1985) ("Experience has shown that general allegations of this kind can be made without adequate basis. Municipalities have been put to great expense in defending against such complaints only to be granted summary judgment at the close of discovery."). This requirement of pleading specific facts at first appears to conflict with the stringent standard for granting motions to dismiss, under which a complaint may not be dismissed unless the plaintiff could prove *no* set of facts in support of his claim. In *Strauss,* however, the Seventh Circuit resolved this seeming contradiction by holding that while the Federal Rules normally do not require a plaintiff to set out in detail the facts upon which he bases his claim, the plaintiff at the very least must state the grounds upon which his claim rests. A plaintiff cannot simply add *Monell* boilerplate to his complaint and expect it to survive a motion to dismiss; rather, he must set out specific facts that support the existence of a municipal policy. *Id.* at 767–68.

Of course, what particular allegations would satisfy the *Monell* requirement vary, depending on the facts of the case. *Zwarton,* 625 F.Supp. at 1212. Indeed, it is conceivable that "a single incident, the very one complained of, could occur under circumstances warranting an inference of official approval...." *Id.* This case presents such a scenario. Under Illinois law the police may make custodial arrests for any crime, even misdemeanors not committed in the officer's presence, so long as there is probable cause. *See infra* part IV.B.2. The plaintiff has asserted that "[a]t all times relevant, there has been in force and effect a rule or policy of the the [sic] police department of the City of Chicago authorizing Chicago police officers to make warrantless, custodial arrests for all misdemeanors ... not committed in the officer's presence." Amended Complaint ¶ 19.

Boston v. City of Chicago, Not Reported in F.Supp. (1988)

1988 WL 31532

Given the existence of the Illinois law, of which this court may take judicial notice, it seems reasonable to believe that the Chicago Police Department's arrest policy tracks state law.[17] In this manner, the plaintiff's case is readily distinguishable from the other cases which held that the allegation of a single incident, coupled with *Monell* boilerplate, is insufficient.[18] Dismissing this complaint and requiring the plaintiff specifically to plead that the defendant's arrest policy tracks state law, or to plead specific instances of other similar incidents, would neither protect the legitimate interests of the defendant nor promote judicial efficiency. Although the plaintiff's amended complaint certainly is not a model of clarity or precision, it is sufficient to put the City on notice of the allegations made against it and therefore survives the motion to dismiss.

2. *Underlying Constitutional Violation*

**\*11** The City next claims that the plaintiff has not properly alleged an underlying constitutional violation and therefore has not stated a claim under section 1983. The gist of the City's argument is that "[i]t is axiomatic that the standard for a valid arrest under the fourth amendment is probable cause." Memorandum in Support of Defendant's Motion to Dismiss at 12. The plaintiff disputes this probable-cause requirement, stating that the fourth amendment requires the seizure to be "reasonable," and that the reasonableness of the arrest depends upon the circumstances. Specifically, the plaintiff claims that warrantless custodial arrests for misdemeanors not committed in the presence of the arresting officer are "unreasonable" under the fourth amendment.[19]

At common law, police officers could make warrantless custodial arrests of misdemeanor suspects only if the misdemeanors were committed in the officers' presence. *See Gramenos v. Jewel Cos.,* 797 F.2d 432, 441 (7th Cir.1986), *cert. denied,* 107 S.Ct. 1952 (1987). *See generally* E. Fisher, *Laws of Arrest* 180–228 (1967); 2 W. LaFave, *Search and Seizure* § 5.1, at 387–436 (2d ed. 1987); W. LaFave, *Arrest: The Decision to Take a Suspect into Custody* 15–30 (1965). Illinois, however, has abrogated the common law and now allows police officers to make full custodial arrests for any offense—felony or misdemeanor —so long as there is probable cause to believe that a crime has been committed. *Gramenos,* 797 F.2d at

441; *see* Ill.Ann.Stat. ch. 38, para. 107–2(1)(c) (Smith–Hurd Supp.1987). Both the Seventh Circuit and the United States Supreme Court thus far have declined to decide whether the Illinois statute "abrogating the common law rule—without putting equivalent guarantees of reasonable conduct in its place—comports with the fourth amendment." *See Gramenos,* 797 F.2d at 441.[20]

Nevertheless, it is clear that "probable cause" and "reasonableness" are not necessarily coterminous. *Id.* at 441–42. Because the parties have not adequately briefed the issue, however, the court at this point will not rule on the merits of this claim. If the parties wish in the future to file motions for summary judgment, or if they choose to wait until the time of trial, this court requires that they include a thorough historical and theoretical discussion whether or to what extent the fourth amendment incorporates the common law rule. *See id.* at 441 (discussing usefulness of historical analysis to fourth amendment questions). Therefore, any future briefing should include appropriate references to treatises and law review articles, as well as pertinent references to state or federal decisions on similar statutes.

V. *Conclusion*

For the reasons stated above, this court dismisses with prejudice the declaratory action of the plaintiff—and, therefore, that of the proposed class—for lack of standing. The court denies the defendant's motion to dismiss Claim II for failure to allege the existence of a municipal policy, but stays ruling on the merits of that claim until the parties adequately rebrief the issue. The court stays ruling on the *Doulin* claim pending the Seventh Circuit's decision in that case. Finally, the court requires that the plaintiff file a second amended complaint by April 25, 1988, in which the plaintiff sets forth her two claims in separate counts. *See* Fed.R.Civ.P. 10 ("Each claim founded upon a separate transaction or occurrence ... shall be stated in a separate count ... whenever a separation facilitates the clear presentation of the matters set forth."). The court sets the next status hearing for May 2, 1988, at 9:00 a.m.

**All Citations**

Not Reported in F.Supp., 1988 WL 31532

Boston v. City of Chicago, Not Reported in F.Supp. (1988)

1988 WL 31532

Footnotes

1   Section 1983 provides, in relevant part:
    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any ... person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2   The plaintiff has not separated her claims into different counts, as required by Federal Rule of Civil Procedure 10. The court, therefore, requires the plaintiff to file a second amended complaint that complies with Rule 10. *See infra* part V.

3   In her original complaint, the plaintiff asserted only one claim (now Claim II of the amended complaint): that warrantless custodial arrests for misdemeanor offenses not committed in the presence of the arresting officer are unreasonable under the fourth amendment. The defendant's motion to dismiss was directed to the plaintiff's original complaint. After this court referred the motion to Magistrate Rosemond, the plaintiff filed an amended complaint, in which she added a claim for compensatory damages caused by a *Doulin* violation—the excessive postarrest detention caused by the fingerprint-clearing policy. (The plaintiff attached to the amended complaint a copy of the judgment order in *Doulin.*) The magistrate apparently directed his Report only to the original complaint (even though he discusses at length General Order 78–1, which is nowhere mentioned in the plaintiff's original complaint). Nevertheless, both parties in their objections to the Report refer to the amended complaint. Accordingly, this court will treat the briefs as applying to the amended complaint.

4   At the time of her arrest, the plaintiff had in her possession a photo identification card issued by the state of Illinois, a social security card, and two credit cards, all of which identified her as "Deborah Boston."

5   Because the plaintiff's request for damages does not fit within the scope of the class relief ordered by Judge Rovner, her claim cannot be resolved by joining that class. *See McGaughey v. City of Chicago,* 664 F.Supp. 1131, 1142 n. 11 (N.D.Ill.1987) (Judge Aspen allowing plaintiff to bring damages action on *Doulin* claim).

6   The City concedes that the plaintiff has standing to litigate her individual claim for damages.

7   *See Flast,* 392 U.S. at 94 ("As is so often the situation in constitutional adjudication, those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government.").

8   In addition, the plaintiff must satisfy the requirements of each type of prospective relief. The Declaratory Judgment Act, 28 U.S.C. § 2201 (1982), requires the existence of an "actual controversy." *See Foster,* 798 F.2d at 242. A request for injunctive relief depends, in part, on a showing of irreparable harm and of the inadequacy of remedies at law. *See id.*

9   *See, e.g., Kohlender v. Lawson,* 461 U.S. 352, 355 n. 3 (1983) (because plaintiff alleged fifteen instances of injury, which occurred within a period of less than two years, he had demonstrated a "credible threat" that he again would be subject to illegal conduct).

10  *Honig* involved a challenge based on the Education of the Handicapped Act, 20 U.S.C. §§ 1400–1485 (Supp. III 1985) (EHA), which confers upon handicapped children between the ages of three and twenty-one a right to a free public education that is appropriate for their needs. The EHA also established a comprehensive system of procedural safeguards designed to ensure meaningful parental participation in all aspects of a child's educational placement, including an opportunity for a due process hearing with respect to any complaints that parents may have concerning their child's placement. The EHA also contains a "stay-put" provision, *id.* § 1415(3), which directs that a disabled child remain in his current educational placement pending completion of the review proceedings.
    The plaintiffs in the case were emotionally disturbed students who were suspended indefinitely, pending the completion of expulsion proceedings, for violent and disruptive behavior related to their disabilities. By the time the appeal reached the Supreme Court, one of the plaintiffs was 24 years old; because he no longer was eligible under the EHA, the Court held that his claim was moot. 108 S.Ct. at 601. Another plaintiff, however, was only 20 years old, and the Court held that the case was not moot as to him. The Court held that this plaintiff could invoke the "capable-of-repetition" doctrine because there was a "reasonable expectation" that he again would be subject to the same conduct. First, the Court reasoned that because he was unable to conform his conduct to socially acceptable norms, and because there was no indication he would overcome these behavioral problems, it was reasonable to expect that he would again engage in aggressive and disruptive classroom conduct. Furthermore, the Court stated, it was also reasonable to expect that if the plaintiff did engage in disruptive conduct, the school authorities would again suspend him and disregard the "stay-put" provision, given the lack of a statewide policy regarding local school responses to disability-related misconduct and the defendants' insistence that local school districts retain residual authority to expel disabled children for dangerous conduct. Thus, given that the EHA's review procedures were "ponderous," and the fact that

Boston v. City of Chicago, Not Reported in F.Supp. (1988)
1988 WL 31532

an aggrieved student will often be finished with school or otherwise be ineligible for EHA protections by the time the Supreme Court could review his case, the defendants' conduct was "capable or repetition, yet evading review," and the plaintiff's claims therefore were not moot.

11    In *Lyons* the Court seemed to place a limit on the "evading review" prong of the "capable of repetition" doctrine by stating that because the plaintiff requested damages in addition to prospective relief, his claim "remain[ed] to be litigated in his suit for damages; in no sense does that claim 'evade' review." 461 U.S. at 110.

12    By focusing on the likelihood of future injury, the standing and mootness inquiry overlap to some extent. One commentator has explained this interrelatedness by defining mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973) (footnote omitted); *see also Lewis*, 99 F.R.D. at 639 ("[T]hough the issues of 'mootness' and 'standing' ... typically arise at different stages of a lawsuit, or in different lawsuits, the essential inquiry is indistinguishable.... [The Plaintiff must have] a legal[ly] cognizable interest in the outcome."). Nevertheless, despite the similarity of inquiry, the distinction between the two doctrines becomes important in the context of class actions. As the next section demonstrates, a named plaintiff's ability to litigate the claim on behalf of a class, when he no longer has a personal stake in the outcome, depends in part on whether his claim has become moot or whether he never had standing from the outset of the litigation.

13    The Court later extended this doctrine to cases in which class certification had been denied. In *Geraghty*, the Court held that an action brought on behalf of a class did not become moot upon expiration of the named plaintiff's substantive claim, even though class certification had been denied. The Court reasoned that the named plaintiff still retained a personal stake to appeal the denial of class certification. If on appeal the denial of class certification is reversed, and the class subsequently is certified, then the named plaintiff can press the merits of the claim. But the Court's holding was limited to the appeal of the denial of the class certification motion. A named plaintiff whose class expires may not continue to press the appeal on the merits; rather, he must wait until the class is certified before he can continue litigating the claim on the merits. 445 U.S. at 404.

14    In *Palmer* the court held that some of the named plaintiffs lacked standing to seek injunctive relief because they could not allege a real and immediate threat of future harm. The plaintiff attempts to distinguish *Palmer* because "the district court's class certification ... was not challenged on appeal." Plaintiff's Memorandum in Opposition to Motion to Dismiss at 7. The plaintiff fails to realize that the issue of class certification under the Federal Rules of Civil Procedure is distinct from the standing inquiry. Only after the court decides that the named plaintiff has Article III standing does it determine the propriety of class certification: "[The fact that the case is not moot] does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, but it does shift the focus of examination from the elements of justiciability to the ability of the named representative to 'fairly and adequately protect the interest of the class.' " *Sosna*, 419 U.S. at 403 (*quoting* Fed.R.Civ.P. 23(a)). Thus, the fact that the court in *Palmer* did not rule on the propriety of the Rule 23 certification is irrelevant, for the collapse of a class is implicit in a finding that the named plaintiff lacked standing from the outset of the litigation. In addition, the fact that defendants do not challenge the standing of the plaintiff is of no consequence, for a court must always determine whether it has subject matter jurisdiction.

15    Furthermore, the plaintiff here, unlike the twenty-year-old plaintiff in *Honig*, cannot demonstrate that her claim is "capable of repetition." Given that she is presumed to conduct herself within the confines of the law, there is no "reasonable expectation" that she again will be subjected to the same conduct; therefore, she cannot seek prospective relief on her own behalf.

16    The court acknowledges that other courts in this district have reached a different conclusion. *See, e.g., Doulin*, 662 F.Supp. at 320 n. 4; *Robinson v. City of Chicago*, 638 F.Supp. 186 (N.D.Ill.1986); *Doulin v. City of Chicago*, No. 82 C 6771, slip op. at 4–8 (N.D.Ill. June 29, 1984) (Moran, J.); *Lewis*, 99 F.R.D. at 639–42. This court, however, adopts the reasoning and conclusion of Judge Aspen in *Williams*. *See also Fabianich v. City of Chicago*, No. 86 C 6819 (N.D.Ill. July 24, 1987); *Todd v. County of Cook*, No. 86 C 1059 (N.D.Ill. May 1, 1986).

17    Thus, in this case state law itself provides sufficient evidence of the existence of a municipal policy—at least for purposes of a motion to dismiss. Therefore, the plaintiff need not specifically delineate other incidents or produce statistical facts that would imply a policy or custom. *But cf. Zwarton*, 625 F.Supp. at 1212.

18    In *Strauss*, for example, the Seventh Circuit held the complaint insufficient when it simply alleged that the police department had a policy of hiring policemen with a history of brutality and of knowingly acquiescing in their brutality once they began their jobs. The court stated that "[a] complaint that tracks *Monell* 's requirement of official policy with bare allegations cannot stand when the policy identified is nothing more than acquiescence in prior misconduct." 760 F.2d at 767 (footnote omitted). In this case, the City's alleged conduct goes beyond mere acquiescence in the wrongful acts

**Boston v. City of Chicago, Not Reported in F.Supp. (1988)**

1988 WL 31532

committed by its employees. The allegations in *Strauss,* by contrast, smacked of respondeat superior liability and are therefore distinguishable.

