**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

IMMANUEL CAMPBELL, et al.,

|  |  |
|---|---|
| Plaintiffs, | |
| v. | Case No. 17cv4467 |
| CITY OF CHICAGO, et al., | Hon. John Z. Lee |
| Defendants. | |

**DEFENDANT THE CITY OF CHICAGO'S
<u>REPLY IN SUPPORT OF ITS MOTION TO DISMISS</u>**

Dated: January 16, 2018

Respectfully submitted,

**CITY OF CHICAGO**

By: /s/ Allan T. Slagel
One of Its Attorneys

Allan T. Slagel (ARDC #6198470)
aslagel@taftlaw.com
Heather A. Jackson (ARDC #6243164)
hjackson@taftlaw.com
Barton J. O'Brien (ARDC # 6276718)
bobrien@taftlaw.com
Jeffrey M. Schieber (ARDC #6300779)
jschieber@taftlaw.com
Elizabeth E. Babbitt (ARDC #6296851)
ebabbitt@taftlaw.com
Rachel M. Schaller (ARDC #66306921)
rschaller@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone:   (312) 527-4000
Facsimile:   (312) 527-4011

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................................ ii

ARGUMENT ................................................................................................................................ 1

    I.    Plaintiffs lack standing to seek equitable relief. ................................................... 1

        A.    Allegations regarding a pattern or practice of excessive force are insufficient to confer standing to seek injunctive or declaratory relief. ..... 2

            1.    Allegations regarding a pattern or practice are insufficient to establish standing under *Lyons*. ...................................................... 2

            2.    The alleged practices on which Plaintiffs rely to establish standing are no longer in place. .................................................... 6

        B.    Allegations that Plaintiffs were acting lawfully do not establish standing. 7

        C.    Allegations regarding racial disparities do not establish standing. ........... 10

    II.    The organizational Plaintiffs lack standing. .......................................................... 14

        A.    The organizational Plaintiffs fail to establish standing through an alleged diversion of resources. ............................................................................... 14

        B.    Black Live Matters Chicago ("BLMC"), Families for Justice Black Lives Matter ("FFJ"), and 411 Movement for Pierre Loury ("411 Movement") are not entities with the capacity to sue under Fed. R. Civ. P. 17(b). ........ 17

    III.    Plaintiffs' injunctive relief claims are moot. ........................................................ 18

    IV.    Plaintiffs' Illinois Civil Rights Act claim should be dismissed. ........................... 22

        A.    Plaintiffs do not challenge a facially neutral policy that results in disparate impact. ..................................................................................................... 22

        B.    Plaintiffs improperly seek to challenge an absence of a policy, rather than a distinct policy or practice resulting in disparate impact. ........................ 23

        C.    Plaintiffs do not meet the robust causality requirement to allege disparate impact. ..................................................................................................... 26

    V.    Plaintiffs' failure to train and screen allegations are deficient. ........................... 27

    VI.    The conspiracy claims should be dismissed. ........................................................ 28

CONCLUSION ............................................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

*Al Matar v. Borchardt,*
2017 WL 2214993, at *1 (N.D. Ill. May 19, 2017) .................................................. 27

*Allee v. Medrano,*
416 U.S. 802 (1974) ................................................................................................. 5, 7

*Alton Evening Tel. v. Doak,*
296 N.E.2d 605 (Ill. App. Ct. 1973) ......................................................................... 18

*Anderson v. Cornejo,*
1999 WL 258501, at *1 (N.D. Ill. Apr. 21, 1999) ...................................................... 8

*Anderson v. Cornejo,*
284 F. Supp. 2d 1008 (N.D. Ill. 2003) ...................................................................... 12

*Apex Digital, Inc. v. Sears, Roebuck & Co.,*
572 F.3d 440 (7th Cir. 2009) .................................................................................... 17

*Ass'n for Disabled Americans v. Claypool Holdings, LLC,*
2001 WL 1112109, at *15 (S.D. Ind. Aug. 6, 2001) .......................................... 15, 16

*Barrios v. City of Chicago,*
2016 WL 164414, at *8 (N.D. Ill. Jan. 14, 2016) ....................................................... 9

*Bonte v. U.S. Bank, N.A.,*
624 F.3d 461 (7th Cir. 2010) .................................................................................... 28

*Central Austin Neighborhood Ass'n v. City of Chicago,*
2013 IL App (1st) 123041 .......................................................................................... 25

*Chaveriat v. Williams Pipe Line Co.,*
11 F.3d 1420 (7th Cir. 1993) .................................................................................... 21

*Chavez v. Ill. State Police,*
251 F.3d 612 (7th Cir. 2001) .................................................................................... 12

*Chi. Urban League v. State of Illinois,*
2009 WL 1632604, at *1 (Ill. Cir. Ct. Apr. 15, 2009) .............................................. 25

*Church v. City of Huntsville,*
30 F.3d 1332 (11th Cir. 1994) ............................................................................ 11, 13

*City of Joliet, Illinois v. New W., L.P.,*
825 F.3d 827 (7th Cir.) .............................................................................................. 23

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .................................................................................... passim

*City of Los Angeles v. Wells Fargo & Co.*,
    2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015) .................................................. 23

*City of Miami v. Bank of Am. Corp.*,
    171 F. Supp. 3d 1314 (S.D. Fla. 2016) .................................................................. 22

*Daniels v. Southfort*,
    6 F.3d 482 (7th Cir. 1993) ................................................................................ 15

*Ellis v. City of Minneapolis*,
    860 F.3d 1106 (8th Cir. 2017) ........................................................................... 26

*Fair Elections Ohio v. Husted*,
    770 F.3d 456  n.1 (6th Cir. 2014) ...................................................................... 14

*Fed. of Advertising Indus. Reps., Inc. v. City of Chicago*,
    326 F.3d 924 (7th Cir. 2003) ............................................................................ 19

*Floyd v. City of New York*,
    283 F.R.D. 153 (S.D.N.Y. 2012) .......................................................................... 4

*Franklin v. City of Chicago*,
    102 F.R.D. 944 (N.D. Ill. 1984) ........................................................................... 9

*Goldstein v. Costco Wholesale Corp.*,
    278 F. Supp. 2d 766 (E.D. Va. 2003) .................................................................... 15

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971) ....................................................................................... 23

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ....................................................................................... 14

*Hobley v. Burge*,
    2004 WL 2658075, at *12 (N.D. Ill. Oct. 13, 2004) .................................................. 12

*Honig v. Doe*,
    484 U.S. 305 (1988) .................................................................................. 11, 13

*Hvorcik v. Sheahan*,
    870 F. Supp. 864 (N.D. Ill. 1994) ..................................................................... 9, 10

*Illinois Migrant Council v. Pilliod*,
    540 F.2d 1062 (7th Cir. 1976) .......................................................................... 5, 7

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
  2017 WL 3498335, at *9 (N.D. Tex. Aug. 16, 2017)............................................. 26

*Inclusive Communities Project, Inc. v. Tex. Dept. of Housing and Comm. Affairs*,
  2016 WL 4494322, at *6-7 (N.D. Tex. Aug. 26, 2016) ........................................ 24

*Inclusive Communities Project, Inc. v. U.S. Dept. of Treasury*,
  2016 WL 6397643, at *11 (N.D. Tex. Oct. 28, 2016)........................................... 23

*International Brotherhood of Teamsters v. United States*,
  431 U.S. 324 (1977)............................................................................................ 12

*Kozlowski v. Fry*,
  238 F. Supp. 2d 996 (N.D. Ill. 2002) .................................................................. 12

*LaDuke v. Nelson*,
  762 F.2d 1318 (9th Cir. 1985) ............................................................................ 10

*Magnuson v. City of Hickory Hills*,
  933 F.2d 562 (7th Cir. 1991) .............................................................................. 20

*McFadden v. Bd. of Educ.*,
  2006 WL 6284486, *1-2, 7 (N.D. Ill. Oct. 3, 2006) ............................................ 25

*Md. State Conf. of NAACP Branches v. Md. Dept. of State Police*,
  72 F. Supp. 2d 560 (D. Md. 1999)........................................................... 11, 12, 13

*Mid-City Nat. Bank of Chicago v. City of Joliet, Ill.*,
  137 S. Ct. 518 L. Ed. 2d 407 (2016)................................................................... 23

*National Congress for Puerto Rican Rights v. City of New York*,
  75 F. Supp. 2d 154 (S.D.N.Y. 1999) ..................................................................... 4

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)...................................................................................... 10, 11

*Palmquist v. Selvik*,
  111 F.3d 1332 (7th Cir. 1997) ............................................................................ 28

*Plotkin v. Ryan*,
  239 F.3d 882 (7th Cir. 2001) .............................................................................. 15

*Prip v. Erwin*,
  2015 WL 4394526 (W.D. Wis. July 16, 2015)...................................................... 20

*Ragsdale v. Turnock*,
  841 F.2d 1358 (7th Cir. 1988) ............................................................................ 20

*Rice v. Rice Foundation*,
    610 F.2d 471 (7th Cir. 1979) ................................................................ 17

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ............................................................................. 11