19    Nevertheless, the plaintiff at times appears to vacillate regarding the nature of her claim. In her amended complaint, she asserts that "[p]laintiff's claim is that warrantless custodial arrests for misdemeanor offenses which had not been committed in the presence of the arresting officer are unreasonable under the Fourth Amendment." Amended Complaint ¶ 21(b). At various points in her briefs, however, the plaintiff appears to believe that probable cause to arrest is the touchstone of her complaint. *See, e.g.,* Plaintiff's Memorandum in Opposition to Objections to Report and Recommendation at 4 (emphasis added):

> Plaintiff's claim against the City of Chicago is based on the allegation that, pursuant to a municipal policy, *the police officers who were summoned to the store did not undertake any investigation into the existence of probable cause.* As the magistrate noted, "Had the arresting Chicago police officer permitted plaintiff to show the receipt for the allegedly stolen item, there would have been no grounds for arresting her."

> The plaintiff should reassess her arguments and decide whether she wishes to pursue a typical false-arrest claim (lack of probable cause) or a claim that her arrest was unconstitutional regardless of whether there was probable cause— or to argue in the alternative and pursue both claims. Of course, in all cases she must sufficiently allege the existence of a municipal policy. But if her claim is that the City has a policy of authorizing arrests without probable cause, she must allege more than the *Monell* boilerplate. This claim, unlike her misdemeanor arrest claim, is not evidenced by Illinois law and therefore would require the pleading of specific facts that demonstrate the existence of such a policy. Whatever the plaintiff decides, she must be prepared to inform the court of her decision by the next status hearing.

20    The City's argument that *Gramenos* held that probable cause still is the gravamen of every fourth amendment violation is baseless. The Seventh Circuit explicitly stated that "[it was] not authorized to decide in this case whether [the Illinois statute] ... comports with the fourth amendment" because the plaintiff did not seek relief against the operation of the statute. 797 F.2d at 441–42. Furthermore, while the Seventh Circuit did expressly rule that "the officers' decision to arrest Gramenos cannot be the basis for an award of damages if there was probable cause," *id.* at 441, the court made that statement in the context of deciding whether the individual officers, who could assert qualified immunity as a defense to a damages suit, acted *reasonably.* The court stated that given the existence of the Illinois statute authorizing arrests based on probable cause, the officers would have acted reasonably, and therefore could not be liable for damages, if there were probable cause to arrest. *Id.; see Akins v. Board of Governors of State Colleges & Univs.,* No. 87–1961, slip op. at 11 (7th Cir. Mar. 4, 1988) ("The issue [regarding qualified immunity for government officials] is whether the defendant official violated '*clearly established statutory or constitutional rights of which a reasonable person would have known.*' ") (*quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)) (emphasis added). In this case, however, the plaintiff has not sued any governmental officials—only a municipality. Therefore, the defendant cannot claim qualified immunity as a defense and consequently cannot assert that the statements in *Gramenos* apply to this case.

---

**End of Document**                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

De Gonzalez v. City of Richmond, Not Reported in F.Supp.2d (2014)

2014 WL 2194816

2014 WL 2194816
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Vilma Nubia Romero De Gonzalez,
Ana Vilma Vides Romero, Plaintiffs,

v.

City of Richmond et al, Defendants.

No. C–14–00386 DMR
|
Signed May 23, 2014

**Attorneys and Law Firms**

Panos Lagos, Law Offices of Panos Lagos, Oakland, CA,
for Plaintiffs.

David Blake Newdorf, Newdorf Legal, San Francisco,
CA, for Defendants.

ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS [DOCKET NO. 10]

DONNA M. RYU, United States Magistrate Judge

**\*1** Defendants City of Richmond, City of Richmond
Police Department, Chief of Police Chris Magnus
and Police Officer George Marcus (collectively,
"Defendants") move the court pursuant to Federal Rule
of Civil Procedure 12(b)(6) to dismiss portions of Plaintiffs
Vilma Nubia Romero De Gonzalez and Ana Vilma Vides
Romero's complaint for failure to state a claim upon
which relief can be granted. [Docket No. 10.] The court
conducted a hearing on May 22, 2014, during which
the parties were given an opportunity to present oral
argument. For the reasons below, Defendants' motion is
granted.

**I. Background**

This lawsuit arises from a traffic stop and arrest
that occurred in Richmond, California on July 2,
2013. Plaintiffs make the following allegations in their
complaint, all of which are taken as true for purposes
of this motion.[1] On the morning of July 2, 2013,
Gonzalez was driving in Richmond with Romero, her 65

year old mother. (Compl.¶ 13.) At approximately 7:25
a.m., Defendant Richmond Police Officer George Marcus
stopped Plaintiffs for an alleged moving violation.[2]
(Compl.¶ 13.) Plaintiffs dispute that any violation
occurred, asserting that Marcus had no reasonable
suspicion or probable cause to believe a violation had
occurred. (Compl.¶ 13.)

According to Plaintiffs, when Gonzalez questioned
Marcus about the stop, he dragged her out of the
vehicle, twisting her arm, handcuffing her, and placing
her under arrest. (Compl.¶ 13.) Plaintiffs also allege that
Romero questioned Marcus about the stop and that
Marcus pushed Romero to the ground causing her to
fall, lose consciousness, and suffer injuries. (Compl.¶ 13.)
Plaintiffs allege that Marcus never issued any order,
instruction, or warning before taking these actions and
never informed Gonzales of the grounds for her arrest.
(Compl.¶ 13.) Following the stop, Plaintiffs allege that
Marcus wrongfully caused criminal charges to be brought
against Gonzalez, which remain pending. (Compl.¶ 14.)

Plaintiffs sue the City of Richmond, Marcus, and Chris
Magnus, Chief of Police of the City of Richmond, alleging
claims under 42 U.S.C. § 1983 and California state law
arising out of the traffic stop and Gonzalez's arrest.
Defendants now move to dismiss Plaintiffs' Section 1983
claim based on the Due Process Clause of the Fourteenth
Amendment and their thirteenth claim for injunctive
relief. (Compl. ¶¶ 15–18; 67–70.)

**II. Legal Standards**

**\*2** A motion to dismiss under Federal Rule of Evidence
12(b)(6) tests the legal sufficiency of the claims alleged in
the complaint. *See Parks Sch. of Bus. v. Symington,* 51
F.3d 1480, 1484 (9th Cir.1995). When reviewing a motion
to dismiss for failure to state a claim, the court must
"accept as true all of the factual allegations contained in
the complaint," *Erickson v. Pardus,* 551 U.S. 89, 94 (2007)
(per curiam) (citation omitted), and may dismiss the case
"only where there is no cognizable legal theory or an
absence of sufficient facts alleged to support a cognizable
legal theory." *Shroyer v. New Cingular Wireless Servs.,
Inc.,* 622 F.3d 1035, 1041 (9th Cir.2010) (citation and
quotation marks omitted). When a complaint presents a
cognizable legal theory, the court may grant the motion
if the complaint lacks "sufficient factual matter to state

De Gonzalez v. City of Richmond, Not Reported in F.Supp.2d (2014)

2014 WL 2194816

a facially plausible claim to relief." *Id.* (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citation omitted).

## III. Analysis

### A. Plaintiffs' Fourteenth Amendment Due Process Claim

Defendants assert that Plaintiffs' Fourteenth Amendment due process claim fails as a matter of law because Plaintiffs' allegations implicate Fourth Amendment rights. The Supreme Court has held that where a constitutional claim is covered by a specific constitutional amendment, then the claim must be analyzed under "that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997); *see also Galbraith v. Cnty. of Santa Clara,* 307 F.3d 1119, 1127 (9th Cir.2002) (holding that the Fourth Amendment, "not the more generalized notion of substantive due process, must be the guide for analyzing" claims of "pretrial deprivations of liberty" (citations and internal quotation marks omitted)). Plaintiffs do not oppose this aspect of Defendants' motion. Accordingly, Plaintiffs' Fourteenth Amendment substantive due process claim is dismissed.

### B. Plaintiffs' Claim for Injunctive Relief

Defendants next move to dismiss Plaintiffs' claim for injunctive relief prohibiting Defendants' use of excessive and/or unnecessary force. (*See* Compl. ¶¶ 68–69.) Defendants argue that Plaintiffs have not alleged sufficient facts providing Plaintiffs with standing to seek injunctive relief, citing *City of Los Angeles v. Lyons,* 461 U.S. 95 (1982). Defendants contend that *Lyons* requires Plaintiffs to show a likelihood of future harm as a result of an official policy or practice to maintain a claim for injunctive relief and assert that Plaintiffs have alleged no facts showing they will again be subjected to the same alleged harm.[3] Plaintiffs allege that there is a pattern of ongoing constitutional violations by Richmond police officers consisting of the use of unnecessary and excessive force against citizens and an informal custom or policy ratifying these unlawful acts by tolerating and promoting their continued use. (Compl.¶ 20.) Plaintiffs argue that

they have standing to seek injunctive relief where the challenged police conduct was authorized by a policy or practice, as they allege in their second claim for relief pursuant to *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

A plaintiff must demonstrate standing "separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 185 (2000). In *Lyons,* the plaintiff alleged that the defendant officers stopped him for a vehicle violation and that without provocation or justification, the officers seized him and applied a chokehold which injured him. *Id.* at 97–98. Plaintiff further alleged that the City of Los Angeles authorized and instructed its police officers to use chokeholds and that police "regularly and routinely" applied chokeholds "in innumerable situations." *Lyons,* 461 U.S. at 98. Plaintiff sued the city for injunctive relief to prevent officers from using the chokehold technique in the future, alleging that he was fearful the police would choke him again. *Id.* at 98.

**\*3** The Supreme Court rejected the injunctive relief claim, holding that plaintiffs seeking injunctive relief must demonstrate a "real or immediate threat that they will be wronged again—a likelihood of substantial and immediate irreparable injury." *Id.* at 111 (internal quotation marks and citation omitted). Therefore, whether a plaintiff has standing to seek an injunction depends on whether he or she is likely to suffer future injury from allegedly unconstitutional behavior, and "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " *Id.* at 102, 106 (citations omitted). Because the plaintiff in *Lyons* made no showing that he was "realistically threatened by a repetition" of the alleged injury, he failed to meet the requirements for seeking an injunction. *Id.* at 109. In so holding, the Court noted that "[a]bsent a sufficient likelihood that he will again be wronged in a similar way, [the plaintiff] [was] no more entitled to an injunction than any other citizen of Los Angeles[.]" *Id.* at 111.

Here, as in *Lyons,* Plaintiffs have not alleged that they are realistically threatened by a repetition of the alleged misconduct by Defendants. Moreover, although Plaintiffs allege a pattern or practice of conduct by the Richmond police that Defendants have ratified through inaction, they have not alleged that they have been personally injured by the alleged pattern, other than during the July

De Gonzalez v. City of Richmond, Not Reported in F.Supp.2d (2014)

2014 WL 2194816

2013 traffic stop at issue. The lack of such allegations distinguishes this case from *Thomas v. County of Los Angeles,* 978 F.2d 504 (9th Cir.1992) (class action alleging that police used excessive force in detaining minority citizens and employed unlawful procedures in searching homes of minority residents), and other pattern and practice cases relied upon by Plaintiffs. (*See* Pls.' Opp'n 4–5, n.2–3.) Further, even if Plaintiffs have another encounter with Richmond police officers, Plaintiffs have alleged no facts indicating that excessive force would likely be used. Therefore, cases cited by Plaintiffs where it was undisputed that an injury would occur again are also distinguishable. (*See* Pls.' Opp'n 4–5 n.2. (citing *Jones v. City of Los Angeles,* 444 F.3d 1118, 1131 (9th Cir.2006), *opinion vacated on other grounds,* 505 F.3d 1006 (9th Cir.2007) (challenge by homeless individuals to enforcement of city ordinance that criminalized sitting, lying, or sleeping on public streets during nighttime hours; "undisputed" plaintiffs would be fined, arrested, imprisoned, and/or prosecuted under ordinance again).) Nothing in this case sufficiently distinguishes it from *Lyons* or demonstrates that these Plaintiffs are likely to suffer the same harm again. *See East v. City of Richmond,* No. C 10–2392 SBA, 2010 WL 4580112, at *6 (N.D.Cal. Nov. 3, 2010) (dismissing complaint for failure to allege "sufficient facts to establish that Plaintiff has standing to seek equitable relief ... [plaintiff had] not identified any realistic future threat or that she will be subject to the same harm again."); *see also Gest v. Bradbury,* 443 F.3d 1177, 1181 (9th Cir.2006) (when seeking injunction, a plaintiff must demonstrate that she is "realistically threatened by a repetition of the violation" (internal quotation marks and citations omitted)).

Plaintiffs also attempt to distinguish this case from *Lyons* by arguing that Defendants' conduct chilled Plaintiffs' freedom of speech under the First Amendment. As noted by another court in this district, "allegations showing a plaintiff's continued intent to engage in protected speech and a governmental entity's continued efforts to chill such speech may establish a likelihood of future injury sufficient for standing." *Bass v. City of Fremont,* No. C12–4943 TEH, 2013 WL 891090, at *9 (N.D.Cal. Mar. 8, 2013) (dismissing claim for injunctive relief based on First Amendment retaliation claim where plaintiff did not allege his continued intent to engage in protected speech and government's continued efforts to chill such speech, citing *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir.2000)). Plaintiffs' complaint makes only bare and conclusory allegations that Defendants violated Plaintiffs' First Amendment rights, (*see, e.g.,* Compl.¶¶ 16(c), 20, 68); it does not allege any plausible facts that Plaintiffs' freedom of speech and First Amendment rights have been chilled.

*4 In sum, Plaintiffs have failed to allege sufficient facts to establish standing to pursue their claim for injunctive relief. Plaintiffs' claim for injunctive relief is accordingly dismissed. As it is not apparent that amendment would be futile, the court dismisses this claim without prejudice and grants Plaintiffs leave to amend this claim to allege facts sufficient to confer standing to seek injunctive relief. *See Foman v. Davis,* 371 U.S. 178, 182 (1962).

### IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted. Plaintiffs' Fourteenth Amendment Due Process claim is dismissed. Plaintiffs' claim for injunctive relief is dismissed with leave to amend. Any amended complaint shall be filed within fourteen (14) days of this order.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2014 WL 2194816

Footnotes

1   When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

2   Marcus stopped Gonzalez based on an alleged violation of California Vehicle Code section 22526(a), which prohibits a driver from entering an intersection unless there is sufficient space on the other side of the intersection to accommodate the vehicle driven without obstructing the through passage of vehicles from either side. (*See* Compl. ¶ 13.)

**De Gonzalez v. City of Richmond, Not Reported in F.Supp.2d (2014)**

2014 WL 2194816

3    Defendants do not move pursuant to Rule 12(b)(1) for lack of Article III standing and subject matter jurisdiction, but instead move pursuant to Rule 12(b)(6) for failure to state a claim. A plaintiff's lack of standing may be raised at the pleading stage under Rule 12(b)(6). *See Schmier v. U.S. Court of Appeals for the Ninth Circuit,* 279 F.3d 817, 823 (9th Cir.2002).

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Hegwood v. City of Berwyn, Not Reported in F.Supp.2d (2010)
2010 WL 5232281

2010 WL 5232281
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Talmon HEGWOOD, Jr., Plaintiff,
v.
CITY OF BERWYN, Joseph Petersen,
Kmart Department Store, Robert Hartz,
and Paola Raimondi, Defendants.

No. 09 C 7344.
|
Dec. 16, 2010.

Attorneys and Law Firms

Talmon Hegwood, Jr., East Moline, IL, pro se.