*Robinson v. City of Chi.*,
    868 F.3d 959 n.5 (7th Cir. 1989) ............................................................ 1

*Sassak v. City of Park Ridge*,
    431 F. Supp. 2d 810 (N.D. Ill. 2006) .................................................... 27

*Silha v. ACT, Inc.*,
    807 F.3d 169 (7th Cir. 2015) ................................................................ 15

*Smith v. City of Chicago*,
    143 F. Supp. 3d 741 (N.D. Ill. 2015) ......................................... 4, 7, 8, 20

*Stanfield v. Dart*,
    2011 WL 1429172, *5-*6 (N.D. Ill. Apr. 14, 2011) .............................. 25

*Stotts v. Community Unit Sch. Dist. No. 1*,
    230 F.3d 989 (7th Cir. 2000) ................................................................ 21

*TBS Group, LLC v. City of Zion*,
    2017 WL 5129008, at *9 (N.D. Ill. Nov. 6, 2017) ................................ 26

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
    135 S. Ct. 2507 (2015) ................................................................ 22, 23, 26

*Thomas v. County of Los Angeles*,
    978 F.2d 504 (9th Cir. 1992) ....................................................... 4, 5, 6, 11

*Vill. of Bellwood v. Dwivedi*,
    895 F.2d 1521 (7th Cir. 1990) .............................................................. 22

**Statutes**

805 ILCS 105/113.70 ................................................................................ 17

## DEFENDANT THE CITY OF CHICAGO'S
## REPLY IN SUPPORT OF ITS MOTION TO DISMISS

Plaintiffs' memorandum of law in opposition to defendant City of Chicago's (the "City")

motion to dismiss (the "opposition" or "Opp.") [Dkt. 126-1] fails to cure the defects identified in

the City's motion (the "motion" or "Mot.") [Dkt. 86]. Accordingly, the Court should grant the

City's motion and dismiss certain portions of the Second Amended Class Action Complaint (the

"complaint" or "Compl.") [Dkt. 83].

## ARGUMENT

### I.        Plaintiffs lack standing to seek equitable relief.

Plaintiffs acknowledge that the "general standing requirements set forth in *Lyons* control

here." Opp. at 17 fn.13. Accordingly, the individual Plaintiffs' "standing to seek the injunction

requested depend[s] on whether [they are] likely to suffer future injury from the use of"

excessive force by CPD officers. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).[1] As

explained in the City's motion, allegations regarding past incidents of allegedly excessive force

"do[] nothing to establish a real and immediate threat that" the individual Plaintiffs will again be

subjected to excessive force by a CPD officer. *Id.*

In their opposition, Plaintiffs maintain that they have standing to pursue equitable relief

for three reasons, all of which purportedly distinguish this action from *Lyons*. First, Plaintiffs

claim that their allegations regarding "CPD's pervasive pattern and practice of using excessive

force" mean that the City "ordered or authorized" CPD officers to use excessive force, thereby

establishing standing. Opp. at 18, 20. Second, Plaintiffs assert that allegations that they were

acting lawfully at the time of their encounters with CPD officers are sufficient to establish

---

[1] Plaintiffs do not dispute that "the same standard and reasoning applies to plaintiff[s]' claim for declaratory relief." *Robinson v. City of Chi.*, 868 F.3d 959, 966 n.5 (7th Cir. 1989).

standing. *See id.* at 23-24. Finally, Plaintiffs suggest that allegations that Black and Latinx individuals are more likely to be subjected to excessive force than white individuals also confer standing. *See id*. at 25-26. As shown below, these arguments ignore *Lyons* and should consequently be rejected.

### A. Allegations regarding a pattern or practice of excessive force are insufficient to confer standing to seek injunctive or declaratory relief.

Plaintiffs assert that they established standing by alleging "a non-speculative risk of future injury stemming from the CPD's pervasive pattern and practice of using excessive force on people within Chicago." Opp. at 18. As detailed below, this argument fails for two reasons. First, Plaintiffs ignore *Lyons*' holding that allegations of a policy or practice are insufficient to confer standing to seek injunctive relief absent allegations tending to establish that there exists a "real and immediate threat" that the plaintiff himself or herself is likely to be subjected to harm as a result of the policy or practice. Second, CPD significantly changed its policies, practices, and training regarding the use of force following the issuance of the PATF and DOJ Reports, which Plaintiffs rely on for their "pattern or practice" allegations. *See* Opp. at 18-19. This is yet another reason why the past policies evaluated by the PATF and the DOJ cannot be relied on by Plaintiffs to assert a "non-speculative risk of future injury"; those policies are no longer in place.

### 1. Allegations regarding a pattern or practice are insufficient to establish standing under *Lyons*.

Putting aside the fact that the policies and practices that Plaintiffs challenge are not even in place any more, *Lyons* itself makes clear that allegations of a pattern or practice, without more, cannot establish standing to pursue equitable relief. In *Lyons*, the plaintiff alleged that LAPD officers:

> *pursuant to the authorization, instruction and encouragement of defendant City of Los Angeles*, regularly and routinely apply these choke holds in innumerable situations where they are not

2

> threatened by the use of any deadly force whatsoever, that numerous persons have been injured as a result of the application of the chokeholds, that Lyons and others similarly situated are threatened with irreparable injury in the form of bodily injury and loss of life, and that Lyons justifiably fears that any contact he has with Los Angeles police officers may result in his being choked and strangled to death without provocation, justification or other legal excuse.

461 U.S. at 98 (emphasis added). The Supreme Court explained that while the plaintiff's past injury afforded him standing to seek monetary damages, it "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105. Critically, "[t]he additional allegation . . . [that LAPD officers] routinely apply chokeholds in situations where they are not threatened by the use of deadly force falls far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id.*

The reason for this holding was, and is, straightforward. Even if "the City authorized the use of the control holds," the complaint failed to explain "why Lyons might realistically be threatened by police officers who acted within the strictures of the City's policy." *Id.* at 106. To wit:

> any future threat to Lyons from the City's policy or from the conduct of police officers would be no more real than the possibility that *he would again have an encounter with the police* and that either he would illegally resist arrest or detention or the officers would disobey their instructions and again render him unconscious without any provocation.

*Id.* (emphasis added). Accordingly, *Lyons* boils the standing inquiry down to two questions: (1) is the plaintiff likely to have another encounter with the police and (2) if so, is he or she likely to be subjected to excessive force?

Here, as in *Lyons*, Plaintiffs falter on both questions. Each individual Plaintiff alleges that he or she was subjected to excessive force by CPD officers on one occasion. As in *Lyons*, there are "no allegations of further unfortunate encounters between" the individual Plaintiffs and CPD officers. *Id.* at 108. This key fact distinguishes this action from cases like *Smith v. City of Chicago*, where there were "allegations that CPD officers repeatedly subjected [the named plaintiffs] to unconstitutional stops," 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015); *Floyd v. City of New York*, where one of the plaintiffs was stopped three times before the lawsuit was filed and once after filing, 283 F.R.D. 153, 169 (S.D.N.Y. 2012); *National Congress for Puerto Rican Rights v. City of New York*, where "at least three of the named plaintiffs claim they have been victimed by these unconstitutional practices repeatedly," 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999); and *Thomas v. County of Los Angeles*, where "some minority residents of the area have been mistreated by deputies more than once." 978 F.2d 504, 508 (9th Cir. 1992). Plaintiffs here have not alleged that police "repeatedly subjected" any of the individual Plaintiffs to excessive force; in these circumstances, they cannot establish a "real and immediate threat" that they will be subjected to excessive force in the future, and they lack standing to seek injunctive relief. *Lyons*, 461 U.S. at 105-06.

Plaintiffs do not even attempt to cure this deficiency. In fact, they concede that they cannot, instead insisting that they do not need to allege as much because they are proceeding under the supposed "second prong" of *Lyons*. *See* Opp. at 20. This is a red herring. *Lyons* is clear that allegations of a future encounter are a prerequisite to proceeding under its second prong:

> In order to establish an actual controversy in this case, Lyons *would have had not only to allege that he would have another encounter with the police* but also to make the incredible assertion either . . . (2) that the City ordered or authorized police officers to act in such manner.

4

*Lyons*, 461 U.S. at 105-06 (emphasis added). In other words, plausible allegations of a future encounter must be set forth before the Court considers whether a pattern or practice has been adequately alleged. Yet Plaintiffs offer no factual allegations suggesting that they will have another encounter with CPD officers.