Andrew Yahres Acker, Michael R. Durkin, Storino, Ramello & Durkin, Rosemont, IL, Anna–Katrina S. Christakis, Raechelle D. Norman, Grady Pilgrim Christakis Bell LLP, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

VIRGINIA M. KENDALL, District Judge.

**\*1** Plaintiff Talmon Hegwood, Jr. ("Hegwood") filed suit against the City of Berwyn and two Berwyn police officers, Joseph Petersen ("Petersen") and Paola Raimondi ("Raimondi"), as well as K–Mart Department Store ("K–Mart")[1] and K–Mart manager Robert Hartz ("Hartz") (collectively "Defendants"), alleging various civil rights violations. In the First Amended Complaint Count I alleges that Petersen illegally searched and seized Hegwood, in violation of Section 1983; Count II alleges that Petersen and Hartz conspired to deprive him of his constitutional rights, in violation of Section 1983 and 1985; Count III alleges false imprisonment against Petersen; Count IV alleges state law intentional infliction of emotional distress against Raimondi; Count V alleges indemnification against the City of Berwyn; Count VI alleges respondeat superior against K–Mart; Count VII alleges state law false arrest against Petersen and Hartz; Count VIII alleges state law malicious prosecution against Petersen and Hartz; Count IX alleges state law intentional

infliction of emotional distress against Petersen and Hartz; and Count X alleges state law battery against Raimondi. K–Mart and Hartz (collectively "K–Mart Defendants") move to dismiss Counts II, VI, VII, VIII, and IX. For the following reasons, the K–Mart Defendants' Motion to Dismiss is granted.

*BACKGROUND*

On October 19, 2008, Hegwood alleges that he called the Berwyn Police Department to report a child abduction. (First Am. Compl. ¶ 9.) Upon arrival at the scene, police questioned Hegwood and another person, who said Hegwood approached him in the bathroom and made him feel uncomfortable so he asked Hegwood to leave. (R. 89, Hegwood's Amended Resp. to Mot. to Dismiss 90.) The responding officers did not allow Hegwood to leave the restaurant while they conducted a warrant check by radio, and the check revealed that there was an outstanding warrant to arrest Hegwood. (*Id.* at 88, 90.) The officers therefore took Hegwood into custody. (First Am. Compl. ¶ 10.)

At the police station the officers conducted an inventory of Hegwood's possessions, which consisted of a rolling duffel bag and contents within the bag. (R. 89, Hegwood's Amended Resp. to Mot. to Dismiss 90.) The duffel bag had a K–Mart price tag on it. (*Id.* at 90.) Inside the bag were a variety of K–Mart items, including hats, shirts, and jackets; these items still had prices tags and theft detection devices attached and some were still on hangars. (*Id.*) Hartz, a K–Mart manager, identified these items as stolen merchandise based on a surveillance video of Hegwood while he was in the store. (*Id.* at 65, 78, 90–93.) A grand jury indicted Hegwood for possession of stolen property and theft on November 13, 2008. (*Id.* at 89.) The State dismissed the theft charge *nolle prosequi* because Hegwood was already found guilty of violating his conditional discharge and a finding of guilty for the theft charge would have been served concurrently and would not have increased his overall time in prison. (*Id.* at 33.)

**\*2** Hegwood claims that Officer Petersen, who responded to Hegwood's call, arrested him without probable cause upon arriving at the scene. (First Am. Compl. ¶ 10.) Hegwood further contends that Officer Petersen falsely filled out police reports regarding his

Hegwood v. City of Berwyn, Not Reported in F.Supp.2d (2010)

2010 WL 5232281

arrest for theft and violating probation. (First Am. Compl. ¶ 14.) He also claims that in the course of preparing for the related criminal prosecution Hartz conspired with Petersen to "provide false and misleading information" to the state prosecutors. (First Am. Compl. ¶ 13.)

## STANDARD OF REVIEW

The K–Mart Defendants seek dismissal of Hegwood's claims under Rule 12(b)(6) for failing to state a claim upon which relief can be granted. To state a proper claim, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Detailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true ... 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." Iqbal, 129 S.Ct. at 1950. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines if they plausibly give rise to an entitlement to relief. Id.

## DISCUSSION

### I. Count II Against Hartz: Conspiracy Under 42 U.S.C. §§ 1983 and 1985

Hegwood claims that Petersen and Hartz conspired to deprive him of his constitutional rights, in violation of 42 U.S.C. §§ 1983 and 1985. To successfully plead conspiracy, the plaintiff must "indicate the parties, general purpose, and approximate date [of the conspiracy] so that the defendant has notice what he is charged with." Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir.2002).

Count II specifically alleges that Petersen and Hartz "reached an agreement amongst themselves to unlawfully search and seize Plaintiff, and to thereby deprive Plaintiff of his Constitutional rights." (First Am. Compl. ¶ 19.) The Court interprets this allegation to refer to an alleged agreement between Petersen and Hartz to seize, arrest and search Hegwood on October 19, 2008. Hegwood fails

to allege the reason for this alleged agreement, when it was entered into, the specific role of each conspirator or even the end goal of the agreement. See Ryan v. Mary Immaculate Queen Center, 188 F.3d 857, 859–60 (7th Cir.1999) (no conspiracy because "form and scope of conspiracy" were "entirely unknown" based on allegations); Walker, 288 F.3d at 1007–08. Without these facts alleged, Hegwood fails to allege a conspiracy. These are insufficient allegations to allow Hartz to "prepare his defense" or for the court to "determine whether the claim [is] within the ballpark of possibly valid conspiracy claims." Walker, 288 F.3d at 1008. The alleged conspiracy based on the arrest therefore fails to state a claim.

*3 Although Hegwood adds a location for his allegation of conspiracy against the Cook County State's Attorney, specifically that it occurred at the courthouse in October and November 2009, this allegation suffers from the same defect as the previous allegation. Hegwood's conclusory allegation again fails to provide the purpose of this alleged agreement, the false information provided, and the role of each conspirator. These facts are similarly insufficient to put Hartz properly on notice and narrow the focus of discovery for the parties. Hegwood's alleged conspiracy claims are therefore dismissed.

### II. Count VI Against K–Mart: Respondeat Superior

Hegwood's First Amended Complaint asserts that K–Mart is liable under the theory of respondeat superior because Hartz "committed the acts alleged above [conspiracy and false arrest] in the scope of their [sic] employment as employees of the City of Berwyn." (First Am. Compl. ¶ 20.) As an initial matter, this allegation refers to the City of Berwyn as Hartz's employer, not the correct employer, K–Mart. For this simple reason Count VI does not state a claim against K–Mart and therefore is dismissed.

Even assuming Hegwood properly referred to K–Mart as Hartz's employer, Hegwood still does not state a respondeat superior claim. As a private corporation K–Mart "is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." Johnson v. Dossey, 515 F.3d 778, 782 (7th Cir.2008) (quoting Iskander v. Vill. of Forest Park, 690 F.2d 126, 128 (7th Cir.1982)). A private corporation, however, can be liable if its policy or practice is the "moving force" behind the constitutional violation. Dossey, 515 F.3d at 782. In addition, just like municipalities, "liability [against

private corporations] can be 'demonstrated indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policy-making level' " of the corporation was " 'bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned ... the misconduct of subordinate officers.' " *Dossey*, 515 F.3d at 782 (quoting *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir.2004)). Here, Hegwood claims that Hartz's role in the conspiracy can be imputed to K–Mart. No facts in the First Amended Complaint, however, support such a claim. The conspiracy allegations against Hartz and Petersen do not even remotely suggest K–Mart was involved. The Court thus dismisses Hegwood's respondeat superior claim relating to the conspiracy count.

Nor is there a factual basis in the First Amended Complaint to hold K–Mart liable under respondeat superior for the state law claims against Hartz (Count VII: false arrest; Count VIII: malicious prosecution; and Count IX: intentional infliction of emotional distress). An employer is liable for the torts of an employee if they are committed "within the scope of employment." *See, e.g., Pesek v. Marzullo*, 566 F.Supp.2d 834, 843 (N.D.Ill.2008) (Bucklo, J.). "To be within the scope of employment, an employee's acts must be: (a) the kind for which the employee is empowered to perform; (b) substantially within the authorized time and space limits; and (c) actuated, at least in part, by a purpose to serve the master." *See, e.g., Arias v. Allegretti*, No. 05 C 5940, 2008 WL 191185, at *5 (N.D.Ill. Jan.22, 2008) (Gettleman, J.). Besides asserting the conclusory statement that Hartz was acting in the scope of his employment, which is clearly deficient under the pleading rules, no facts show Hartz was authorized to act the way he allegedly did, or that he acted with the goal of benefitting K–Mart. Accordingly, the facts in the First Amended Complaint also fail to establish a claim against K–Mart under respondeat superior for the state law claims.

### III. Count VII Against Hartz: False Arrest
 *4 A private defendant may be liable for false arrest if the defendant "participates" in making an arrest that is eventually found to be unlawful. *Odorizzi v. A.O. Smith Corp.*, 452 F.2d 229, 231–32 (7th Cir.1971) (no false arrest if defendant does not "procure" the arrest, "command" that police make the arrest, or "campaign" to have defendant arrested). In other words, this is a factual determination, where the defendant can be liable

for "directing" the illegal arrest but not for merely "giving information." *See, e.g., Doe v. City of Chicago*, 39 F.Supp.2d 1106, 1113–14 (N.D.Ill.1999) (Williams, J.) (no false arrest claim because defendant described events that occurred leading to arrest and did not "request" that arrest be made). Here, the First Amended Complaint contains only one allegation regarding Hegwood's actual arrest: "Defendant Petersen, who responded to Plaintiff's call for help, arrested Plaintiff without probable cause or any other legal justification." (First Am. Compl. ¶ 10.) No facts suggest that Hartz had any involvement in Hegwood's arrest. It was Petersen that responded to Hegwood's call and eventually arrested him. Hartz did not "direct," "command," or "order" the arrest. In fact, even though merely providing police with information leading to an arrest is not a basis for false arrest liability, Hartz did not even do that. Factual allegations suggesting Hartz had any role in Hegwood's arrest are entirely lacking. Accordingly, the Court dismisses Count VII.

### IV. Count VIII Against Hartz: Malicious Prosecution
Under Illinois law, a plaintiff must establish five elements for a malicious prosecution claim: "(1) the commencement or continuance of an original or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such a proceeding; (4) the presence of malice; and (5) damages." *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 922 (7th Cir.2001) (quoting *Swick v. Liautaud*, 82 Ill.2d 40, 44 Ill.Dec. 260, 411 N.E.2d 229, 231 (Ill.1980)). While the First Amended Complaint satisfies the second element because the charges were dismissed *nollo prosequi*, the other elements lack the requisite factual detail to state a claim. As to the first element—defendant commencing or continuing a criminal proceeding—the defendant "must have initiated the criminal proceeding or 'his participation in it must have been of so active and positive a character as to amount to advice and cooperation.' " *Logan*, 246 F.3d at 922 (quoting *Denton v. Allstate Ins. Co.*, 152 Ill.App.3d 578, 105 Ill.Dec. 471, 504 N.E.2d 756, 760 (Ill.App.Ct.1987)). Typically, the defendant "commences" a criminal judicial proceeding by filing a complaint. *See, e.g., Schwartz v. Coulter*, No. 91 C 7954, 1993 WL 398578, at *8 (N.D.Ill. Oct.6, 1993) (Williams, J.).

Here, as in *Logan*, the First Amended Complaint does not allege that Hartz filed a criminal complaint against Hegwood, provided false information at the time of arrest,

Hegwood v. City of Berwyn, Not Reported in F.Supp.2d (2010)

2010 WL 5232281

or "pressured" the Berwyn officers to arrest Hegwood. The allegations pertaining to Hegwood's arrest include only the facts that Hegwood called the police reporting suspicious activity at McDonalds and Officer Petersen responded to the call and arrested Hegwood "without probable cause." (First Am. Compl. ¶¶ 9, 10.) Any allegations against Hartz relate to his involvement, about a year after the arrest, in providing false information to prosecutors. (First Am. Compl. ¶ 13.) The first element is therefore lacking because no facts link Hartz to the commencement of the case against Hegwood. The same factual deficiencies also apply to elements three and four, which provide no notice to Hartz about the nature and scope of this claim. The Court has no basis to find that Hegwood's allegations amount to a valid claim. Because of these deficiencies, Count VIII fails to state a claim of malicious prosecution against Hartz.

### V. Count IX Against Hartz: Intentional Infliction of Emotional Distress

*5 Under Illinois law, a claim of intentional infliction of emotional distress requires that the plaintiff show that "(1) defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen–El v. Cook County Sheriff's Dep't,* 602 F.3d 852, 864; *Kolegas v. Heftel Broad. Corp.,* 154 Ill.2d 1, 180 Ill.Dec. 307, 607 N.E.2d 201, 211 (Ill.1992). The "extreme and outrageous" element covers conduct that is "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas,* 180 Ill.Dec. 307, 607 N.E.2d at 211.

The conclusory allegations in Hegwood's First Amended Complaint do not involve the type of conduct that has qualified as extreme and outrageous. *See, e.g., Fox v. Hayes,* 600 F.3d 819, 842–43 (7th Cir.2010) (during interrogation of father of victim that was found sexually assaulted and killed, it was extreme and outrageous for officers to yell to the victim's mother, who was also present during the interrogation, that her husband committed the crime, was a liar, and never loved her or her daughter); *Naeem v. McKesson Drug Co.,* 444 F.3d 593, 605–06 (7th Cir.2006) (employer's conduct was extreme and outrageous for forcing the plaintiff, while she was pregnant, to climb up an unstable stairway to hook up her computer as well as denying her access to her computer and altering files by "sabotaging" her computer). Hegwood's allegations simply restate the elements for an intentional infliction of emotional distress claim without providing any other factual support. There is no plausible basis to find that Hartz's actions were improper at all; his conduct does not even "come close" to being the kind of behavior that is "extreme and outrageous." *Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617, 626 (7th Cir.2010). Accordingly, Count IX is dismissed.

### *CONCLUSION AND ORDER*

The Court grants Hartz and K–Mart's Motion to Dismiss. Counts II, VI, VII, VIII, and IX are dismissed.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 5232281

Footnotes

1     In its Motion to Dismiss, Defendant K–Mart points out that Hegwood apparently named the wrong entity in his First Amended Complaint—K–Mart Department Store instead of K–Mart Corporation. K–Mart, however, did not advance any argument in this regard.

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1020747
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Linda Construction Inc., Linda
McGee and Jesse McGee, Plaintiffs,
v.
City of Chicago, et al., Defendants.

Case No. 15 C 8714
|
Signed 03/15/2016

### MEMORANDUM OPINION AND ORDER

Harry D. Leinenweber, Judge

**\*1** Before the Court are three Motions to Dismiss filed by Defendants Seng LLC ("Seng") and John Doe (collectively the "the Seng Defendants"); Defendants City of Chicago ("the City") and Jamie L. Rhee ("CPO Rhee") (collectively "the City Defendants"); and Defendants Republic Services Inc. ("Republic"), Allied Waste Transportation Inc. ("Allied"), Mark Riley, and Brian Holcomb (collectively "the Republic Defendants") [ECF Nos. 28, 32, 33].