This deficiency distinguishes this action from cases cited by Plaintiffs like *Allee v. Medrano*, *Illinois Migrant Council v. Pilliod*, and *Thomas*, each of which involved appeals after district courts heard evidence and made factual findings that the pattern or practice of recurrent constitutional violations alleged by the plaintiffs, in fact, existed. *See Allee*, 416 U.S. 802, 804-05 (1974); *Pilliod*, 540 F.2d 1062, 1065-66 (7th Cir. 1976); *Thomas*, 978 F.2d at 506-07. Moreover, neither *Allee* nor *Pilliod*—both of which were decided pre-*Lyons*—applied the "real and immediate threat" standard announced in *Lyons.* In fact, "the only question before" the *Allee* court was whether a preliminary injunction issued by the lower court "was an appropriate exercise of the federal court's equitable powers," and particularly whether the plaintiffs had satisfied 'the necessity of showing irreparable injury;" *Allee* did not address standing. 416 U.S. at 814. And while *Pilliod* discusses standing, it does not apply the *Lyons* test. Further, the *Pilliod* court explicitly noted that the requested relief did "not involve the court in the internal affairs of the" defendant law enforcement agency, but instead "simply orders compliance with the Constitution." 540 F.2d at 1068-69 (noting that awarding injunctive relief would not "inject" the judiciary "into the day-today-internal affairs . . . of the INS but merely insures compliance with the Fourth Amendment by those who had participated in the illegal transgressions"). Here, in contrast, the expansive relief plaintiffs seek would enmesh the Court in the day-to-day operations of CPD. Lastly, *Thomas*, as noted above, was predicated in part on factual findings

that "some minority residents of the area have been mistreated by deputies more than once," 978 F.2d at 508; such allegations are not present here.

>    **2.    The alleged practices on which Plaintiffs rely to establish standing are no longer in place.**

As explained, Plaintiffs' reliance on CPD's alleged "pattern and practice" of using excessive force cannot support standing; Plaintiffs need allegations that the individual Plaintiffs were repeatedly subjected to excessive force in the past, which they lack. Equally problematic, if the alleged practices on which Plaintiffs rely ever existed, they do not exist now. In particular Plaintiffs rely on the findings of the DOJ and PATF Reports to allege a "pattern and practice" of excessive force by CPD officers. *See* Opp. at 18 (explaining that their complaint "reflects the PATF's city-wide finding of excessive force" and noting that "[t]he DOJ made similar conclusions"). Assuming, only for the sake of argument, that these allegations are sufficient to show that CPD once had a pattern or practice of using excessive force, they do not support the inference that such a pattern or practice remains in place. To the contrary, and as explained in the City's motion, the City conducted a comprehensive review of its use of force policies in 2016 and 2017 and instituted and trained its officers on new policies to address the concerns raised in the DOJ and PATF Reports. *See* Mot. at 8-10.

The City's new policies include increased emphasis on principles such as de-escalation and force mitigation and impose limits on the use of less-than-lethal force, while providing for enhanced investigation and review of uses of force by CPD officers. *See id.* at 10. Those policies are now in effect. *See* Supplemental Declaration of Karen Conway (Exhibit A) ¶ 5. To ensure that CPD officers understand the new policies, CPD developed a four-hour training course on those policies. *See* Mot. at 11. CPD also developed a new 16-hour training course focused on force mitigation principles, skills and tactics. *See id.* All CPD officers have now

completed the four-hour course. *See* Supplemental Declaration of Daniel Godsel (Exhibit B) ¶ 5. Moreover, 3,000 CPD officers have completed the new 16-hour training course, and the remainder is expected to complete the course this year. *See id.* ¶ 4.

The fact that the "pattern and practice" alleged by Plaintiffs no longer exists is yet another ground on which to distinguish the cases cited by Plaintiffs. In *Allee* and *Pilliod*, for example, the district court heard evidence and made findings that the policies and practices about which the plaintiffs complained not only existed in the past but were presently in effect. *See Allee*, 416 U.S. at 808, 815 (noting district court's factual finding that "law enforcement officials took sides in what was essentially a labor-management controversy" and explaining that if plaintiffs were to regain their labor organization rights, "they required protection from appellants' concerted conduct"); *Pilliod*, 540 F.2d at 1065-67 (describing district court's factual findings regarding a policy of interrogating persons of Mexican ancestry without reasonable suspicion and explaining that the plaintiffs "will be subjected to continued injury by the very nature of the policy challenged"). Likewise, *Smith*, on which Plaintiffs also rely, explains that allegations regarding "*ongoing* constitutional violations *pursuant to* an unconstitutional policy or practice *in tandem* with allegations that CPD officers repeatedly subjected [the plaintiffs] to unconstitutional stops and frisks . . . leads to the reasonable inference of the likelihood that CPD officers *will* unlawfully stop and frisk Plaintiffs in the future." 143 F. Supp. 3d at 752 (emphasis added). In short, Plaintiffs' allegations regarding CPD's past—as opposed to present—policies and practices do not support their standing argument.

### B. Allegations that Plaintiffs were acting lawfully do not establish standing.

Plaintiffs mischaracterize *Lyons* as holding that the plaintiff "lacked standing to seek equitable relief as he was engaged in illegal conduct prior to encountering the police, so future injury depended on him again violating the law." Opp. at 23 n.19. To the contrary, *Lyons* held

7

that to establish such standing, the plaintiff needed to "allege that he would have another encounter with police." *Lyons*, 461 U.S. at 105-06. In addition, the plaintiff must allege:

> either, (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such manner.

*Id.* at 106 (emphasis in original). The Court explained that, absent these allegations, "it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, *or other encounter* between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse"). *Id.* at 108 (emphasis added). Any suggestion that *Lyons* depends on the nature of the plaintiff's conduct is misplaced and should be rejected.

To be sure, Plaintiffs cite cases where courts reasoned that the plaintiffs' innocent conduct factored into the standing analysis. Each of those cases, however, involved additional distinguishing factors not present here. In *Smith*, the plaintiffs "alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice in tandem with allegations that CPD officers repeatedly subjected them to unconstitutional stops and frisks." 143 F. Supp. 3d at 752. Similarly, in *Anderson v. Cornejo*, a case involving improper customs searches at O'Hare airport, the plaintiffs submitted declarations that they had been subjected to illegal searches at least once a year, that they regularly took international flights into O'Hare, and that they had plans to take such a flight in the near future. *See* No. 97 C 7556, 1999 WL 258501, at *1 (N.D. Ill. Apr. 21, 1999). Moreover, "[e]very person returning on an international flight is potentially subject to being searched by the Customs Service." *Id.* at *2. In contrast, there are no allegations here that Plaintiffs *both* suffered repeated instances of excessive force in the past *and* expect to find themselves in circumstances where they will suffer excessive force in the future.

8

Likewise, in *Barrios v. City of Chicago*, one of the plaintiffs alleged that he was twice "the victim of the City's alleged policy" regarding the impoundment of vehicles. No. 15 C 2648, 2016 WL 164414, at *8 (N.D. Ill. Jan. 14, 2016). Accordingly, the court's reasoning that a second plaintiff, whose car had been impounded once, had standing to seek injunctive relief is dicta, as it was not necessary to the court's ultimate decision. *See id.* at *9. Even more importantly, the *Barrios* plaintiffs alleged that the City had a mandatory policy of contacting lienholders in an attempt to coerce them to repossess vehicles by threatening forfeiture. *See id.* at *3. There are no such allegations of a mandatory policy—*i.e.*, that the City directs its officers to use excessive force in every encounter with citizens—here.

*Franklin v. City of Chicago* involved similar allegations of a mandatory policy. In that case, the plaintiff alleged that the City had a policy "which allowed police to arrest individuals without the intention that charges would be filed or prosecution pursued." 102 F.R.D. 944, 948 (N.D. Ill. 1984). The court reasoned that this policy, coupled with a policy that "unequivocally requires arresting officers to transport all arrestees by squadrol" and left "no discretion . . . to police officers with regard to this procedure," gave the plaintiff standing to challenge the transportation policy. *Id.* *Franklin* diverges significantly from the precedent set forth by the Supreme Court in *Lyons* by accepting at face value the plaintiff's allegation that "he is likely to suffer future arrest by police officers." *Id.* More significantly, however, there is no allegation here—unlike in *Franklin*—that CPD has a mandatory policy requiring officers to use excessive force on all persons with whom they come into contact.

Finally, *Hvorcik v. Sheahan* involved a scenario where a plaintiff's arrest warrant was quashed, yet remained on the Cook County Sheriff's system and subsequently caused his arrest. *See* 870 F. Supp. 864, 867 (N.D. Ill. 1994). The court distinguished *Lyons* by reasoning that

9

"'members of plaintiff class do not have to induce a police encounter before the possibility of injury can occur;'" the fact that their names showed up on the sheriff's system with outstanding warrants was enough alone to cause such an encounter. *Id.* at 869 (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1326 (9th Cir. 1985)). Here, however, it is axiomatic that the individual Plaintiffs must have another encounter with a CPD officer before CPD officers can again use excessive force against them. Yet, Plaintiffs allege no facts suggesting that they will again encounter CPD officers, much less be subjected to excessive force.

### C. Allegations regarding racial disparities do not establish standing.

Plaintiffs are correct that persons "who are likely to suffer constitutional violations as a result of possessing certain immutable characteristics are entitled to seek injunctive relief." Opp. at 26. The problem for Plaintiffs, illustrated above and by the cases upon which they rely, is that their allegations are not sufficient to establish a "real and immediate threat" that the individual Plaintiffs will suffer constitutional violations in the future. The rule set forth in *Lyons* applies fully to plaintiffs asserting constitutional claims. *See* 461 U.S. at 98 (noting that Lyons brought a Fourteenth Amendment claim). Thus, although the complaint alleges that Black and Latinx persons are more likely to be subjected to force than their white counterparts, its failure to include allegations establishing that the individual Plaintiffs are likely to have another encounter with CPD officers, much less be subjected to excessive force again, dooms Plaintiffs' argument for standing.