In addition, the Court considers Plaintiffs' Motion for Preliminary Injunction, Motion for Evidentiary Hearing, and Motion for Leave to Present New Evidence [ECF Nos. 17, 56, 60], as well as the Seng Defendants' Motion for Sanctions [ECF No. 42].

For the reasons stated herein, the Motions to Dismiss are granted. The Motion for Preliminary Injunction, Motion for Evidentiary Hearing, and Motion for Leave to Present New Evidence are, in turn, denied as moot. The Motion for Sanctions is also denied.

### I. BACKGROUND

The following facts are contained in Plaintiffs' Complaint and documents attached to, referenced in, and critical to, the Complaint. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Because Plaintiffs chose not to

provide the Court with a statement of the relevant facts in their responsive briefing, the following is the Court's best attempt to cobble together from the disjointed allegations in the Complaint the facts pertaining to the Motions presently before the Court.

On November 9, 2009, the City, through its Department of Procurement Services ("DPS"), advertised for bids on a contract for "Operation and Maintenance of City-Owned Materials Recycling and Recovery Facilities" (the "MRRF contract"). In its solicitation for bids for the MRFF contract the City specified a minimum goal participation of 16.9 percent Minority-Owned Business Enterprises ("MBEs") and 4.5 percent Women-Owned Business Enterprises ("WBEs"). The winning contractor was required to list the utilization percentages of MBEs and WBEs in its bid proposal to the City.

On or about December 11, 2009, Defendant Allied submitted its sealed bid to provide handling, treatment, storage, transportation, hauling, and disposal of Municipal Solid Waste for a thirty-six month period from March 9, 2010 through February 14, 2013 ("Contract No. 21472"). In the spring of 2010, the City accepted Allied's bid and awarded Contract No. 21472 to Allied. (Compl. Ex. A; City Def.'s Mem. Ex. A, ECF No. 32-1).

Plaintiffs allege that Contract No. 21472 between Allied and the City "required [Allied] to enter into a 'joint venture' with a minority owned contractor"; that Plaintiff Linda Construction Inc. ("LCI") — an African-American owned business — was that contractor; that the contract gave LCI a three-year probationary period to prove it was capable of doing the required work; and that if LCI succeeded during the probationary period it would be eligible to bid for the City contract as prime contractor. After thoroughly examining Contract No. 21472, the Court is unable to find any of these allegations to be true. In ruling on a 12(b)(6) motion, "[w]here an exhibit and the complaint conflict, the exhibit typically controls." *Forrest v. Universal Sav. Bank, F.A.,* 507 F.3d 540, 542 (7th Cir. 2007). Therefore, the Court "is not bound by" LCI's characterization of the exhibit and "may independently examine and form its own opinions about the document." *Id.*

**\*2** From the terms of Contract No. 21472, it appears that Allied identified LCI as one of several MBE entities that it would serve as a subcontractor if Allied won the

Linda Construction Inc. v. City of Chicago, Not Reported in F.Supp.3d (2016)

2016 WL 1020747

bid with the City. LCI was identified as a certified MBE subcontractor that would provide Hauling Services to Allied, as prime contractor, and be rewarded equivalent to 3 percent of all net payments made to Allied under the contract. Moreover, LCI was required to "enter into a formal written agreement for the above work with [Allied] as Prime Contractor, conditioned upon [Allied's] execution of a written contract with the City of Chicago...." On March 19, 2010, after Allied was awarded Contract No. 21472, LCI indeed entered into a formal written subcontractor agreement with Allied. But that contract is not attached to the Complaint, nor do Plaintiffs purport to base their claims on the terms of that agreement.

Instead, Plaintiffs center their claims on Contract No. 21472, the contract between Allied and the City. They allege that the City and Allied were not happy that LCI was awarded the MBE contract, and therefore set about doing "whatever was possible to cause [LCI] to fail...so that [LCI] would not become eligible to bid for any [future] contracts." (Compl. ¶ 5). Plaintiffs allege that Allied and its parent company, Republic, with the help and participation of the City, recruited other named Defendants to treat LCI "differently than they treated white owned contractors" and "to ensure that LCI failed...by obstructing LCI's operations", (id. at ¶ 6), and rendering it insolvent. (Id. at ¶ 50). In support of this accusation, Plaintiffs point to the following occurrences:

1. Republic and Allied — who operated the transfer station — refused to load LCI's trucks and intentionally delayed the loading process to ensure LCI was unable to complete the required number of daily loads. (Id. at ¶¶ 35, 42).

2. Republic instructed Local Union 731 not to allow LCI employees to sign membership applications, and then Allied attempted to terminate its agreement with LCI because LCI employees were not members of the Union. (Id. at ¶ 35).

3. Even after resolving this dispute with the Union, LCI was prohibited from bringing any disciplinary actions against its employees for any reason. Specifically, LCI contends that the Union leaders encouraged LCI employees to misbehave and obstruct LCI's operations, and then consistently sided with LCI's employees despite their obvious misconduct. (Id. at ¶¶ 36, 37). LCI filed a grievance with the Union to no avail. (Id. at ¶ 36).

4. The Union filed frivolous lawsuits against LCI for unpaid dues, and then reportedly threatened LCI's attorneys retained to defend against the suits. (Id. at ¶ 39).

5. CPO Rhee paid Republic and Allied without obtaining signed approvals from LCI, in violation of the City's express policy. (Id. at ¶ 41).

6. Brian Holcomb, of Allied, promised to pay LCI $800,000 towards a $1.6 million invoice, but failed to do so. (Id. at ¶ 43). Later, Holcomb told LCI that Allied could only pay $400,000 towards the invoice. (Id.). But to date, no funds have been paid. (Id.).

7. LCI brought the aforementioned concerns to the attention of CPO Rhee (in fact, they made at least 24 complaints in 16 months), but she did nothing to remedy the situation. (Id. at ¶¶ 42, 44, 47).

8. On March 29, 2012, Allied attempted unsuccessfully to terminate LCI by claiming lack of performance. (Id. at ¶ 45).

9. Allied allowed TC Transportation, a white-owned company, to utilize sites that were contractually exclusive to LCI. (Id. at ¶ 46).

10. In December 2013, Republic refused to pay LCI on a $1.4 million invoice because it claimed LCI had failed to meet its daily load requirement (it is unclear from the pleadings whether this invoice is different than the $1.6 million invoice discussed previously). (Id. at ¶ 48).

11. Seng, a creditor of LCI, claimed it was owed money and seized LCI's trucks. LCI contends that it had already paid Seng and therefore Seng's claim against it was false and the seizure of the trucks was improper. (Id. at ¶ 50).

*3 12. In March 2014, Allied accused LCI of violating the terms of its agreement by allowing garbage to build up at the transfer station, but withdrew the allegation once it was disclosed that the garbage build-up was due to Allied shutting down the transfer station for a day and a half. (Id. at ¶ 52).

Ultimately, on April 7, 2015, Allied terminated its agreement with LCI claiming that LCI was insolvent and unable to perform at the required level. (Id. at ¶ 53). Plaintiffs contest these allegations and contend that their

**Linda Construction Inc. v. City of Chicago, Not Reported in F.Supp.3d (2016)**

2016 WL 1020747

circumstances were the product of Defendants' actions. As a result of the foregoing conduct, LCI was unable to bid on the November City contracts. (*Id.* at ¶ 54).

Plaintiffs filed the instant suit raising five counts against the various Defendants: violation of 42 U.S.C. § 1981 (Count I); violation of 42 U.S.C. § 2000e (Count II); violation of 42 U.S.C. § 1983 (Count III); violation of 42 U.S.C. § 1985(3) (Count IV); and tortious interference with contract (Count VI). Plaintiffs also allege that the City, Republic and Allied committed breach of contract (Count V). The Seng Defendants, the City Defendants, and the Republic Defendants now bring three separate Motions to Dismiss. The City and Republic Defendants both argue that Plaintiffs Linda and Jesse McGee lack standing to maintain any of the alleged causes of action. The Court will address this argument first. The Court will then discuss the viability of each of Plaintiffs' claims in light of the numerous interrelated and independent reasons for dismissal cited by Defendants.

## II. LEGAL STANDARD

A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Hallinan v. Fraternal Order of Chi. Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). When considering a Rule 12(b)(6) motion to dismiss, a court must accept the plaintiff's allegations as true, and view them in the light most favorable to the plaintiff. *Meriwether v. Faulkner,* 821 F.2d 408, 410 (7th Cir. 1987). A court need not accept as true "legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)) (internal quotations and alterations omitted).

## III. ANALYSIS

### A. Standing as to Linda and Jesse McGee

The City and Republic Defendants argue that Plaintiffs Linda and Jesse McGee lack standing to maintain any of the alleged causes of action because they did not suffer any injury separate and apart from those allegedly suffered by LCI. Although the Complaint alleges that Linda McGee is the president and majority shareholder of LCI and that Jesse McGee is the Vice President of the company, well-established precedent holds that "shareholders do not have standing to sue for harms to the corporation, or even for the derivative of harm to themselves that might arise from a tort or other wrong to the corporation." *Hammes v. AAMCO Trans., Inc.,* 33 F.3d 774, 777 (7th Cir. 1994).

For Linda and Jesse McGee to have standing, they must be able to allege an injury that affects their own legal rights, not those of their company, LCI. *J.F. Shea Co. v. City of Chicago,* 992 F.2d 745, 749 (7th Cir. 1993); *see also, Southwest Suburban Bd of Realtors, Inc. v. Beverly Area Planning Assoc.,* 830 F.2d 1374 (7th Cir. 1987) (corporation's employees, officers, stockholders, and creditors had no injury distinct from corporation and lacked standing to maintain antitrust suit); *Pitchford v. Pepi, Inc.,* 531 F.2d 92, 97 (3d Cir. 1975) (corporate president lacked standing to sue either in his capacity as a stockholder or as an officer because injuries were derivative of the company's injuries), *cert. denied,* 426 U.S. 935 (1976), 440 U.S. 981 (1979). They fail to do so. Neither Linda nor Jesse was party to either contract cited in the complaint, and the alleged discriminatory behavior upon which Plaintiffs base their claims was directed entirely at LCI. The Complaint contains no allegation of conduct that was personally directed at, or resulted in distinct personal injury to, Linda and Jesse McGee. Without such allegations, Plaintiffs Linda and Jesse McGee lack standing and the Court dismisses all claims brought by them. Plaintiffs are granted fourteen (14) days from the date of this Opinion to file an Amended Complaint.

### B. Count I – Discrimination on the Basis of Race, Violation of 42 U.S.C. § 1981

**\*4** Under section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and territory to make and enforce contracts...and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." The term "make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions

Linda Construction Inc. v. City of Chicago, Not Reported in F.Supp.3d (2016)

2016 WL 1020747

of the contractual relationship." *Id.* at § 1981(b). To state a claim under 42 U.S.C. § 1981, Plaintiffs must allege that: (1) they are members of a racial or ethnic minority; (2) Defendants intended to discriminate against them on the basis of race or ethnicity; and (3) the discrimination concerned the making and enforcing of a contract. *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 756 (7th Cir. 2006). Thus, a successful section 1981 claim depends upon the existence of a contract. *Gonzalez v. Ingersoll Milling Mach. Co.,* 133 F.3d 1025, 1034 (7th Cir. 1998); *Stone v. Am. Fed'n of Gov't Employees,* 135 F.Supp.2d 873, 875 (N.D. Ill. 2001).

Plaintiffs allege that Defendants treated LCI differently to ensure that they did not qualify to bid for City contracts, and that this was done because of Plaintiffs' race. (Compl. ¶ 61). Plaintiffs do not base their section 1981 claim on any existing contract to which they were a party, instead, they claim that Defendants interfered with "the making" of a contract between LCI and the City. But a claim for interference with the right to make and enforce a contract "must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities." *Morris v. Office Max, Inc.,* 89 F.3d 411, 414 (7th Cir. 1996) (allegation that defendant interfered with "prospective" contractual rights is "speculative and insufficient to state a claim under § 1981"). Plaintiffs have pleaded themselves out of court by admitting that they did not bid on the "November City contracts." (Compl. ¶ 54). Because Plaintiffs did not attempt to obtain the November contracts by placing bids, they never sought to enter into a contractual relationship with the City. As such, there was no contractual interest in which Defendants could interfere. Plaintiffs suffered only the possible loss of a future contractual opportunity, which is insufficient.

Moreover, it is well settled that a plaintiff cannot maintain a section 1981 claim when she is responsible for terminating the transaction. *Bagley v. Ameritech Corp.,* 220 F.3d 518, 521 (7th Cir. 2000); *Morris v. Office Max, Inc.,* 89 F.3d 411, 414 (7th Cir. 1996); *Hart v. Wal-Mart Stores, Inc.,* No. 09-CV-2125, 2010 WL 2663081, at *6 (C.D. Ill. July 1, 2010). Plaintiffs terminated the transaction with the City by failing to bid on the November contracts. In doing so, they extinguished any possible claim of racial discrimination under section 1981. Therefore, Plaintiffs' section 1981 claim fails as a matter of law and the Court dismisses Count I with prejudice as to all Defendants.

### C. Count II – Discrimination on the Basis of Race, Violation of 42 U.S.C. § 2000e ("Title VII")

Title VII prohibits discrimination in employment. 42 U.S.C. § 2000e-2. Plaintiffs' Title VII claim fails because they have not set forth any facts alleging that they applied for employment with, or were ever employed by, any of the named Defendants. *See, e.g., Alam v. Miller Brewing Co.,* 709 F.3d 662, 667 (7th Cir. 2013) (affirming dismissal of Title VII claim where plaintiff failed to plead facts establishing that an employment relationship existed between plaintiff and defendant); *Mays v. BNSF Ry. Co.,* 974 F.Supp.2d 1166, 1177 (N.D. Ill. 2013) (dismissing plaintiff's Title VII claim where plaintiff admitted that he "was never employed by [defendant]"). The closest Plaintiffs come is in their relationship with Allied. But that relationship is best described as an independent contractor relationship, which is not covered by Title VII. *Knight v. United Farm Bureau Mut. Ins. Co.,* 950 F.2d 377, 380 (7th Cir. 1991). Because Plaintiffs cannot cure this defect by amending their pleadings, the Court dismisses Count II with prejudice as to all Defendants.

### D. Count III – Violation of the Fourteenth Amendment, 42 U.S.C. § 1983

*5 To state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege that "some person has deprived him of a federal right" and "that the person who has deprived him of the right acted under color of state...law." *Gomez v. Toledo,* 446 U.S. 635, 640 (1980). Plaintiffs allege Defendants deprived them of equal protection under the law in violation of the Fourteenth Amendment. An equal protection cause of action accrues whenever a state "den [ies] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To state an equal protection claim, a section 1983 plaintiff must allege that a state actor or a person acting under the color of state law purposefully discriminated against him because of his identification with a particular group. *Sherwin Manor Nursing Ctr., Inc. v. McAuliffe,* 37 F.3d 1216, 1220 (7th Cir. 1994).

Because the viability of a section 1983 equal protection claim depends upon the defendant's classification as a state actor or a person acting under state law, the Court

Linda Construction Inc. v. City of Chicago, Not Reported in F.Supp.3d (2016)

2016 WL 1020747

will discuss the liability of the City Defendants before turning to the claims against the Republic Defendants and the Seng Defendants.