Indeed, decisions pre-dating *Lyons* further confirm the necessity of such allegations, including where the plaintiffs allege that they were discriminated against based on their race. In *O'Shea v. Littleton*, the plaintiffs accused the defendants (two state court judges) of discriminating against Black persons in their bail-setting, sentencing, and fining practices. *See* 414 U.S. 488, 491-92 (1974). The Court held that the plaintiffs' allegations regarding racial

disparities were insufficient to confer standing to seek equitable relief: "attempting to anticipate whether and when these respondents will be charged with crime and will be made to appear before either petitioner takes us into the area of speculation and conjecture." *Id.* at 497. Similarly, in *Rizzo v. Goode*, the plaintiffs alleged that the Philadelphia police department engaged in unconstitutional conduct toward minorities. *See* 423 U.S. 362, 366-67 (1976). As in *O'Shea*, allegations regarding racial disparities were insufficient to establish standing to seek equitable relief. *See id.* at 372 (explaining that plaintiffs' allegations that they would be subject to future mistreatment were "even more attenuated than those allegations of future injury found insufficient in *O'Shea* to warrant invocation of federal jurisdiction").

Plaintiffs cite only one precedential case for the assertion that their race provides standing for equitable relief. *See* Opp. at 26 (citing *Honig v. Doe*, 484 U.S. 305 (1988); *Church v. City of Huntsville*, 30 F.3d 1332 (11th Cir. 1994); *Thomas v. County of Los Angeles*, 978 F.2d 504 (9th Cir. 1992); and *Md. State Conf. of NAACP Branches v. Md. Dept. of State Police*, 72 F. Supp. 2d 560 (D. Md. 1999)). Yet *Honig* did not address standing; instead the question there was whether the plaintiffs' claims were moot. *See* 484 U.S. at 317-18. *Thomas* is distinguishable—and in fact supports the City's position regarding the type of allegations needed to establish standing—because it was decided on a record of "numerous instances of police misconduct . . . in a small six by seven block area" which also showed that "some minority residents of the area have been mistreated . . . more than once." 978 F.2d at 507-08 (contrasting *Lyons* as holding that "one citizen in a very large city[] could not credibly allege that he would again be detained by the police and again be the victim of a police chokehold"). As for *Church* and *Maryland State Conference*, in those cases the plaintiffs relied on an alleged pattern of subjecting a class of persons to unlawful conduct. *See Church*, 30 F.3d at 1339 (relying on allegations of a municipal

11

policy of unlawfully harassing and arresting persons and destroying their property because of their homeless status); *Maryland State Conf.*, 72 F. Supp. 2d at 564-65 (relying on allegations, and prior finding, of pattern and practice of racially discriminatory stops).

In contrast, without any basis to allege that the individual Plaintiffs themselves have suffered repeated acts of excessive force at the hands of Chicago police in the past (and are therefore likely to suffer such acts again), Plaintiffs resort to allegations that the individual Plaintiffs "fear" they will again be subjected to excessive force by CPD officers and try to bolster that assertion by reference to statistics about the use of force. As explained, this approach is inconsistent with *Lyons* and should be rejected outright. Plaintiffs' cited cases do not counsel in favor of a different approach. They may hold that statistical analysis is important where "'the existence of discrimination is a disputed issue,'" Opp. at 22 fn.17 (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 (1977)), but none holds that a plaintiff may rely on statistics, as Plaintiffs seek to do here, to establish standing to seek injunctive relief; indeed, not one even addresses a question of standing. *See Int'l Brotherhood of Teamsters*, 431 U.S. at 339-40 (discussing use of statistics to prove employment discrimination claim); *Chavez v. Ill. State Police*, 251 F.3d 612, 638 (7th Cir. 2001) (discussing use of statistics prove equal protection claim); *Anderson v. Cornejo*, 284 F. Supp. 2d 1008, 1037 (N.D. Ill. 2003) (same, and cautioning that "[a]ny statistical analysis that is used must be both relevant and reliable"); *Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1014 (N.D. Ill. 2002) (discussing use of statistics to prove employment discrimination claim); *Hobley v. Burge*, No. 03 C 3678, 2004 WL 2658075, at *12 (N.D. Ill. Oct. 13, 2004) (discussing a "rare" case where statistics led to inference of discriminatory intent for purposes of alleging equal protection claim).

Moreover, even if Plaintiffs could rely on statistical allegations to support standing, Plaintiffs' statistics do not establish a "real and immediate" threat that any individual Plaintiff likely will be subject to excessive force. To the contrary, according to Plaintiffs' own statistics, the likelihood that they will experience a second encounter with police that involves a use of force, regardless of whether the force used was excessive, is small:

- In the 1st District, where Mr. Campbell was allegedly abused, "a young Black man has a roughly 19 percent chance of having forced [sic] used on him over a ten-year span." Compl. ¶ 231.

- In the 12th District, where Mr. Carter was allegedly abused, "young Black men have an estimated 9 percent chance of being subject to force over a ten year period." *Id.* ¶ 241.

- In the 5th District, where Mr. Sharkey was allegedly abused, "young Black men have an estimated 10 percent chance of being subject to police force over a ten year period." *Id.* ¶ 254.

- In the 3rd District, where Mr. Beckwith was allegedly abused, "[y]oung Black men . . . have an estimated 11 percent chance of being subject to police force over a ten year period." *Id.* ¶ 265.

- Plaintiffs opted not to allege the ten year chance of abuse for young Black persons in the 18th District, where Ms. Jackson and Ms. Linwood were allegedly abused, but allege that "Black people are subject to force at an annual rate of roughly 9 incidents per 1,000 residents." *Id.* ¶ 277.

In short, Plaintiffs allege that, over the next ten years, there is somewhere between a .9% and a 19% likelihood that the individual Plaintiffs will again be subjected to a use of police force that may or may not be excessive. Such allegations do "nothing to establish a real and immediate threat" that the individual Plaintiffs will be subjected excessive force in the future. *Lyons*, 461 U.S. at 105. They are simply not the type of real and immediate threat of future harm present in *Honig*, where future behavioral problems and resultant unilateral school actions were probable, *see* 484 U.S. 320-22; *Church*, where the city specifically targeted homeless persons engaging in day-to-day activities, *see* 30 F.3d at 1339; or *Maryland State Conference*, 72 F. Supp. 2d at 565,

where the court had previously found a pattern and practice of racially motivated stops. Accordingly, Plaintiffs lack standing to assert their equitable relief claims.

## II.     The organizational Plaintiffs lack standing.

### A.     The organizational Plaintiffs fail to establish standing through an alleged diversion of resources.

Because Plaintiffs have not set forth allegations establishing that the individual Plaintiffs face a "real and immediate threat" that they will be subjected to excessive force by a CPD member in the future, *see supra* § I, the organizational Plaintiffs lack standing to sue on behalf of their members for the "same type of harms suffered by the Individual Plaintiffs."  Opp. at 32. With respect to the organizations' ability to sue on their own behalf, Plaintiffs assert that "[t]he fact that an organization has had to divert resources from a core purpose in order to address the unlawful conduct will suffice to show cognizable injury."  Opp. at 30.  Plaintiffs thus appear to seek to establish "associational standing" based on the rule set forth in *Havens Realty Corp. v. Coleman* that if a defendant's conduct "perceptibly impaired" an organizational plaintiff's core functions, "the consequent drain on the organization's resources" was a sufficient injury to establish standing.  455 U.S. 363, 379 (1982).

But *Havens* is inapplicable where, as here, an organization seeks only equitable relief. Case in point, in *Havens*, the organizational plaintiffs sought only damages.  *Id.* at 378.  It is within this context that the Court held the (past) diversion of resources was an injury in fact sufficient to confer standing to pursue a damages claim.  *Id.*; s*ee also Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 n.1 (6th Cir. 2014) (finding *Havens* inapposite where an organization seeks equitable relief only).  Assuming, *arguendo*, that Plaintiffs have in fact diverted their resources as a result of City action, this harm occurred, if at all, in the past.  Plaintiffs do not allege that they are in immediate danger of diverting future resources.  Further, a remedy at law

(i.e., money damages) would be sufficient to remedy the alleged harm (diversion of resources), rendering injunctive relief unavailable and warranting dismissal of the Amended Complaint. *See*, *e.g.*, *Daniels v. Southfort*, 6 F.3d 482, 485-86 (7th Cir. 1993) (dismissing complaint for injunctive relief because damages were an adequate remedy at law).