### *1. The City Defendants*

A local governmental unit is subject to suit under 42 U.S.C. § 1983. But *respondeat superior* will not suffice to impose Section 1983 liability on the City. *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690–91 (1978); *Moore v. Bd. of Educ. of City of Chgo,* 300 F.Supp.2d 641, 645 (N.D. Ill. 2004). Instead, for liability to follow, a City policy must be the source of the discrimination. *Monell,* 436 U.S. at 694; *Small v. Chao,* 398 F.3d 894, 898 (7th Cir. 2005). Thus, to state a claim against the City Defendants, Plaintiffs must allege the existence of either: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Moore,* 300 F.Supp.2d at 645; *see also, Kentucky v. Graham,* 473 U.S. 159, 165 (1985) (the entity's "policy or custom" must have played a part in the violation of federal law).

Plaintiffs have not alleged that their civil rights were violated by an express policy or that CPO Rhee was a final policymaker for purposes of imposing liability on the City. Instead, Plaintiffs essentially allege that the City acquiesced in, or ratified, the misbehavior of the other Defendants and CPO Rhee. But such allegations do not rise to the level of a "widespread practice" that, though not officially authorized, "is so permanent and well settled as to constitute a custom or usage with the force of law." *Moore,* 300 F.Supp.2d at 645.

Plaintiffs' allegation that the City of Chicago has never contracted with a minority-owned business to haul garbage does not cure this deficiency. This statistic could be due to many causes — most of which are completely innocent. Nowhere is it alleged with any particularity how this fact reflects an improper City policy; indeed the City's express policy on contracts not only prohibits discrimination against minorities, but actually requires the City to have a goal of granting contracts to MBEs and

WBEs. Therefore, Plaintiffs' Section 1983 claim as to the City is dismissed with leave to amend within fourteen (14) days of the date of this Opinion.

In their claim against CPO Rhee in her individual capacity, Plaintiffs seek to impose personal liability upon CPO Rhee as a government official for actions she took under color of state law. *Graham,* 473 U.S. at 165. To do so, they need only allege that CPO Rhee, acting under color of state law, caused the deprivation of a federal right because of their race. The allegations in the complaint concerning CPO Rhee are that she "participated in disparate treatment," (Compl. ¶ 34); that she "enabled" and "permitted Republic and Allied to obstruct LCI," (*id.* at ¶ 41); that LCI complained to CPO Rhee and she "ignored all the complaints," (*id.*); and that CPO Rhee approved payments to Allied without obtaining signed approvals from LCI, (*id.*). It is without dispute that, in taking the complained-of actions, CPO Rhee was acting under the color of state law. But Plaintiffs' allegations as to CPO Rhee's discriminatory motive are general and conclusory and do not raise a plausible claim of intentional discrimination on the basis of race. Therefore, the Court dismisses Plaintiffs' Section 1983 claim against CPO Rhee with leave to amend within fourteen (14) days.

### *2. The Republic Defendants and Seng Defendants*

*6 When a plaintiff brings a Section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law. *Rodriguez v. Plymouth Ambulance Serv.,* 577 F.3d 816, 822 (7th Cir. 2009). This requires that a court find such a "'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Id.* at 823 (quoting *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 351 (1974)). Plaintiffs have not even attempted to plead such a connection between the actions of the Republic and Seng Defendants and the City. Therefore, Plaintiffs' Section 1983 claim as to the Republic and Seng Defendants is dismissed with leave to amend within fourteen (14) days of the date of this Opinion.

### E. Count IV – Conspiracy between Private Actors and Government Officials, Violation of 42 U.S.C. § 1985(3)

Linda Construction Inc. v. City of Chicago, Not Reported in F.Supp.3d (2016)

2016 WL 1020747

A civil conspiracy under section 1985 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Lenard v. Argento,* 699 F.2d 874, 882 (7th Cir. 1983); *Copeland v. Nw. Mem'l Hosp.,* 964 F.Supp. 1225, 1234 (N.D. Ill. 1997). Thus, to establish a *prima facie* case of civil conspiracy under Section 1985, a plaintiff must show an express or implied agreement among the defendants to deprive the plaintiff of his constitutional rights, and a deprivation of those rights in the form of an overt act in furtherance of the agreement. *Scherer v. Balkema,* 840 F.2d 437, 441 (7th Cir. 1988).

It is not enough for a Section 1985 plaintiff to plead mere conclusory allegations of a conspiracy. Rather, the plaintiff must plead specific material facts that show the existence of a conspiracy. *See, Winterland Concessions Co. v. Trela,* 735 F.2d 257, 262 (7th Cir. 1984) ("[c]onclusory pleadings of a conspiracy must be dismissed"). To succeed, a plaintiff must allege a "single plan, the essential nature and scope of which is known to each person who is to be held responsible for its consequences." *Hoffman– LaRoche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir. 1971). Moreover, the alleged conspirators must have intended to discriminate against the plaintiff and deprive him of equal protection or equal privileges and immunities *because of* his race. *Griffin v. Breckinridge,* 403 U.S. 88, 102-03 (1983); *see also, Jafree v. Barber,* 689 F.2d 640 at 643 ("To sufficiently state a cause of action [under Section 1985] the plaintiff must allege some facts that demonstrate that his race *was the reason for* the defendant's [action]." (emphasis added)). This type of allegation also must be supported by material facts, not conclusory statements. *Jafree,* 689 F.2d at 644.

Plaintiffs have not alleged any facts indicating that the City or its agent, CPO Rhee, entered into an agreement with any of the other Defendants with the goal of depriving Plaintiffs of their constitutional rights because of their race. Plaintiffs' contention that a conspiracy existed is a legal conclusion that the Court need not accept as true, *Brooks,* 578 F.3d at 581, and Plaintiffs offer only conclusory allegations in support of this contention. Plaintiffs allege repeatedly that Defendants intended to "ensure that LCI failed during its probationary period," and would do "whatever was possible to cause [LCI] to

fail." These allegations simply are insufficient to show that any meeting of the minds occurred between the City and the various Defendants to deprive Plaintiffs of their constitutional rights.

*7 Furthermore, Plaintiffs have failed to allege facts to indicate that racial animus underlay Defendants' alleged conspiracy against LCI. Although Linda and Jesse McGee are African American and LCI is an African American-owned business, Plaintiffs make no further allegations to demonstrate that the alleged actions of the various Defendants were motivated by race. Plaintiffs simply tack on the phrases "because of Plaintiffs Linda and Jesse McGee's race" or "because of [Plaintiffs'] race" to each of their contentions in Count IV. Plaintiffs' allegations in the body of the Complaint that they were "treated differently than white owned contractors," and that Defendants "were not happy about having [a] black-owned contractor com[e] in and tak[e] their contract," are conclusory at best. Plaintiffs fail to allege *facts* showing any kind of racial animus on the part of the City or the other Defendants.

Finally, the Section 1985 claim against the City, like that under Section 1983, must be dismissed because Plaintiffs cannot hold the City liable for constitutional injury under Section 1985 unless an official custom, policy, or practice has caused the deprivation. *Monell,* 436 U.S. at 694. The allegations in the Complaint show that Plaintiffs are attempting to impose liability on the City not for its own policies, or for the acts of its policymakers, but rather for the alleged conspiratorial acts of its agent, CPO Rhee. Such allegations simply will not support holding the City liable under Section 1985(3).

Because Plaintiffs have not alleged the essential elements of a Section 1985(3) claim, Count IV is dismissed as to all Defendants. However, because it is conceivable that Plaintiffs can amend the Complaint to state a successful Section 1985(3) claim, the dismissal is without prejudice. Plaintiffs may amend within fourteen (14) days of the date of this Opinion.

### F. Count V – Breach of Contract

Plaintiffs make a claim for breach of contract as to the City, Republic and Allied. Under Illinois law, only a party to the contract, one in privity with a party to the contract, or a third-party beneficiary of the contract has standing

Linda Construction Inc. v. City of Chicago, Not Reported in F.Supp.3d (2016)

2016 WL 1020747

to sue on a contract. *Haake v. Bd. of Educ. for Twp. High Sch. Glenbard Dist. 87,* 925 N.E.2d 297, 306 (Ill. App. Ct. 2010). Plaintiffs are not a party to Contract No. 21472, which is between Allied and the City. Nor have Plaintiffs alleged (nor could they in good faith) that they are third-party beneficiaries to Contract No. 21472. *See, Cronimet Holdings, Inc. v. Keywell Metals, LLC,* 73 F.Supp.3d 907, 917 (N.D. Ill. 2014) (stating that to treat a third party as a beneficiary to a contract, the contracting parties must intend to benefit directly the third party, and such intention "must be shown by an express provision in the contract identifying the third-party beneficiary by name or by description of a class to which the third party belongs"). Thus, Plaintiffs do not have standing to sue for breach of Contract No. 21472.

Although Plaintiffs were party to a separate contract with Allied, they do not base their claims on that contract, nor does that relationship confer privity on Plaintiffs in regard to Contract No. 21472. *See, Haake,* 925 N.E.2d at 306-07. Accordingly, Plaintiffs' breach of contract claim against the City, Republic, and Allied based on Contract No. 21472 is dismissed. If Plaintiffs wish to replead this claim based on the contract between Plaintiffs and Allied, they must do so within fourteen (14) days of the date of this Opinion.

### G. Count VI – Tortious Interference with Contract

To establish a claim of tortious interference with contract a plaintiff must plead: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other caused by the defendant's wrongful conduct; and (5) damages. *Grund v. Donegan,* 700 N.E.2d 157, 160 (Ill. App. Ct. 1998). Because Plaintiffs have not alleged a viable breach of contract claim, their claim for tortious interference with contract necessarily fails. *See, Cohen v. Am. Sec. Ins. Co.,* 735 F.3d 601, 613 (7th Cir. 2013). The Court dismisses Count VI with leave to amend within fourteen (14) days of the date of this Opinion.

### H. Seng Defendants' Motion for Sanctions

**\*8** Finally, the Court considers briefly the Seng Defendants' Motion for Sanctions [ECF No. 42]. In general, Rule 11 grants this Court the power to impose sanctions upon counsel and a represented party, including reasonable attorneys' fees. FED. R. CIV. PRO. 11. Sanctions are appropriate when a pleading or motion is neither well-grounded in fact nor warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law. In addition, sanctions are appropriate in the event a pleading or motion is interposed for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

Essentially, the Seng Defendants request that the Court impose sanctions against Defense Counsel, Maurice Salem, for filing a pleading for an improper purpose. They argue that Mr. Salem is attempting to litigate a version of the same claims arising out of the same facts and against the same parties as a case in Illinois state court. The Seng Defendants claim the Illinois state court case resulted in, among other things, a judgment against LCI, and therefore *res judicata* prevents Plaintiffs from relitigating the matter in federal court.

Although the Seng Defendants raise this argument in their Motion to Dismiss, they do so summarily without citing any case law. Moreover, application of *res judicata* turns on whether the issues presented in this case are the same as the issues decided by the Illinois state court in issuing its final judgment, yet the Seng Defendants neglected to provide the Court with any documentation of the state court's decision. Although the Seng Defendants cite to two exhibits (presumably concerning the state court case) in their Motion for Sanctions, they actually failed to attach the exhibits for the Court's review. The Court cannot take judicial notice of the state court decision based entirely on the Seng Defendants' characterization of the case. This is especially true because Plaintiffs contend that their claims against the Seng Defendants in the present case involve distinct legal issues from those decided by the state court.

In light of these circumstances, the Court declines to grant the Seng Defendants' Motion for Sanctions at this time. But if Plaintiffs choose to continue to pursue their claims against the Seng Defendants and the Seng Defendants can provide some documentary proof of the state court judgment and the issues decided thereby, the Court may be open to revisiting the request for sanctions.

**Linda Construction Inc. v. City of Chicago, Not Reported in F.Supp.3d (2016)**

2016 WL 1020747

### IV. CONCLUSION

For the reasons stated herein, Defendants' Motions to Dismiss [ECF Nos. 28, 32, 33] are granted. The Court dismisses with leave to amend all claims brought by Plaintiffs Linda and Jesse McGee for lack of standing. The Court dismisses all counts of the Complaint as follows: Count I and Count II of the Complaint are dismissed with prejudice; Count III and Count IV are dismissed without prejudice; Count V is dismissed with prejudice as to the City, but without prejudice as to Republic and Allied; and Count VI is dismissed without prejudice. If Plaintiffs do not amend the Complaint within fourteen (14) days, these dismissals will convert into dismissals with prejudice.

In light of this conclusion, the Court also denies as moot Plaintiffs' Motion for Preliminary Injunction, Motion for Evidentiary Hearing, and Motion for Leave to Present New Evidence [ECF Nos. 17, 56, 60].

The Court also declines to grant the Seng Defendants' Motion for Sanctions at this time. But if Plaintiffs choose to continue to pursue their claims against the Seng Defendants and the Seng Defendants can provide some documentary proof of the state court judgment and the issues decided thereby, the Court may be open to revisiting the request for sanctions.

**\*9 IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.3d, 2016 WL 1020747

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Otero v. Dart, Not Reported in F.Supp.2d (2012)

2012 WL 5077727

KeyCite Yellow Flag - Negative Treatment
Distinguished by Macaluso v. City of Chicago, N.D.Ill., November 12, 2015

2012 WL 5077727
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Brian OTERO, Plaintiff,
v.
Thomas J. DART, Sheriff of Cook County,
and Cook County Illinois, Defendants.

No. 12 C 3148.
|
Oct. 18, 2012.

**Attorneys and Law Firms**

Jacie C. Zolna, Myron Milton Cherry, Christopher J. Werner, Myron M. Cherry & Associates, Peter Lawrence Currie, The Law Firm of Peter L. Currie, P.C., Chicago, IL, Robert M. Foote, Matthew J. Herman, Foote, Meyers, Mielke & Flowers, LLC, Kathleen Currie Chavez, Chavez Law Firm P.C., St. Charles, IL, for Plaintiff.

James Charles Pullos, Anthony E. Zecchin, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

AMY J. ST. EVE, District Judge.

**\*1** Defendants Thomas J. Dart ("Dart") and Cook County Illinois (collectively, the "Defendants") move to dismiss Plaintiff Brian Otero's ("Otero") claims pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) and Rule 12(b)(1) or to strike under Rule 12(f). For the following reasons, the Court grants the motion in part and denies it in part. [1]

**RELEVANT FACTS**

Otero alleges the following facts in support of his claims, which the Court accepts as true for the purpose of this motion. On November 23, 2009, the Chicago Police Department arrested Otero for an alleged burglary. (R. 1, Compl. ¶ 21.) Otero was charged with burglary and held in Cook County Jail pending trial because he could not afford to make bail. (*Id.*) Otero stood trial for burglary July 18–21, 2011 and was found "not guilty" on all charges. (*Id* . ¶ ¶ 22, 24.) Otero had no outstanding warrants at the time of the acquittal. (*Id.* ¶ 25.) After the acquittal, Defendants placed Otero in handcuffs and transported him back to Cook County Jail for processing. (*Id.* ¶ 27.) Defendants detained Otero in the "bullpen" at Cook County Jail for approximately twelve hours while Defendants completed the procedure to process Otero for release. (*Id.* ¶ 29.) Defendants have a policy or practice to hold individuals in custody pending the completion of a check for warrants and holds (the "Unlawful Detention Policy"). (*Id.* ¶ 32.) While in the bullpen, an inmate punched and pummeled Otero about the face and body after Otero informed the inmate that he had been acquitted. (*Id.* ¶ 30.)