Moreover, even if *Havens* does apply to claims for injunctive relief, if one of an organization's "primary purpose[s]" is to combat the complained-of conduct, the organization's "participation in the instant case does not impair [its] ability to do its work; rather, it is the very work of the Association to litigate [the complained of conduct]." *Ass'n for Disabled Americans v. Claypool Holdings, LLC*, No. IP00-0344-C-T/G, 2001 WL 1112109, at *15 (S.D. Ind. Aug. 6, 2001). In such instances, the organization's "participation in this action and expenditure of resources is insufficient to constitute a concrete and demonstrable injury to its activities." *Id.* *See also Plotkin v. Ryan*, 239 F.3d 882, 886 (7th Cir. 2001) ("ordinary expenditures as part of an organization's purpose do not constitute the necessary injury-in-fact required for standing"); *Goldstein v. Costco Wholesale Corp.*, 278 F. Supp. 2d 766, 771 (E.D. Va. 2003) ("Ordinary programming costs are insufficient to establish an injury in fact."). Applying this analysis, the organizational Plaintiffs should be dismissed.

Each organizational Plaintiff bears the burden of establishing standing. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Their own allegations establish, however, that the expenditures upon which they rest their claim to standing are within their organizations' core missions. Each organizational Plaintiff alleges that, as a result of the City's allegedly unlawful policies and practices relating to use of force, they have been forced to dedicate resources to

combatting police violence. *See* Compl. at ¶¶ 25-31, 33.[2] But this is squarely within the primary purpose of these organizations. According to the allegations in the Complaint:

- Black Lives Matter Chicago "works to end state violence and criminalization of Black communities by deconstructing the white supremacist, capitalist patriarchy." Compl. ¶ 25.

- "Discriminatory policing is an area of concern for" Blocks Together. *Id.* ¶ 26.

- Brighton Park Neighborhood Council's mission includes "end[ing] all forms of violence, including police violence." *Id.* ¶ 27.

- Chicago Urban League provides "strategic and impactful advocacy, programming and outreach in . . . social justice." *Id.* ¶ 28.

- Justice for Families – Black Lives Matter Chicago is "committed to working with families impacted by violence, including state and police violence." *Id.* ¶ 29.

- The National Association for the Advancement of Colored People's "mission is to . . . eliminate race-based discrimination, including but not limited to racially biased police practices." *Id.* ¶ 30.

- "Discriminatory policing is an area of concern for Network 49." *Id.* ¶ 31.

- 411 Movement for Pierre Loury "was created as a response to the problematic culture of violence being committed in the city of Chicago by the civil servants that are sworn to serve, protect, and uphold the law." *Id.* ¶ 33.

In short, by Plaintiffs' own admissions, lawsuits like this one *are* their work. Because a "primary purpose" of each organizational Plaintiff is to fight police misconduct, their participation in this action "does not impair [their] ability to do [their] work," and allegations regarding diversion of resources are insufficient to establish standing. *Ass'n for Disabled Americans*, 2001 WL 1112109, at *15.

---

[2] The remaining plaintiff, Women's All Points Bulletin, does not assert claims on its own behalf. *See* Compl. ¶ 32 fn.4.

    **B.**    **Black Live Matters Chicago ("BLMC"), Families for Justice Black Lives Matter ("FFJ"), and 411 Movement for Pierre Loury ("411 Movement") are not entities with the capacity to sue under Fed. R. Civ. P. 17(b).**

Plaintiffs have failed to establish in either the Complaint or their Response that Plaintiffs BLMC, FFJ, and 411 Movement possess the requisite capacity to sue under Fed. R. Civ. P. 17(b). These Plaintiffs are loosely referred to as "organizations" in the Complaint (Compl. ¶¶ 25, 29, 33), but this is not enough to establish that they are entities capable of filing suit. Fed. R. Civ. P. 17(b) provides that parties capable of filing suit or being sued are (1) individuals; (2) corporations, by the law under which they were organized; and (3) other entities, by the law of the state where the court is located. The Illinois General Not for Profit Corporation Act states that "[n]o foreign corporation conducting affairs in this state without authority to do so is permitted to maintain a civil action in any court of this State, until such corporation obtains such authority." 805 ILCS 105/113.70. Plaintiffs BLMC, FFJ, and 411 Movement do not appear to have registered as corporations with the State of Illinois Secretary of State. In fact, the evidence is to the contrary. BLMC is a website, FFJ is a program within the BLMC website, and 411 Movement is a Facebook page. *See* Group Exhibit C, reflecting screenshots from the BLMC and FFJ websites and the 411 Movement Facebook page. *See also Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) ("the court may look beyond the complaint and review any other evidence to resolve the jurisdictional issue.") (citation omitted). Accordingly, under Illinois law, these Plaintiffs must obtain authority to maintain a civil action in this State's courts; there is no indication they have done so.

Lack of capacity to sue creates an "exception to the diversity jurisdiction of federal courts which may require dismissal of a suit for lack of jurisdiction even where the requisite citizenship and amount in controversy have been established." *Rice v. Rice Foundation*, 610 F.2d 471, 474 (7th Cir. 1979). Because BLMC, FFJ, and 411 Movement lack capacity to sue, they are not

capable of being parties to this lawsuit.  *See*, *e.g.*, *Alton Evening Tel. v. Doak*, 296 N.E.2d 605, 606 (Ill. App. Ct. 1973) ("A suit brought in a name which is not that of a natural person, a corporation or of a partnership is a mere nullity; and, in such a case, it has been held that the whole action fails.")  Accordingly, these organizational Plaintiffs should be dismissed from the lawsuit.

## III.    Plaintiffs' injunctive relief claims are moot.

Since the issuance of the PATF Report in April 2016 and the DOJ Report in January 2017, the City and CPD have made great strides towards police reform.  To be sure, these reform efforts are far-reaching and will remain ongoing for some time.  But the breadth of the police reform efforts to which the City has committed should not undercut CPD's accomplishments regarding use of force policies and training, which render Plaintiffs' injunctive claims moot.

Plaintiffs argue the City has not established that the alleged pattern and practice of unconstitutional uses of force has ceased; question whether the reforms have been implemented as described (and request discovery and an evidentiary hearing on this issue); and misinterpret the City's position as solely an assurance that it will (in the future) reform CPD.  *See* Opp. at 9-13.  None of these arguments alter the crucial fact that policing in the City and the City's accountability system for police officers are dramatically different today from how they were when the incidents alleged in the complaint occurred.  Nowhere is this difference as pronounced as it is regarding CPD's use of force policies and training.

Following the 2017 revisions, the City's official and implemented use of force policies – today and into the future – are:

- To act with the foremost regard for the preservation of human life and the safety of all persons involved.  *See* General Order G03-02, II.A (Ex. 3 to Conway Decl. (Ex. A to Mtn.) [Dkt. 86-1 at p. 49 of 94];

- To require that any use of force be "objectively reasonable, necessary, and proportional." *Id.*, III.B [Dkt. 86-1 at p. 49 of 94].

- "To use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to dos so based on the totality of the circumstances." *Id.*, III.B.4 [Dkt. 86-1 at p. 50 of 94].

- To prohibit force used as punishment or retaliation, and prohibit the use of force based on bias against a person's race, ethnicity, nationality, religion, disability, gender, gender identity, sexual orientation, or any other protected characteristic. *Id.*, III.B.5 [Dkt. 86-1 at p. 50 of 94].

- To prohibit the use of deadly force unless, as a last resort, "to protect against an imminent threat to life or to prevent great bodily harm to the member or another person." *Id.*, III.C.3 [Dkt. 86-1 at p. 51 of 94].

- To require members "who directly observes a use of force that is excessive or otherwise in violation of this directive will contact a supervisor as soon as practicable." *Id.*, V.B [Dkt. 86-1 at p. 52 of 94].

- To require supervisors to "respond to the scene when the involved member has discharged any weapon or an injury has occurred to a subject, bystander, or any member" and "to ensure that known available witnesses are identified and interviewed and that the required information is recorded." General Order G03-02-02, V.A [Dkt. 86-1 at p. 64 of 94].

- To have a Force Review Unit act "in an after-action-review capacity for [certain] incidents involving the use of force," "recommend additional training or policy review for the involved members," and "if applicable, identify specific modification to existing policy, procedures, training, tactics, or equipment that could result in minimizing the: a. occurrences of use of force incidents; and b. inherent risks involved in use of force incidents." General Order G08-06 [Dkt. 86-1 at 86 of 94].

All CPD officers have been trained on these policies; they now are in use. *See* Supp. Conway Decl. at ¶ 5; Supp. Godsel Decl. at ¶ 5. CPD's revisions to its use of force policies moot Plaintiffs' claims for injunctive relief.

In arguing otherwise, Plaintiffs ask this Court to ignore the City's reform efforts over the past year (which has involved significant time, resources, and input of countless City residents) and presume that the City and CPD are not committed to these efforts. Plaintiffs' position is incompatible with Seventh Circuit precedent, which requires that Courts presume good faith in

19

the part of governmental actors.  *See Fed. of Advertising Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) ("'When the defendants are public officials . . .  we place greater stock in their acts of self-correction, so long as they appear genuine.'") (quoting *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991)); *see also Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988).