**LEGAL STANDARD**

**I. Rule 12(b)(1)**

When a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction on a Rule 12(b)(1) motion, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *See Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443–44 (7th Cir.2009); *United Phosphorus, Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 946 (7th Cir.2003) (en banc), *overruled on other grounds by MinnChem, Inc. v. Agrium, Inc.,* 683 F.3d 845 (7th Cir.2012). "Where jurisdiction is in question, the party asserting a right to a federal forum has the burden of proof, regardless of who raises the jurisdictional challenge." *Craig v. Ontario Corp.,* 543 F.3d 872, 876 (7th Cir.2008).

**II. Rule 12(b)(6)**

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir.2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank, FSB v. Hofer,* 649 F.3d

Otero v. Dart, Not Reported in F.Supp.2d (2012)

2012 WL 5077727

610, 614 (7th Cir.2007) (internal quotation and citation omitted). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a) (2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

 **\*2**  "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank,* 649 F.3d at 614. "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.,* 665 F.3d 930, 934–35 (7th Cir.2012) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted)). "The complaint 'must actually suggest that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level.' " *Id.* at 935 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.,* 536 F.3d 663, 668 (7th Cir.2008)). "[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.' " *Id.* (citing *Twombly,* 550 U.S. at 556 (internal quotation omitted)). "To meet this plausibility standard, the complaint must supply 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Id.* (citing *Twombly,* 550 U.S. at 556).

### III. Rule 12(f)

"Rule 12(f) provides that a district court 'may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.' " *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.,* 554 F.3d 1133, 1141 (7th Cir.2009) (quoting Fed.R.Civ.P. 12(f)). Motions to strike pursuant to Rule 12(f) are usually discouraged. *See Smith v. Bray,* 681 F.3d 888, 903 (7th Cir.2012). Motions to strike are appropriate, however, if

they serve to expedite litigation. *See Heller Fin., Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1294 (7th Cir.1989); *see also Talbot v. Robert Matthews Distrib. Co.,* 961 F.2d 654, 664 (7th Cir.1992) (allegations may be stricken if the matter bears no possible relation to controversy). District courts have considerable discretion to strike allegations under Rule 12(f). *See Delta,* 554 F.3d at 1141–42. "The party moving to strike has the burden of showing that the challenged allegations are so unrelated to plaintiff's claim as to be devoid of merit, unworthy of consideration, and unduly prejudicial." *E & J Gallo Winery v. Morand Bros. Beverage Co.,* 247 F.Supp.2d 979, 982 (N.D.Ill.2003) (citation and internal quotation omitted).

### ANALYSIS

On April 27, 2012, Otero filed a one count complaint against Thomas Dart, the Sheriff of Cook County, and Cook County Illinois. (Compl.¶¶ 34–41.) Defendants jointly filed Defendants' Motion to Dismiss and/or Strike the Plaintiff's Complaint. (R. 16, Mot. to Dismiss.) Defendants' argue (1) Otero has failed to state a claim for relief under 42 U.S.C. § 1983; (2) Otero lacks standing to seek equitable relief; and (3) Otero cannot assert substantive claims against Cook County, which is an essential party only for the purposes of indemnification. (*Id.*) The Court addresses these arguments in turn.

### I. Unlawful Detention in Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1983

 **\*3**  Otero alleges that Defendants have a "policy or practice of unlawfully detaining, holding in custody or imprisoning free citizens following a trial or other proceeding at which the citizen is found not-guilty or otherwise acquitted" in violation of 42 U.S.C. § 1983. (Compl.¶¶ 1, 36.) Defendants move to dismiss on the basis that Otero has not sufficiently alleged facts to demonstrate that a custom or policy by either Sheriff Dart or Cook County caused injuries of a "constitutional magnitude." (Mot. to Dismiss at 4.) The Court disagrees.

Section 1983 provides a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. §

Otero v. Dart, Not Reported in F.Supp.2d (2012)

2012 WL 5077727

1983. Where, as here, the Section 1983 defendants are public entities,[2] the plaintiff must demonstrate both an underlying deprivation of a federal right, and that the deprivation "was caused by an official policy or custom." *Sow v. Fortville Police Dep't,* 636 F.3d 293, 301 (7th Cir.2011) (citing *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

A plaintiff may establish that a governmental entity's policy caused a violation of his constitutional rights through one of three ways. A governmental entity may be liable under Section 1983 if the alleged constitutional violations were caused by: (1) an official policy adopted and promulgated by the entity's officers; (2) a governmental practice or custom that, though not officially authorized by law or express policy, is widespread and well settled so as to constitute a custom or usage with the force of law; or (3) an act by an official with final policymaking authority where that act is in conformity with, or in the creation of, governmental policy or rules that essentially have the force of law. *See Thomas v. Cook Cnty. Sheriff's Dept.,* 604 F.3d 293, 303 (7th Cir.2009) (citing *Monell,* 436 U.S. at 690); *Valentino v. Vill. of S. Chi. Heights,* 575 F.3d 664, 674 (7th Cir.2009)). Otero alleges that Defendants' policy or practice of holding in custody or imprisoning citizens after their acquittal "is so widespread, permanent and well settled that it constitutes a custom or usage with the force of law." (Compl.¶ 8.)

Otero asserts that the Unlawful Detention Policy violated his Fourth and Fourteenth Amendment rights because Defendants detained him for an unreasonable length of time and in an unreasonable manner after Defendants no longer had probable cause or any right to detain him. (*Id.* ¶ 32.) Specifically, Otero alleges that the Unlawful Detention Policy led to twelve hours of unlawful detention, during which he sustained physical injuries from a beating in the bullpen. (*Id.* ¶¶ 29, 30.) Whether the factual record fully bears out Otero's allegations after discovery is a matter for another day. "The issue [at the motion to dismiss stage] is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank,* 649 F.3d at 614.

**\*4** Otero need not identify a specific unlawful policy at this stage because he sufficiently describes the policy or practices at issue. *See Wiek v. Keane,* No. 09 CV 920, 2010 WL 1976870, at \*4 (N.D.Ill. May 12, 2010) (holding that a plaintiff "is not required to provide extrinsic evidence that a policy existed" and that "[plaintiff's] assertions that the officers held him overnight in accordance with a municipal policy are sufficient to put the City on notice of his claim."); *Padilla v. City of Chi.,* No. 07 CV 5253, 2011 WL 3793413, at \*5–6 (N.D.Ill. Aug.24, 2011) (finding it sufficient for a *Monell* claim that plaintiff pointed to particular practices, though plaintiff did not point to a particular policy); *Riley v. Cnty. of Cook,* 682 F.Supp.2d 856, 861 (N.D.Ill.2010) ("[A]n official capacity claim can survive even with conclusory allegations that a policy or practice existed, so long as facts are pled that put the defendants on proper notice of the alleged wrongdoing."). Specifically, Otero alleges that the Unlawful Detention Policy includes placing acquitted inmates in the general population and holding them in custody pending the completion of a check for warrants and holds. (Compl.¶ 32.) These allegations amount to more than just boilerplate language reciting the elements of the offense. Otero has sufficiently apprised Defendants of the allegedly unconstitutional policy or custom, and thus has alerted Defendants to the nature of his claim.

It is also not fatal that Otero alleges facts relating only to his own detention, while asserting that the Unlawful Detention Policy is "widespread" and applies to others. *See Hunt v. Hardy,* No. 11 C 4396, 2012 WL 2458943, at \*6 (N.D.Ill. June 27, 2012) (denying a motion to dismiss when plaintiff alleged that he was denied medical treatment while incarcerated as a result of a widespread custom among correctional employees and the warden); *Hoskins v. Dart,* No. 09 CV 5145, 2010 WL 4823065, at \*3–4 (N.D.Ill. Nov.16, 2010) (finding plaintiff stated a claim for relief under Section 1983 by alleging that the sheriff, in his official capacity, carried out a policy of placing rival gangs together in lockup, despite the fact that plaintiff only referenced facts relating to incidents involving himself); *see also McCormick v. City of Chi.,* 230 F.3d 319, 324–35 (7th Cir.2000) (holding that inclusion of phrases such as "highest policymaking officers" and "widespread custom" is enough to withstand a motion to dismiss for a Section 1983 municipal liability claim). Because Otero has sufficiently pled a Section 1983 claim, the Court denies Defendants' motion to dismiss the Complaint.

**II. Otero's Requests for Equitable Relief**

Otero v. Dart, Not Reported in F.Supp.2d (2012)

2012 WL 5077727

Otero seeks a permanent injunction and other equitable relief necessary to eliminate the Unlawful Detention Policy. (Compl. ¶ 2 .) Defendants move to dismiss or strike these claims for equitable relief asserting that Otero does not have standing to seek injunctive relief because he is not subject to ongoing unconstitutional detention following acquittal and was not detained at the time he filed suit. (Mot. to Dismiss at 8.) The Court agrees that Otero lacks standing to seek equitable relief under Article III of the Constitution because he has not shown a "real and immediate danger that the alleged harm will occur." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("past exposure to illegal conduct does not in itself show a present case for injunctive relief"); *see also Sierakowski v. Ryan,* 223 F.3d 440, 444 (7th Cir.2000) (finding that plaintiff lacked the requisite personal stake in the outcome of the litigation to seek injunctive relief because the prospects of future injury were purely speculative).

**\*5** Otero was previously incarcerated in Cook County Jail, but is not currently incarcerated or being detained in any way at Cook County Jail. (Compl.¶¶ 23–29.) Otero, therefore, does not assert any harm that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Even if Otero had alleged that he may personally be subjected to the Unlawful Detention Policy in the future, which he does not, such allegations would be highly speculative and too attenuated to establish standing. Indeed, he would have to show that he might one day be arrested, detained in Cook County Jail, acquitted, and then detained after his acquittal. Speculation about a possible chain of future events does not establish standing. *See e.g., O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (finding a plaintiff lacks standing when the "prospect of future injury rests on the likelihood that respondents will again be arrested for and charged with violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners"); *Campbell v. Miller,* 373 F.3d 834, 836 (7th Cir.2004) (holding that a plaintiff alleging a policy of unlawful body-cavity searches lacked standing to pursue injunctive relief because "unless the same events are likely to happen again *to him* there is no controversy between him and the City about the City's future handling of other arrests") (emphasis in original); *Knox v. McGinnis,* 998 F.2d 1405, 1413 (7th Cir.1993) (finding the "mere possibility" that

the prisoner plaintiff would be returned to the segregated unit of the prison where officers use a "black box" on prisoners did not establish a real and immediate case or controversy); *Robinson v. City of Chi.,* 868 F.2d 959, 969 (7th Cir.1989) (holding that plaintiffs lacked Article III standing to obtain an injunction against certain policies that resulted in misdemeanor arrestees being held for excessive periods of time because they could not "show a real or immediate threat that they will be wronged again"); *Swangian v. City of Chi.,* No. 08 C 4780, 2012 WL 28696, at \*5 (N.D.Ill. Jan.4, 2012) (finding no actual case and controversy existed as to a police "hold" procedure because plaintiff did not plead that he would be arrested again and the court assumed he would follow the law and not encounter the allegedly unlawful procedure again); *Simack v. City of Chi.,* No. 02 C 3139, 2003 WL 924335, at \*3–4 (N.D.Ill. Mar.6, 2003) (finding the possibility that the plaintiff would be wrongfully arrested for a misdemeanor and detained unreasonably too speculative to establish standing).

Otero also cannot attain standing to seek equitable relief based on the harms that may occur to potential members of an alleged class that has not been certified and may never be. *See e.g., Miller,* 373 F.3d at 836 (7th Cir.2004) (holding that where a district court has yet to certify a class, plaintiff may not rely on "the prospect that other arrested persons may be subjected" to the same treatment he is now challenging as unconstitutional); *Yachnin v. Village of Libertyville,* 803 F.Supp.2d 844, 850 (N.D.Ill.2011) (refusing to allow defendant, for purposes of standing, to represent all persons arrested or all persons who may be arrested in the future pursuant to a particular policy, when the class was not yet certified).

**\*6** Otero has sufficiently pled a claim for relief under Section 1983, as discussed above, and may seek damages, but he does not have standing to seek equitable relief. *See Yachnin,* 803 F.Supp.2d at 849 (" 'plaintiff must demonstrate standing separately for each form of relief sought' ") (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 185, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)); *see also Lyons,* 461 U.S. at 95 (finding that plaintiff had standing to seek damages but not to seek injunctive relief against abusive police practices). The Court, therefore, strikes all references to equitable relief from the Complaint. *See Jumpfly, Inc. v. Torling,* No. 10 C 0385, 2010 WL 1978732, at \*1 (N.D.Ill. May 17, 2010)

Otero v. Dart, Not Reported in F.Supp.2d (2012)

2012 WL 5077727

(granting in part motion to strike prayer for injunctive relief).

**III. Cook County as a Party**

Otero sues Sheriff Dart in his official capacity and joined Cook County as a party pursuant to *Carver v. Sheriff of LaSalle Cnty.,* 324 F.3d 947, 948 (7th Cir.2003). (Compl.¶ 10) Cook County is an indispensable party to this lawsuit because state law requires the county to pay judgments entered against the Sheriff's office in its official capacity. *See Carver,* 324 F.3d at 948 ("a county in Illinois is a necessary party in any suit seeking damages from an independently elected county officer (sheriff, assessor, clerk of court, and so on) in an official capacity"); *see also Askew v. Sheriff of Cook Cnty.,* 568 F.3d 632, 636 (7th Cir.2009). "Illinois law establishes that the Sheriff is an independently elected county officer and is not an employee of the county in which the sheriff serves." *Askew,* 568 F.3d at 636 (citations omitted); *Thomas* 604 F.3d at 305 n. 4 (7th Cir.2010) ("the Sheriff is an independently-elected officer who is accountable only to the people, rather than the County board") (citing *Thompson v. Duke,* 882 F.2d 1180, 1187 (7th Cir.1989)). Cook County, therefore, is not vicariously liable for actions taken by the Sheriff or his hired deputies. *See Milestone v. City of Monroe, Wis.,* 665 F.3d 774, 780 (7th Cir.2011) ("There is no respondeat superior liability under § 1983; the Supreme Court 'distinguish[es] acts of the municipality from acts of employees of the municipality.'") (citation omitted); *see also Franklin v. Zaruba,* 150 F.3d 682, 685–86 n. 4 (7th Cir.1998) (finding that the county cannot be liable under Section 1983 *Monell* claim for policies of a sheriff, and also explaining that the county has no respondeat superior liability) (citing *Moy v. Cnty. of Cook,* 159 Ill.2d 519, 203 Ill.Dec. 776, 640 N.E.2d 926 (Ill.1994) (holding that Cook County is not liable under respondeat superior for the acts of the sheriff because the sheriff is an independently elected county officer rather than an employee of the county)).

Additionally, Cook County cannot be held liable under *Monell* because the county lacks the authority to establish any policies regarding the training or performance by the employees of the Sheriff's Office. *See Thompson,* 882 F.2d at 1187 (affirming dismissal of Cook County as a defendant against a *Monell* claim since the County had "no authority to train the employees involved or to set the policies under which they operate"); *see also Ebrahime v. Dart,* No. 09 C 7825, 2010 WL 4932655, at *6 (N.D.Ill. Nov.30, 2010) (dismissing a *Monell* claim against the county "because it is the Sheriff who is the policymaker at the county jail"). It is unclear from the Complaint whether Otero asserts substantive claims against Cook County beyond indemnification because Otero refers to Defendants collectively. To the extent that Otero alleges substantive claims against Cook County, the Court dismisses those claims under Rule 12(b)(6).