*Prip v. Erwin*, 2015 WL 4394526 (W.D. Wis. July 16, 2015) (cited by Plaintiffs, Opp. at 13), is instructive here.  In *Prip*, the plaintiff alleged that the defendants' arrest policy caused his injuries, and filed a lawsuit request that the policy be enjoined.  However, prior to the lawsuit, the defendants amended the policy; thus, the policy the plaintiff was challenging no longer existed.  Under these circumstances, the court held, the plaintiff's claim for injunctive relief was moot.  *See* 2015 WL 4394526, at *10 ("plaintiff has failed to meet his burden of demonstrating an ongoing threat, and the court will dismiss any claim for injunctive relief as moot").  Similarly here, since the events at issue in the complaint, CPD had amended its policies relating to the use of force, and has trained the entirety of the Department on the amended policies.  Plaintiffs' request that this Court enjoin the policies is therefore moot.

In this regard, this case is distinguishable from *Smith*, 143 F. Supp. 3d at 741, on which Plaintiffs also rely.  In *Smith*, the Court determined that a private agreement between the ACLU and the City that included commitments by the City to make certain reforms to its policies and practices relating to investigatory stops *in the future* did not moot the plaintiffs' claim for an injunction.  The court reasoned—consistent with the other cases cited by Plaintiffs, *see* Opp. at 14—that an agreement to do something *in the future* will not moot current claims.  As *Smith* explained, the City's "promises to comply with the August 2015 Agreement—without more— does not moot Plaintiffs' claims for prospective relief at this juncture, keeping in mind that '[t]he

requirement that a case have an actual, ongoing controversy extends throughout the pendency of the action.'" 143 F. Supp. 3d at 751 (quoting *Stotts v. Community Unit Sch. Dist. No. 1*, 230 F.3d 989, 990 (7th Cir. 2000)). Here, the City is not relying upon a "promise" to do something in the future. Instead, it is relying upon its past reforms of its use of force policies, and training on those revised policies, bolstered by the City's commitment to continue reform efforts.

Finally, Plaintiffs' suggestion that the City is judicially estopped from arguing mootness by its position in *State of Illinois v. City of Chicago*, Case No. 17 C 6260 (N.D. Ill.), rests on a misconception about the City's position in that case. In *State of Illinois*, the parties jointly requested that the district court stay a lawsuit brought by the Illinois Attorney General so that the State and the City could negotiate a consent decree, and the district court allowed this request. Contrary to Plaintiffs' argument (Opp. at 13), the City at no point took the position in the *State of Illinois* matter that the allegedly unlawful policies and practices about which Plaintiffs complain here are ongoing. Rather, the City's position (as articulated in the parties' joint motion for stay) is that a stay was necessary "to focus [the parties'] efforts on settlement negotiations, while allowing the Court to conserve its resources by avoiding potentially needless proceedings." Joint Mot. to Stay Proceedings in *State of Illinois* action (attached as Exhibit D) at 2. Nowhere in that filing—or in any other filing in the *State of Illinois* action—did the City assert that the past policies and practices challenged by Plaintiffs have not in fact ceased.

Consequently, Plaintiffs are wrong to suggest that the criteria for applying judicial estoppel are met here: the City has not sought "to repudiate an earlier position successfully asserted," nor is this an instance where "one of two related decisions has to be wrong because a party took opposite positions and won both times." *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427-28 (7th Cir. 1993). Plaintiffs' position boils down to the unsupported assertion that

if a party seeks to settle one case, it cannot litigate a different case raising similar (though not identical) allegations. This argument should be rejected.

## IV. Plaintiffs' Illinois Civil Rights Act claim should be dismissed.

The City's Motion to Dismiss explained why law enforcement practices do not lend themselves to a disparate impact analysis. Mot. at 26-30. In response, Plaintiffs note (Opp. at 35-36) that the DOJ has taken the position, applying Title VI, that pedestrian and/or vehicular stop practices are subject to review for disparate impact, and that a small number of district courts have held that challenges to vehicle stop practices survived a motion to dismiss on a disparate impact theory. Each of these reports and decisions were published *before* the Supreme Court decided *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015). Faithful application of *Inclusive Communities* demonstrates that Plaintiffs' ICRA claim must be dismissed for three separate reasons.

### A. Plaintiffs do not challenge a facially neutral policy that results in disparate impact.

First, *Inclusive Communities* reiterated that a disparate impact claim requires a showing that a policy or practice, although neutral on its face, disproportionately or negatively impacts members of a protected class. 135 S. Ct. at 2530. Here, though, the "policies" that Plaintiffs allege result in disparate impact are not facially neutral. For example, Plaintiffs allege that the CPD engages in "racial profiling." Compl. ¶ 312. Similarly, Plaintiffs assert that the City "intentionally targets Black and Latinx individuals." *Id*. ¶ 2. Relying on race to "profile" individuals is not a facially neutral policy, and therefore, this is not a proper basis for a disparate impact claim. *See City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016) (dismissing disparate impact claim where the policies at issue were not facially neutral, but instead alleged that minorities were "targeted" and intentionally discriminated against, and

finding that the "alleged intentional conduct" was not a basis for a disparate impact claim); *see also Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529 (7th Cir. 1990) (describing an interaction where a realtor treats "a black customer differently from a white one because the customer is black" as "deliberate conduct," because the realtor "knows they are of different races and treats them differently because of that knowledge."). Plaintiffs' disparate impact claim should be dismissed on this basis alone.

### B.   Plaintiffs improperly seek to challenge an absence of a policy, rather than a distinct policy or practice resulting in disparate impact.

Plaintiffs' disparate claim should be dismissed for the additional reason that the "policies" they challenge aren't policies at all. "Disparate-impact liability mandates the 'removal of artificial, arbitrary, and unnecessary barriers,' not the displacement of valid governmental policies." *Inclusive Communities*, 135 S. Ct. at 2522 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431(1971)).

"Guidance from the Supreme Court," therefore, "is unambiguous that disparate impact claims must solely seek to *remove* barriers." *City of Los Angeles v. Wells Fargo & Co.*, No. 2:12-cv-09007, 2015 WL 4398858, at *8 (C.D. Cal. July 17, 2015), *affirmed* 691 Fed. App'x 453 (9th Cir. May 26, 2017) (granting defendant's motion for summary judgment on disparate impact claim where plaintiff argued "that a *lack* of policy produced the disparate impact") (emphases original). Thus, where a plaintiff alleges "that the *lack* of a policy produced the disparate impact," its claim fails, as there is no "authority that suggests that litigants can use disparate impact claims to impose new policies on government actors." *Inclusive Communities Project, Inc. v. U.S. Dept. of Treasury*, No. 3:14-CV-3013-D, 2016 WL 6397643, at *11 (N.D. Tex. Oct. 28, 2016) (granting motion to dismiss disparate impact claim where plaintiff challenged defendant's "*failure to act* to prevent" disparate impact) (emphasis in original); *see also City of*

*Joliet, Illinois v. New W., L.P.*, 825 F.3d 827, 830 (7th Cir.), *cert. denied sub nom. Mid-City Nat. Bank of Chicago v. City of Joliet, Ill.*, 137 S. Ct. 518, 196 L. Ed. 2d 407 (2016) (noting that the Supreme Court in *Inclusive Communities Project*, 135 S.Ct. at 2522–24, "stressed the importance of considering both whether a policy exists and whether it is justified.").  In short, a plaintiff must "affirmatively identify a specific policy that produced a disparate impact, rather than point to a lack of policy that caused it."  *Inclusive Communities Project, Inc. v. Tex. Dept. of Housing and Comm. Affairs*, No. 3:08-CV-0546-D, 2016 WL 4494322, at *6-7 (N.D. Tex. Aug. 26, 2016) (granting defendant's motion to dismiss on remand from the Supreme Court where plaintiff failed to "sufficiently identif[y] a specific, facially-neutral policy that has caused a statistical disparity" because "the court cannot fashion a remedy that removes that policy").

Here, Plaintiffs' ICRA claim suffers from the same problem, and does so repeatedly.  The Complaint repeatedly accuses the City of sins of omission rather than commission:

- **Foot pursuits:** Plaintiffs assert that alleged unreasonable use of force stems from "the CPD's failure to institute a foot pursuit policy or take corrective action concerning such violence."  Compl. ¶ 90.

- **Body-worn Cameras:**  Plaintiffs allege that "the CPD lacks any policy directly providing that officers who intentionally fail to use their body-cameras will be subject to discipline."  *Id.* ¶ 149.

- **Training:**  Plaintiffs contend that the CPD "fails to adequately train its officers," *id.* ¶ 167, and specifically, that the "CPD lacks effective training related to implicit and explicit bias, cultural competency and awareness, procedural justice, ethics, community dignity, community perceptions of the police in Chicago, and the effect of racial and ethnic segregation on Chicago's communities."  *Id.* ¶ 170.

- **Discipline:**  Plaintiffs assert that the CPD suffers from a "systematic lack of discipline," *id.* ¶ 132, and that the City has "failed . . . to devise and impart meaningful and consistent discipline for officers who violate the constitutional rights of others."  Compl. ¶ 125(a).