**CONCLUSION**

**\*7** For the reasons set forth above, the Court denies Defendants' motion to dismiss Count I, but grants the motion to the extent that the Complaint asserts substantive claims against Cook County. The Court also grants Defendants' motion to strike Otero's requests for equitable relief.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5077727

Footnotes

1    Otero withdrew his prayer for punitive damages. (R. 20, Resp. at 8.) The Court, therefore, denies Defendants' requests regarding punitive damages as moot.

2    Otero sues Dart in his official capacity only. (Compl.¶ 10.) "Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir.2008) (citing *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)).

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 2384601
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Hiwana Polk, et al., Plaintiffs,
v.
Sherod Dent, et al., Defendants.

No. 13 CV 9321
|
Signed May 19, 2015

**Attorneys and Law Firms**

Irene K. Dymkar, Chicago, IL, for Plaintiffs.

Christopher Sean Hennessy, Tracey A. Dillon, Meckler Bulger Tilson Marick & Pearson LLP, Terrence Michael Burns, Daniel Matthew Noland, Harry N. Arger, Paul A. Michalik, Dykema Gossett PLLC, Marion Claire Moore, City of Chicago Department of Law, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

 **\*1** Presently before us is Defendant the City of Chicago's (the "City's") motion to strike Plaintiffs' claims for equitable relief. For the reasons discussed below, the City's motion is granted.

## BACKGROUND

This case arises from a traffic stop on the evening of December 31, 2011. Plaintiffs Hiwana Polk, Individually ("Polk") and as Administrator of the Estate of Bejian Booker, Deceased ("Booker"), and Cornel Dawson, Jr., by Parent Sherrice Rainey ("Dawson"), allege that during a traffic stop unidentified police officers used excessive force against them and conducted an illegal search of their vehicle and persons. In addition to emotional injuries, Plaintiffs claim that the officers' conduct resulted in physical injuries, particularly to Plaintiff Booker who was a minor suffering from terminal cancer at the time. According to the complaint, Booker was admitted to the hospital a couple days after the incident as a direct result of the stress and exposure caused by the officers.

Plaintiffs brought a number of federal and state claims against the City and unknown officers.[1] In support of their claims against the City, Plaintiffs contend that the unknown officers' misconduct occurred pursuant to official City policies and practices, including the widespread failure of the Chicago Police Department to "make any reports, create any documentation, or communicate orally regarding any unconstitutional or questionable conduct that does not result in a formal arrest, in order to avoid public scrutiny and personal accountability." (Compl.¶¶ 56, 64, 70, 81, 87, 103.) They allege that this inadequacy and the City's related failure to adequately punish misconduct, lead "Chicago police officers to believe their actions will never be scrutinized and, in that way, directly encourages future abuses." (*Id.*) In their request for relief, Plaintiffs seek monetary damages against all Defendants and two forms of equitable relief against the City for the alleged Constitutional violations: an injunction prohibiting the City from using the "unconstitutional policies, procedures, and practices set forth [in the complaint]," and a declaratory judgment that "the Chicago Police Department policies, procedures, and practices complained of [are] unconstitutional." (Compl. at 24–25.)

The City moved to dismiss the complaint April 9, 2014. (Dkt.27.) In its reply, though not in its opening brief, the City argued that Plaintiffs' claims for equitable relief are not viable. (Dkt. 40 at 8–11.) We initially granted Defendants' motion to dismiss the § 1983 claims against the City on other grounds, and thus had no occasion to consider Defendants' arguments regarding equitable relief. (Dkt.41.) On Plaintiffs' motion for reconsideration, however, we reinstated their § 1983 *Monell* claims against the City.[2] (Dkt. 44; Dkt. 53 at 10–12.) The City now moves to strike or dismiss Plaintiffs' claims for equitable relief against it, renewing the arguments made in their motion to dismiss reply brief.

## ANALYSIS

 **\*2** The City argues four independent grounds for striking Plaintiffs' request for equitable relief. Although the City does not state the Rule(s) under which it brings its

2015 WL 2384601

motion, three of the City's arguments appear to attack the sufficiency of the pleadings under Rule 12(b)(6): (1) the complaint does not plead a sufficiently defined policy to be enjoined; (2) the complaint fails to allege that irreparable harm will occur absent injunctive relief; and (3) the complaint establishes that Plaintiffs have an adequate remedy at law. The City's fourth argument challenges the Plaintiffs' standing and our subject matter jurisdiction under Rule 12(b)(1). (Mot.; Reply at 1–2 (summarizing arguments).)

A plaintiff's standing is a prerequisite to our subject matter jurisdiction, thus we will address that argument first. *Apex Digital, Inc. v. Sears, Roebuck & Co.,* 572 F.3d 440, 443 (7th Cir.2009); *Johnson v. Wattenbarger,* 361 F.3d 991, 992 (7th Cir.2004). Since we find Plaintiffs do not have standing to bring their claims for equitable relief against the City, we dismiss those claims without addressing the City's remaining arguments.

**I. Standard of Review**
When a defendant makes a facial challenge to a plaintiff's standing by attacking our subject matter jurisdiction on the four corners of the complaint, the plaintiff is held to the same standard she would be held to for a 12(b)(6) motion to dismiss. *Apex,* 572 F.3d at 443. The plaintiff "need only show the existence of facts that could, consistent with the complaint's allegations, establish standing." *Id.; see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2137 (1992) (finding that because standing is an indispensable part of the plaintiff's case, each element must be supported with the same manner and degree of evidence required at that successive stage of the litigation). In evaluating our subject matter jurisdiction, we must accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Apex,* 572 F.3d at 443; *Otero v. Dart,* No. 12 C 3148, 2012 WL 5077727, at *1 (N.D.Ill. Oct. 18, 2012). "Where jurisdiction is in question, the party asserting a right to a federal forum has the burden of proof, regardless of who raises the jurisdictional challenge." *Craig v. Ontario Corp.,* 543 F.3d 872, 876 (7th Cir.2008); *Kontos v. U.S. Dep't of Labor,* 826 F.2d 573, 576 (7th Cir.1987). [3]

**II. Standing to Seek Equitable Relief**
Article III of the United States Constitution grants to federal courts "judicial power" over "cases" and "controversies." U.S. Const. Art. III § 2. To assert a case

or controversy, the plaintiff must demonstrate standing by alleging "that he suffered an injury in fact, the defendant's actions caused the injury, and the remedy he seeks would redress his injury." *Bell v. Keating,* 697 F.3d 445, 451 (7th Cir.2012); *accord Swanson v. City of Chetek,* 719 F.3d 780, 783 (7th Cir.2013) (citing *Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136). Relatedly, when the plaintiff seeks equitable relief against a prospective harm, he must establish that "he is immediately in danger of sustaining some direct injury as the result of the challenged official conduct, and that the injury or threat of injury is both real and immediate, not conjectural or hypothetical." *Bell,* 697 F.3d at 451 (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665 (1983)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 676 (1974)); *see Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 108, 118 S.Ct. 1003, 1019 (1998) (finding respondent did not have standing to request injunctive relief because it only alleged past harm); *Schirmer v. Nagode,* 621 F.3d 581, 585 (7th Cir.2010) ("As a general rule, the fact that a person was previously prosecuted for violating a law is insufficient by itself to establish that person's standing to request injunctive relief."). Instead, a plaintiff's standing to seek equitable relief depends on whether she is "likely to suffer future injury from" the conduct alleged. *Lyons,* 461 U.S. at 105, 103 S.Ct. at 1667.

*3 When a § 1983 complaint is based upon the defendant's unconstitutional behavior—as opposed to a statute that criminalizes the plaintiff's conduct—"the putative injury typically proves too remote or attenuated to sustain our jurisdiction under Article III." *Bell,* 697 F.3d at 451. We find this to be the case here. The past misconduct alleged in the complaint establishes Plaintiffs' standing to sue the City for damages that they suffered as a result of those acts, but it does not, alone, establish a real and immediate threat warranting injunctive or declaratory relief for future conduct. *See Schirmer v. Nagode,* 621 F.3d 581, 584–85 (7th Cir.2010) (distinguishing standing to sue for damages and for equitable relief); *Lyons,* 461 U.S. at 105, 103 S.Ct. at 1667. In order for Plaintiffs to allege a controversy regarding the City's prospective conduct, they must plausibly claim that they themselves are likely to be repeat victims of the unconstitutional practices in the imminent future. More specifically, Plaintiffs would

have to allege, at a minimum, that they face a real and immediate threat of being stopped by the police *again* and subjected to excessive force and/or an unlawful search. Not only do Plaintiffs fail to allege the likelihood of these future events, but even if they did, such allegations would be equally too speculative and too attenuated to confer standing. *See Jimenez v. Waller,* 498 Fed.Appx. 633, 636 (7th Cir.2012) (finding the plaintiff lacked standing to sue where she did not allege that she was likely to be prevented from making a victim impact statement again in the future); *Campbell,* 373 F.3d at 836; *Knox v. McGinnis,* 998 F.2d 1405, 1413 (7th Cir.1993) (finding the "mere possibility" that officers might use a black box on prisoner plaintiffs did not establish a real and immediate case or controversy); *Camasta v. Jos. A Bank Clothiers, Inc.,* No. 12 C 7782, 2013 WL 474509, at *6 (N.D.Ill. Feb. 7, 2013) (holding that standing did not exist where the plaintiff did not allege "that he personally [would] experience any harm in the future"); *Otero,* 2012 WL 5077727, at *5 (dismissing the plaintiff's claim to enjoin the Cook County Jail's detention policy where he did not allege that he might be subjected to the policy in the future, and where, in any event, "such allegations would be highly speculative and too attenuated to establish standing.").

To the extent Plaintiffs seek to "end the unconstitutional practices that were the moving force behind [their past injury]," (Resp. at 5), on behalf of *other* citizens likely to experience similar conduct in the future, they cannot do so. To confer federal jurisdiction, the injury alleged must be specific to the plaintiff; plaintiffs may not bring generalized claims of municipal misconduct on behalf of other citizens. *Campbell v. Miller,* 373 F.3d 834, 836 (7th Cir.2004) ("Unless the same events are likely to happen again *to him* there is no controversy between him and the City about the City's future handling of our arrests."); *Camasta,* 2013 WL 474509, at *7 ("[Plaintiff] cannot establish standing based solely upon harms to the class members that do not establish a claim for relief

personally."); *Bohn v. Boiron, Inc.,* No. 11 C 08704, 2013 WL 3975126, at *3 (N.D.Ill. Aug. 1, 2013); *Yachnin v. Vill. of Libertyville,* 803 F.Supp.2d 844, 850 (N.D.Ill.2011) (holding that the plaintiff could not seek equitable relief on behalf of "all persons" who might suffer from the challenged policy in the future); *see Citizens for a Better Env't,* 523 U.S. at 108, 118 S.Ct. at 1019 (finding that a "generalized interest in deterrence ... is insufficient for purposes of Article III"). That is not to say that Plaintiffs' concerns regarding the "systemic problem" alleged are unimportant or should be ignored by local authorities. Absent great and immediate irreparable injury, however, generalized complaints regarding municipal policies and practices should be addressed to the state or local government, not the federal court. *Lyons,* 461 U.S. at 111–12, 103 S.Ct. at 1670. "In exercising their equitable powers federal courts must recognize '[t]he special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.' " *Id.* at 112, 103 S.Ct. at 1670 (quoting *Stefanelli v. Minard,* 342 U.S. 117, 120, 72 S.Ct. 118, 120 (1951)).

Since Plaintiffs have not alleged a real and imminent threat of future injury to themselves, they do not have standing to seek equitable relief as to the City's future conduct.

## CONCLUSION

The City's motion to dismiss Plaintiffs' claims for equitable relief is granted. Plaintiffs may pursue their *Monell* claims against the City and their related request for monetary damages, but they are not entitled to equitable relief on these claims.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 2384601

---

Footnotes

1.  So far Plaintiffs have been unable to identify the specific officers who participated in the alleged conduct. This appears to be at least in part because no police report or incident report were filed for the stop. (See Compl. ¶¶ 54–55.)
2.  The claims currently remaining in this case consist of: (1) all Plaintiffs' *Monell* claims against the City (Counts 1, 2, 4, 5, 8); (2) Dawson's state and federal claims against Unknown Officers (Counts 1–7, 9) and the related indemnification claim (Count 10); and (3) Booker's and Dawson's *respondeat superior* state claims against the City (Counts 3, 6, 7, 9).
3.  We agree with the City that *Swanigan v. City of Chicago,* 775 F.3d 953, 963 (7th Cir.2015) is not controlling. As the City points out, *Swanigan* was decided on procedural missteps that are not applicable here. There, the Seventh Circuit found the district court erred by dismissing plaintiff's request for equitable relief *before* allowing plaintiff to amend his

**Polk v. Dent, Not Reported in F.Supp.3d (2015)**

2015 WL 2384601

complaint once "as a matter of course" as required by Rule 15(a)(1)(B). The court noted that the plaintiff "may not be able to establish standing to sue for injunctive relief[,] ... [b]ut the time to evaluate any jurisdictional or legal impediments to the *Monell* suit is after [plaintiff] has amended his complaint, as Rule 15(a)(1)(B) entitles him to do." *Id.* at 964. Here, Rule 15(a)(1)(B) is not a barrier to our evaluation of Plaintiffs standing claim because, unlike in *Swanigan,* we have already permitted them to amend their complaint twice.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Simack v. City of Chicago, Not Reported in F.Supp.2d (2003)

2003 WL 924335

2003 WL 924335
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Linda SIMACK, Ronald Portis, Mardric
Lance and Emmett Lynch, individually
and on behalf of a class, Plaintiffs,
v.
CITY OF CHICAGO, Chicago Police Department,
Terry G. Hillard, Superintendent of the Chicago
Police Department, Joseph Griffin, John Risely,
Francis Kehoe and Evert L. Johnson, Defendants.

No. 02 C 3139.
|
March 6, 2003.

*MEMORANDUM OPINION AND ORDER*

GETTLEMAN, J.

**\*1** Plaintiffs Linda Simack, Ronald Portis, Mardric Lance, and Emmett Lynch, individually and on behalf of all others similarly situated, have brought a three count second amended putative class action complaint against the City of Chicago, Chicago Police Department ("CPD"), Terry G. Hillard, Joseph Griffin, John Risely, Francis Kehoe, and Evert L. Johnson pursuant to 42 U.S.C. § 1983. The complaint alleges generally that the City and the CPD have a policy and practice of unconstitutionally detaining for excessive periods of time, individuals arrested for non-violent ordinance violations, punishable by fine only, with no period of incarceration. Count I, brought against all defendants, seeks injunctive relief. Counts II and III, brought against the City and individual defendants respectively, seek monetary damages on behalf of the putative class. Defendants have moved to dismiss all three counts for lack of standing and failure to state a claim. For the reasons stated below, the court grants defendants' motion in part and denies it in part.