- **Monitoring and Supervision:** Plaintiffs claim that there is an "utter lack of supervisor investigation pertaining to officer uses of force," *id.* ¶ 140, and allege a "failure to properly screen, train, and supervise CPD officers," as well as a "failure to adequately monitor and discipline officers."  *Id.* ¶ 318.

- **Data:** Plaintiffs allege that "While the CPD collects data on officer performance, including complaints and lawsuits, data is often incomplete and analysis is limited." *Id.* ¶ 132. Plaintiffs assert that the CPD has failed to maintain adequate "municipal data collection systems," which "impede[s] accountability and transparency in the CPD." *Id.* ¶ 14.

Plaintiffs' ICRA claim must be dismissed because allegations, like Plaintiffs' here, that the City lacks appropriate policies are not cognizable under a disparate impact theory.

This flaw in Plaintiffs' pleading distinguishes each of the cases on which Plaintiffs rely. For example, in *Central Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, the plaintiffs challenged the City's policy for responding to 911 calls, rather than its lack thereof.[3] Likewise, in the other cases Plaintiffs rely upon, the plaintiffs identified specific policies that they believed disparately impacted them and brought suit seeking removal of these policies. *See McFadden v. Bd. of Educ.*, No. 05 C 0760, 2006 WL 6284486, *1-2, 7 (N.D. Ill. Oct. 3, 2006) (alleging racially disparate impact as a result of the school closures implemented under the defendant school district's "Redistricting Plan"); *Stanfield v. Dart*, No. 10 C 6569, 2011 WL 1429172, *5-*6 (N.D. Ill. Apr. 14, 2011) (alleging defendant sheriff's department "engaged in a policy, practice, and pattern of sexual harassment")[4]; *Chi. Urban League v. State of Illinois*, No. 08 C 30490, 2009 WL 1632604, at *1 (Ill. Cir. Ct. Apr. 15, 2009) (challenging the defendants' "creation and application of a funding system for its public schools"). Plaintiffs'

---

[3] *CANA* in inapposite for the additional, and more fundamental, reason that, as explained in the City's Motion to Dismiss, the court there did not even hold that the plaintiffs had stated an ICRA claim. Mot. at 27 n. 12.

[4] In fact, it is not even clear that the plaintiff *Stanfield* sought to allege a disparate impact theory under ICRA: she alleged that the defendants "intentionally subjected Plaintiff to unequal and discriminatory treatment by creating a hostile and abusive work environment," and "intentionally engag[ed] in and condon[ed] sexual harassment against Plaintiff." *Stanfield*, First Am. Compl., Dkt. No. 10-cv-6569, ¶¶ 87-88.

allegations regarding the City's "*failure to act*" do not set forth a cause of action for disparate impact liability, and their ICRA claim should consequently be dismissed.

### C. Plaintiffs do not meet the robust causality requirement to allege disparate impact.

Further still, Plaintiffs have not presented allegations to establish a causal connection between the statistical disparities alleged and any policy or practice of the City. The Supreme Court has cautioned that "[a] robust causality requirement" is necessary to ensure that disparate-impact liability does not "displace valid governmental and private priorities, rather than solely" removing unnecessary barriers. *Inclusive Communities Project, Inc.*, 135 S. Ct. at 2523-24. Plaintiffs' allegations do not satisfy this requirement of a "robust" causal link. Plaintiffs point to statistics that minorities are more likely to experience a use of police force, and conclusorily assert that the City's policies "create a disparate impact," Compl. ¶ 323, but controlling Supreme Court precedent requires them to produce "statistical evidence *demonstrating* a causal connection" between the City's policies and these disparities, and Plaintiffs have not done so. *Inclusive Communities*, 135 S. Ct. at 2523 (emphasis added).

This failure puts this case squarely among those in which lower courts, following the roadmap created by the Supreme Court in *Inclusive Communities*, have dismissed disparate impact claims for a failure to satisfy the causality requirement. *See*, *e.g.*, *TBS Group, LLC v. City of Zion*, Case No. 16-cv-5855, 2017 WL 5129008, at *9 (N.D. Ill. Nov. 6, 2017) (dismissing disparate impact claim under Fed. R. Civ. P. 12(b)(6) where the plaintiff failed to "lay out a chain of inferences explaining how the Ordinance will *cause* a racially disparate impact, as distinct from just resulting in a disparate impact") (emphasis in original); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1114 (8th Cir. 2017) (affirming dismissal of a disparate impact claim where the plaintiffs failed to allege that a specific policy was "causing the problematic

disparity."); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, No. 3:17-CV-206-K, 2017 WL 3498335, at *9 (N.D. Tex. Aug. 16, 2017) appeal filed, Case No. 17-10943, (5th Cir. Aug. 24, 2017) (dismissing disparate impact claims where the plaintiff failed to meet the robust causality requirement and finding that "[t]he statistical information and arguments presented by Plaintiff ICP is conclusory rather than descriptive of how Defendants' policy actually caused a disparate impact.").

In short, Plaintiffs present no allegations that any particular policy of CPD causes the racial disparities alleged. And, Plaintiffs continue to ignore a host of other factors that might cause such racial imbalance, such as the demographics of certain geographical areas of the City and relative crime rates, as well as the demographical information of criminal suspects and arrestees. Accordingly, Plaintiffs' claim of disparate impact under ICRA should be dismissed.

**V.  Plaintiffs' failure to train and screen allegations are deficient.**

The complaint fails to allege sufficient facts to state a *Monell* claim based on either a failure to train or failure to screen theory. While Plaintiffs protest that other, unpublished and out-of-jurisdiction cases have survived dismissal based on allegations similar to theirs, a close examination of these cases demonstrates why Plaintiffs' *Monell* claim falls short.[5]

For example, in *Al Matar v. Borchardt*, the plaintiff alleged officers pushed her and ripped off her hijab and niqab, and that this action was due, in part, to the failure to train officers regarding "sensitivity of religious expression and freedom." No. 16-CV-8033, 2017 WL 2214993, at *1 (N.D. Ill. May 19, 2017). These allegations are far more specific than those asserted in the Complaint. Here, Plaintiffs do not point to any particular training that, in their

---

[5] The only published decision Plaintiffs cite, *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810 (N.D. Ill. 2006), is scarcely helpful to their cause. In that case, the court found that the plaintiff failed to allege sufficient facts supporting a failure to train theory as the allegations concerning causation were lacking. *Id.* at 816.

view, would have prevented the alleged uses of force on the individual Plaintiffs. This deficiency is fatal to Plaintiffs' failure to train claim.

"In determining the adequacy of training, the focus must be on the program, not whether particular officers were adequately trained." *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997). Submitting only that police needed "better or more" training does not pass muster. *Id*. Not only do Plaintiffs fail to identify any specific training, they offer no allegations as to how that training might be inadequate. *See id*. (rejecting failure to train claim for lack of allegations why the Illinois state standards for training police in handling abnormal behavior are deficient under the U.S. Constitution).

There is an even more tenuous connection between the alleged failure to train theory and the injury the organizational Plaintiffs allege they have sustained. Those Plaintiffs allege they have been injured because they have had to devote resources to addressing police/citizen interactions. They do not allege they have diverted any resources to seek reforms to CPD training programs or have otherwise attempted to remedy the perceived failure to train.

Additionally, Plaintiffs do not address the City's argument that their failure to screen allegations are deficient. Failure to respond to an argument, as Plaintiffs have done here, results in waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). Having failed to allege any facts suggesting a failure to train or failure to screen caused injury to either the individual Plaintiffs or the organizational Plaintiffs, the *Monell* claim should be dismissed to the extent it relies on those theories.

## VI. The conspiracy claims should be dismissed.

Finally, Plaintiffs have agreed to voluntarily dismiss their conspiracy claims against the City. *See* Opp. at 4 n.6. Accordingly, those claims should be dismissed with prejudice.

## CONCLUSION

For the reasons stated herein and in the City's Motion to Dismiss, the Court should dismiss Plaintiffs' claims against the City.  Plaintiffs lack standing to bring the claims for equitable relief, and even if they could establish standing, such claims are moot.  Plaintiffs are unable to assert a disparate impact theory under ICRA.  Plaintiffs' claims further fail to the extent they rely on claims that the City failed to sufficiently screen and train CPD officers.  Finally, Plaintiffs have voluntarily agreed to dismiss their conspiracy claims.

Dated:  January 16, 2018                                     Respectfully submitted,

                                                            **CITY OF CHICAGO**


                                                            By:   /s/ Allan T. Slagel
                                                                  One of Its Attorneys

Allan T. Slagel (ARDC #6198470)
aslagel@taftlaw.com
Heather A. Jackson (ARDC #6243164)
hjackson@taftlaw.com
Barton J. O'Brien (ARDC # 6276718)
bobrien@taftlaw.com
Jeffrey M. Schieber (ARDC #6300779)
jschieber@taftlaw.com
Elizabeth E. Babbitt (ARDC #6296851)
ebabbitt@taftlaw.com
Rachel M. Schaller (ARDC #66306921)
rschaller@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive
Suite 2800
Chicago, Illinois 60601
Telephone:     (312) 527-4000
Facsimile:     (312) 527-4011

21770233.9

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IMMANUEL CAMPBELL, et al., | |
| Plaintiffs, | |
| | Case No. 17cv4467 |
| v. | |
| | Hon. John Z. Lee |
| CITY OF CHICAGO, et al., | |
| Defendants. | |

### SUPPLEMENTAL DECLARATION OF KAREN CONWAY

Pursuant to 28 U.S.C. § 1746, I, Karen Conway, state and affirm as follows:

1.     I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could competently testify thereto.

2.     I am the Director of the Division of Research and Development of the Chicago Police Department ("CPD"). In that capacity, I have been involved in the process of revising CPD's use of force policies.