*BACKGROUND*

Plaintiffs, each at separate times and on separate dates, were arrested for non-violent, non-jailable misdemeanor offenses. Plaintiffs' offenses included disorderly conduct, peddling without a license, ticket scalping and soliciting donations. After arrest, each plaintiff was then taken to a Chicago police station where standard administrative procedures were completed. After completion of all these administrative procedures incident to an arrest, plaintiffs claim they were detained for anywhere from 5.5 to 15 hours.

Plaintiffs allege they were each eligible for release on an I–Bond pursuant to Rule 553(d) of the Illinois Supreme Court, Ill. Sup.Ct. R. 553(d), because each were arrested for a non-jailable misdemeanor, had no pending arrest warrants and were unable to meet the amount of bail set for each respective offense.

*STANDARD FOR MOTIONS TO DISMISS*

A complaint should not be dismissed for lack of standing unless the plaintiff can not prove the necessary allegations. When asking for injunctive relief, the plaintiff is required to allege a "real and immediate danger that the alleged harm will occur." *City of Los Angeles v. Lyons,* 461 U.S. 95, 102 (1983). As a result, in determining whether plaintiffs have standing, the court accepts as true all well-pled allegations in the complaint, but can also consider information beyond the complaint. *Perry v. Village of Arlington Heights,* 186 F.3d 826, 829 (7th Cir.1999) (citing *Warth,* 422 U.S. at 501); *see also United Transp. Union v. Gateway Western Ry. Co.,* 78 F.3d 1208, 1210 (7th Cir.1996).

A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hartford Fire Insurance Co., et al. v. California et al.,* 113 S.Ct. 2891, 2917 (1993). The court accepts as true all of the plaintiff's well pled factual allegations, and gives the plaintiff the benefit of every reasonable inference that it may draw from these facts. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1979); *Powe v. City of Chicago,* 664 F.2d 639, 642 (7th Cir.1981).

*DISCUSSION*

Simack v. City of Chicago, Not Reported in F.Supp.2d (2003)

2003 WL 924335

**\*2** Defendants move to dismiss all counts generally, asserting that plaintiffs have failed to state a claim for violation of their Fourth Amendment rights. Plaintiffs allege that they were entitled to release on bond, but were detained, and were not released on an I–Bond until hours later. Plaintiffs claim this violates their Fourth Amendment right against unreasonable detention. Defendants, on the other hand, claim the police officers have the right to detain these individuals for a period of time before their release.

First, under Illinois law,

> "persons arrested for or charged with an offense covered by Rules 526, 527 and 528 who are unable to secure release from custody under these rules may be released by giving individual bond (in the amount required by this article) by those law enforcement officers designated by name or office by the chief judge of the circuit, except when the accused is (1) unable or unwilling to establish his identity or submit to being fingerprinted as required by law, (2) is charged with an offense punishable by imprisonment and will pose a danger to any person or the community, or (3) elects release on separate bail under Rule 503(a) (3) or 503(a)(4) ...

Ill. Sup.Ct. R. 553(d).

Plaintiffs claim that according to this statute, even if an individual arrested for a nonviolent misdemeanor offense cannot post bond, they are entitled to immediate release on I–Bond. Defendants claim, however, that because this statute states the individual "may" be released on bond, they have discretion and can hold the individual for a reasonable time before going to an officer who is able to authorize release.

The Illinois Appellate Court in *Lampe v. Ascher,* 376 N.E.2d 74, 77 (4th Dist.1978), held, however, that there is no such police discretion, and that police are required to issue a bond to misdemeanor detainees. The court stated that while the statutes regulating the use and acceptance of bond use the word "may" in discussing when an officer

is to accept bail, the intent of the drafters "must be determined not simply and automatically from the words themselves but from all of the circumstances before the court including the presence of a public interest which is deserving of protection." *Id.* The court then stated the purpose of accepting bond from misdemeanor defendants was to avoid undue delay in detentions. *Id.* Therefore, the court held that the proper definition of "may" is that there is a "mandatory duty on a police department to accept tendered bail set either by a judge or a supreme court rule from misdemeanor defendants". *Id.* at 77–8.

Defendants contend this interpretation applies only to tendered bail. However, defendants' interpretation would be contrary to the purpose of the statute. As the Appellate Court noted, if discretion were allowed by police officers, this bond acceptance process would be considered unconstitutional because it would deny equal protection as it relates to each misdemeanor defendant. *Id.* at 78. To prevent that occurrence, police officers are required to accept the bond whenever it is set. This statutory construction has been adopted by other courts considering the issue. *See, e.g., Hood v. Chicago,* 1987 U.S. Dist. LEXIS 12082 at \*6; *Doulin v. Chicago,* 662 F.Supp. 318, 329 (N.D. Ill 1987). The fact that the term "may" should be construed as "shall" is now included as a comment to 725 ILCS 5/110–9.

**\*3** Bond is required by Illinois Supreme Court Rule 553(d), which allows those misdemeanor defendants who are unable to secure bail the ability to be released on an individual bond. Ill. Sup.Ct. R. 553(d). In the instant case each plaintiff alleges that he or she satisfies the requirements for being released on the I–Bond, because each was arrested for a non-violent misdemeanor offense, had no other pending arrest warrants, and was unable to pay the set amount of cash bond. Therefore, the police officers processing these plaintiffs had no discretion in releasing them on I–Bonds.

Defendants also argue that the United States Supreme Court has adopted a "reasonableness" standard in detention cases. *County of Riverside v. McLaughlin,* 500 U.S. 44 (1991). According to defendants, even if the officers were required to release the individuals on I–Bond, they were allowed a "reasonable" amount of time to detain them. However, this "reasonable" detention period applies only when the detainee is being held in order to wait for a probable cause determination by a magistrate.

Simack v. City of Chicago, Not Reported in F.Supp.2d (2003)
2003 WL 924335

*Id.* (discussing only the "reasonable" amount of time for detention when waiting for a probable cause hearing). In this case, none of the plaintiffs were ever given a probable cause hearing after their detention period.

Further, in the case of misdemeanors, courts have stated that the right to be released on bond is the substitute for a probable cause hearing. *Hood,* 1987 U.S. Dist. LEXIS 12082 at *6. Thus, after standard administrative procedures are complete, police officers have a mandatory duty to release on I–Bond those individuals who are eligible and are not waiting for probable cause determinations. *Id .* Plaintiffs here allege that the officers held the individual plaintiffs for anywhere from 5 to 15 hours after the administrative procedures were complete. The court thus concludes that the plaintiffs did have a right to be released on I–Bond, and that they have sufficiently alleged that the length of detention is unreasonable under the circumstances.

In addition to defendant's basic argument that plaintiffs had no guaranteed right to be released on I–Bonds, and therefore have not stated a claim for a Fourth Amendment violation, defendants have also argued against the validity of each count separately. The court will address each of these arguments.

*Count I*
Count I of plaintiffs' second amended complaint seeks injunctive relief against defendants from unlawfully detaining individuals qualifying for release on I–Bond. Defendants move to dismiss this count, asserting that plaintiffs do not have standing to seek injunctive relief. In a § 1983 claim, the plaintiff must show a "real and immediate danger that the alleged harm will occur." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 102 (1983) ("past exposure to illegal conduct does not in itself show a present case for injunctive relief."). Thus, plaintiffs must first allege a real and immediate danger of future arrest and then unlawful detention. *Tatum v. Davis,* 1996 WL 388405, at *4 (N.D.Ill. July 9, 1996). In doing so, plaintiffs cannot base their claim on their anticipation that defendant will violate some law in the future. *O'Shea v. Littleton,* 414 U.S. 488, 496–7 (1974).

*4 In their response to defendant's motion to dismiss, plaintiffs claim that three of the plaintiffs will continue to panhandle and that they will be arrested for some misdemeanor crime while doing so. Because plaintiffs cannot allege that they will violate a law in the future, *O'Shea,* 414 U.S. at 496–7, they are speculating that they will be wrongfully arrested for some misdemeanor in the future. They not only must anticipate being wrongfully arrested for a misdemeanor, but must also anticipate that they will be detained unreasonably. These possibilities, however, are speculative rather than real nor immediate. Speculation does not satisfy a standing requirement. *Sierakowski v. Ryan,* 223 F.3d 440, 444 (7th Cir.2000). The only support plaintiffs rely on is an alleged past wrong—that individuals have been unlawfully detained after a lawful arrest for a misdemeanor violation. While past wrongs may be indicative of some similar future occurrence, it does not satisfy the necessary requirements of standing for injunctive relief. *Id.* at 445. Therefore, defendants' motion to dismiss Count I is granted.

*Count II*
In Count II of their second amended complaint, plaintiffs seek monetary damages from the City of Chicago based on the City's policy and procedure of detaining plaintiffs after arrests of non-violent, non-jailable, ordinance violations for an extended period. The defendants move to dismiss Count II, arguing that plaintiffs fail to state a policy and practice claim against the City. Defendants first claim that a policy or custom must be shown through deliberate conduct and there must be a direct causal link. *Board v. Brown,* 117 S.Ct. 1382 (1997). Defendants claim that plaintiffs have not satisfied this requirement as it relates to the City of Chicago. Defendants also argue that although a complaint need not plead evidence, there must be more than just a conclusory allegation of a policy or custom. *Hood,* 927 F.2d at 315. Finally, defendants state that the policy must be made or condoned by a person with "final policymaking authority". *Latuszkin v. Chicago,* 250 F.3d 502, 505 (7th Cir.2001).

Plaintiffs have alleged that the Mayor and City Council have a policy of community policing programs that frequently arrest and detain people found to be committing misdemeanors, including loitering, disorderly conduct, panhandling, and scalping tickets. Plaintiffs have also alleged that the Mayor and City Council post public notices stating that the community will arrest these individuals, that they are aware these individuals are usually not prosecuted, and that they are aware these arrests do not typically stop the individuals from pursuing these activities again in the future. Plaintiffs have also cited a case pending against the City, which details over

Simack v. City of Chicago, Not Reported in F.Supp.2d (2003)
2003 WL 924335

2,000 arrest reports for defendants arrested for the above cited misdemeanors.

Thus, while plaintiffs are not required to plead evidence, they have done more than merely allege that there is a policy or custom in a conclusory fashion. Assuming these allegations to be true, these statements provide a linkage between the City of Chicago and the policy or custom. Finally, plaintiffs have alleged that the Mayor, City Council, and Supervisors of the Police Board are responsible for this policy and custom, which satisfies the "final policymaking authority" requirement. In this court's previous opinion, this count was dismissed because, while plaintiffs did plead a policy or practice on the part of the CPD, they failed to do so as to the City of Chicago. They now have pled facts that if true would sufficiently establish a policy or practice by the City. Therefore, the motion to dismiss on Count II is denied.

*Count III*

**\*5** Count III of the second amended complaint seeks monetary damages from individual defendants Hillard, Griffin, Risely, Kehoe, E. Johnson and Robert Johnson based upon their unlawful detention of individuals arrested for misdemeanor offenses and qualifying for release on I–Bonds. Plaintiffs have brought these claims against these defendants in both their official and individual capacities.

Defendants move to dismiss the claims against the individual defendants in their official capacity because those claims are redundant. When an official is sued in his or her official capacity, it is the equivalent of suing the agency of which that official is an employee. Naming the individual officials as well as the government or agency is thus redundant. *Nagle v. Chicago School Reform Bd., Trustees,* No. 96 C 4150, 1999 WL 160234 at \*12 (N.D.Ill. March 10, 1999); *Smith v. Metropolitan School Dist. Perry Township,* 128 F.3d 1014, 1021, n. 3 (7th Cir.1997); *McLin v. Chicago,* 742 F.Supp. 994 (N.D.Ill.1990). Therefore, the case should be dismissed as to the individuals performing in their official capacity.

Defendants move to dismiss claims against defendants in their individual capacities arguing that they are protected under qualified immunity, and that plaintiffs have not sufficiently alleged each defendant's personal involvement. When a defendant asserts the defense of

qualified immunity, the plaintiff then has the burden of proving otherwise. *Erwin v. Daley,* 92 F.3d 521, 525 (7th Cir.1996). To do so, plaintiffs must prove: (1) that there was a violation of a constitutional right; and (2) that those constitutional standards were clearly established at the time of the offense. *Id.* As discussed above, plaintiffs have sufficiently alleged a violation of their Fourth Amendment constitutional rights.

To demonstrate that the constitutional right was clearly established, plaintiffs may rely on a closely analogous case that had been decided before the conduct in question, or a showing that the violation is so obvious that the individuals must have known of it. *Id.* Again, as discussed above, before the detentions in question occurred, *Lampe v. Ascher* had settled that a police officer has no discretion in accepting a bond once it has been set by a judge or a Supreme Court rule. *Lampe,* 376 N.E.2d at 77. With this in mind, the fact that an officer may not unreasonably detain an individual is so obvious that the individuals must have known of its existence. As discussed above, no law gives an officer the right to detain an individual for an unreasonable period of time after the administrative procedures are complete and they are eligible for release. *See Gerstein v. Pugh,* 95 S.Ct. 854, 863 (1975) (allowing only a brief period of detention in order to complete necessary administrative procedures). Once the "brief" period for administrative procedures is complete, the detainee must then be brought before a magistrate for a probable cause determination, or must be released. *Gramenos v. Jewel Tea Co.,* 797 F.2d 432, 437 (7th Cir.1986). Therefore, because it is clearly established in Illinois that a police officer must release an eligible individual on I–Bond, and then so clearly established that an officer may not unreasonably detain an individual, defendant's motion to dismiss Count III based on qualified immunity is denied.

**\*6** Next, defendants move to dismiss Count III based on plaintiffs' failure to allege sufficient personal involvement on the part of the individually named defendants. For a § 1983 claim, personal liability must be established on the part of each individual defendant. The doctrine of respondeat superior does not apply as it relates to these types of claims. *Gossmeyer v. McDonald,* 128 F.3d 481, 495 (7th Cir.1997). A court will find liability, however, if "the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it." *Id.; Baskin v. City of Des Plaines,* 138 F.3d 701, 705 (7th Cir.1998).

2003 WL 924335

The individual's "direct participation" is not required. *Crowder v. Lash,* 687 F.2d 996, 1005 (7th Cir.1982). Rather, the requirement of personal involvement will be satisfied if the plaintiffs show "a deliberate or reckless disregard" of plaintiffs' rights. *Id.* Assuming all plaintiffs' well-pled allegations to be true, plaintiffs have alleged that the individual defendants knew of the policy and practice of unlawfully detaining misdemeanor offenders, and never acted to change that. Plaintiffs allege that the individual supervisors were made aware through the review of reports, lock-up inspections and through the eventual approval of the releases on I–Bonds. Plaintiffs are not merely alleging that these defendants were negligent in not observing and then stopping the practice; they are asserting that the individual defendants were reckless— they knew of the policy and did nothing to stop it. Therefore, assuming all of plaintiffs allegations to be true, plaintiffs have sufficiently alleged these defendants'

personal involvement. Defendants' motion to dismiss all claims against them in their individual capacities are denied.

## CONCLUSION

For the foregoing reasons, the court: dismisses Count I, denies defendants' motion to dismiss Count II, dismisses Count III as it relates to the defendants in their official capacities, but denies defendants' motion to dismiss Count III against the individual defendants in their individual capacities. This matter is set for a report on status March 18, 2003, at 9:00 a.m.

**All Citations**

Not Reported in F.Supp.2d, 2003 WL 924335

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.