3.     I submitted a declaration in support of the City of Chicago's motion to dismiss, in which I described the process of revising CPD's use of force policies.

4.     At the time I submitted my declaration, CPD had prepared, but not yet implemented, revised use of force policies. Those revised policies were referenced in Paragraph 10 of my declaration and attached as Exhibit 3 to my declaration.

5.     The revised policies have since been implemented and are currently in effect.

6.     I declare under penalty of perjury that the foregoing is true and correct.

Date: January 12, 2018

Karen Conway
Director
Research and Development Division
Chicago Police Department

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IMMANUEL CAMPBELL, et al.,

Plaintiffs,

v.

CITY OF CHICAGO, et al.,

Defendants.

Case No. 17cv4467

Hon. John Z. Lee

**SUPPLEMENTAL DECLARATION OF COMMANDER DANIEL GODSEL**

Pursuant to 28 U.S.C. § 1746, I, Daniel Godsel, state and affirm as follows:

1.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could competently testify thereto.

2.  I am a Commander at the Chicago Police Department ("CPD") at the Training and Education Division. In that capacity, I have been involved in the process of developing training for Department members on CPD's revised use of force policies.

3.  I submitted a declaration in support of the City of Chicago's motion to dismiss the complaint, in which I described some of CPD's training efforts regarding the use of force.

4.  The 16-hour in-service course focused on force mitigation principles and skills and tactics for interacting with individuals in crisis (including mental health crisis) referenced in Paragraph 3 of my declaration was provided to approximately 3,000 CPD members in 2017. The remaining CPD members will receive this training in 2018.

5.  Further, the four hour course on CPD's revised use of force policies referenced Paragraph 5 and 6 of my declaration has been provided to all CPD members and the additional

one hour training for supervisors referenced in Paragraph 6 of my declaration has been provided to all CPD supervisors.

      6.     I declare under penalty of perjury that the foregoing is true and correct.


Date: January 11, 2018

                               Commander Daniel Godsel
                               Education and Training Division
                               Chicago Police Department

# GROUP EXHIBIT C

cklivesmatterchicago.com

Home | DOJ Investigation | Contact | OurStoryChi | Justice for Families | Know Your Rights | Archive | Donate!

Enter email address

Subscribe

**BLACK LIVES MATTER**
# CHICAGO

Enter

Take Action!

ACTION STEPS:

1. Tell Ald. Sophia King to rename the playground at 53rd & King to Ronnieman Park

2. Sign the petition to reopen the case and rename the playground where he was killed to Ronnieman Park
JusticeForRonnieman.com

Call Alderwoman Sophia King: (773) 536-8103

Email Sophia King: ward04@cityofchicago.org

Ronald Johnson Park

READ ABOUT OUR LAWSUIT AGAINST CPD

Federal Judge Must Oversee Chicago Police Reform: Black Lives Matter Suit

Listen to an interview with us about the lawsuit:
From oversight to abolition:
Black Lives Matter

search










Home | DOJ Investigation | Contact | OurStoryChi | Justice for Families | Know Your Rights | Archive | Donate!

Enter email address

Subscribe

# BLACK LIVES MATTER CHICAGO

*We honor your lives. We speak your names. We refuse to allow you to be erased.*

*Justice for Families is a program of Black Lives Matter Chicago.*



Since 1996, more than 1,600 people have been shot by Chicago cops. That's an average of more than one person a week. Over 90% are Black men or boys. Oldest killed was 86. Youngest killed was 14.

2017 – 2 Killed

2016 – 11 Killed

2015 – 11 Killed

2014 – 19 Killed

2013 – 15 Killed

2012 – 13 Killed

2011 – 25 Killed

# facebook

Email or Phone

Password

Log In

Forgot account?





## The 411 Movement For Pierre Loury

@The411movementforPier
reLoury

Home

About

Photos

Events

Likes

Videos

Posts

Create a Page

👍 Like    ➤ Share    ✏ Suggest Edits    ···

Send Message

### Photos



Cause

### Community

👍 149 people like this

🔊 148 people follow this

### About    See All

🗋 Cause

People    ＞

**149** likes

See more of The 411 Movement For Pierre Loury on Facebook

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|                         |            |
|-------------------------|------------|
| STATE OF ILLINOIS,      |            |
|                         | Plaintiff, |
| v.                      |            |
| CITY OF CHICAGO,        |            |
|                         | Defendant. |

Case No. 1:17-cv-06260

Honorable Robert M. Dow Jr.

## JOINT MOTION TO STAY PROCEEDINGS

Plaintiff, the State of Illinois, and Defendant, the City of Chicago (collectively, the "Parties"), respectfully move for the entry of the attached proposed Order for a stay of all proceedings to continue settlement negotiations which, if successful, will take the form of a consent decree. In support of this motion, the Parties state as follows:

1.      The State of Illinois (the "State") filed a Complaint against the City of Chicago (the "City") on August 29, 2017 alleging that, through acts and omissions, the City and its agents maintain policies, customs, or practices of police officers, which are in violation of the Fourth Amendment of the U.S. Constitution and Article I, Section 6 of the Illinois Constitution. The State maintains that certain of these policies, customs, or practices have a disparate impact on African Americans and Latinos in violation of the Illinois Civil Rights Act of 2003 and the Illinois Human Rights Act. The complaint further alleges that these policies, customs, or practices are further reflected in, and caused by, the City's failure to effectively train, supervise, and support law enforcement officers, and the City's failure to establish reliable programs to detect officer misconduct and administer effective discipline.

2.      The Parties have been conferring both before and after the filing of the Complaint and have expressed a mutual interest in resolving the State's claims through settlement rather than what would likely amount to protracted litigation. Moreover, the Parties have agreed that settlement of the matter will take the form of a consent decree.

3.      The Parties intend to seek input from the community and police officers—in addition to subject-matter experts—while negotiating and drafting the terms of the consent decree.

4.      Given the breadth and complexity of the reforms required to settle this case, the Parties request that the Court stay all proceedings and toll all pending deadlines, including the responsive pleading date and mandatory initial discovery, so that the Parties have sufficient time to focus their efforts on negotiating and drafting a consent decree.

5.      "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *In re Groupon Derivative Litig.*, 882 F. Supp. 2d 1043, 1045 (N.D. Ill. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "That inherent authority includes the power to stay proceedings where the party seeking the stay would be spared hardship or inequity, the prejudice to the non-movant would be comparatively minor, and the stay would significantly advance judicial economy." *Freed v. Friedman*, 215 F. Supp. 3d 642, 658 (N.D. Ill. 2016).

6.      Staying this matter will help secure the just and efficient resolution of this case and will reduce the burden of litigation on the Parties as well as the Court. A stay will allow the Parties to focus their efforts on settlement negotiations, while also allowing the Court to conserve its resources by avoiding potentially needless proceedings.

7.      The Parties also agree that they will not be prejudiced or tactically disadvantaged by a stay.

8.      The Parties plan to negotiate in good faith and do not intend to unduly delay resolution of this case.

9.      The Parties propose filing a joint status report with the Court within 60 days on the settlement negotiations and, if efforts to resolve this matter are unsuccessful, to promptly notify the court of any potential issues or propose a scheduling order to govern the remaining conduct of the litigation.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion and enter an order staying all proceedings and deadlines in this case, including those provided for in Northern District of Illinois Mandatory Initial Discovery Pilot Program and under the Federal Rules of Civil procedure.

Respectfully submitted, this 31st day of August, 2017,

| For Plaintiff State of Illinois: | For Defendant City of Chicago: |
|---|---|
| Lisa Madigan | Edward N. Siskel |
| Attorney General for the State of Illinois | Corporation Counsel for the City of Chicago |
| By:  /s/ Cara A. Hendrickson | By:  /s/ Allan T. Slagel |
| Assistant Attorney General | Allan T. Slagel (ARDC #6198470) |
| OFFICE OF ILLINOIS ATTORNEY GENERAL | aslagel@taftlaw.com |
| 100 W. Randolph St., 12th Floor | Heather A. Jackson (ARDC #6243164) |
| Chicago, Illinois 60601 | hjackson@taftlaw.com |
| (312) 814-3000 | TAFT STETTINIUS & HOLLISTER LLP |
| chendrickson@atg.state.il.us | 111 East Wacker Drive |
|  | Suite 2800 |
|  | Chicago, Illinois 60601 |
|  | Telephone: (312) 527-4000 |
|  | Facsimile: (312) 527-4011 |

21222139.1